**OFFICE OF THE CITY ATTORNEY**
NANCY L. ISSERLIS (WSBA #11623)
City Attorney
Elizabeth L. Schoedel (WSBA #20240)
Nathaniel J. Odle (WSBA #39602)
Hunt M. Whaley (WSBA #46419)
Assistant City Attorneys
808 W. Spokane Falls Blvd.
Spokane, Washington 99201-3326
Telephone: (509)625-6225
Fax: (509)625-6277

**BARON & BUDD, P.C.**
Scott Summy *(pending Pro Hac Vice)*
(Texas Bar No. 19507500)
Carla Burke *(pending Pro Hac Vice)*
(Texas Bar No. 24012490)
Celeste Evangelisti *(pending Pro Hac Vice)*
(CA Bar No. 225232)
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219-4281
Telephone: (214) 521-3605

**GOMEZ TRIAL ATTORNEYS**
John H. Gomez *(pending Pro Hac Vice)*
(CA Bar No. 171485)
John P. Fiske *(pending Pro Hac Vice)*
(CA Bar No. 249256)
655 West Broadway, Suite 1700
San Diego, CA 92101
Telephone: (619) 237-3490

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| CITY OF SPOKANE, a municipal corporation located in the County of Spokane, State of Washington, | CASE NO. _____ |
| Plaintiff, | **PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL** |
| v. | |
| MONSANTO COMPANY, SOLUTIA INC., and PHARMACIA CORPORATION, and DOES 1 through 100, | |
| Defendants. | |

GOMEZ
TRIAL ATTORNEYS

## I.    INTRODUCTION

1.    Polychlorinated biphenyls (or "PCBs") are man-made chemical compounds that have become notorious as global environmental contaminants — found in bays, oceans, rivers, streams, soil, and air.  As a result, PCBs have been detected in the tissues of all living beings on earth including all forms of marine life, various animals and birds, plants and trees, and humans.

2.    The extent of environmental PCB contamination is troubling because PCBs cause a variety of adverse health effects.  In humans, PCB exposure is associated with cancer as well as serious non-cancer health effects, including effects on the immune system, reproductive system, nervous system, endocrine system and other health effects. In addition, PCBs destroy populations of fish, birds, and other animal life.

3.    Monsanto Company was the sole manufacturer of PCBs in the United States from 1935 to 1979, and trademarked the name "Aroclor" for certain PCB compounds.  Although Monsanto knew for decades that PCBs were toxic and knew that they were widely contaminating all natural resources and living organisms, Monsanto concealed these facts and continued producing PCBs until Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of PCBs as of January 1, 1979.

4.    PCBs have migrated into the Spokane River by a variety of ways.  PCBs were used in many industrial and commercial applications such as paint, caulking, transformers, capacitors, coolants, hydraulic fluids, plasticizers, sealants, inks,

GOMEZ
TRIAL ATTORNEYS

1  lubricants, and other uses.  PCBs regularly leach, leak, off-gas, and escape their

2  intended applications, causing runoff during naturally occurring storm and rain events,

3  after being released into the environment.  The runoff originates from multiple sources

4

5  and industries and enters the Spokane River with stormwater and other runoff.

6      5.    The natural fate and transport of PCBs results in the gathering and

7  collection in waste and stormwater through no fault of the City of Spokane, which

8

9  lawfully discharges waste and stormwater into the Spokane River through its two

10 NPDES[1] Permit, issued by the State of Washington Department of Ecology

11 ("Ecology").

12

13     6.    A condition of receiving an NPDES Permit from the State of Washington is

14 compliance with the Clean Water Act, which requires dischargers like Spokane to limit

15 their discharge of certain chemicals into impaired bodies of water.

16

17     7.    Spokane River ("the River") is contaminated with PCBs, which have been

18 detected in the River's water, sediments, fish, and wildlife.  The Spokane River is in

19 violation of the water quality standards for the presence of PCBs.  The Spokane River is

20

21 listed on the Washington State Water Quality Assessment list of impaired water bodies,

22 in accordance with section 303(d) of the Clean Water Act.[2]

23

24 _____

25 [1] National Pollutant Discharge Elimination System.

26 [2] Water Quality Improvement Project, Department of Ecology, State of Washington,

27 http://www.ecy.wa.gov/programs/wq/tmdl/spokaneriver/SpokPCBTMDL.html

28

GOMEZ
TRIAL ATTORNEYS

3

PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

8.    The Spokane River contains elevated levels of PCBs in surface water, sediments, and fish tissue.[3]

9.    The Washington State Department of Health and Ecology issued a revised Health Advisory for Spokane River Fish Consumption, and certain segments of the River are designated as "catch and release only."[4]

10.    Human consumption of fish from affected areas of the River may be associated with serious health risks.  U.S. Environmental Protection Agency ("EPA") (2000b) has classified PCBs as "probably human carcinogens." Studies have suggested that PCBs may play a role in inducing breast cancer. Studies have also linked PCBs to increased risk for several other cancers including liver, biliary tract, gall bladder, gastrointestinal tract, pancreas, melanoma, and non-Hodgkin's lymphoma. PCBs may also cause non-carcinogenic effects, including reproductive effects and developmental effects (primarily to the nervous system).  PCBs tend to accumulate in the human body in the liver, adipose tissue (fat), skin, and breast milk.  PCBs have also been found in human plasma, follicular fluid, and sperm fluid.  Fetuses may be exposed to PCBs in utero, and babies may be exposed to PCBs during breastfeeding.  According to U.S. EPA (2000b), [s]ome human studies have also suggested that PCB exposure may cause adverse effects in children and developing fetuses while other studies have not shown

---

[3] *Id.*

[4] *Id.*

PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

effects.  Reported effects include lower IQ scores, low birth weight, and lower behavior assessment scores.

11.    The Washington State Department of Ecology determined that taking steps to reduce PCBs immediately is an effective method for achieving desired water quality goals, and such methods require identifying and reducing PCBs at their sources in the watershed.[5]

12.    In 2011, the Spokane River Regional Toxics Task Force ("Task Force") was established to characterize the sources of toxic chemicals such as PCBs in the Spokane River and identify and implement appropriate actions needed to make measureable progress towards meeting applicable water quality standards for the State of Washington, State of Idaho, and The Spokane Tribe of Indians, and in the interests of public and environmental health.[6]  This Task Force is a collaboration of public and private entities in Washington and Idaho.

13.    Spokane's NPDES Permit currently requires that performance-based PCB limits be established and that Spokane participate in the Task Force.[7]

14.    According to a recent federal case[8], Spokane will become subject to a TMDL, or Total Maximum Daily Load, which is a maximum amount of a pollutant that

---

[5] *Id.*

[6] *Id.*

[7] *Id.*

a body of water such as the Spokane River can receive while still meeting water quality standards.

15.    A TMDL is intended to protect the beneficial uses that are affected by PCBs, including fish consumption.[9]

16.    The City of Spokane is a municipality acting for the benefit of the state and the general public in the City of Spokane and others throughout the State of Washington. The City of Spokane has a duty and inherent responsibility to manage its waste and stormwater systems to maintain the clean waterways of the State of Washington.

17.    The Washington State Legislature declares it is "the public policy of the State of Washington to maintain the highest possible standards to insure the purity of all waters of the state consistent with public health and public enjoyment thereof, the propagation and protection of wild life, birds, game, fish and other aquatic life, and the industrial development of the state, and to that end require the use of all known available and reasonable methods by industries and others to prevent and control the pollution of the waters of the state of Washington."[10]

---

[8] *Sierra Club v. McLerran*, 2015 U.S. Dist. LEXIS 32152 (W.D. Wash. March 16, 2015)

[9] United States Environmental Protection Agency,

http://water.epa.gov/lawsregs/lawsguidance/cwa/tmdl/overviewoftmdl.cfm

[10] RCW 90.48.010.

PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

18.    To promote the public policy of clean water, "the State of Washington will exercise its powers, as fully and as effectively as possible, to retain and secure high quality for all waters of the state."[11]

Plaintiff CITY OF SPOKANE hereby alleges, upon information and belief, as follows:

**II.    PARTIES**

19.    The CITY OF SPOKANE ("Spokane" or "Plaintiff") is a municipal corporation, duly organized and existing by virtue of the laws of the State of Washington.

20.    Spokane brings this suit pursuant to RCW 7.48.010, *et al.* and any other applicable codes or forms of relief available for monetary damages and removal of the public nuisance caused by Monsanto's PCBs in the Spokane River.

21.    Spokane manages and operates a municipal stormwater system (MS4), which collects and transports stormwater to be discharged into the River.  In order to discharge stormwater into the River, Spokane is subject to the Eastern Washington Phase II Municipal Stormwater Permit issued by the State of Washington, Department of Ecology, pursuant to the National Pollutant Discharge Elimination System under the Clean Water Act.

/ / /

---

[11] *Id.*

GOMEZ
TRIAL ATTORNEYS

22.     Spokane is also a permittee under an NPDES Permit, for the City of Spokane Riverside Park Water Reclamation Facility and Combined Sewer Overflows (CSOs), which requires certain action to reduce discharge of stormwater containing PCBs, as the River is impaired for PCBs.

23.     Spokane has spent money and will continue to spend money in its effort to reduce PCB discharges into the River.

24.     Spokane expects to spend over one hundred million dollars to prevent PCBs from entering and/or to remove PCBs from its stormwater, thereby reducing the PCBs discharged into the Spokane River.

25.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its principal place of business in St. Louis, Missouri.

26.     Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

27.     Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor to the original Monsanto Company) is a Delaware LLC with its principal place of business in Peapack, New Jersey.  Pharmacia is now a wholly-owned subsidiary of Pfizer, Inc.

28.     The original Monsanto Company ("Old Monsanto") operated an agricultural products business, a pharmaceutical and nutrition business, and a chemical products business.  Old Monsanto began manufacturing PCBs in the 1930s and continued to manufacture commercial PCBs until the late 1970s.

29.    Through a series of transactions beginning in approximately 1997, Old Monsanto's businesses were spun off to form three separate corporations. The corporation now known as Monsanto operates Old Monsanto's agricultural products business. Old Monsanto's chemical products business is now operated by Solutia. Old Monsanto's pharmaceuticals business is now operated by Pharmacia.

30.    Solutia was organized by Old Monsanto to own and operate its chemical manufacturing business. Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemicals business.[12]

31.    Although Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto Company) for certain liabilities related to the chemicals business, Defendants have entered into agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims arising from Old Monsanto's chemical business --- including the manufacture and sale of PCBs.[13]

---

[12] *See* MONSANTO COMPANY'S ANSWER TO THE COMPLAINT AND JURY DEMAND, *Town of Lexington v. Pharmacia Corp., Solutia, Inc., and Monsanto Company*, C.A. No. 12-CV-11645, D. Mass. (October 8, 2013); *see* also Relationships Among Monsanto Company, Pharmacia Corporation, Pfizer Inc., and Solutia Inc., http://www.monsanto.com/whoweare/pages/monsanto-relationships-pfizer-solutia.aspx (last accessed February 20, 2014).

[13] *See id.*

GOMEZ
TRIAL ATTORNEYS

32.     In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code.  Solutia's reorganization was completed in 2008.  In connection with Solutia's Plan of Reorganization, Solutia, Pharmacia and New Monsanto entered into several agreements under which Monsanto continues to manage and assume financial responsibility for certain tort litigation and environmental remediation related to the Chemicals Business.[14]

33.     Monsanto, Solutia, and Pharmacia are collectively referred to in this Complaint as "Defendants."

## III.     JURISDICTION AND VENUE

34.     This Court has jurisdiction pursuant to 28 U.S.C. §1332 because complete diversity exists between Plaintiff and Defendants.  The Plaintiff is located in Washington, but no Defendant is a citizen of Washington.  Monsanto is a Delaware corporation with its principal place of business in St. Louis, Missouri.  Solutia is a Delaware corporation with its principal place of business in St. Louis, Missouri.  Pharmacia is a Delaware limited liability company with its principal place of business in Peapack, New Jersey.

/ / /

_____

[14] *See* Monsanto's Form 8-K (March 24, 2008), and Form 10-Q (June 27, 2008), available at http://www.monsanto.com/investors/pages/sec-filings.aspx (last accessed February 20, 2014).

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

35.    Venue is appropriate in this judicial district pursuant to 28 U.S.C. Section 1391(a) because a substantial part of the property that is the subject of the action is situated in this judicial district.

**IV.    FACTUAL ALLEGATIONS**

    **A.    PCBs are Toxic Chemicals that Cause Environmental Contamination.**

36.    Polychlorinated biphenyl, or "PCB," is a molecule comprised of chlorine atoms attached to a double carbon-hydrogen ring (a "biphenyl" ring).  A "PCB congener" is any single, unique chemical compound in the PCB category.  Over two hundred congeners have been identified.[15]

37.    PCBs were generally manufactured as mixtures of congeners.  From approximately 1935 to 1979, Monsanto Company was the only manufacturer in the United States that intentionally produced PCBs for commercial use.[16]  The most common trade name for PCBs in the United States was "Aroclor," which was trademarked by Old Monsanto.

---

[15] Table of PCB Congeners, available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/congeners.htm (last accessed February 20, 2014).

[16] *See* 116 Cong. Record 11695, 91st Congress, (April 14, 1970) ("Insofar as the Monsanto Co., the sole manufacturer of PCB's is concerned . . . ."); 121 Cong. Record

GOMEZ
TRIAL ATTORNEYS

38.    Monsanto's commercially-produced PCBs were used in a wide range of industrial applications in the United States including electrical equipment such as transformers, motor start capacitors, and lighting ballasts.  In addition, PCBs were incorporated into a variety of products such as caulks, paints, and sealants.

39.    As used in this Complaint, the terms "PCB," "PCBs," "PCB-containing products," and "PCB products" refer to products containing polychlorinated biphenyl congener(s) manufactured for placement into trade or commerce, including any product that forms a component part of or that is subsequently incorporated into another product.

40.    PCBs easily migrate out of their original source material or enclosure and contaminate nearby surfaces, air, water, soil, and other materials.  For example, PCB compounds volatilize out of building materials (such as caulk) into surrounding materials such as masonry, wood, drywall, and soil, thereby causing damage to those surrounding materials.  PCBs can also escape from totally-enclosed materials (such as light ballasts) and similarly contaminate and damage surrounding materials.

41.    PCBs present serious risks to the health of humans, wildlife, and the environment.

---

33879, 94th Congress, (October 23, 1975) ("The sole U.S. producer, Monsanto Co. . . . ."). *See also* MONS 058730-058752 at 058733 (identifying other producers as "all ex-USA."), attached as Exhibit A.

GOMEZ
TRIAL ATTORNEYS

42.    Humans may be exposed to PCBs through ingestion, inhalation, and dermal contact. Individuals may inhale PCBs that are emitted into the air. They may also ingest PCBs that are emitted into air and settle onto surfaces that come into contact with food or drinks. And they may absorb PCBs from physical contact with PCBs or PCB-containing materials.

43.    EPA has determined that Monsanto's PCBs are probable human carcinogens. In 1996, EPA reassessed PCB carcinogenicity, based on data related to Aroclors 1016, 1242, 1254, and 1260.[17] EPA's cancer reassessment was peer reviewed by 15 experts on PCBs, including scientists from government, academia and industry, all of whom agreed that PCBs are probable human carcinogens.

44.    In addition, EPA concluded that PCBs are associated with serious non-cancer health effects. From extensive studies of animals and primates using environmentally relevant doses, EPA found evidence that PCBs exert significant toxic effects, including effects on the immune system, the reproductive system, the nervous system, and the endocrine system.

45.    PCBs affect the immune system by causing a significant decrease in the

_____

[17] EPA, PCBs: Cancer Dose-Response Assessment and Application to Environmental Mixtures, EPA/600/P-96/001F (September 1996), available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/pcb.pdf (last accessed May 5, 2014).

PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

size of the thymus gland, lowered immune response, and decreased resistance to viruses and other infections.  The animal studies were not able to identify a level of PCB exposure that did not affect the immune system.  Human studies confirmed immune system suppression.

46.    Studies of reproductive effects in human populations exposed to PCBs show decreased birth weight and a significant decrease in gestational age with increasing exposures to PCBs.  Animal studies have shown that PCB exposures reduce birth weight, conception rates, live birth rates, and reduced sperm counts.

47.    Human and animal studies confirm that PCB exposure causes persistent and significant deficits in neurological development, affecting visual recognition, short-term memory, and learning. Some of these studies were conducted using the types of PCBs most commonly found in human breast milk.

48.    PCBs may also disrupt the normal function of the endocrine system.  PCBs have been shown to affect thyroid hormone levels in both animals and humans.  In animals, decreased thyroid hormone levels have resulted in developmental deficits, including deficits in hearing.  PCB exposure is also been associated with changes in thyroid hormone levels in infants in studies conducted in the Netherlands and Japan.

49.    PCBs are associated with other health effects including elevated blood pressure, serum triglyceride, and serum cholesterol in humans; dermal and ocular effects in monkeys and humans; and liver toxicity in rodents.

50.    Children may be affected to a greater extent than adults.  The Agency for

Toxic Substances and Disease Registry explained:  "Younger children may be

particularly vulnerable to PCBs because, compared to adults, they are growing more

rapidly and generally have lower and distinct profiles of biotransformation enzymes, as

well as much smaller fat deposits for sequestering the lipophilic PCBs."[18]

51.    PCBs are known to be toxic to a number of aquatic species and wildlife

including fish, marine mammals, reptiles, amphibians, and birds.  Exposure is

associated with death, compromised immune system function, adverse effects on

reproduction, development, and endocrine function.  PCB exposure affects liver

function, the digestive system, and nervous systems and can promote cancer in a

number of animal species.  The presence of PCBs can cause changes in community and

ecosystem structure and function.[19]

/ / /

/ / /

/ / /

---

[18] Agency for Toxic Substances and Disease Registry, Toxicological Profile for

Polychlorinated Biphenyls (PCBs), (November 2000), at 405, available at

www.atsdr.cdc.gov (last accessed May 1, 2014).

[19] *See* EPA, Understanding PCB Risks, available at

http://www.epa.gov/housatonic/understandingpcbrisks.html#WildlifeEcologicalRiskAss

essment (last accessed March 5, 2015).

### B.    Monsanto Has Long Known of PCBs' Toxicity.

52.    Monsanto was well aware of scientific literature published in the 1930s that established that inhalation in industrial settings resulted in toxic systemic effects. [20]

53.    An October 11, 1937, Monsanto memorandum advises that "Experimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects.  Repeated bodily contact with the liquid Aroclors may lead to an acne-form skin eruption."[21]

54.    A September 20, 1955, memo from Emmet Kelly set out Monsanto's position with respect to PCB toxicity:  "We know Aroclors are toxic but the actual limit has not been precisely defined.  It does not make too much difference, it seems to me, because our main worry is what will happen if an individual develops [sic] any type of liver disease and gives a history of Aroclor exposure.  I am sure the juries would not pay a great deal of attention to [maximum allowable concentrates]."[22]

55.    On November 14, 1955, Monsanto's Medical Department provided an opinion that workers should not be allowed to eat lunch in the Aroclor department:

> It has long been the opinion of the Medical Department that eating in process departments is a potentially hazardous procedure that could lead to serious difficulties.  While the Aroclors are not particularly hazardous from our own experience, this is a difficult problem to define because early literature work claimed that

---

[20] *See* Exhibits B, C, and F

[21] MONS 061332, attached as Exhibit B.

[22] MONS 095196-7, attached as Exhibit C.

PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

chlorinated biphenyls were quite toxic materials by ingestion or inhalation.[23]

56.    On January 21, 1957, Emmet Kelly reported that after conducting its own tests, the U.S. Navy decided against using Monsanto's Aroclors: "No matter how we discussed the situation, it was impossible to change their thinking that Pydraul 150 is just too toxic for use in a submarine."[24]

57.    In 1966, Kelly reviewed a presentation by Swedish researcher Soren Jensen, who stated that PCBs "appeared to be the most injurious chlorinated compounds of all tested."[25]  Jensen refers to a 1939 study associating PCBs with the deaths of three young workers and concluding that "pregnant women and persons who have at any time had any liver disease are particularly susceptible."[26]  Kelly does not dispute any of Jensen's remarks, noting only, "As far as the section on toxicology is concerned, it is true that chloracne and liver trouble can result from large doses."[27]

/ / /

/ / /

---

[23] Monsanto Chemical Company, Memorandum to H.B. Patrick, November 14, 1955 (no Bates number), attached as Exhibit D.

[24] MONS 095640, attached as Exhibit E.

[25] *See* JDGFOX00000037-63, attached as Exhibit F.

[26] *Id*. at JDGFOX00000039.

[27] *Id*. at JDGFOX00000037.

PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

**C.  Monsanto Has Long Known that PCBs Were "Global Contaminants" Causing Harm to Animals and Fish.**

58.    At the same time, Monsanto became aware that PCBs were causing widespread contamination of the environment, far beyond the areas of its use.[28] Monsanto's Medical Director reviewed an article by Swedish researcher Soren Jensen, who reported the detection of PCBs in the tissues of fish and wildlife in Sweden.[29]  The report noted that PCBs were also detected in the air over London and Hamburg and found in seals caught off the coast of Scotland.  Jensen concluded that PCBs can "be presumed to be widespread throughout the world."[30]

59.    A December 1968 article by Richard Risebrough identified chlorinated hydrocarbons (which include PCBs) as "the most abundant synthetic pollutants present in the global environment."[31]  The article reported finding significant concentrations of PCBs in the bodies and eggs of peregrine falcons and 34 other bird species.  The report linked PCBs to the rapid decline in peregrine falcon populations in the United States.

/ / /

---

[28] *See* Exhibits G, H, and L;

[29] New Scientist (December 15, 1986), MONSFOX00003427, attached as Exhibit G.

[30] *Id.*

[31] R.W. Risebrough, Polychlorinated Biphenls in the Global Ecosystem, Nature, Vol. 220 (December 14, 1968), attached as Exhibit H.

60.    Despite growing evidence of PCBs' infiltration of every level of the global ecology, Monsanto remained steadfast in its production of Aroclors and other PCBs.

61.    On March 6, 1969, Monsanto employee W. M. Richard wrote a memorandum discussing Risebrough's article that criticized PCBs as a "toxic substance", "widely spread by air-water; therefore, an uncontrollable pollutant . . . causing extinction of peregrine falcon … [and] endangering man himself."[32]  Richard explained that Monsanto could take steps to reduce PCB releases from its own plants but cautioned, "It will be still more difficult to control other end uses such as cutting oils, adhesives, plastics, and NCR paper.  In this applications exposure to consumers is greater and the disposal problem becomes complex."[33]

62.    On September 9, 1969, Monsanto employee W.R. Richard wrote an interoffice memo titled "Defense of Aroclor."[34]  He acknowledged the role of Aroclor in water pollution:  "Aroclor product is refractive, will settle out on solids – sewerage sludge – river bottoms, and apparently has a long life."  He noted that Aroclors 1254 and 1260 had been found along the Gulf Coast of Florida causing a problem with shrimp; in San Francisco Bay, where it was reported to thin egg shells in birds; and in the Great Lakes.  Richard advised that the company could not defend itself against all

---

[32] MONS 096509-096511, attached as Exhibit I.

[33] *Id.*

[34] DSW 014256-014263, attached as Exhibit J.

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

criticism: "We can't defend vs. everything.  Some animals or fish or insects will be harmed.  Aroclor degradation rate will be slow.  Tough to defend against.  Higher chlorination compounds will be worse [than] lower chlorine compounds.  Therefore we will have to restrict uses and clean-up as much as we can, starting immediately."[35]

63.    On January 29, 1970, Elmer Wheeler of the Medical Department circulated laboratory reports discussing results of animal studies.  He noted: "Our interpretation is that the PCB's are exhibiting a greater degree of toxicity in this chronic study than we had anticipated.  Secondly, although there are variations depending on species of animals, the PCB's are about the same as DDT in mammals."[36]

64.    Monsanto expressed a desire to keep profiting from PCBs despite the environmental havoc in a PCB Presentation to Corporate Development Committee.  The report suggests possible reactions to the contamination issue.  It considered that doing nothing was "unacceptable from a legal, moral, and customer public relations and company policy viewpoint."  But the option of going out of the Aroclor business was also considered unacceptable:  "there is too much customer/market need and selfishly too much Monsanto profit to go out."[37]

/ / /

---

[35] *Id.*

[36] MONS 098480, attached as Exhibit K.

[37] Ex. A at 058737.

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

65.    The Aroclor Ad Hoc Committee held its first meeting on September 5, 1969.  The committee's objectives were to continue sales and profits of Aroclors in light of the fact that PCB "may be a global contaminant."[38]  The meeting minutes acknowledge that PCB has been found in fish, oysters, shrimp, birds, along coastlines of industrialized areas such as Great Britain, Sweden, Rhine River, low countries, Lake Michigan, Pensacola Bay, and in Western wildlife.  Moreover, the committee implicated the normal use of PCB-containing products as the cause of the problem:  "In one application alone (highway paints), one million lbs/year are used.  Through abrasion and leaching we can assume that nearly all of this Aroclor winds up in the environment."[39]

66.    A month later, on October 2, 1969, the Committee reported extensive environmental contamination.  The U.S. Department of Interior, Fish and Wildlife found PCB residues in dead eagles and marine birds.  Similarly, the Bureau of Commercial Fisheries reported finding PCBs in the river below Monsanto's Pensacola plant.   The U.S. Food and Drug Administration had discovered PCBs in milk supplies.  The Committee advised that Monsanto could not protect the environment from Aroclors as "global" contaminants but could protect the continued manufacture and sale of Aroclors:

/ / /

---

[38] MONS 030483-030486, attached as Exhibit L.

[39] *Id.*at 030485.

PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

> There is little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls (the higher chlorinated – e.g. Aroclors 1254 and 1260) as nearly <u>global environmental contaminants</u> leading to <u>contamination of human food</u> (particularly fish), the <u>killing of some marine species</u> (shrimp), and the possible extinction of several species of fish eating birds.
>
> Secondly, the committee believes that there is no practical course of action that can so effectively police the uses of these products as to prevent environmental contamination.  <u>There are, however a number of actions</u> which must be undertaken <u>to prolong the manufacture, sale and use of these particular Aroclors</u> as well as to protect the continued use of other members of the Aroclor series.[40]

67.   Monsanto's desire to protect Aroclor sales rather than the environment is reflected in the Committee's stated objectives:

1.   Protect continues sales and profits of Aroclors;
2.   Permit continued development of new uses and sales, and
3.   Protect the image of the Organic Division and the Corporation as members of the business community recognizing their responsibilities to prevent and/or control contamination of the global ecosystem.[41]

68.   An interoffice memorandum circulated on February 16, 1970, provided talking points for discussions with customers in response to Monsanto's decision to eliminate Aroclors 1254 and 1260:  "We (your customer and Monsanto) are not interested in using a product which may present a problem to our environment." Nevertheless, the memo acknowledges that Monsanto "can't afford to lose one dollar of business."  To that end, it says, "We want to avoid any situation where a customer wants to return fluid. . . . We would prefer that the customer use up his current inventory and

---

[40] DSW 014612-014624, at 014615, attached as Exhibit M.

[41] *Id.*

PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

purchase [new products] when available. He will then top off with the new fluid and eventually all Aroclor 1254 and Aroclor 1260 will be out of his system. <u>We don't want to take fluid back</u>." [42]

69.    In 1970, the year after Monsanto formed the "ad hoc" committee, and despite Monsanto's knowledge of the global reach of PCB contamination, PCB production in the United States peaked at 85 million pounds.

70.    Growing awareness of the ubiquitous nature of PCBs led the Unites States to conduct an investigation of health and environmental effects and contamination of food and other products. An interdepartmental task force concluded in May 1972 that PCBs were highly persistent, could bioaccumulate to relatively high levels, and could have serious adverse health effects on human health. [43]

71.    After that report, environmental sampling and studies indicated that PCBs were a "more serious and continuing environmental and health threat than had been originally realized." [44] To address these concerns, EPA undertook a study to assess PCB levels in the environment on a national basis. That study revealed widespread occurrence of PCBs in bottom sediments in several states; in fish and birds; in lakes and rivers; in the Atlantic Ocean, the Pacific Ocean, and the Gulf of Mexico; sewage

---

[42] MONS 100123-100124, attached as Exhibit N.

[43] EPA, Review of PCB Levels in the Environment, EPA-560/7-76-001 (January 1976).

[44] *Id*. at 1.

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

treatment facilities; in a variety of foods including milk, poultry, eggs, fish, meat, and grains; and in human tissues, blood, hair, and milk.[45]

72.    At the same time, Monsanto was promoting the use and sale of Aroclor and other PCB compounds.  In a 1960 brochure, Monsanto promotes the use of Aroclors in transformers and capacitors, utility transmission lines, home appliances, electric motors, fluorescent light ballasts, wire or cable coatings, impregnants for insulation, dielectric sealants, chemical processing vessels, food cookers, potato chip fryers, drying ovens, thermostats, furnaces, and vacuum diffusion pumps.  Aroclors could also be used, the brochure advertised, as a component of automotive transmission oil; insecticides; natural waxes used in dental casting, aircraft parts, and jewelry; abrasives; specialized lubricants; industrial cutting oils; adhesives; moisture-proof coatings; printing inks; papers; mastics; sealant; caulking compounds; tack coatings; plasticizers; resin; asphalt; paints, varnishes, and lacquers; masonry coatings for swimming pools, stucco homes, and highway paints; protective and decorative coatings for steel structures, railway tank and gondola cars; wood and metal maritime equipment; and coatings for chemical plants, boats, and highway marking. [46]

73.    A 1961 brochure explains that Monsanto's Aroclors are being used in "lacquers for women's shoes," as "a wax for the flame proofing of Christmas trees," as

---

[45] Id., passim.

[46] The Aroclor Compounds (hand dated May 1960), 0509822- 66, attached as Exhibit S.

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

"floor wax," as an adhesive for bookbinding, leather, and shoes, and as invisible marking ink used to make chenille rugs and spreads. [47]

74.     Thus, by February 1961, at the latest, Monsanto knew that its Aroclors were being used in a variety of industrial, commercial, household, and consumer goods. Moreover, Monsanto affirmatively encouraged these uses by encouraging salesmen to market products for these and other applications.

75.     A few years later, in 1970, Monsanto tried to distance itself from the variety of applications of Aroclors that it proudly espoused a few years before.  In a press release, the company claimed:  " 'What should be emphasized . . . is that PCB was developed over 40 years ago primarily for use as a coolant in electrical transformers and capacitors.  It is also used in commercial heating and cooling systems.  It is not a 'household' item.' " [48]

**D.     Monsanto Concealed the Nature of PCBs from Governmental Entities.**

76.     While the scientific community and Monsanto knew that PCBs were toxic and becoming a global contaminant, Monsanto repeatedly misrepresented these facts, telling governmental entities the exact opposite — that the compounds were not toxic

---

[47] Plasticizer Patter (February 1961), 0627503-21, attached as Exhibit T.

[48] *See* Press release (July 16, 1970), MCL000647-50, attached as Exhibit U, at MCL000648.

GOMEZ
TRIAL ATTORNEYS

and that the company would <u>not</u> expect to find PCBs in the environment in a widespread manner.[49]

77.    In a March 24, 1969 letter to Los Angeles County Air Pollution Control District, Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or skin absorption."[50]  Addressing reports of PCBs found along the West Coast, Monsanto claimed ignorance as to their origin, explaining that "very little [Aroclor] would normally be expected either in the air or in the liquid discharges from a using industry."[51]  A similar letter to the Regional Water Quality Control Board explained that PCBs are associated with "no special health problems" and "no problems associated with the environment."[52]

78.    In May, 1969, Monsanto employee Elmer Wheeler spoke with a representative of the National Air Pollution Control Administration, who promised to

///

///

---

[49] *See* Exhibits O-R (letters to governmental agencies).

[50] Letter from Monsanto to Los Angeles County Air Pollution Control District (March 24, 1969), attached as Exhibit O.

[51] *Id.*

[52] Letter from Monsanto to State of California Resources Agency (March 27, 1969), attached as Exhibit P.

PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

relay to Congress the message that Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread fashion."[53]

79.     Monsanto delivered the same message to the New Jersey Department of Conservation in July, 1969, claiming first, "Based on available data, manufacturing and use experience, we do not believe the PCBs to be seriously toxic."[54]  The letter then reiterates Monsanto's position regarding environmental contamination:  "We are unable at this time to conceive of how the PCBs can become wide spread in the environment. It is certain that no applications to our knowledge have been made where the PCBs would be broadcast in the same fashion as the chlorinated hydrocarbon pesticides have been."[55]

## FIRST CAUSE OF ACTION

## PUBLIC NUISANCE

80.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this cause of action.

81.     Monsanto manufactured, distributed, marketed, and promoted PCBs in a manner that created or participated in creating a public nuisance that is harmful to health and obstructs the free use of the Spokane River.

---

[53] Monsanto Memorandum to W.R. Richard (May 26, 1969), attached as Exhibit Q.

[54] Letter from Monsanto to Department of Conservation and Economic Development (July 23, 1969), attached as Exhibit R.

[55] *Id.*

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

82.     Monsanto's conduct and the presence of PCBs annoys, injures, and endangers the comfort, repose, health, and safety of others.

83.     Monsanto's conduct and the presence of PCBs obstructs and tends to obstruct the use of the Spokane River.

84.     Monsanto's conduct and the presence of PCBs in the Spokane River is injurious to health.

85.     Monsanto's conduct and the presence of PCBs interferes with the free use and enjoyment of the Spokane River, including for fishing and recreation.

86.     Monsanto's conduct and the presence of PCBs in the Spokane River obstructs the free use of the Spokane River so as to essentially interfere with the comfortable enjoyment of the use the Spokane River, a public waterway.

87.     The presence of PCBs interferes with the free use of the River for ecological preservation and habitat restoration.

88.     Pursuant to federal law, court rulings, the Clean Water Act, and NPDES Permit requirements, Spokane may be required to reduce its discharge of PCBs into the River to prevent further contamination of the already impaired water body.  Currently, Spokane has incurred costs associated with participating in the Task Force, testing and monitoring PCBs, and other actions to reduce PCB levels in stormwater.

89.     Protecting the waters of the state is an exercise of sovereignty consistent with "the public policy of the state of Washington to maintain the highest possible standards to insure the purity of all waters of the state consistent with public health and

PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

public enjoyment thereof, the propagation and protection of wild life, birds, game, fish and other aquatic life, and the industrial development of the state, and to that end require the use of all known available and reasonable methods by industries and others to prevent and control the pollution of the waters of the state of Washington." RCW 90.48.010.

90.    Monsanto's conduct and the presence of PCBs affects equally the rights of an entire community, and Spokane has been harmed in that it is legally required to reduce the discharge of PCBs in the River.

91.    An ordinary person would be reasonably annoyed or disturbed by the presence of toxic PCBs that endanger the health of fish, animals, and humans and degrade water quality and destroy marine habitats.

92.    The seriousness of the environmental and human health risk far outweighs any social utility of Monsanto's conduct in manufacturing PCBs and concealing the dangers posed to human health and the environment.

93.    The rights, interests, and inconvenience to Spokane far outweighs the rights, interests, and inconvenience to Monsanto, which profited heavily from the manufacture of PCBs and which can no longer produce PCBs.

94.    Spokane has suffered and will continue to suffer harm and incur substantial costs in excess of one hundred million dollars ($100,000,000) to remove CSO and stormwater flows from the Spokane River.

GOMEZ
TRIAL ATTORNEYS

95.     Monsanto had a duty to cease manufacturing, distributing, selling and promoting PCBs and failed to do so.  Monsanto also had a duty to warn about the dangers of PCBs and failed to do so.

96.     Monsanto's conduct caused and continues to cause harm to Spokane.

97.     Monsanto knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PCBs was causing and would cause the type of contamination now found in the River.  Monsanto knew that PCBs would contaminate water supplies, would degrade marine habitats, would kill fish species, and would endanger birds and animals.  In addition, Monsanto knew PCBs are associated with serious illnesses and cancers in humans and that humans may be exposed to PCBs through ingestion of fish and/or dermal contact.  As a result, it was foreseeable to Monsanto that humans may be exposed to PCBs through swimming in contaminated waters or by eating fish from those waters.  Monsanto thus knew, or should have known, that PCB contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of any coastal marine areas.

98.     As a direct and proximate result of Monsanto's creation of a public nuisance, Spokane has suffered, and continues to suffer, monetary damages to be proven at trial.

/ / /

/ / /

/ / /

PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

# SECOND CAUSE OF ACTION

## PRODUCTS LIABILITY- DEFECTIVE DESIGN

99.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this cause of action.

100.    Monsanto's PCBs were not reasonably safe as designed at the time the PCBs left Monsanto's control.

101.    PCBs' toxicity and inability to be contained rendered them unreasonably dangerous at all times.

102.    Monsanto's PCBs were unsafe as designed to the extent that the United State Congress banned the production and sale of PCBs pursuant to the Toxic Substances Control Act in 1979.

103.    Due to their toxicity and inability to be contained, Monsanto knew its PCBs were not safe at the time the product was manufactured because it was certain that the product would become a global contaminant and cause toxic contamination of waterways and wildlife, such as Spokane's stormwater and the fish in the Spokane River, due to the nature of PCBs.

104.    Monsanto knew its PCBs were unsafe to an extent beyond that which would be contemplated by an ordinary person because of the overwhelming seriousness of creating global contamination.

105.    Monsanto manufactured, distributed, sold, and promoted PCBs despite such knowledge in order to maximize its profits despite the known harm.

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

106.    Monsanto's PCBs caused and continue to cause injury to Spokane.

107.    Spokane has suffered and will continue to suffer damages.

### THIRD CAUSE OF ACTION

### PRODUCTS LIABILITY- FAILURE TO WARN

108.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

109.    Monsanto's PCBs were not reasonably safe because they lacked adequate warnings at the time the PCBs left Monsanto's control.

110.    At the time Monsanto manufactured, distributed, sold, and promoted its PCBs, Monsanto knew it was a certainty that PCBs would become a global contaminate and contaminate waterways and wildlife such as Spokane's stormwater and fish in the Spokane River.

111.    Despite Monsanto's knowledge, Monsanto failed to provide adequate warnings that its PCBs would become a global contaminant and contaminate waterways and wildlife, such as Spokane's stormwater and fish in the Spokane River.

112.    Monsanto could have warned of this certainty but intentionally concealed the certainty of global contamination in order to maximize profits.

113.    Monsanto learned and concealed the dangers of PCBs after it manufactured, distributed, promoted, and sold PCBs.

114.    Without adequate warnings or instructions, Monsanto's PCBs were unsafe to an extent beyond that which would be contemplated by an ordinary person.

PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

115.    Monsanto knowingly failed to issue warnings or instructions concerning the dangers of PCBs in the manner that a reasonably prudent manufacturer would act in the same or similar circumstances.

116.    Monsanto's PCBs caused and continue to cause injury to Spokane.

117.    Spokane has suffered and will continue to suffer damages.

## FOURTH CAUSE OF ACTION

### NEGLIGENCE

118.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restates in this count.

119.    Monsanto failed to exercise ordinary care because a reasonably careful company that learned of its product's toxicity would not manufacture that product if the product could not be contained during normal production and use or would warn of its toxic properties.

120.    Monsanto failed to exercise ordinary care because a reasonably careful company that learned that its product could not be contained during normal production and use would not continue to manufacture that product or would warn of its dangers.

121.    Monsanto failed to exercise ordinary care because a reasonably careful company would not continue to manufacture PCBs or do so in mass quantities and to the extent that Monsanto manufactured them.

122.    Monsanto was grossly negligent because it failed to exercise even slight care.

PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

123.    Monsanto's negligence caused and continues to cause injury to Spokane.

124.    Spokane has suffered and will continue to suffer damages.

## FIFTH CAUSE OF ACTION

## EQUITABLE INDEMNITY

125.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

126.    Pursuant to federal case law, court rulings, the Clean Water Act, and NPDES Permit requirements, Spokane has been and will continue to be legally obligated to spend money to remove PCBs from wastewater and stormwater before discharging into the Spokane River.

127.    Monsanto is responsible for contaminating the waste and stormwater with PCBs.

## PRAYER FOR RELIEF

Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1.  Compensatory damages according to proof;

2.  Litigation costs and attorney's fees as provided by law;

3.  Pre-judgment and post-judgment interest;

4.  Any other and further relief as the Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial.

GOMEZ
TRIAL ATTORNEYS

34

PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

Dated:  July 31, 2015

By: _____

**OFFICE OF THE CITY ATTORNEY**
NANCY L. ISSERLIS WSBA #11623
Elizabeth L. Schoedel WSBA #20240
Nathaniel J. Odle WSBA #39602
Hunt M. Whaley WSBA #46419
Assistant City Attorneys

**BARON & BUDD, P.C.**
Scott Summy (*pending Pro Hac Vice*)
Carla Burke (*pending Pro Hac Vice*)
Celeste Evangelisti (*pending Pro Hac Vice*)

**GOMEZ TRIAL ATTORNEYS**
John H. Gomez (*pending Pro Hac Vice*)
John P. Fiske (*pending Pro Hac Vice*)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL