# EXHIBIT B

Page 1

1                  UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF WASHINGTON

3

4    CITY OF SPOKANE, a municipal      )
     corporation, located in the       )
5    County of Spokane, State of       )
     Washington,                       )
6                                      )
                   Plaintiff,          )
7                                      )
             vs.                       ) Case No.
8                                      ) 15-cv-00201-SMJ
     MONSANTO COMPANY, SOLUTIA INC.,   )
9    and PHARMACIA CORPORATION, and    )
     DOES 1 through 100,               )
10                                     )
                   Defendants.         )
11   _____)

12

13        VIDEO DEPOSITION OF DANIEL SCHLENK, PhD

14                  NOVEMBER 13, 2019

15                SAN DIEGO, CALIFORNIA

16

17

18

19

20

21   Reported by:

22

23   Cynthia J. Vega, RMR, RDR, CSR 6640, CCRR 95

24

25   Job No.  171796

Decl. of A. Miller in Support of Daubert Motion
To Exclude D. SCHLENK Expert Testimony - 111

Page 2

1

2

3

4                          November 13, 2019

5                            9:06 a.m.

6

7

8

9          The video deposition of Daniel Schlenk, PhD, a

10   Witness herein, taken on behalf of Defendants, held at

11   11440 West Bernardo Court, Suite 265, in the City of

12   San Diego, County of San Diego, State of California,

13   before Cynthia J. Vega, Certified Shorthand Reporter

14   6640, Registered Merit Reporter, Registered Diplomate

15   Reporter, California Certified Realtime Reporter 95.

16

17

18

19

20

21

22

23

24

25

```
 1                         APPEARANCES

 2

 3     For the Plaintiffs:

 4     BARON & BUDD

 5     BY:  BRETT LAND, ESQ.

 6     3102 Oak Lawn Avenue

 7     Dallas, Texas  75219

 8

 9

10

11     For the Defendants:

12     SHOOK, HARDY & BACON

13     BY:  STEPHEN HANSEN, ESQ.

14          ALAN WONG, ESQ.

15     125 Summer Street

16     Boston, Massachusetts  02110

17

18

19

20

21     The Videographer:

22     MICHAEL DUARTE

23

24                         *  *  *  *  *

25
```

```
 1                    INDEX

 2   WITNESS

 3   Daniel Schlenk, PhD

 4

 5   EXAMINATION                              PAGE

 6   By Mr. Hansen                             8

 7

 8

 9                   EXHIBITS

10   EXHIBIT      DESCRIPTION                 PAGE

11   Exhibit 1    Defendants' Notice of Videotaped    18

12                Deposition of Daniel Schlenk

13   Exhibit 2    Plaintiff's Objections and          22

14                Responses to Defendants' Requests

15                for Production of Documents -

16                Daniel Schlenk

17   Exhibit 3    Expert Report of Daniel Schlenk,    23

18                Ph.D., October 11, 2019

19   Exhibit 4    An Ecological Hazard Assessment     35

20                for PCBs in the Spokane River,

21                April 2001

22   Exhibit 5    Ecological Risk Analysis of         37

23                Elevated Metal Concentrations in

24                the Spokane River, Washington,

25                November 6, 2000
```

1                          EXHIBITS

2    EXHIBIT        DESCRIPTION                          PAGE

3    Exhibit 6      Burke Museum website printout          53

4    Exhibit 7      Intermountain Province Subbasin        55

5                   Plan Executive Summary, GEI

6                   Consultants, Inc., May 2004

7    Exhibit 8      Periodic Status Review for the         59

8                   American White Pelican, October

9                   2016

10   Exhibit 9      Document titled "Living with           63

11                  Wildlife Black Bears"

12   Exhibit 10     Article titled "Development and        79

13                  Evaluation of Consensus-Based

14                  Sediment Quality Guidelines for

15                  Freshwater Ecosystems"

16   Exhibit 11     Department of Ecology Sediment         91

17                  Management Standards, Chapter

18                  173-204 WAC, September 2013

19   Exhibit 12     Chapter 2, Station Clustering and      94

20                  Site Identification WAC

21                  173-204-510 and 173-204-520

22   Exhibit 13     Technical Guidance for Screening       98

23                  Contaminated Sediments

24   Exhibit 14     Screening and Assessment of            99

25                  Contaminated Sediment, June 24, 2014

```
 1                       EXHIBITS

 2    EXHIBIT        DESCRIPTION                      PAGE

 3    Exhibit 15     Department of Ecology Development   103

 4                   of Benthic SQVs for Freshwater

 5                   Sediments in Washington, Oregon,

 6                   and Idaho, November 2011

 7    Exhibit 16     Article titled "Use of tissue and   119

 8                   sediment-based threshold

 9                   concentrations of polychlorinated

10                   biphenyls (PCBs) to protect

11                   juvenile salmonids listed under

12                   the US Endangered Species Act"

13    Exhibit 17     Article titled "Correlation of     130

14                   hepatic biomarkers with whole

15                   animal and population-community

16                   metrics"

17    Exhibit 18     Document titled "Canadian Tissue    136

18                   Residue Guidelines for the

19                   Protection of Wildlife Consumers

20                   of Aquatic Biota"

21    Exhibit 19     Protocol for the Derivation of      144

22                   Canadian Tissue Residue Guidelines

23                   for the Protection of Wildlife

24                   that Consume Aquatic Biota

25
```

1              SAN DIEGO, CALIFORNIA

2         WEDNESDAY, NOVEMBER 13, 2019, 9:06 A.M.

3

4              THE VIDEOGRAPHER:  This is the start of media

5    label number 1 of the video-recorded deposition of

6    Dr. Daniel Schlenk, PhD, in the matter of the City of

7    Spokane, et al., versus Monsanto Company, et al., in the

8    United States District Court, Eastern District of

9    Washington.  Number 15-cv-00201-SMJ.

10           This deposition is being held at Baron & Budd,

11   11440 West Bernardo Court, San Diego, California 92127,

12   on November 13, 2019, at approximately 9:06 a.m.

13           My name is Michael Duarte.  I am the legal

14   video specialist from TSG Reporting, Inc., headquartered

15   at 747 Third Avenue, New York, New York.

16           The court reporter is Cindy Vega in association

17   with TSG Reporting.

18           Will the court reporter please swear in the

19   witness.

20

21              DANIEL SCHLENK, PhD,

22   Witness herein, being first duly sworn, testifies as

23   follows:

24

25           MR. HANSEN:  We'll waive video introductions

1      A.    The health of the Spokane River, we did the

2   assessment to determine the risks of PCBs to organisms

3   in the Spokane River.

4      Q.    So you were focused solely on PCBs; correct?

5      A.    In this particular assessment, yes.

6      Q.    And you did not consider any other constituents

7   that might be in the sediment, tissue, or water of fish

8   or wildlife?

9      A.    I did not conduct a risk assessment on any

10  other constituent.

11     Q.    So you didn't analyze, for example,

12  concentrations of metal in sediment, tissue, or water;

13  correct?

14     A.    In the Spokane River, not that I can recall.

15          MR. HANSEN:  Okay.  I'll mark this as

16  Exhibit 4.

17          (Exhibit 4 was marked for identification.)

18  BY MR. HANSEN:

19     Q.    Dr. Schlenk, showing you what's been marked as

20  Exhibit 4.  Is this the Ecology 2001 study that we were

21  discussing and is referenced in your report?

22     A.    Yes, I believe it is.

23     Q.    And just for -- the full title is "An

24  Ecological Hazard Assessment for PCBs in the Spokane

25  River"; correct?

1       A.   Yes.

2       Q.   And it's by Johnson, if you look on the second

3    page?

4       A.   Yes.

5       Q.   And if you turn to page 30, and look at the

6    bottom of the page under the subheading "Other Chemical

7    Contaminants."

8       A.   Yes.

9       Q.   The first paragraph reads, "Metals

10   contamination of the Spokane River with zinc, cadmium,

11   and lead from upstream sources in Idaho is well known.

12   A number of the previously referenced reports contain

13   data on metals concentrations in fish and sediment.

14   Water data can be found in Pelletier (1994) and Hopkins

15   and Johnson (1997).  A TMDL for zinc, cadmium, and lead

16   was proposed by Pelletier and Merrill (1998) and

17   approved by EPA."  Did I read that correctly?

18      A.   Yes, you read that correctly.

19      Q.   Okay.  So the report -- this is the report that

20   you are updating?  Is that a fair assessment of --

21   characterization of your report, you want to update this

22   Johnson 2001 from Ecology?

23      A.   The idea was to use the Johnson 2001 report and

24   then evaluate -- do the same analysis that they had done

25   at a later date.

1     Q.   And Johnson here acknowledges the well-known

2  contamination of metals in fish tissue in the Spokane

3  River?

4     A.   The way I read that is that they acknowledge

5  that there are other compounds that are present in the

6  Spokane River.

7     Q.   And in fish tissue?

8     A.   Yes.  It says in fish.

9          MR. HANSEN:  This is Exhibit 5.

10         (Exhibit 5 was marked for identification.)

11  BY MR. HANSEN:

12    Q.   I've shown you what's been marked as Exhibit 5.

13  And I believe because it's an online printout, the

14  actual report starts on page -- the second page.  It's

15  described as "Ecological Risk Analysis of Elevated Metal

16  Concentrations in the Spokane River, Washington."

17  It's -- did I read that right?

18    A.   Yes, you read that right.

19    Q.   And this is a 2000 report and it's by Kadlec;

20  correct?

21    A.   Yes.

22    Q.   And so this metals concentrations analysis

23  predates the Johnson report that we were referring to as

24  Exhibit 4?

25    A.   The date that's on this page is before the

1    2001.

2       Q.    You'd agree with me that in certain

3    concentrations, metals, like cadmium, lead, and zinc,

4    may be toxic to fish species and harmful to ecological

5    resources?

6            MR. LAND:  Objection.  Vague.

7            THE WITNESS:  All things are toxic.  Metals in

8    excess of thresholds would be considered toxic to

9    organisms for those thresholds in those organisms.

10   BY MR. HANSEN:

11      Q.    That includes metals described in Kadlec?

12      A.    If concentrations of metals exceed thresholds

13   for those metals in those organisms, then you would

14   estimate risks from that relationship.

15      Q.    I'd ask you to turn to Roman numeral V, which

16   is the abstract of this Kadlec report.  So in the

17   abstract, they're describing the intent of the purpose

18   of the paper.  About three sentences down, it starts

19   off, "The ecological effects of this and other enriched

20   elements are discussed.  The aggregate effects of

21   multiple metals, other manmade contaminants, and

22   excessive water temperature are considered in overall

23   risk.  There is substantial evidence of metal-induced

24   ecological degradation in the Spokane River

25   progressively increasing in severity upstream, nearer

1    species of birds that may potentially be infected by PCB

2    concentrations; is that correct?

3          A.    Yes.

4          Q.    And in this paragraph, you specifically state

5    herons, osprey, white pelicans, and bald eagles; is that

6    right?

7          A.    Correct.  I spelled herons wrong, though.

8          Q.    I wasn't going to point that out.

9                So these are examples of species that you refer

10   to?

11         A.    These are examples of birds that occur in

12   eastern Washington according to the Burke Museum.

13         Q.    All right.  I'll ask you about that in a

14   second.  Am I correct that in this report you did not

15   use specific exposure parameters for these -- excuse me.

16   Let me strike that question and ask it in a better way.

17               Am I correct that in your report you did not

18   use exposure parameters specific to these individual

19   species of birds?

20         A.    Exposure parameters.  I'm not sure what you

21   mean by that.

22         Q.    Sure.  So essentially my question concerns --

23   let me ask it this way:  You used a generic avian value

24   for the thresholds that you used in this report;

25   correct?

1     A.   Correct.

2     Q.   And those don't consider, for example,

3  species-specific dietary intakes; correct?

4     A.   They use a -- as I understand it, they actually

5  use a dietary evaluation that attempts to encompass all

6  birds.  That's how I understand the way that they create

7  those thresholds.  But there is not a species-specific

8  evaluation in there that I know of in terms of how they

9  determine those thresholds.

10    Q.   Okay.  And I guess, is it -- then is it fair

11 for me to refer to that as a generic avian threshold?

12    A.   I wouldn't use the term "generic."  I would use

13 a "surrogate" is a more -- word that we use.

14    Q.   Okay.  So, for example, in these -- with

15 respect to these four avian species that you identify in

16 this particular paragraph, the value selected refer to

17 that surrogate avian value and not, for example, an

18 osprey-specific value?

19    A.   Correct.  I don't know of a osprey-specific

20 value.

21    Q.   And if I -- am I correct that the dietary

22 intake for, for example, the eagle, the bald eagle, is

23 different than the dietary intake from the heron?

24    A.   I do not know that.

25    Q.   Okay.  And if I could call your attention to

1      Q.    And you mentioned that -- so you mentioned

2   earlier that you relied upon the Burke Museum for the

3   ranges of the species?

4      A.    The website, the BurkeMuseum.org and also the

5   GEI 2004.

6      Q.    That's in -- both of those sources are on

7   page 12 of your report, the last paragraph -- or the

8   last paragraph before toxicity equivalents, you list

9   BurkeMuseum.org and GEI 2004?

10     A.    Right.

11          MR. HANSEN:  Mark this as -- I believe this

12   is 6.

13          (Exhibit 6 was marked for identification.)

14   BY MR. HANSEN:

15     Q.    So I'm showing you -- and feel free to take a

16   flip through.  There is not much there, but I'm showing

17   you what has been marked as Exhibit 6.  I'll represent

18   to you that it's not a very good printout, but it's a

19   printout of BurkeMuseum.org.  And I'll be honest, I

20   don't know where the data comes from that purports to

21   identify the species-specific ranges and diets that you

22   mentioned in your report.  It's pretty much just a

23   typical front page of museum website.  There appears to

24   be hours open, some children looking at -- pictures of

25   children experiencing the museum; is that correct?

1        A.    Based on what you have provided, that is

2    correct.

3        Q.    Okay.  And so if I were to try to ascertain the

4    data that you used for eastern Washington species, would

5    I be able to find it in your report?

6        A.    You would find it on this website.  You would

7    have to either enter in that data to search for that or

8    look through some of the other links that are provided

9    on that website to find that information.

10        Q.    Okay.  And you mentioned in your testimony that

11    you used the Burke Museum to ascertain the habitats of

12    the species in eastern Washington.  Did you go anymore

13    specific and go to the Spokane River basin or watershed?

14        A.    The intent was to use the Spokane River

15    watershed as a source.  I don't recall what I actually

16    entered into the search engine to find those species,

17    but -- but as far as I can remember, they were located

18    in the Spokane River watershed.

19        Q.    So I'm correct in that I would have to do more

20    digging into the BurkeMuseum.org website and search

21    white pelicans and that would yield data that shows that

22    they are located in eastern Washington?

23        A.    I'm not sure if you entered in white pelican

24    what that would find you.

25        Q.    Okay.

1      A.   And I honestly can't remember what I entered in

2  to find that.  I would assume that I did a Spokane River

3  drainage or eastern Washington search within that

4  website.

5      Q.   So -- sorry.  I didn't mean to interrupt you.

6  Sorry.

7           So as we sit here today, you can't point me to

8  anything that shows white pelicans along the Spokane

9  River, you can just --

10     A.   I can point you to the Burke Museum website

11 which I utilized to determine that white pelicans are in

12 that location.

13          MR. HANSEN:  Exhibit 7.

14          (Exhibit 7 was marked for identification.)

15 BY MR. HANSEN:

16     Q.   So Exhibit 7 before you is titled

17 "Intermountain Province Subbasin Plan Executive

18 Summary."  And it's by GEI Consultants, Inc.  Is this

19 your reference GEI 2004?

20     A.   I believe it is.

21     Q.   And this was the additional citation that you

22 mentioned for estimated ranges and dietary preferences

23 of the species that you identified; correct?

24     A.   No.  I used this as examples of animals that

25 would -- fish-eating animals that reside in the area of

1    the Spokane River drainage.

2        Q.    What did I ask?  Sorry.  You don't have to

3    answer that.

4            I guess my question was:  You used this -- I

5    was just using your language.  You said these species

6    were determined using estimated ranges and dietary

7    preferences provided from the Burke Museum, but you also

8    list GEI 2004 in that paragraph; correct?

9        A.    Correct.

10       Q.    Okay.  And then -- so this is the GEI 2004

11   document.  But you didn't use the GEI 2004 document to

12   ascertain the estimated ranges or habitats of the

13   species that you list?

14       A.    I listed it to determine that they occur in

15   that location --

16       Q.    Okay.

17       A.    -- as examples.

18       Q.    Is occurrence sufficient for your purposes for

19   this ecological risk assessment?

20       A.    Occurrence -- occurrence is appropriate when I

21   used them as examples of mammals that would be in those

22   locations.

23       Q.    Okay.  Can I ask you to turn to page 4-38 of

24   this particular exhibit, towards the back.

25       A.    Uh-huh.  Oh, there it is.

1    Q.   So I see -- essentially on this page you see a

2    subheading saying "American White Pelican," and below

3    that "Population Status and Trend"; correct?

4    A.   Yes.

5    Q.   That's right under the table.

6         Middle of the first paragraph in this report

7    that you use, it says, "Presently, a single breeding

8    colony exists in the state at the McNary National

9    Wildlife Refuge, downstream of Pasco, Washington.  As

10   many as 2,000 nonbreeding pelicans have come to the

11   Potholes region of the Columbia Basin.  Wintering

12   concentrations of 40 to 300 individuals use the Columbia

13   River from the Walla Walla River confluence to Priest

14   Rapids."  Did I read that correctly, omitting some of

15   the references?

16   A.   You read that correctly.

17   Q.   Okay.  And is this your reference point for the

18   existence of white pelicans on the Spokane River?

19   A.   I don't recall.  It was either this reference

20   or the Burke Museum is where I got that information.

21   Q.   And if you go down a little bit further, the

22   paragraph starting with "Doran et al."

23        "Doran et al. (1999) include the southern

24   portion of the Spokane and Upper Columbia subbasins

25   within the species range.  However, the only documented

1    record in the Washington Priority Habitats and Species

2    database occurred in June 2000 when ten foraging

3    individuals were sighted on the Pend Oreille" --

4    O-r-e-i-l-l-e -- "River north of Newport in the Pend

5    Oreille subbasin.  The Washington State GAP analysis

6    found no evidence of current breeding within the

7    province."

8            And I guess I'll just ask the same question.

9    Is this the reference that you're relying on for the

10   existence of white pelicans along the Spokane River?

11       A.   It is very likely a reference that I used to

12   locate that, yes.

13       Q.   Am I correct that at least in this portion of

14   the document under white pelicans on 4-38 and extending

15   on to 4-39, there is no specific reference to the

16   Spokane River?

17       A.   Well, I would disagree with that because it

18   says, "include the southern portion of Spokane and Upper

19   Columbia subbasins," which would include the drainage to

20   the Spokane River.

21            It also says further on in that paragraph that

22   "WDFW notes that nonbreeding pelicans may be

23   underrepresented in the WDFW database."  So I took that

24   to indicate that they -- you cannot rule out the

25   possibility that they are in the Spokane River system.

1    River along the Washington population status for the

2    white pelican from this Department of Fish and Wildlife

3    report.

4         A.   Is that a question?

5         Q.   It's leading to a question.

6              My question is:  Why would you not have used --

7    if you wanted to do an assessment of the species that

8    were specific to the Spokane River, why would you not

9    have relied upon the Washington Department of Fish and

10   Wildlife or the Washington Department of Ecology

11   documents?

12             MR. LAND:  Objection.  Assumes facts.

13   Misleading as the first statement.

14             Otherwise, you can answer.

15             THE WITNESS:  As I mentioned, the purpose of

16   the study was to evaluate -- to provide examples of

17   animals that would be feeding on fish contaminated with

18   PCBs.  We were not conducting a population assessment of

19   any avian wildlife.  We were not conducting a population

20   assessment of any other biota that was present in that

21   river system.  So I would not have looked for this

22   particular document because my purpose was to provide

23   examples of animals that reside within those locations.

24   BY MR. HANSEN:

25        Q.   But if you -- but you conclude that avian

1    correctly from as stated in this document?

2        A.   I did not see where you read.  Which one was

3    that?

4        Q.   Okay.  Sorry.  Bullet point number 1 under

5    "Food and Feeding Behavior."

6        A.   Yes.  I see it now.

7        Q.   Okay.  And then a few bullet points down, maybe

8    five or so, you have a bullet point that says,

9    "Typically, a small proportion of the black bear's

10   annual diet is made up of animal matter, including

11   insects, mice, voles, ground squirrels, fawns and elk

12   calves, eggs, carrion (animal carcasses), and fish, but

13   their availability varies and is often unpredictable.

14   An occasional bear may take livestock."  Did I read that

15   correctly?

16       A.   Yes.

17       Q.   So this is the data from the Department of Fish

18   and Wildlife discussing the black bear's dietary intake;

19   correct?

20       A.   A description of annual diet and predicted

21   items.  Yes.

22       Q.   Okay.  And so according to this document, a

23   small proportion of a black bear's annual diet is made

24   up of nonplant diet; correct?

25       A.   According to this document, that's what those

1    words say, yes.  It also says that they eat fish too,

2    so...

3        Q.    In -- during the report that -- in your

4    assessment that you conducted, do you ascertain how much

5    fish a black bear eats as a percentage of its diet?

6        A.    We did not do a species-specific feeding

7    analysis, no.

8        Q.    Similar to the questions before, am I correct

9    that your report has no scientific data or analysis of

10   population trends of black bears in and around the

11   Spokane River?

12       A.    We did not do a population assessment of black

13   bears.

14       Q.    So you don't know one way or the other whether

15   black bears -- the populations of black bears near or

16   around the Spokane River are increasing or decreasing?

17       A.    I do not know whether the population of black

18   bears are increasing or decreasing around the Spokane

19   River.

20       Q.    Another fish-eating mammal you identify on

21   page 12 of your report is the raccoon.  Am I correct

22   that your report doesn't identify anywhere how much of

23   the average raccoon diet is composed of fish?

24       A.    I did not do a species-specific evaluation of

25   the feeding strategies for raccoons.

1      Q.   If I can refer you to Johnson 2001, page 38.  I

2   direct your attention to the last paragraph on this

3   page.  Johnson 2001 -- excuse me.  The last sentence of

4   this page.  "The raccoon was not evaluated because its

5   diet is approximately 37 percent aquatic invertebrates,

6   for which there are little data, and 60 percent from

7   nonriver sources."  And that's from TAMS 2000.

8          So am I correct that Ecology decided, at least

9   in this particular report, not to evaluate the diet of a

10   raccoon because 97 percent of it was from -- was

11   nonfish?

12      A.   Actually, again they were using values from the

13   Hudson River to come up with those particular values, so

14   based upon their analysis of that data source, they

15   decided not to do -- it would appear they decided not to

16   evaluate raccoons as a receptor.

17      Q.   But you list it as a potential receptor?

18      A.   I list it as an example of mammals that consume

19   fish.  I did not list it as a receptor.

20      Q.   So your report has a -- you create a

21   distinction in your report between a mammal that can at

22   some point consume fish and a potential receptor for --

23      A.   I did not consider any of these as receptors.

24   I considered them as examples.  We used fish-eating

25   mammals as a receptor, but these particular species we

1   did not use as receptors.  We used them as examples of

2   fish-eating mammals and birds.

3       Q.   But at least according to the Johnson

4   evaluation, 97 percent of a raccoon's diet is nonfish

5   based?

6       A.   In the Hudson River, it would appear that

7   97 percent of their diet is nonfish based.

8       Q.   And the department of -- Washington Department

9   of Ecology took that analysis and opted not to do a

10  specific review of the raccoon's diet; correct?

11      A.   It would appear that's what they decided, yes.

12      Q.   Would you agree with me that mammals that eat

13  less fish in their diet have less opportunity for

14  exposure to PCBs contained in fish tissue?

15          MR. LAND:  Objection.  Incomplete hypothetical.

16          THE WITNESS:  I think it depends on the

17  location, what their other food supply is, and that is

18  site specific as well as species specific.

19  BY MR. HANSEN:

20      Q.   And you can't answer that for the Spokane River

21  because you didn't do a site-specific or

22  species-specific analysis; correct?

23      A.   We did not do a site-specific or

24  species-specific analysis of fish-eating mammals or

25  fish-eating birds.

 1    that mink -- strike that.  Let me start over.  That was

 2    a bad question.

 3             In the process of updating this Johnson report

 4    with newer data or newer values, did you identify any

 5    data that would indicate that this is an incorrect or

 6    out-of-date statement by Ecology in 2001?

 7    A.    So, again, let me just clarify.  We didn't

 8    necessarily update the Johnson report.  We wanted to

 9    compare parts of the report, so we did not take the

10    report as its entirety.  We took parts of the report and

11    evaluated those parts.  We did not do population

12    assessment on any mammal or any bird as part of that

13    exercise.

14    Q.    Okay.  I only use the word "update" because you

15    used it in the report.  I think you used it in your

16    testimony.  So if you don't think that's accurate --

17    A.    We did update a part of it, but not the entire

18    report.  As I mentioned earlier, there were things in

19    the report that we did not target as an update sort of

20    exercise.

21    Q.    And to the extent -- and again, because all of

22    these are examples that you identify from

23    BurkeMuseum.org, that data is present somewhere within

24    the BurkeMuseum.org website and not present within the

25    four corners of your report; correct?

1    the Great Lakes that showed that relationship.

2        Q.    Okay.  So the answer to my question would be

3    no, you don't have any data or scientific studies that

4    identify these observed effects?

5        A.    We do have -- we do have threshold -- we have

6    exposure values that exceed thresholds that were

7    determined on species that also reside in the Spokane

8    River basin.

9        Q.    But you don't have actual observed effects as

10   you identify in this for this particular --

11       A.    We have --

12            MR. LAND:  Wait for him to finish.

13   BY MR. HANSEN:

14       Q.    So my question is essentially -- you list a

15   number of actual observed effects.  And my question is

16   very simple.  Do you have any scientific data that shows

17   actual observed effects from the Spokane River area?

18       A.    Okay.  I see what you're saying now.  We did

19   not measure effects in mammals.  And we did not know of

20   data that provide those effects in mammals or

21   fish-eating birds specifically collected from the

22   Spokane River drainage.

23       Q.    Okay.  So that data doesn't exist?

24       A.    I can't --

25       Q.    Strike that.  It was my fault.  I interrupted

1    you.

2           My question is:  So that data either does not

3    exist or you were not aware of it?

4        A.   I'm not aware of it.

5           MR. HANSEN:  Okay.  I think now is a good time

6    for another 15-minute break or 10.

7           MR. LAND:  Sounds good.

8           THE VIDEOGRAPHER:  Going off the record.  The

9    time is 11:14 a.m.

10           (Recess, 11:14 a.m. to 11:29 a.m.)

11           THE VIDEOGRAPHER:  We are back on the record.

12    The time is 11:29 a.m.

13    BY MR. HANSEN:

14        Q.   Dr. Schlenk, I wanted to switch topics and talk

15    to you about your sediment assessments of which are

16    indicated on table 7 of your report, page 14.

17        A.   Okay.

18        Q.   And under the subheading "Sediment

19    Assessments," the first sentence is "A consensus

20    threshold derived from MacDonald, et al. (2000) was used

21    to assess risk from sediment concentrations of PCBs"; is

22    that correct?

23        A.   Yes.  You've read that correctly.

24        Q.   And then the second sentence indicates that

25    these thresholds were normalized to TOC, which is total

1      A.   If I wanted -- I guess probable and threshold

2   are two different words.  I guess it depends on what

3   your ultimate goal was in determining whether things

4   were probable or not.

5           And again, these are definitions that MacDonald

6   uses.  I think in any case that you're doing a risk

7   assessment in a system using a combined threshold, you

8   want to be as conservative as possible.  So you -- in my

9   expertise, we always use the most conservative value

10  when we are assessing a value for the -- or a system for

11  effects that there is limited data on.

12     Q.   Is there limited data in these circumstances

13  with respect to the Spokane River?

14     A.   In my opinion, there is limited data especially

15  for the sediment evaluations.

16     Q.   You'd agree that MacDonald's 676 value for PEC

17  that he identifies for PCBs is about ten times more than

18  the threshold that you use?

19     A.   It is ten times higher, yes.  Well, higher.

20  More than ten times higher.

21     Q.   On page 29 of MacDonald, I think it probably

22  just articulates what the table articulates, but the

23  very last sentence on this page under the "Summary"

24  subheading.

25     A.   Yes.

Page 99

1   BY MR. HANSEN:

2       Q.   If I can refer you back to page -- all the way

3   back to page 7 of your -- excuse me -- table 7 of your

4   report, the one we were discussing earlier about benthic

5   thresholds.

6       A.   Yes.  I'm there.

7       Q.   Okay.  And the citation that you use, the

8   second value that you had referred to as a threshold is

9   12 million nanograms per kilogram of normalized to total

10  organic carbon; is that correct?

11      A.   Yes.

12      Q.   Okay.  And the citation for that is NYSDEC

13  1998?

14      A.   Yes.

15      Q.   Is that NYSDEC 1998 reference Exhibit 13 that's

16  before you now?

17      A.   I believe it is.

18      Q.   And the title of that document is "Technical

19  Guidance for Screening Contaminated Sediments," and it's

20  prepared by New York State Department of Environmental

21  Conservation; is that correct?

22      A.   I believe so.

23           (Exhibit 14 was marked for identification.)

24  BY MR. HANSEN:

25      Q.   And the document that I just handed or that was

1    just handed to you as Exhibit 14, that's titled

2    "Screening and Assessment of Contaminated Sediment," and

3    that's also New York State Department of Environmental

4    Conservation, June 24, 2014?

5        A.   Okay.

6        Q.   Did I read that correctly?

7        A.   I believe so.

8        Q.   And if you turn to page 1 which under the

9    "Purpose" subheading.

10       A.   Okay.

11       Q.   I'm actually looking at the very last paragraph

12   on this document.  And I'll read it and say, "This

13   document supersedes previous editions of 'Technical

14   Guidance for Screening Contaminated Sediment,' the most

15   recent of which is dated January 1999."

16            Is it your understanding that this document

17   from New York State Department of Environmental

18   Conservation from 2014 supersedes the document that you

19   identify on table 7 of your report?

20       A.   It would appear, yes.

21       Q.   And I'd ask you to turn to pages 66 and 67 of

22   the current Exhibit Number 14.

23       A.   Okay.

24       Q.   And it's a table, Table 5, "Freshwater Sediment

25   Guidance Values"; is that correct?

1    concentrations that were above threshold.

2        Q.   And does that mean for two of the three species

3    that you examined, their concentrations were below

4    threshold?

5        A.   In some cases, yes.

6        Q.   And given that you did not look at more

7    than 3 -- strike that.

8             The phrase "at least one" expresses to me as a

9    reader that there is some uncertainty in your analysis.

10   Do you review that opinion as being uncertain?

11       A.   No.  I consider it to be conservative because

12   it means that the species that we did look at, there was

13   at least one species that actually showed that and

14   potentially more that we didn't look at that may be

15   above threshold, but we didn't have the -- they didn't

16   fit the criteria for that particular study that we were

17   trying to do.

18       Q.   And when you say "didn't fit the criteria" for

19   the type of study that you were trying to do, can you

20   explain what you mean by that?

21       A.   Sure.  Yes.  So again, the idea here was to

22   evaluate a time period after 2001 to determine if there

23   were still exceedances of threshold values for sediment

24   and fish tissue.  That was the premise to do that

25   particular study.  Then in order to do that, what I did

1    is I evaluated the studies that were provided by the

2    State of Washington on a database.  And I looked

3    specifically for species that were in multiple locations

4    on the Spokane River that allowed me to look at tissue

5    concentrations.  And I tried to pick sites where we had

6    multiple species, and in this particular case there were

7    three that tended to be the most prevalent where we had

8    that data and the sites where those three species tended

9    to reside.

10          And so that was the criteria for -- and so

11   that's why we chose 2012 was because that criteria was

12   met.  There were other fish species that had, you know,

13   PCB concentrations, but they weren't distributed in a

14   way that allowed us to make those site-to-site

15   comparisons and species-to-species comparisons that we

16   wanted to compare in 2001.

17   Q.   And so what you just described to me in your

18   testimony, would you consider that to be selection

19   criteria for the sampling that you used for this

20   assessment?

21   A.   We did a selection criteria, yes.

22   Q.   And is that selection criteria within this

23   report?

24   A.   It's not written in there.  It's not.  We --

25   yeah, it's not written in there.

1    Q.   So you looked at their methodology; correct?

2    A.   Correct.

3    Q.   Is that what you're saying?

4    A.   Yes.

5    Q.   Just going back to that opinion on page 4.

6    You -- the second part says, it poses "a hazard to at

7    least one species of fish at Upper Lake Spokane and

8    above Monroe"; is that correct?

9    A.   Yes.

10   Q.   Okay.  And then is this -- sorry.

11        This specific opinion, does this refer to those

12   sampling locations?  Is your opinion of the hazard

13   specific to that one species of fish at those two

14   sampling locations?

15   A.   Is -- can you state that one more time?

16   Q.   Yeah, sure.  No problem.  I'll try to rephrase

17   it in what I'm trying to get at.

18        Essentially what I'm asking is:  A river

19   essentially flows, right, and so there is a wide stretch

20   of the river, and then you've identified specifically in

21   this opinion two locations on the river?

22   A.   We didn't identify those locations.  Those were

23   locations that fish were sampled from by the State of

24   Washington.

25   Q.   Okay.  And that's getting to what I'm asking

1   is:  Is your opinion specific to those sampling

2   locations?

3       A.   My opinion is specific to the sites that we had

4   samples from.

5       Q.   And so your opinion wouldn't necessarily be

6   representative of other reaches of the Spokane River?

7       A.   It's representative of the locations where we

8   collected samples.

9       Q.   Okay.

10      A.   Or where samples were collected for us, I

11  should say.  That's probably more accurate.

12      Q.   So my question, I guess, would be:  If you were

13  to take your opinion here that PCBs pose a hazard to at

14  least one species of fish at Upper Lake Spokane and

15  above Monroe, you wouldn't necessarily be able to

16  predict or assess the hazard at locations other than

17  Upper Lake Spokane or above Monroe?

18      A.   To fish?

19      Q.   To fish.

20      A.   Correct.

21      Q.   Okay.  In -- and I'm not sure.  In the

22  documents that you produced through your counsel --

23  through counsel yesterday included a number of Avista

24  Corporation documents.  Do you recall using those fish

25  population assessment reports to FERC?

1    A.   Yes.

2    Q.   Okay.  Is it your understanding that Avista

3  Corporation is essentially required to do this because

4  they operate hydropower dams on the Spokane River?

5    A.   I have no idea about that.

6    Q.   All right.  Would you agree with the statement

7  that dams on a river can have an ecological effect on

8  fish populations?

9    A.   I would agree that dams on a river can affect

10  fish populations, yes.

11    Q.   For the purposes of your assessment, would it

12  have made -- been appropriate to divide the Spokane

13  River into reaches or stretches between dams in order to

14  more accurately assess fish tissue data?

15    A.   Again, I was dependent upon the State of

16  Washington's collection methods for that assessment.  So

17  I had no say in terms of site locations of where they

18  collected their fish.

19    Q.   And so that -- so your opinions are dependent

20  on the specific sampling locations selected that you

21  included -- that you included in your report?

22    A.   Correct.

23    Q.   Okay.  Am I correct that the three species of

24  fish that you looked at sampling for in your report were

25  the mountain whitefish, the large scale sucker, and the

1    A.    No.   The mountain whitefish is not a salmonid.

2    Q.    It's not a salmonid.

3          What is the mountain whitefish?

4    A.    It's a nonsalmonid fish.

5    Q.    That's fair.  Perfectly fair.

6          So the rainbow trout of the three is the only

7    one you consider to be a salmonid?

8    A.    Correct.

9    Q.    And the large scale sucker as evidenced in that

10   Ecology is a nonsalmonid?

11   A.    As well, yes.

12   Q.    And the large scale sucker is the specific

13   species that you refer to in your page 4 opinion as

14   being affected by a hazard at Upper Lake Spokane and

15   above Monroe, is that the species of fish that you're

16   referring to?

17   A.    For fish effects, it was, looks like -- let me

18   see here.  Let me check a second just to confirm.

19   Q.    Sure.

20         MR. LAND:  Yeah, take your time.

21         THE WITNESS:  It would be mountain whitefish

22   for total PCBs on wet weight above Monroe, above

23   Nine Mile, Upper Lake Spokane.  That would be exceedance

24   of fish-eating organism, which includes fish or birds.

25   Go to table 3.  We have large scale sucker above Monroe

1   and Upper Lake Spokane that exceed the lipid normalized

2   thresholds.  We also have upper river and upper lake --

3   above upriver and above Upper Lake Spokane that exceed

4   the fishing organisms, which could be another fish

5   actually.  And 4.  For rainbow trout, right.

6          This would have been above Monroe for lipid

7   normalized threshold and for weight -- wet weight

8   normalized threshold above Monroe.

9   BY MR. HANSEN:

10   Q.   So on page 4 when you say "pose a hazard to at

11   least one species of fish at Upper Lake Spokane and

12   above Monroe," what species of fish are you referring

13   to?

14   A.   At least one.  There is more than one, but at

15   least one.  It could be -- it could be mountain

16   whitefish.  That's above -- that's in Upper Lake

17   Spokane.  And rainbow trout or above Monroe.  Mountain

18   whitefish are above Monroe, above Nine Mile and Upper

19   Lake Spokane.  So at least one species, but it also

20   means that some of the others might also be affected.

21   Q.   So when you wrote "PCBs pose a hazard to at

22   least one species of fish at Upper Lake Spokane and

23   above Monroe," you're not referring to one specific

24   species of fish?

25   A.    In that particular case, it could -- there

Page 126

1    are -- it could be either one of those three.  Right.

2    Well, the ones that I mentioned just a minute ago.  So

3    it could be mountain whitefish at above Nine Mile.  It

4    could be mountain whitefish above Upper Lake Spokane,

5    which is one species.  It could be rainbow trout at --

6    or large scale sucker above Monroe and at Upper Lake

7    Spokane.  Or it could be rainbow trout at above Monroe.

8         Q.   Okay.

9         A.   Does that answer your question?

10        Q.   I believe so.

11             The lipid normalized benchmarks that you used

12   come from Meador; correct?

13        A.   Meador.  Yes.

14        Q.   Meador.  Sorry.  Said that wrong again.

15             And those benchmarks are found on table 2 of

16   Meador?

17        A.   Yes.  That is table 2 --

18        Q.   And --

19        A.   -- in the bottom right-hand corner.

20        Q.   So if I'm -- the value you use in sort of as a

21   note to the table is fish health threshold 2.4 million

22   nanograms per kilogram liquid -- lipid -- sorry --

23   lipid, and that's the value that you used from Meador?

24        A.   Yeah.  In Meador, it's different units as well.

25   It's 2.35, which I round to 2.4, but that's 2.4

Page 137

1    avian.

2        A.    Right.

3        Q.    48,000 nanograms per kilogram wet weight.  And

4    then C is prey threshold for fish-eating mammal, 15,000

5    nanograms per kilogram wet weight.  And you're saying

6    this identifies it is an environmental Canada --

7    Environment Canada source, but you're saying now that

8    you got those from another publication?

9            MR. LAND:  I think also this might be a

10   different document than the 2002 document, because this

11   is a 2001 document from what I'm seeing.

12           THE WITNESS:  Yeah.  So there is a 2002

13   document that supposedly has both of these -- has the

14   TEQ values and the wet weight value, because everybody

15   cites the 2002 document in the literature.

16           So what I can do is provide you with that

17   peer-reviewed study that cites that value, but the

18   Environment Canada -- we can look through the

19   Environment Canada website, but it took me a fairly

20   amount of time to get this particular document.  It's

21   very difficult to find this one off of the website

22   directly.

23   BY MR. HANSEN:

24       Q.   So you're saying this document before you

25   that's marked as an exhibit was used to develop -- or

Page 138

1    used to derive the TEQ values?

2        A.    Yes.  So in table 1, if you look in table 1 on

3    the right of that document, those values, that .79 and

4    the 2.4, the TEQ-based avian and fish-consuming mammal

5    document or value for TEQs.

6        Q.    And you -- sorry.

7        A.    And the total PCB value is -- there is a

8    discussion about total PCBs.  They just don't put it in

9    a table for that, that's present.  So if you look

10   through the mammalian toxicity component, they talked

11   about what doses were given for mink, what doses were

12   given for other mammals, for example, and, you know,

13   there is another one for birds, what doses were given of

14   different Aroclors and PCBs that actually provided.  But

15   the actual number's not provided in a table, so the

16   numbers that are tabular -- excuse me -- are from other

17   reports essentially.

18           So I can provide that other report that has

19   those numbers or we can try to find it off of the

20   Environment Canada website, which I am not very --

21           MR. LAND:  We'll search for that document.  If

22   we find it, we'll send it over.

23           MR. HANSEN:  That's the document I was asking

24   you about and you -- this is the one you sent.

25           MR. LAND:  Yeah, and I must have been mistaken

1    if that's the case.

2              MR. HANSEN:  Okay.

3              THE WITNESS:  I was -- actually, it's my fault.

4    I thought this had -- I thought this had the total PCB

5    values in it as well.  It just has the TEQ values.

6    BY MR. HANSEN:

7         Q.   Got it.  So we'll -- we'll address the TEQ

8    values then.  We'll use this document for now --

9         A.   Okay.

10        Q.   -- for that purpose.

11        A.   My apologies for that.

12        Q.   No.  No problem.

13             You mentioned that table 1 is the Canadian

14   tissue residue guideline for PCBs for the protection of

15   wildlife consumers of aquatic biota.  These are the

16   guideline values that you reference on tables 2

17   through 4?

18        A.   Correct.

19        Q.   Okay.  The TEQ threshold for fish-eating

20   mammals is .79 nanograms per kilogram wet weight; is

21   that right?

22        A.   Nanograms per kilogram wet weight, correct.

23        Q.   And then the TEQ threshold for fish-eating

24   fish/avian is 2.4 nanograms per kilograms wet weight?

25        A.   Correct.

1    Aroclor 1254 per kilogram per day experienced a

2    10 percent reduction in growth rate."

3           So is it your understanding that these

4    Environment Canada values at least for reference

5    concentrations for birds are based upon white Leghorn

6    chickens based on this document?

7    A.   Based upon what I read in this document, yes,

8    because they're again the most conservative value.

9    They're the most sensitive species.

10   Q.   And if you go down further about midway through

11   this paragraph, it notes "that white Leghorn chickens

12   may be inherently 10 to 1,000 times more sensitive to

13   TEQ exposure than wildlife species"; is that correct?

14   A.   Than wildlife species.  I don't know if I see

15   that one.  Yes, there it is.  That's based upon the

16   potency differences, yes.

17   Q.   And then sort of the last paragraph -- or

18   excuse me -- the last sentence on this paragraph, it

19   says, "Also, consultations with avian experts from the

20   Canadian Wildlife Service corroborated the fact that the

21   Leghorn chicken is a particularly sensitive species and

22   perhaps not fully representative of all avian species."

23   A.   In terms of its sensitivity, that is correct.

24   Q.   Okay.  And so these Environment Canada TEFs for

25   birds that you used are based on the most sensitive

1     species to PCBs?

2         A.    TEQs --

3         Q.    I'll reask it.

4         A.    -- were based upon -- were based upon this

5     document.  And it appears that they used -- I'm not -- I

6     do not know how that number was integrated into the

7     development of these particular values.

8         Q.    This document specifically -- strike that.

9             This document specifically identifies the

10    reference concentration as being white Leghorn chickens;

11    correct?

12        A.    It identifies -- it identifies LOAELs and

13    NOAELs and a TDI of 2.3 nanograms per kilogram per day,

14    but it doesn't indicate how 2.4 was derived.  And -- oh,

15    sorry.  On the last sentence of the top paragraph, so

16    they took the lowest TDI and then divided it by a food

17    borne estimate, and that's how they got the 2.4.  So it

18    appears that they did use the Leghorn chick -- the

19    Leghorn chicks for that, yes.

20        Q.    And then the mammalian reference concentration,

21    which is above that, is derived, according to the first

22    sentence, from a study in which male and female minks

23    were fed diets containing --

24        A.    That's how I understand it, yes.

25        Q.    And so these two concentrations were developed

Page 144

1    using a species that are known to be particularly

2    sensitive to PCBs?

3            MR. LAND:  Objection.  Vague.  Misleading.

4            Go ahead.

5            THE WITNESS:  These are species that were

6    thought to be conservative species to protect other

7    species that may not be evaluated.

8    BY MR. HANSEN:

9        Q.    Given the documented sensitivity, would you

10    agree that any criteria based on chickens or mink would

11    overestimate risk -- has the potential to overestimate

12    risk to wildlife?

13            MR. LAND:  Objection.  Vague.  Incomplete

14    hypothetical.  Misleading.

15            THE WITNESS:  And I disagree completely.

16    Again, the idea is in any type of risk assessment, you

17    use the most sensitive species as a surrogate to control

18    for other animals that you don't have guidelines for.

19    So you try to use the most sensitive species in any type

20    of risk assessment.

21            (Exhibit 19 was marked for identification.)

22    BY MR. HANSEN:

23        Q.    The exhibit that was placed before you has a

24    title called "Canadian Tissue Residue Guidelines for the

25    Protection of Wildlife Consumers of Aquatic Biota"; is

1    that right?

2        A.    Yes.

3        Q.    And it looks like it was a 1999 document.    I'm

4    not sure if it's the document you're referencing or if

5    there is a later version, but your understanding is that

6    this is the tissue residue guidelines that, for lack of

7    a better term, guide Environment Canada in creating

8    these values?

9        A.    So these are guidelines that help develop

10   tissue residue guidelines.    So it's a guideline to

11   develop a guideline essentially.

12       Q.    Okay.    Turn your attention to tables 1 and 2,

13   which are on pages 11 and 12.    And table 1 is a table

14   described as "Body weights and daily food ingestion

15   rates of avian species that consume aquatic biota";

16   correct?

17       A.    Yes.

18       Q.    So this Environment Canada guideline is

19   providing species-specific data with respect to body

20   weights and food consumption?

21       A.    It would appear they're doing -- they're

22   calculating food intake to body weight ratios and

23   estimating what daily food consumption it would be on a

24   wet weight basis.

25       Q.    In this particular table, table 1 has specific

1    information for bird species that you identified as

2    examples in the Spokane River; correct?

3        A.    I believe there is a bald eagle and osprey on

4    there, yes.

5        Q.    And then if you look at the right side of the

6    page, there is a heron as well?

7        A.    There is two herons.

8        Q.    Great blue heron?

9        A.    Uh-huh.    And a green-backed heron.

10       Q.    And then if you look at page 12, table 2, it's

11   described as body weights and daily food ingestion rates

12   of mammalian species that consume aquatic biota;

13   correct?

14       A.    Yes.

15       Q.    And it contains two of the species that you

16   identify as examples in your report, the mink and the

17   otter; correct?

18       A.    Yes.

19       Q.    And it lists their specific body weight

20   averages and daily food ingestion rates?

21       A.    Correct.

22       Q.    This table doesn't include the black bear;

23   correct?

24       A.    I do not see black bear on there.

25       Q.    And if you look to the right-hand side of the

1    page underneath table 3, there is a narrative that

2    says -- I guess it continues.  It starts on page 10.  It

3    says, "Based on our existing data," then it continues on

4    page 12, "(tables 1 and 2), there are avian and

5    mammalian species with ratios as high as .94 and .24,

6    respectively (although in some cases these are based on

7    allometric equations and not field-derived data).  Use

8    of these ratios in developing RCs will result in

9    conservative TRGs protective of all wildlife species."

10   Did I read that correctly?

11      A.   Yes, you did.

12      Q.   And that's what -- that's what you did, you

13   used a value that was conservative and protective of all

14   species, a surrogate figure?

15      A.   I did not use food intake to body weight ratio

16   in values.  I used a value that incorporates some of

17   that information, but the value that I did did not

18   incorporate a body weight to food ingestion ratio.

19      Q.   And the paragraph continues, "On a

20   site-specific basis, RCs can be calculated for key

21   indicator species provided that accurate information is

22   available regarding FI, BW, and other species-specific

23   and site-specific data (e.g., dietary preferences).  The

24   result can be compared to the generic TRG developed to

25   protect all wildlife"; correct?

 1      A.    That's what the -- that's what the document

 2   says.

 3      Q.    So this guidance document recommends the

 4   calculation based on site-specific and species-specific

 5   data?

 6      A.    When the data is available, it says on a

 7   site-specific basis, RCs can be calculated provided that

 8   accurate information is available.  So if you have

 9   accurate information, you would probably use this.  I

10   would argue, though, if you already have a threshold

11   value, which is what these are used for to develop, then

12   you use the threshold value that's already present.

13      Q.    Did you not have sufficient data in order to

14   incorporate species-specific assessment?

15            MR. LAND:  Objection.  Mischaracterization of

16   prior testimony and misleading.

17            THE WITNESS:  I used a peer-reviewed value that

18   was present in government documents and in the

19   peer-reviewed literature to do my assessments.

20   BY MR. HANSEN:

21      Q.    My question was:  Did you not have the data in

22   order to do a site- or species-specific assessment?

23            MR. LAND:  Objection.  Misleading.

24            THE WITNESS:  I did not use -- we did not -- so

25   you're asking did I have data to do a site-specific

Page 149

1    evaluation?  I did not do a site-specific evaluation

2    because I used a value that was already provided by

3    Environment Canada and the peer-reviewed literature to

4    do that assessment -- to do a risk-based assessment.

5    BY MR. HANSEN:

6        Q.    Is Environment Canada recommending here that

7    you do a site-specific analysis?

8        A.    Environment Canada is indicating this is how

9    they use these -- this guidance to come up with guidance

10   values that you can use in site-specific assessments.

11       Q.    Well, can I ask you to turn to page 17 of your

12   report.  This is table 8, and then there are additional

13   tables on page 18 and 19.  Those are tables 9 and 10.

14       A.    Yes.

15       Q.    And this -- these tables identified predicted

16   values of total PCBs based on future remediation

17   scenarios; is that correct?

18       A.    Yes.

19       Q.    And so the tables themselves identify six

20   different remediation scenarios?

21       A.    Yes.

22       Q.    I don't see any reference to these six

23   scenarios elsewhere in your report.  Where does -- where

24   do these six scenarios come from?

25       A.    These scenarios come from -- I believe it's

1   the -- it's either the Gobas report or the other

2   fellow's name that I can't remember his name.  Yeah.  I

3   can't recall the other report.  It's basically from

4   either Gobas or the other report.

5        Q.   And I asked you earlier if you had relied on

6   anything from Gobas and you said you hadn't because you

7   hadn't seen his report.

8        A.   I hadn't seen what his conclusions of the

9   report were.  These are numbers that were actually

10  generated by Azimuth, so it wasn't directly from him.

11       Q.   And so how were these values -- how were these

12  scenarios presented to you in your capacity?

13       A.   They were presented by Azimuth from Gobas.  So

14  I guess indirectly I was dependent upon Gobas

15  information.  It just wasn't directly from his -- any

16  communication with him.

17       Q.   Okay.  And do you have any idea of the

18  methodology used to create these remediation scenarios?

19       A.   I know it was a model that he had developed and

20  based on loadings that were present.  That was the Gobas

21  component.  And then the other -- the second report that

22  I can't recall the name of was based on water treatment

23  models, if I recall.

24       Q.   Was it Dilkes?

25            MR. LAND:  I think he's talking about Trapp.

1          THE WITNESS:  That's the one.

2   BY MR. HANSEN:

3      Q.   The Trapp, Bowdan report?

4      A.   Yes.

5      Q.   Okay.  And so you don't have any -- you don't

6   have any idea of the model that was used either by

7   Trapp, Bowdan, or Gobas to create these remediation

8   scenarios?

9      A.   Correct.

10      Q.   And you don't have any idea what data inputs

11   went into develop those particular models -- or excuse

12   me -- develop those particular scenarios?

13      A.   As I mentioned, I believe there was a loading

14   component that was associated with that and a trophic

15   model that Gobas uses to do that, but I don't know what

16   the parameters are for that model.

17      Q.   And so as I understand it from table 8 where

18   you presented a set of sediment values to assume -- or I

19   guess a better question would be to ask generally:  How

20   was the information presented to you and what did you do

21   with it to create table 8?

22      A.   So the values that are present in table 8 were

23   provided to me in a table with these headlines -- with

24   these headers for scenario 1, scenario 2, scenario 3,

25   the 2013 to 2018 arithmetic mean concentration, as well

Page 160

1    You don't have -- one way or the other, you don't know

2    whether or not these fish tissue calculations in

3    tables 9 and 10 are representative of the fish on the

4    Spokane River as a whole?

5        A.    I do not know -- I guess I'm not sure how to

6    answer that.  Can you ask that again?  I'm not sure

7    what --

8        Q.    Sure.

9        A.    Are they representative of fish on the Spokane

10   River?  I cannot make that assessment.  I know that they

11   are calculated from a model that those fish should have

12   that level if this treatment takes place.  That's all I

13   know.

14           MR. HANSEN:  We'll go off the record.

15           THE VIDEOGRAPHER:  Going off the record.  The

16   time is 3:02 p.m.

17           (Recess, 3:02 p.m. to 3:14 p.m.)

18           THE VIDEOGRAPHER:  We are back on the record.

19   The time is 3:14 p.m.

20   BY MR. HANSEN:

21       Q.    Dr. Schlenk, I just had a couple more questions

22   for you.

23           If I could ask you to turn to the bottom of

24   page 15 of your report.

25       A.    Okay.

1      Q.    And the last paragraph says, "These data

2   indicate hazard and elevated risks to aquatic organisms

3   and mammalian, avian, and other fish that consume fish

4   within the Spokane River where samples were collected."

5   Am I correct that this specific opinion is, I guess,

6   specified to the area on the Spokane River where samples

7   were collected?

8      A.    That's the -- where the samples were collected

9   is where I did the risk assessment, yes.

10      Q.    So that's a yes?

11      A.    Well, if you want to say, does it indicate

12   risks at other parts of the river.  It's potential that

13   you could have risks at other parts of the river, but in

14   terms of where those samples are collected, that's where

15   the risk was.  Obviously fish move and they can move to

16   other locations where you might have risk as well.

17      Q.    So you anticipated my follow-up question, which

18   was, was you don't know one way or the other whether

19   these -- whether your assessment applies to locations on

20   the Spokane River where sampling was not done?

21      A.    Correct.

22      Q.    And during our break, you weren't able to

23   locate that reference, that Environment Canada --

24      A.    No.

25      Q.    -- 2002?

1          MR. LAND:  He's going to search for it after

2      today and I will get back to you with whatever he finds.

3      BY MR. HANSEN:

4          Q.    All right.  And I think we've already covered

5      what specific references you used -- you pulled from

6      that document.

7          A.    Yes.

8          MR. HANSEN:  And I didn't have any other

9      questions on that document or with respect to your

10     report.  So thank you for your time.

11         MR. LAND:  Nothing for me.

12         THE VIDEOGRAPHER:  This concludes today's

13     videotaped deposition.  The time is 3:16 p.m.  We are

14     now off the record.

15         (Deposition adjourned at 3:16 p.m.)

16                         *  *  *  *  *

17

18

19

20

21

22

23

24

25

Page 163

1          I declare under the penalty of perjury under

2     the laws of the State of California, United States of

3     America, that the foregoing is true and correct; that I

4     have read my deposition and have made the necessary

5     corrections, additions or changes to my answers that I

6     deem necessary.

7          Dated:  _12/9/2019_____

8

9

10

11     _____

12                    Daniel Schlenk, PhD

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 164

1

2                      REPORTER'S CERTIFICATE

3

4            I, Cynthia J. Vega, a Certified Shorthand

5    Reporter for the State of California, do hereby certify:

6            That the witness in the foregoing deposition

7    was by me duly sworn; that the deposition was then taken

8    before me at the time and place herein set forth; that

9    the testimony and proceedings were reported by me

10   stenographically and were transcribed through

11   computerized transcription under my direction; and the

12   foregoing is a true and correct record of the testimony

13   and proceedings taken at that time.

14           I further certify that I am not of counsel or

15   attorney for either or any of the parties in the

16   foregoing proceeding and caption named or in any way

17   interested in the outcome of the cause in said caption.

18           IN WITNESS WHEREOF, I have subscribed my name

19   this 18th day of November, 2019.

20           Reading and Signing was not requested.

21

22

23                      *Cynthia Vega*

24           _____

25                      Cynthia J. Vega, CSR No. 6640

Case Name:    City of Spokane v. Monsanto Company, et al.

Deposition Date:    November 13, 2019

Deponent:    Daniel Schlenk, PhD

Corrections from Schlenk Deposition:

| Pg. | No. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| Page 69 | 22 | temper | temporal | Wrong word |
| | | | | |
| Page 72 | 18 | Spoor | Spokane | Wrong name |
| | | | | |
| Page 88 | 10 | --- | ecosystem | Missing word |
| | | | | |
| Page 132 | 14 | adverse outcome path | adverse outcome pathway | Wrong word |