000137

# EXHIBIT 2

000137

Page 1

1              UNITED STATES DISTRICT COURT
2              EASTERN DISTRICT OF WASHINGTON
3
4     CITY OF SPOKANE, a          )
      municipal corporation,      )
5     located in the County of    )
      Spokane, State of           )
6     Washington,                 ) No.: 2:15-cv-00201-0
                                  )
7                 Plaintiff,      )
                                  )
8      vs.                        )
                                  )
9     MONSANTO COMPANY,           )
      SOLUTIA, INC., and          )
10    PHARMACIA CORPORATION       )
      and DOES 1 through 100,     )
11                                )
                  Defendants.     )
12    _____ )
13
14
                 30(B)(6) VIDEOTAPED DEPOSITION
15                            OF
                        MARCIA DAVIS
16
                         VOLUME I
17
          Taken at the instance of the Defendants
18
19
20
21
                         September 10, 2019
22
                         9:09 a.m.
23
                         510 West Riverside Avenue
24
                         Spokane, Washington
25    Job No. 167395

Page 245

1                        Marcia Davis

2                 UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF WASHINGTON
3  _____

4  CITY OF SPOKANE, a              )
   municipal corporation,          )
5  located in the County of        )
   Spokane, State of               )
6  Washington,                     )
                                   )
7                   Plaintiff,     )
                                   )
8  vs.                             ) Case No.
                                   ) 15-cv-00201-SMJ
9  MONSANTO COMPANY,               )
   SOLUTIA INC., and               )
10 PHARMACIA CORPORATION,          )
   and DOES I through 100,         )
11                                 )
           Defendants.             )
12 _____

13

14

      VIDEOTAPED DEPOSITION OF MARCIA DAVIS, VOLUME II
15
                      11:01 a.m.
16
                  September 11, 2019
17
                  Spokane, Washington
18

19

20

21

22 Job No: 167396

23

24

25 Reported by: Anna M. Stewart, CCR

000140

1                          MARCIA DAVIS

2        Q.    Under what circumstances does interior

3   fireproofing have an impact on stormwater?

4        A.    Is there a floor drain that's connected to

5   our stormwater system?  Is there a way that it could

6   get into our stormwater system?  That would be -- if

7   it had some way that it could get into our stormwater

8   system, it would have an impact.

9        Q.    How about interior electrical work?  How

10  would that conceivably be related to stormwater

11  management?

12       A.    I don't know of a way that that would be

13  connected to stormwater management.

14       Q.    So in any event, you would agree with me

15  that as a general proposition that it wouldn't be

16  appropriate for the city to claim as damages for

17  stormwater management items that do not impact

18  stormwater?

19              MR. LAND:  Objection.  Vague.

20  Incomplete.  Hypothetical.  Misleading.

21              THE WITNESS:  Well, I'm not sure what

22  the -- that's kind of the legal team's view of what

23  makes sense for us to claim for damages.

24       Q.    (BY MR. GOUTMAN:)  I'm asking you as a

25  representative of the city whether you believe it

1                          MARCIA DAVIS

2    itself, does not decide whether it will get a grant.

3    That decision is made by others.  Correct?

4         A.    That's correct.

5         Q.    Others whom you don't, this meaning the

6    city, doesn't control.  Correct?

7         A.    That's correct.

8         Q.    And with respect to those future projects,

9    if in fact you do receive a grant -- let's back up.

10              If you do apply for a grant, you don't know

11   the extent to which that grant will cover all your

12   costs.  Right?

13        A.    That's correct.

14        Q.    It may cover a hundred percent; it may

15   cover fifty percent.  You just don't know.

16        A.    The grants have a match requirement, and so

17   generally we know the city is going to be required to

18   cover the match amount.  But the total project costs

19   and what's reimbursable by the grant, we don't always

20   know that before the project starts of what really

21   will be eligible.  So you're right.  From the

22   beginning of the project, we're not sure how much --

23   if it'll cover a hundred percent of the eligible costs

24   or not.

25        Q.    So for those projects for which, which will

Page 33

1                              MARCIA DAVIS

2    be constructed only if you receive a grant, it would

3    be speculation right now to say how much those grants

4    will be.  Correct?  And whether those grants will even

5    be made.  Correct?

6                    MR. LAND:  Objection.  Compound.

7                    THE WITNESS:  Speculation is in the

8    fact that I'm not really sure I would call it

9    speculation.  It's part of our planning and it is

10   what we think will happen.  If that's speculation,

11   then that's the way we program our projects is we

12   think we can get that money, and we think it would be

13   available.  A lot of times we delay projects until we

14   do get the money.

15       Q.    (BY MR. GOUTMAN:)  Have you ever done a --

16   not done a project, a planned project, because you had

17   not yet received funding?

18       A.    I need to think just a moment on that.

19                              (Pause in proceedings.)

20       A.    I am not aware of a project that we did not

21   do because we didn't get the money.  I know there are

22   projects we have delayed because we did not get the

23   money at the timing we expected.

24       Q.    And we'll get to these specific projects,

25   future projects.  Um, you're aware, and I think I've

Page 36

MARCIA DAVIS

1

2  River?  Do you have a date?

3      A.    I don't have a specific date.  I know

4  generally it was around 2000 -- well, I don't know the

5  specific date.  I know that the waters of the 303(b)

6  listing that PCBs came up at some point.

7      Q.    Okay.  Well, answer my question.

8      A.    No.  I don't know specifically.

9      Q.    And, once again, we covered this with

10  Mr. Hendron, so I'm not going to burden the record.

11          Why don't we mark this as Exhibit 4.

12          (Deposition Exhibit Number 4 was marked for

13                            identification.)

14      Q.    This is -- we went over this article with

15  Mr. Hendron, but it's an article by a -- used to be, a

16  former professor at Eastern Washington University,

17  Raymond Soltero.  Do you know him or know of him?

18      A.    No.  I'm not aware -- no.  I don't know

19  him.

20      Q.    In any event, if you flip to page 39,

21  bottom, it talks about sampling PCBs in the Spokane

22  River on October 22, 1989.  Do you see that?

23      A.    Yes.

24      Q.    And other pesticides and so forth?

25      A.    Yes.

1                      MARCIA DAVIS

2       Q.    And it goes on to say it "showed no

3   detection of volatiles, non-volatiles,

4   polychlorobiphenyls or pesticides at either site."  Do

5   you see that?

6       A.    Yes.

7       Q.    So are you aware of any PCB testing that

8   preceded this chronologically, that is 1989.

9                 MR. LAND:  Objection.  Beyond the

10  scope of this deposition.

11                THE WITNESS:  No.  I'm not aware of

12  any.

13      Q.    (BY MR. GOUTMAN:)  Okay.  So to be clear,

14  based upon what you've just told us, the CSO storage

15  tanks and the stormwater basins were planned before

16  any PCBs were detected in the Spokane River.  Is that

17  correct?

18                MR. LAND:  Objection.  Compound.

19                THE WITNESS:  The combined sewer

20  basins were really the only planning the city did

21  before they started -- for the CSO program.  Once

22  they became separated out they became MS4 bay basins.

23                And there was --

24      Q.    (BY MR. GOUTMAN:) Perhaps you don't

25  understand my question.  I don't want to interrupt

000145

Page 38

1                           MARCIA DAVIS

2    you.

3         A.    Okay.

4         Q.    What I'm saying is planning for the

5    construction of these CSO tanks --

6         A.    Yes.

7         Q.    -- which we've already established in

8    1972 --

9         A.    Okay.

10         Q.    -- and the construction of MS4 basins,

11   which we've established at 1980 or earlier --

12         A.    Okay.

13         Q.    -- that occurred before PCBs were detected

14   in the Spokane River.  Is that correct?

15         A.    Yes.

16         Q.    Okay.  Thank you.  Now, am I correct

17   that -- am I correct that around 1987 it was ordered

18   that with respect to the CSO outfalls, there would not

19   be more than one discharge per outfall per year?

20                    MR. LAND:  Objection.  Beyond the

21   scope.

22                    THE WITNESS:  Yes, best of my

23   knowledge, that's the correct date.

24         Q.    (BY MR. GOUTMAN:)  Okay.  And that rule or

25   regulation related -- was not specific to any

000145

000146

1                          MARCIA DAVIS

2     constituents of water, but rather related to simply

3     the number of occurrences of a CSO event.  Correct?

4                    MR. LAND:  Objection.  Beyond the

5     scope.

6                    THE WITNESS:  Yes, as far as I know.

7     Yes.

8          Q.    (BY MR. GOUTMAN:)  Okay.  And the reason

9     I'm getting into this, just so you're clear, is that a

10    number of these MS4 projects occur in CSO basins, so

11    that's the relevance.

12                   MR. LAND:  I see what you're saying.

13         Q.    (BY MR. GOUTMAN:)  Okay.  So am I correct,

14    that even as of this year, the city is not in

15    compliance with the CSO, one CSO event per outfall per

16    year.  Is that correct?

17         A.    Yes.  As far as I know.

18         Q.    Okay.  And as a matter of fact -- we'll get

19    those out.

20              Let me mark this as -- I'm marking this as

21    Exhibit 5.

22              (Deposition Exhibit Number 5 was marked for

23                                identification.)

24         Q.    We've marked as Exhibit 5 City of Spokane,

25    Washington, CSO flow moderating project, dated

000146

Page 42

MARCIA DAVIS

1

2     Q.    Seven is the report for July just a couple

3  months ago.  And that shows again, CSO 26 there were

4  two overflow events on 7/16 and 7/23.  Correct?

5     A.    Yes.  Absolutely, as the report shows.

6     Q.    And for a combined total of 612,517 gallons

7  of untreated waste.  Correct?

8     A.    That's the correct number from the July

9  report.

10     Q.    So you'd agree with me that with respect to

11  the CSO basins, overflows remain a problem.  Correct?

12          MR. LAND:  Objection.

13     Q.    (BY MR. GOUTMAN:)  As documented in the

14  city's own documents?

15          MR. LAND:  Objection.  Vague.

16  Hypothetical.  And beyond the scope of this

17  deposition.

18          THE WITNESS:  I agree that CSO basins

19  are still overflowing.  CSO Basin 26 construction is

20  not complete yet.

21     Q.    (BY MR. GOUTMAN:)  With respect to any

22  aspect of the city's storm and wastewater system, is

23  the city subject to any quantitative or numerical

24  limit with respect to the discharge of PCBs into the

25  the Spokane River?

Page 43

1                          MARCIA DAVIS

2          A.    My understanding of the permit, of our

3    discharge permit that the treatment plant, is that we

4    don't have a numeric limit for the PCBs.  But that

5    it's our responsibility to be part of the Spokane

6    toxic task force.  That's the narrative approach.

7          Q.    Okay.  So the answer to my question, which

8    was with respect to any aspect of the city's storm and

9    wastewater system, is the city subject to any

10   quantitative or numerical limit with respect to the

11   discharge of PCBs into the Spokane River?  Is your

12   answer no?

13         A.    No.  We have no quantitative limits.

14         Q.    However there are TMDLs for other

15   constituents.  Correct?

16         A.    Yes.  There are TMDLs for other ones.  Yes.

17         Q.    And they include CBOD.  Right?

18         A.    I'm not sure.

19         Q.    TSS?

20         A.    For stormwater we have TSS.

21         Q.    Yeah.  Fecal coliform?

22         A.    I would assume that there are, but I'm not

23   sure.

24         Q.    Phosphorus?

25         A.    Phosphorus I know we have a TMDL for.

Page 58

1                       MARCIA DAVIS

2              MR. LAND:  Same objections.

3        Q.    (BY MR. GOUTMAN:)  Within that overflow

4    basin.

5        A.    It could.  It depends.

6        Q.    Now, regarding stormwater management, there

7    are numerous constituents that one tries to prevent

8    entering a water body such as the Spokane River by

9    using best management practice, stormwater management.

10   Correct?

11       A.    Yes.

12       Q.    And they would include total suspended

13   solids.  Is that correct?

14       A.    Yes.

15       Q.    From construction sites, erosion from yards

16   and slopes.

17       A.    Yes.

18       Q.    It would include biochemical oxygen demand

19   otherwise known as BOD.  Correct?

20       A.    Yes.  I think so.

21       Q.    Commonly caused by degradable organic

22   material such as animal waste, compost, mulch, and

23   plant debris.  Correct?

24       A.    Yes.

25       Q.    Some of the constituents that one would

000150

1                          MARCIA DAVIS

2    like to remove with an MS4 system includes metals such

3    as zinc, copper, lead, cadmium, chromium, and arsenic.

4    Correct?

5         A.    It could -- it could be.  Yes.

6         Q.    And these can be from auto shops, from wear

7    and tear on brake pads.  Correct?

8                    MR. LAND:  Objection.  Calls for

9    speculation.

10        Q.    (BY MR. GOUTMAN:)  Well, do you know?  I

11   mean, you're an engineer who designs stormwater

12   systems.  Correct?

13        A.    Yes, I am.

14        Q.    You know what's in the stormwater.  Right?

15        A.    I know generally what's in the stormwater.

16        Q.    Do you know that metals from wear and tear

17   of brake pads would be a constituent of concern for an

18   MS4 system?

19                    MR. LAND:  Objection.  Calls for

20   speculation.

21                    MR. GOUTMAN:  Let me finish the

22   question before you object.  Okay.

23                    MR. LAND:  Are you done?

24                    THE WITNESS:  Yeah.

25                    MR. GOUTMAN:  Well, I can't tell.  You

Page 60

1                          MARCIA DAVIS

2   were talking over me.  I completed my sentence, but

3   you were talking at the same time.  So maybe I'll ask

4   it again.

5           Which is, do you know whether wear and

6   tear from brake pads, which might produce metals,

7   would be constituents of concern for a stormwater

8   management system?

9       A.    It could be.  Yes, it could be.

10      Q.    Would you agree that other constituents of

11  concern would include oils, greases and other organic

12  compounds?

13      A.    Yes.  It could be.

14      Q.    Such as fuel and oil drips and spills.

15  Correct?

16      A.    Yes.

17      Q.    And oils and greases from asphalt and cold

18  tar sealants.  Is that correct?

19      A.    Yes, they could be.

20      Q.    You are also concerned, with respect to

21  stormwater management with such nutrients as

22  phosphorus and ammonia.  Correct?

23              MR. LAND:  Objection.  Vague as to

24  concern.

25              Go ahead.

1            MARCIA DAVIS

2            THE WITNESS:  Yes, it could be

3  nutrients.  It could be.

4      Q.    (BY MR. GOUTMAN:)  And this would be runoff

5  from lawns and farms, fertilizers, lawn clippings,

6  septic systems.  Correct?

7      A.    Yes.  That could be a source.

8      Q.    Other constituents of concern that MS4

9  systems are designed to address include pathogenic

10 organisms such bacteria, virus' and protozoa from

11 animal waste?

12     A.    Yes.  It could be.  It could be a concern.

13     Q.    Now, with respect to Spokane and its

14 stormwater system, it is operating under a basically

15 Eastern Washington permit.  Correct?

16     A.    That's correct.

17     Q.    And that permit contains TMDL with respect

18 to certain substances or constituents.  Correct?

19     A.    Yes.

20     Q.    And there is no TMDL for PCBs with respect

21 to the Spokane stormwater system.  Correct?

22     A.    Yes.  It's not in the permit.

23     Q.    And do you know what's in the permit?

24                         (Pause in proceedings.)

25     Q.    Do you know what's in the permit?

1                        MARCIA DAVIS

2        A.    Yes.  I have reviewed the permit.

3        Q.    What's in the permit?  What constituents is

4    or are, or is the City of Spokane obligated to address

5    with respect to the management of their stormwater

6    system under Washington law?

7        A.    Under the Phase II permit of the Eastern

8    Washington Phase II stormwater permit, in the appendix

9    they have the TMDLs.

10            For the city it's the dissolved oxygen

11   TMDL.

12       Q.    And specifically it says dissolved oxygen

13   total maximum daily load, the parameters are total

14   phosphorus, ammonia and CBOD5.  Correct?

15       A.    That's what the permit says.  Yes.

16       Q.    And that's what the permit said for 2014

17   and 2019.  Correct?

18       A.    Yes.

19       Q.    Permit doesn't say anything or doesn't pose

20   any quantitative limitations on the discharge of PCBs

21   into the Spokane River from the City of Spokane

22   stormwater system.  Correct?

23       A.    Yes.  There are no quantitative limits on

24   the stormwater.

25       Q.    Am I correct then that the City of Spokane,

1                     MARCIA DAVIS

2    like every city, has to maintain its infrastructure:

3    roads, pipes, water mains, things like that.  Correct?

4         A.    Yes.

5         Q.    That requires maintenance, repair, and

6    replacement.  Correct?

7         A.    Yes.

8         Q.    And it is now the city policy to

9    incorporate into these capital projects, such as

10   repaving of roads, stormwater management concepts.

11   Correct?

12        A.    Yes.  For integrative projects that --

13   where it's feasible, we include stormwater.

14        Q.    So each time a street construction project

15   is designed, practices to reduce stormwater are

16   prioritized.  Correct?

17        A.    Yes.

18        Q.    With respect to any of the design elements

19   on any MS4 project for which damages are claimed in

20   this case, are any of those designed elements made

21   necessary solely and exclusively by the presence of

22   PCBs in stormwater?

23                MR. LAND:  Objection.  Vague.  And

24   incomplete hypothetical.

25        Q.    (BY MR. GOUTMAN:)  And if your answer is

000155

Page 64

1                          MARCIA DAVIS

2    yes, I'm going to ask you exactly what project and

3    what design element.

4                Want me to repeat the question?

5         A.    Yes.  I would like you to repeat the

6    question, please.

7         Q.    Okay.  With respect to all the MS4 projects

8    that are being claimed in this case, is there any

9    particular design element that is made necessary

10   solely and uniquely because of the presence of PCBs

11   and that would not be necessary if PCBs were not

12   present?

13               MR. LAND:  Objection.  Vague.

14   Incomplete hypothetical.  And misleading.

15               Go ahead.

16               THE WITNESS:  I'm not sure what a --

17   "design element," what you mean by that.

18        Q.    (BY MR. GOUTMAN:)  What are the design

19   elements of an MS4?  How do you -- what is it -- how

20   about aspects of a design?

21               Let's step back.

22        A.    Okay.

23        Q.    You're designing, say you're designing a

24   swale, a grass swale, so what are the elements of that

25   design?

000156

1                        MARCIA DAVIS

2           Would one be size?

3      A.    Yes.  Size.  Depth.

4      Q.    Depth.  What else?

5      A.    Planting materials.  Soil.

6      Q.    Planting materials.  Soil.

7      A.    Piping systems, connections to it.

8      Q.    Okay.  With respect to the elements that

9    you just identified, can you identify any MS4 project

10   for which damages are claimed in this case that would

11   be unnecessary if PCBs weren't present, or was added

12   simply to address PCBs and to the exclusion of other

13   constituents?

14              MR. LAND:  Objection.  Vague.

15   Incomplete hypothetical.  And misleading.

16              THE WITNESS:  There's no specific

17   design aspects or elements that are added to or

18   specifically for PCBs.

19              But these projects we're doing because of

20   the PCBs, because we want to get them out of the

21   river, there's no other constituents that we're

22   trying to get out on those projects.

23      Q.    (BY MR. GOUTMAN:)  Well, that's just false,

24   isn't it?

25              MR. LAND:  Objection.  Harassing.

000157

Page 74

1                    MARCIA DAVIS

2    possible constituents of concern in stormwater?

3              MR. LAND:  Objection.  Misleading.

4    Asked and answered.

5              THE WITNESS:  Okay.  Yes.  Every

6    element we design in those aspects are for PCBs

7    because they remove PCBs as well as they do

8    everything else.

9       Q.   (BY MR. GOUTMAN:)  And that wasn't my

10   question, and I think you know that.  My question was

11   are there any design elements of any of these MS4

12   systems that are designed uniquely, "uniquely," you

13   understand what that word means, uniquely to address

14   PCBs?

15             MR. LAND:  Objection.  Asked and

16   answered.  And misleading.

17                            (Pause in proceedings.)

18             THE WITNESS:  Can I take a break?

19      Q.   (BY MR. GOUTMAN:)  No.  There's a pending

20   question.

21             MR. LAND:  You can answer the

22   question, and then you can take a break.

23                            (Pause in proceedings.)

24             THE WITNESS:  Okay.

25                            (Pause in proceedings.)

000157

Page 75

1                        MARCIA DAVIS

2                   THE WITNESS:  No.

3        Q.    (BY MR. GOUTMAN:)  Now --

4                   MR. LAND:  Did you want to take a

5    break?

6                   THE WITNESS:  Yeah.  I kind of need

7    one.

8                   THE VIDEOGRAPHER:  Going off the

9    record at 10:51 a.m.

10                  THE VIDEOGRAPHER:  Going back on the

11   record at 10:59 a.m.

12       Q.    (BY MR. GOUTMAN:)  You had mentioned the

13   Union Basin Stormwater Improvement Project as a

14   project which in your mind was related solely to PCBs.

15   Is that fair?

16       A.    Yes.

17                  (Deposition Exhibit Number 10 was marked for

18                                    identification.)

19       Q.    I'd like to show you a document prepared by

20   the City of Spokane Integrated Capital Management

21   Department for the Department of Ecology.  It's called

22   "Union Basin Stormwater Improvement Project,

23   preliminary design report," dated August, 2015;

24   revised September, 2015.  Are you familiar with this

25   document?

1                           MARCIA DAVIS

2          Q.    And under nonstructural alternatives they

3    talk about -- let's see, nonstructural alternatives

4    with the greatest potential are "impervious surface

5    connections, regulations, and surface housekeeping.

6    Impervious surface regulation consists of minimizing

7    the direct connection of impervious surfaces to the

8    collection system to provide greater opportunities for

9    pollutant reduction through overland flow, surface

10   storage, and percolation."  Right?

11         A.    That's what the document says.  Yes.

12         Q.    And that's essentially what's going on

13   today in MS4 systems, things like surface storage and

14   percolation.  Correct?

15         A.    Yes.

16         Q.    And these were methods that were recognized

17   and developed beginning at least by 1976.  Correct?

18         A.    That's according to the document.

19         Q.    And if you read, if you go to 265, if you

20   can find that.

21         A.    Okay.

22         Q.    And it says under percolation,

23   "percolation" --

24         A.    Oh, here it is.  I found it.

25         Q.    "Percolation can be regarded as both a

000160

Page 87

                              MARCIA DAVIS

1   Q.    I think we had discussed -- we were talking

2   about nonstructural alternatives, which included,

3   among other things, percolation.

4           And in the next paragraph, it says "surface

5   housekeeping, mainly street sweeping, is one of the

6   most effective methods at reducing the URO" that's

7   urban -- what's the URO?  Urban runoff pollution load.

8   And that was recognized by the mid '70s.  Correct?

9           Street sweeping.

10  A.    It's recognized in this document.  Yes.

11  Q.    Well, it was recognized generally.

12  Correct?  As the best management practice to reduce

13  pollutant loads in stormwater systems.

14          MR. LAND:  Objection.  Calls for

15  speculation.  Lack of foundation.

16          THE WITNESS:  Uh, it depends.  Some

17  systems it is and some it doesn't.  Some it counts,

18  and some it doesn't.

19  Q.    (BY MR. GOUTMAN:)  Well, for the City of

20  Spokane it certainly counts.  Right?  That's a

21  significant element of your efforts to reduce

22  pollutant loading in the stormwater system.  Correct?

23  Street sweeping.

24  A.    It is an element.  Yes.  In the City of

Page 88

1                     MARCIA DAVIS

2    Spokane.

3              (Deposition Exhibit Number 13 was marked for

4                                  identification.)

5        Q.   We've marked as Exhibit 13 a document from

6    Spokane County dated April, 1979, called "Spokane

7    Aquifer Water Quality Management Plan."  Is that

8    correct?

9        A.   That's correct.

10       Q.   And in this document, if you -- it talks

11   about runoff management, if you go to page 65.

12                             (Pause in proceedings.)

13       A.   Okay.  Page 65.

14       Q.   And it talks about recommended actions for

15   implementation and one of them, Number 4, is "sweeping

16   for paved surfaces."

17       A.   Okay.  Yes.

18       Q.   Actions recommended for -- uh, to control

19   pollutants in stormwater runoff.  Correct?

20       A.   Yes, it does.

21       Q.   And then on the next page it talks about

22   use of porous pavement.  Right?

23       A.   Oh, yes.  Here it is.  I see that.

24       Q.   Porous pavement is also known as pervious

25   pavement.  Right?

000162

1                           MARCIA DAVIS

2        A.    Yes, that's correct.

3        Q.    As opposed to impervious pavement.

4        A.    That's correct.

5        Q.    And that's incorporated in some of the

6    projects that are part of the damages claimed in this

7    case.  Correct?

8        A.    Yes.

9        Q.    And this was a best management practice

10   recognized in the 1970s.  Correct?

11       A.    Yes, that's what this document says.  Yes.

12       Q.    And it says "problems," next one, "Problems

13   associated with runoff" talks about education programs

14   e.g. problems:  "Use of fertilizers, pesticides,

15   herbicides, solvents and petroleum products."  Is that

16   what it says?

17       A.    Yes.

18       Q.    So, for example, porous pavement was being

19   evaluated in the 1970s as a way to address those

20   constituents.  Correct?

21       A.    This says we should have a pilot project.

22   It wasn't being evaluated.  It was being suggested.

23   It hadn't been used at that point.

24       Q.    Right.  The pilot project would be to

25   evaluate it.  Correct?

000162

000163

1                    MARCIA DAVIS

2       A.    Yes.

3       Q.    So my question was:  In the 1970s, porous

4  pavement was being evaluated to address problems

5  associated with runoff such as fertilizers,

6  pesticides, herbicides, solvents and petroleum

7  products?

8                    MR. LAND:  Objection.

9  Mischaracterizing the document.

10                    THE WITNESS:  That is what this says.

11  I don't have any knowledge of any of those studies.

12       Q.    (BY MR. GOUTMAN:)  I understand that, we'll

13  get to that.

14             Do you have any reason to believe that the

15  authors of this "Spokane Aquifer Water Quality

16  Management Plan" made up or invented a pilot

17  project -- or a suggestion that a pilot project be

18  undertaken to evaluate porous pavement in parking

19  lots?

20             My question is:  Doesn't this indicate,

21  isn't a fair interpretation of this document that

22  Spokane County was recommending an evaluation of the

23  use of porous pavement to address fertilizers,

24  pesticides, herbicides, solvents and petroleum

25  products in stormwater runoff?

000163

Page 91

1                    MARCIA DAVIS

2        A.    Etcetera.  In -- yes.

3                              (Pause in proceedings.)

4        Q.    Okay.  So we have. . .

5             (Deposition Exhibit Number 14 was marked for

6                                    identification.)

7        Q.    And this is the document that your counsel

8   turned over, I think on Friday or last week sometime.

9   It's called -- it's been marked Exhibit 14.  And it's

10  called "Spokane Aquifer Best Management Practices

11  Handbook."  Correct?

12       A.    That's what the title says.  Yes.

13       Q.    Okay.  And according to the cover sheet

14  it's from 1987 or 1988.  Correct?

15       A.    Yes.  That's the handwritten one.  Yes.

16       Q.    Okay.  So the reason I'm showing you this

17  is it's from '87 and '88 and they talk about

18  various -- evaluation of various best management

19  practices.  Correct?

20       A.    Um --

21       Q.    Well, let's turn to -- if I could just

22  focus your attention on page 947.

23       A.    47.

24       Q.    Bates 947.  It says, in the large first

25  paragraph --

000165

1                       MARCIA DAVIS

2        A.    The first paragraph.

3        Q.    -- "Nearly all of the area of metropolitan

4    Spokane County and most of the city is protected from

5    flooding during storms by dry wells, shallow injection

6    wells that discharge runoff below the land surface."

7    And then it continues on with its evaluation of dry

8    wells.  Correct?

9        A.    Yes.

10       Q.    And then if you skip down, bottom of the

11   page, bottom paragraph, "The concept of the Grass

12   Percolation Area grew out of this view."  Is that

13   correct?

14       A.    That's what it says here.

15       Q.    And it says "grass percolation area."  Is

16   that the same as sort of a grassy swale and so forth

17   that are part of best management practices now?

18       A.    That was the intent of this, I believe.

19       Q.    Okay.  So these techniques were recognized,

20   or at least evaluated in the 1980s?

21       A.    Yes.

22       Q.    And then it concludes on page 54,

23   "Additional work has shown the grassed percolation

24   area concept to be" -- I'm sorry, let me start again.

25             "Additional work has shown the grassed

Page 98

1                            MARCIA DAVIS

2        Q.    But it doesn't list PCBs?

3        A.    That's correct.

4        Q.    And the same can be said for Tables 8 and 9

5    and 10 -- I'm sorry, not 10, 8 and 9 -- 8, 9 and 10,

6    which is evaluating or quantifying contaminant runoff

7    for various years.  Correct?

8        A.    Uh-huh.

9        Q.    Yes?

10       A.    Yes.

11       Q.    And by "same," I mean it lists various

12   contaminants, but not PCBs.  Correct?

13       A.    Yes.

14       Q.    So this grassy or other natural percolation

15   was evaluated in the 1970s and '80s for the removal of

16   contaminants other than PCBs.  Correct?

17       A.    That's correct.

18             MR. LAND:  Quick clarification.

19   Exhibit 14 and 15, both exhibits were produced in

20   October of 2018, not last week.

21             MR. GOUTMAN:  Well, how come I got

22   them last week?

23             MR. LAND:  That's a great question.

24             MR. GOUTMAN:  Well, it seems like just

25   yesterday.

Page 100

1                          MARCIA DAVIS

2      treatment -- well, for the swales that's the

3      treatment.  There also needs to be a conveyance, a way

4      to get the runoff to the system.  So, it could be

5      pipes, it could be curb cuts; catch basins would be

6      part of that potentially.

7           Q.    Okay.

8           A.    But it depends project by project what's

9      included.

10          Q.    So that -- would you call it "water routing

11     methods"?

12          A.    Yeah.  We call it "conveyance."

13          Q.    Conveyance.  Okay.

14          A.    Yes.

15          Q.    Well, you're the engineer, so I'll call it

16     conveyance?

17          A.    Okay.

18          Q.    These conveyance methods, is there anything

19     specific about these conveyance systems designed just

20     for PCBs, as opposed to just capturing water that

21     might contain many things?

22          A.    No.  They're just to capture water.

23          Q.    Okay.  Are there any other elements of MS4

24     systems that comprise the claims in this case that we

25     haven't discussed?

000168

Page 101

MARCIA DAVIS

1

2      A.    I'd like a moment just to refresh myself.

3      Q.    Take your time.

4                          (Pause in proceedings.)

5      A.    The dry wells.  The projects often have dry

6  wells also.

7      Q.    And dry wells certainly date back decades.

8  Right?

9      A.    Right.

10     Q.    And there's nothing unique in the design of

11 dry wells that is devoted solely to PCBs, as opposed

12 to other constituents?

13     A.    Correct.  That's the same drywell we use

14 for everything.

15     Q.    Okay.  Are there any other elements of MS4?

16     A.    Not that I can think of, not anything that

17 comes to mind.

18     Q.    Fair enough.  So just to summarize before

19 we go to the next subject, would it be fair to say,

20 based upon the documents that we've reviewed just now,

21 that the kinds of methods, the best management

22 practices that are incorporated in the MS4 projects

23 that comprise the claim in this case, had been

24 recognized over the years and evaluated for their

25 effectiveness in removal of all kinds of constituents?

000168

1                    MARCIA DAVIS

2        A.    Yes.

3        Q.    And none of them, by design, are uniquely

4    devoted to removing PCBs, as opposed to this long list

5    of other constituents?

6        A.    Yes.

7                              (Pause in proceedings.)

8        Q.    So we've got, I guess, about eight minutes.

9              MR. LAND:  Do you need a --

10             THE WITNESS:  No.  I've got eight

11   minutes or whatever.

12       Q.    (BY MR. GOUTMAN:)  We can get this stuff

13   done here.

14       A.    Just want to not be in the middle of a

15   topic.

16             MR. LAND:  We'll stop at --

17       Q.    (BY MR. GOUTMAN:)  We'll stop whenever you

18   want.  Okay?  Whenever you feel comfortable stopping.

19             We're 15?  16.

20             (Deposition Exhibit Number 16 was marked for

21                              identification.)

22       Q.    So I've handed you a PowerPoint

23   presentation by somebody by the name of Marcia Davis.

24   Do you know her?

25       A.    Yes.

000170

1              MARCIA DAVIS

2      A.    Yes.  There's a timeline that shows a --

3  history of stormwater in the city.

4      Q.    Yeah.  And on the left it has -- in the

5  1800s, as I read that vertical orange arrow -- it

6  says -- why don't you read what it says in that box?

7      A.    We had "Direct Sewers:  Raw sewage and

8  stormwater to Spokane River without treatment."

9      Q.    And then it says around, probably around

10  1958, it says, what?

11     A.    "Sewage to treatment plant.  Wet weather

12  overflows to Spokane River."

13     Q.    And then you have in the 1980s, and we've

14  discussed this, the separation of the MS4 basins.

15  Correct?

16     A.    Yes.  The separation.  "Stormwater

17  separated."  Sole source aquifer was recognized, the

18  documents we read for the sole source aquifer.  And

19  the sewage to the plant and reduce the CSOs.

20     Q.    And that was one of main purposes of MS4,

21  or creation of the MS4 districts, and that is to

22  reduce the CSOs, which discharged raw sewage into the

23  river.  Correct?

24     A.    One of the main reasons also was to protect

25  our sole source aquifer.

000170

Page 107

1                          MARCIA DAVIS

2                               (Pause in proceedings.)

3              MR. LAND:  We're about at a point

4     where we'll need to break if this will take longer

5     than a couple minutes.

6                               (Pause in proceedings.)

7              MR. GOUTMAN:  This'll take a second.

8          (Deposition Exhibit Number 17 was marked for

9                               identification.)

10         Q.   You've mentioned for the stormwater

11    permit -- you refer to appendices.

12         A.   Oh.

13         Q.   So I've marked it as 17.

14         A.   Okay.

15         Q.   2 TMDL, for Eastern Washington Phase II.

16    It's called "stormwater permit."

17              MR. LAND:  Can I get a copy?

18              MR. GOUTMAN:  Oh, I'm sorry.

19         Q.   Did I hand you the highlighted one?

20              And am I correct that it's, the parameters

21    are total phosphorus, ammonia and CBOD5?

22              It's on page 7 of 10.

23         A.   It says we should monitor for phosphorus,

24    ammonia, and CBOD and flow rates?

25         Q.   And I understand.

1                        MARCIA DAVIS

2        A.    It's not giving us a discharge.

3        Q.    I understand that.  But what it says, it

4   says, "Spokane River and Lake Spokane dissolved oxygen

5   total maximum daily load."  Correct?

6        A.    Are we on the same page?  On page 8?  Or 7?

7        Q.    I'm on page 7.

8        A.    Okay.

9        Q.    It says "Spokane River and Lake Spokane

10  dissolved oxygen total maximum daily load."

11       A.    Okay.  I'm with you.

12       Q.    And the parameters are total phosphorus,

13  ammonia and CBOD5.  Correct?

14       A.    Yes.

15       Q.    And PCBs are not listed?

16       A.    They are not in that list.

17       Q.    Okay.  Let's break.

18             THE VIDEOGRAPHER:  Going off the

19  record at 11:46 a.m.

20             MR. GOUTMAN:  I just want to formally

21  request, I'll put it in writing, any documents that

22  would reflect methodology or methodologies used by

23  the city to allocate damages as between wastewater

24  items and non-wastewater items, which the witness

25  said "I don't know if there are documents that

Page 114

1                    MARCIA DAVIS

2        A.    Yes.  It's a couple of MS4 basins.  Yes.

3    It's a couple of MS4 basins.

4        Q.    And I believe according to Appendix A of

5    Exhibit 3, which is the damages disclosure, the city

6    claims $3,385,397.93 in past costs.  Is that correct?

7              For Sharp Avenue.

8        A.    Sharp Avenue.  I would like to look at

9    those.

10                              (Pause in proceedings.)

11       A.    Sharp Avenue?

12       Q.    Yeah.

13       A.    In Appendix A?

14       Q.    Yeah.

15       A.    It has -- this shows 1,47 --

16             MR. LAND:  I think you're a row off

17    there.

18             THE WITNESS:  Am I?  These are little

19    tiny rows.  Let me see if I can do that.  Sharp

20    Avenue.  Oh, it is 3.  I'm sorry.  3,385,394.93.

21       Q.    (BY MR. GOUTMAN:)  Okay.  And am I correct

22    according to Appendix B, the city received a grant of

23    1.26 million dollars for this project.  That's

24    Appendix B.

25       A.    Appendix B.  Yes.  $1,026,000.

000174

1                           MARCIA DAVIS

2           Q.    In Exhibit 3.

3           A.    Yes.  $1,260,000.

4           Q.    Okay.  Am I correct that what precipitated

5    this project was that it -- an existing cast iron

6    water main was from 1893 and is aged, was aged, to the

7    the point where failure was, failure risk was

8    significant.  Is that correct?

9           A.    Yes.  The failure risk was if we did a

10   construction project.

11          Q.    Okay.  "Replacement was necessary to

12   provide an adequate level of service and reliability."

13   Is that correct?

14          A.    Yes.

15          Q.    And as part of that project, of course,

16   there had to be -- the street had to be redone.

17   Correct.

18          A.    The water line was -- the replacement of

19   the water line was because we were doing the street

20   project.  The water line itself was not the reason we

21   did the project.  The reason we did Sharp Avenue was

22   to remove the stormwater from the Spokane River and to

23   do the pilot for permeable pavement.

24          Q.    Well, let's see what the city's documents

25   say about that.

000174

000175

Page 125

1                          MARCIA DAVIS

2       you were testing for PCBs.

3            A.    Okay.

4            Q.    So -- but again, in both the document that

5       has the very important QAPP where you're determining

6       whether this thing works with regard to removal of

7       constituents of concern, as well as this PowerPoint,

8       where you were talking about the Sharp Avenue project,

9       there is no mention of testing for PCBs or schematic

10      representation of the product actually removing PCBs.

11      Correct?

12                       MR. LAND:  Objection.  Misleading and

13      mischaracterization.  She said that she doesn't know

14      if that QAPP was final.

15                       MR. GOUTMAN:  You don't have to --

16      that's a speaking objection.  I think you know better

17      than that.

18                       THE WITNESS:  The PowerPoint slides

19      that you showed me do not list those, but I don't

20      know what -- in the presentation those could have

21      been discussed.

22           Q.    (BY MR. GOUTMAN:)  I'm sorry.  Maybe my

23      question wasn't clear.

24                  You acknowledge that in the PowerPoint

25      presentation that your department put on for the

000175

000176

1                     MARCIA DAVIS

2    public, right?  This is for the public.

3         A.    Right.

4         Q.    For professional engineers and people

5    involved --

6         A.    Right.

7         Q.    -- in stormwater management.  Right?

8               A project that you say was a PCB project.

9    In the PowerPoint presentation that your department

10   put on where it illustrated the contaminants that

11   could be removed with permeable pavement, PCBs are not

12   illustrated.  Correct?

13              MR. LAND:  Objection.  Misleading and

14   mischaracterization of that document.

15        Q.    (BY MR. GOUTMAN:)  Go ahead.  You can

16   answer.

17        A.    There's nothing shown in there.

18        Q.    Is that the answer yes?

19        A.    Yes.

20        Q.    And with respect to the Quality Assurance

21   Plan which showed testing to be performed to determine

22   the effectiveness with which constituents of concern

23   would be removed by using permeable pavement, it lists

24   many constituents of concern, but not PCBs.  Correct?

25        A.    That's right.  This one you showed me does

000176

000177

1                        MARCIA DAVIS

2      not include PCBs.

3           Q.    Okay.  So North Monroe.  Monroe, am I

4      correct -- North Monroe according to Exhibit A of your

5      answers to interrogatories, Exhibit 3, consists of a

6      claim for $1,894,127.68 in past costs.  Correct?

7           A.    Sorry.

8           Q.    No problem.  And then I'm gonna ask you to

9      look at Appendix B too.

10          A.    Okay.  We're talking about Monroe.  Is that

11     correct?

12          Q.    North Monroe.

13          A.    Okay.  And we have $1,894,127.68.

14          Q.    Am I correct that according to Appendix B

15     of Exhibit 3 you've received grants in the amount of

16     $749,250 for that project?

17                          (Pause in proceedings.)

18               MR. LAND:  Can you say what the name

19     is under Appendix B?  It might help.

20               THE WITNESS:  He said North Monroe,

21     but I'm not seeing it.  I'm seeing Monroe Street,

22     which is Washington Basin.

23          Q.    (BY MR. GOUTMAN:)  It's Lincoln-Monroe.

24          A.    That's a different project than North

25     Monroe.

000177

000178

Page 131

1                        MARCIA DAVIS

2                    THE WITNESS:  The project

3    description.  Okay.

4         Q.    (BY MR. GOUTMAN:)  So North Monroe consists

5    of North Monroe storm, Monroe Street, Lincoln Street,

6    8th Avenue to Main Avenue Phase II.  It's, like, these

7    four projects.  Right?

8         A.    Right.  These four projects.

9         Q.    Okay.  With that in mind, going back to the

10   grant.

11        A.    Yes.  Now we can go back to the grant.

12        Q.    Okay.

13        A.    Now that we know the projects.  Okay.

14        Q.    There is a grant listed for Lincoln-Monroe

15   stormwater.

16        A.    Lincoln-Monroe.  Yes.  There is a grant

17   listed for $749,250.

18        Q.    Can we agree that that grant is related

19   to --

20        A.    One of these projects.

21        Q.    -- to the North Monroe claim which consists

22   of four separate projects?

23        A.    Yes.

24                    MR. LAND:  Please make sure to wait

25   for him to ask a question before you answer.

000178

000179

MARCIA DAVIS

2          THE WITNESS:  Got it.

3      Q.    (BY MR. GOUTMAN:)  As long as you're gonna

4  say yes, you don't have to wait.

5      A.    Okay.

6      Q.    Now, this consists of roadway pavement

7  replacement and bio-infiltration.  Correct?

8      A.    Yes.

9      Q.    Okay.  And this bio-infiltration is a

10  methodology that was described back in the '70s and

11  '80s to address numerous constituents.  Correct?

12  Stormwater constituents.

13          MR. LAND:  Objection.  Vague.

14          THE WITNESS:  These all use

15  bio-infiltration, which I'm not sure what the

16  documents -- how it describes it.  I would think they

17  are the same thing, but not knowing exactly the whole

18  description, I would say this is bio-filtration.

19          We use bioretention for these projects

20  which is a BMP, which, I think, is what was described

21  in that document.

22      Q.    And was described in the documents going

23  back to the '70s and '80s that we reviewed earlier

24  today.  Correct?

25      A.    Right.

000180

1                        MARCIA DAVIS

2          Q.    To remove numerous constituents.  Correct?

3          A.    Right.

4          Q.    Now, uh -- and that's what was used in

5    North Monroe.  Correct?

6          A.    Yes.  These all used bio-retention.  Yes.

7          Q.    Okay.  Third, I'm gonna make our way

8    through these.

9          A.    Now where?

10         Q.    I'm going to the next one.

11         A.    Okay.

12         Q.    River Runoff Reduction.  So go to

13   Appendix A --

14         A.    Okay.

15         Q.    -- because my first question is:  The city

16   is claiming $1,862,489.20.  Correct?

17         A.    Yes, that's correct.

18         Q.    And that consists of installing dry wells

19   on residential streets to reduce the amount of

20   untreated stormwater being conveyed to the Spokane

21   River. Correct?

22         A.    Yes.  That's correct.

23         Q.    And these are the same dry wells that were

24   described in documents we reviewed -- at least one

25   document we reviewed -- from the 1970s that dealt with

000180

Page 134

MARCIA DAVIS

1

2  removal of various constituents from stormwater.

3  Correct?

4      A.    Drywell -- well. . .

5      Q.    Well, let me just rephrase it because I

6  understand the problem you might have with how I

7  phrased that question.

8            These dry wells -- the technology is not

9  new.  It goes back decades and decades.  Correct?

10     A.    That's correct.

11     Q.    And that technology is designed to keep

12  stormwater from running off into a body of water.

13  Right?  Just to essentially store it until it

14  infiltrates into the ground.

15            MR. LAND:  Objection.  Compound.

16            THE WITNESS:  Dry wells are -- no.

17  Not exactly.  Dry wells are used for different

18  reasons, they're not considered necessarily for

19  treatment.

20            This project we did specifically to remove

21  the runoff from the streets and specifically because

22  we wanted to remove PCBs from the river.

23     Q.    And what document -- what design document

24  can you show us that says that this was designed just

25  for PCBs?  Is there any such document?

000182

1                          MARCIA DAVIS

2      counsel what we'd do with it.  If it's an error,

3      though, I think we are happy to make a correction.

4                     MR. LAND:  And, yeah.  And we can

5      stipulate to that, Tom.  We'll go back and look at

6      it.  If it is double charging for the same exact

7      bill, we'll --

8           Q.    (BY MR. GOUTMAN:)  How did that happen,

9      that you ended up submitting a damages submission to

10     the court where you double counted, I think, over

11     $300,000.  How'd that happen?

12          A.    I don't know.

13          Q.    Well who QA, QC'd this document, Exhibit 3?

14                     MR. LAND:  Objection.  Calls for

15     speculation.

16                     THE WITNESS:  I don't know who did.

17                               (Pause in proceedings.)

18          Q.    (BY MR. GOUTMAN:)  To a reasonable person

19     it might bring into question the reliability of

20     everything in Exhibit 3, doesn't it?

21                     MR. LAND:  Objection.  Calls for

22     speculation.  Misleading.

23                     THE WITNESS:  I don't know.

24          Q.    Okay.  Pettet Drive.  Am I pronouncing that

25     correctly?

Page 141

1                       MARCIA DAVIS

2        A.     Yes, that's correct.

3        Q.     Uh, if you go to Appendix A, the city

4    $1,533,169.62.  Correct?

5                              (Pause in proceedings.)

6        A.     Pettet Drive.  $1,533,169.62.  Yes.

7        Q.     Okay.  Am I correct that if you go to

8    Appendix B, the city has received a grant of 450,000

9    for that project?

10        A.     Oh, sorry.  I'm in the wrong place.

11                              (Pause in proceedings.)

12        A.     Yes.  $450,000.

13        Q.     Am I correct that this project involved

14    standard MS4 BMP such as construction of bio-retention

15    swales?

16        A.     Yes, that's correct.

17        Q.     It also involved construction of a

18    mixed-use trail.  Isn't that right?

19        A.     It was an integrated project, so as part

20    of -- yes.  As part of that we did road, we did street

21    work and a trail as part of that.

22        Q.     Yeah.  With both bike and pedestrian

23    improvements.  Correct?

24        A.     Yes.  That's correct.

25        Q.     And that's all part of your claim in this

000184

1                        MARCIA DAVIS

2     case.  Correct?

3          A.    I don't know --

4          Q.    You don't know?

5          A.    I'm not sure.  I'll have to check on that.

6                I think we just did stormwater costs on

7     this one.

8          Q.    Well, let me ask you this --

9          A.    Well, the part of the street that had the

10    stormwater lines in it would be part of this, the

11    charges included in here.

12         Q.    But in any event -- and I'll get to that in

13    a second -- but in any event the bio-retention swales

14    were the sorts of things that were discussed beginning

15    at least in the the '70s and '80s and were designed to

16    prevent runoff of numerous constituents.  Correct?

17         A.    Yes.  They're bio-retention swales.

18         Q.    And, um -- so this is a question I have for

19    you and this is the invoice backup for this claim that

20    was submitted to the court and we've marked as 22 that

21    invoice.

22                (Deposition Exhibit Number 22 was marked for

23                                      identification.)

24         Q.    And it has an item, 114,000.  Do you see

25    that?  501?

000184

000185

1                    MARCIA DAVIS

2    7 million, right?  7,093,000.  Is that what you're

3    referring to?

4         A.   Yes.  So this was -- yes.  This was just

5    the work done for this time period.

6         Q.   For this contract?  For this contract?

7         A.   Yes.  Yes.

8         Q.   Okay.  Got it.  So I'd like to. . .

9                         (Pause in proceedings.)

10        Q.   Okay.  Riverside.  Am I correct, referring

11   to Appendix A, the city claims 1,239,162.75.

12                  MR. LAND:  Talking about LID?

13                  MR. GOUTMAN:  Yeah.

14                  THE WITNESS:  Riverside.

15        Q.   (BY MR. GOUTMAN:)  Basically the parking

16   lot project on Riverside.  I refer to it as that.

17        A.   That's not on my list.

18                  MR. LAND:  I think it's RPWRF LID.

19                  THE WITNESS:  Oh, "Ripwirf" LID.

20   Okay.  Yes.  I'm sorry.  Okay.  I'm sorry.

21             Is that what you're referring to?

22        Q.   1,239,162.75.

23        A.   Yes.

24        Q.   And you receive a grant in the amount of

25   347,625.  Is that correct?

000185

000186

                              MARCIA DAVIS

1

2     A.    Yes.  That's correct.

3     Q.    This project involved stormwater

4     improvements as part of a parking lot rehabilitation

5     at the wastewater treatment plant.  Correct?

6     A.    Yes.  It was managing the stormwater and

7     doing a demonstration of permeable pavement.

8     Q.    A demonstration.  Okay.  So you put in

9     permeable concrete in the pavers, porous grass pavers,

10    and porous concrete sidewalks.  Correct?

11                MR. LAND:  Feel free to review the

12    document.

13                            (Pause in proceedings.)

14                THE WITNESS:  Okay.  I'm sorry.  Could

15    you repeat your question.

16    Q.    Sure.  This is a project that installed

17    permeable concrete unit pavers, porous grass pavers,

18    and porous concrete sidewalks.  Correct?

19    A.    That's correct.

20    Q.    To promote infiltration and minimize

21    stormwater runoff.  Correct?

22    A.    That's correct.

23    Q.    And I show you Exhibit 23.

24                (Deposition Exhibit Number 23 was marked for

25                                identification.)

000186

000187

Page 171

MARCIA DAVIS

2    A.    No.   I don't know what the stormwater

3    function of that would be.

4    Q.    Could you tell us the function of the

5    security fence shown in the background, not the

6    function, but the stormwater management function of

7    the security fence shown in the background?

8    A.    No, I can't.

9    Q.    Which was billed at 391,000.

10    (Deposition Exhibit Number 27 was marked for

11    identification.)

12    Q.    This will be 27.  This is the water feature

13    which was billed at 58,000, according to the previous

14    exhibit, or two exhibits ago, the bill.

15    What is the stormwater management function

16    of this water feature?

17    A.    I don't know of a stormwater management

18    function of that.

19    Q.    Okay.  And then it talks about work done at

20    the main entry various -- I'll show you another photo.

21    This is 28.

22    (Deposition Exhibit Number 28 was marked for

23    identification.)

24    Q.    Is this the main entry, 28?

25    A.    Yes.  This is the main entry.

000187

Page 173

1                       MARCIA DAVIS

2     the gentleman who, former employee, who tragically

3     died in the accident there?

4          A.    Yes.

5                               (Pause in proceedings.)

6          Q.    Let's move on.  Making progress here.

7                Okay.  I'd like to talk about the Union

8     stormwater basin.  Is that correct?

9                It is correct.  And I'd like to talk to you

10    about the Union stormwater basin.

11               It's a good thing we're breaking at 4:30,

12    I'm becoming incoherent.

13                    MR. LAND:  Maybe we should keep going.

14                    MR. GOUTMAN:  You should say no more

15    incoherent than you usually are.

16                    THE WITNESS:  Okay.  Union Basin.

17         Q.    (BY MR. GOUTMAN:)  Same -- Appendix A.  So

18    you're claiming 1,142,285.12 in past costs.  Is that

19    correct?

20         A.    Okay.  Here it is.  It's at the top here.

21    Yes.  1,142,285.  Yes.

22         Q.    And Exhibit B, you got a grant for one

23    million dollars for that.  Correct?

24         A.    Yes.

25         Q.    By the way -- I forgot to ask you this, I'm

1                              MARCIA DAVIS

2        that we have an agreement for.

3             Q.    Okay.  So did we, I forget, did we

4        establish that there was a grant for 4 million dollars

5        for --

6             A.    Yes.

7             Q.    And I think we went over this morning and

8        so I won't go into that.

9                  Cochran.

10            A.    Okay.

11            Q.    That's the largest MS4 basin, is it not?

12            A.    Yes, it is.

13            Q.    Something like 50 percent of the stormwater

14       comes out of Cochran?

15            A.    Yes.  Something like that, approximately

16       that.

17            Q.    And that's largely a residential area, is

18       it not?

19            A.    It's got a little bit of everything.  It

20       does have some commercial, limited industrial, mostly.

21       But a large portion of it is residential, but it does

22       a little bit of everything.

23            Q.    And you were claiming, Appendix A, past

24       costs of $1,040,576.83.  Is that correct?

25            A.    Are you -- Cochran Basin.

000190

1            MARCIA DAVIS

2            MR. LAND:  I think there are a few

3    pieces of Cochran Basin.

4        Q.    (BY MR. GOUTMAN:)  Well, referring to

5    Cochran Basin, RRR.

6        A.    Yes.

7        Q.    That's 1,040,576.83.  Is that right?

8        A.    Yes.

9        Q.    Okay.  And. . .

10           (Deposition Exhibit Number 30 was marked for

11                              identification.)

12       Q.    And I'd like to show you something that

13   we're marking the new Exhibit 30.

14       A.    Okay.

15       Q.    And just -- this is from the city's

16   environmental contractor CH2M Hill.  Correct?

17       A.    Yes.

18       Q.    And shows receipt by various colleagues of

19   yours at the city.  Right?

20       A.    Yes.

21       Q.    And former colleagues.

22       A.    Yes.

23       Q.    And it says "High level assessment of

24   pollutant removal in the Cochran stormwater basin."

25   Correct?

Page 177

MARCIA DAVIS

1

2     A.    Uh --

3     Q.    That's the title.

4     A.    Oh.  Yes.

5     Q.    And it was sent to Rick Romero of the City

6   of Spokane.  Right?

7     A.    Yes, it was.

8     Q.    And it relates to -- well, it discusses CSO

9   volumes and CSO pollutant concentrations.  Is that

10  correct?

11    A.    Yes.  Table 2 here talks about CSO volumes.

12    Q.    Right.

13    A.    And pollutant concentrations.

14    Q.    Okay.  And does it -- the pollutant

15  concentrations that they list are for total suspended

16  solids, zinc, lead, cadmium, total phosphorus, and

17  fecal coliform.  Correct?

18    A.    That's correct.

19    Q.    It does not list PCBs.  Right?

20    A.    It does not list PCBs.

21    Q.    And what this is, is they're -- and the

22  next one is on stormwater.  Right?  And what they're

23  doing is measuring stormwater pollutant concentrations

24  for constituents of concern in the stormwater.

25  Correct?

000192

Page 178

1                          MARCIA DAVIS

2          A.    Yes.

3          Q.    So that they can calculate estimated

4     percentage of pollutant removal.  Right?

5          A.    Yes.  That's. . .

6          Q.    For constituents of concern.  Right?

7          A.    Right.

8          Q.    And the constituents of concern are total

9     suspended solids, zinc, lead, cadmium, total

10    phosphorus, and fecal coliform.  That's what they

11    tested for.  Correct?

12         A.    Yes.  That's what's on the list here.

13         Q.    That's what they tested the stormwater for

14    in Cochran Basin.  Right?

15         A.    That's what's recorded here.

16         Q.    And they did not test, according to CH2,

17    CH2M, excuse me, they didn't test for PCBs.  Correct?

18         A.    They don't record that in here.

19               I think they were using the city data and I

20    believe we did test for PCBs.

21         Q.    That wasn't my question.  My question is

22    that --

23         A.    Yes.

24         Q.    Let me rephrase the question.

25         A.    Okay.

000192

1          MARCIA DAVIS

2     Q.    With respect to the city's environmental

3  contractor's assessment of pollutant removal for the

4  Cochran stormwater basin, when they were calculating

5  stormwater pollutant concentrations and estimated

6  percentage of pollutant removals, removal of

7  constituents of concern in stormwater, they did not

8  test for PCBs.  Correct?

9     A.    PCBs is not on this memo.  Yes.

10                         (Pause in proceedings.)

11     Q.    So I'll mark this as Exhibit 31.

12          (Deposition Exhibit Number 31 was marked for

13                              identification.)

14     Q.    And this is -- we're still on Cochran.  And

15  this was an invoice that was included in your damages

16  submission to the court for Clearwater Construction

17  and Management.  Is that correct?

18     A.    Yes.  That's what this invoice is for.

19     Q.    Okay.  And if you go to page, okay, the

20  page that's Bates stamped on the top, 858.  It's the

21  landscape spreadsheet.

22     A.    Okay.

23     Q.    It says "Summary of total costs,"

24  says, "Cochran stormwater $401,261.89 and something

25  called the IO3 Control Facility $6,948,687.25.  So my

Page 185

MARCIA DAVIS

2   Q.   Okay.  And which projects have you not

3   applied for?  We have boat launch, piping, TJ Meenach

4   to Northwest Boulevard, piping, TJ Meenach to

5   Downriver, lift station and control facility, and

6   Downriver Disc Golf course.  Which ones haven't you

7   applied for?

8   A.   Lift station and control facility.

9   Q.   So all the others you've applied for

10  grants.  Correct?

11  A.   We have -- yes.

12  Q.   And I think you indicated earlier that you

13  are normally confident that when you apply for these

14  grants that you'll get them.  Correct?

15  A.   We have a good track record.  Yes.  When we

16  apply for them we generally are successful to the

17  limit of the $5,000,000 we're allowed each year.

18  Q.   Now, with respect to -- if you look at

19  Appendix B -- just so that we're clear.  I'd like to

20  tease out of that the grants that are related to these

21  five projects.  You've got -- as I reviewed the

22  document -- you have Cochran conveyance, 2,000,000.

23  Right?

24  A.   Yes.

25  Q.   You have Cochran Basin conveyance piping,

000195

1                   MARCIA DAVIS

2    5,000,000.  Right?

3       A.    Are we in Appendix B?

4       Q.    Appendix B, it's second from the bottom.

5       A.    Okay.  Yes.

6       Q.    And you have Cochran disc golf, which is

7    kind of in the middle of the page.

8       A.    Yes.

9       Q.    2,512,500.  Correct?

10       A.    Yes.  Yes.

11       Q.    So for example -- oh, I'm sorry.  And you

12   also have -- so with respect to Cochran disc golf, for

13   example, where the grant is for 2,512,500, your

14   damages claim is about 4.6 million in this case.

15   Correct?

16       A.    That's what our --

17       Q.    I think we've already been there.

18       A.    So -- yes.

19       Q.    So why is it -- do you anticipate getting

20   more grant money for the Downriver disc golf?  Have

21   you applied for it?

22       A.    We haven't applied for it.

23       Q.    Will you apply for it?

24       A.    In the future, if we do need more, we would

25   apply for it.  Remember our grants only pay 75 percent

000195

000196

Page 187

MARCIA DAVIS

1

2   of the total project costs, and that's eligible costs.

3   There may be other things that we do that

4   stormwater -- that may not be eligible.  And, um --

5       Q.   Why wouldn't it be eligible for grant

6   money?

7       A.   For instance, since this is park property,

8   and we're using the property we may -- we have to do

9   some paving around the edge.  That's our agreement for

10  using the property.  And that wouldn't be grant

11  eligible.

12      Q.   Why not?

13      A.   Um --

14      Q.   If it's part of, as you said, a stormwater

15  management project, why wouldn't it be grant eligible?

16      A.   Um, it's the rules of the grant funding.

17  They say certain things aren't eligible.

18      Q.   Why isn't it eligible?  What's your

19  understanding?

20      A.   I don't know.  My understanding is if we

21  can tie it to stormwater, generally they'll pay for

22  it.  But some things they don't.

23          So we've gone through and figured out

24  what's eligible.

25          If, back to your earlier question, if we

000196

000197

1                    MARCIA DAVIS

2        Q.    Okay.  But then it says, it says Phase II,

3    at the very last sentence on page 148 --

4        A.    Yes.

5        Q.    Phase II would cost an additional

6    17 million and would be completed as funding becomes

7    available.  Is that correct?

8        A.    That's what it says.

9        Q.    Okay.  So this is work that will be done

10   contingent upon funding being made available.

11   Correct?

12       A.    Yes.

13       Q.    And you don't know whether that funding

14   will be available.  Correct?

15       A.    That's correct.

16       Q.    But you're confident that it probably will?

17       A.    Yes.  At the 5 million dollars a year that

18   we can apply for stormwater grants.

19       Q.    But in any event, you're not gonna do it

20   until that money comes in or is granted?

21       A.    That's true.

22       Q.    You're not doing "it," meaning do this

23   work?

24       A.    Right.

25       Q.    Um, where are we?  Summit Nettleton.

000197

000198

Page 203

1                    MARCIA DAVIS

2                              (Pause in proceedings.)

3      A.    Okay.

4      Q.    Am I correct that the city claims

5   $565,025.57 in past costs?

6      A.    Yes.

7      Q.    Am I correct that the -- of that the city

8   has received a grant of 342,000?

9      A.    Yes.   That's correct.

10                            (Pause in proceedings.)

11     Q.    So Summit Nettleton, does that include a

12   storm garden and a future City of Spokane park?

13     A.    It includes a stormwater facility in a

14   private park.  It's in a park in the city of Spokane.

15     Q.    I see.  Got it.  Donated to the city by

16   Kendall Yards development?

17     A.    Yes.

18     Q.    K-e-n-d-a-l-l.

19           And you applied for a grant outside funding

20   in the amount of 2,190,985.  Is that correct?

21     A.    I did apply for a grant for that.  I don't

22   know if that amount is -- I don't know that amount.

23              MR. LAND:  I don't think it's in

24   there.

25              THE WITNESS:  Yeah.  I don't know the

000198

000199

Page 215

1                         MARCIA DAVIS

2     combination of the retaining wall and the basalt at

3     this facility.

4         Q.   I guess my question is, what added

5     functionality does the basalt veneer have to a

6     concrete retaining wall?  Isn't the concrete strong

7     enough to retain stormwater?

8         A.   Yes.  But it doesn't match the character

9     and intent of the park.

10        Q.   So it's aesthetics?

11        A.   You could say aesthetics, aesthetics or

12    neighborhood, matching the neighborhood character.

13        Q.   So it also includes, if you flip the page,

14    hydroseeding, almost 2 -- sorry.  $2,381.  It's Item

15    145.

16        A.   Yes.

17        Q.   And are you aware of the presence of

18    by-product or inadvertent PCBs in hydroseeding?

19             MR. LAND:  Objection.  Misleading and

20    beyond the scope.

21             THE WITNESS:  Yes, we are now.  But we

22    weren't at the time.

23        Q.   Okay.  And "at the time" was when?  2014?

24        A.   Yes.

25        Q.   So you actually made a design decision that

000200

1                       MARCIA DAVIS

2    added PCB levels to this stormwater system.  Correct?

3                    MR. LAND:  Objection.  Misleading.

4    And beyond the scope.

5                    THE WITNESS:  It may have added.  It

6    may have added that to the project.

7        Q.   (BY MR. GOUTMAN:)  It also includes

8    benches -- a bench and interpretive signs.  Is that

9    correct?

10       A.   Yes, it does have a bench and interpretive

11   signs.

12       Q.   Well, it has three benches at $4,000 each.

13   Correct?

14       A.   Right.  It has benches.  The interpretive

15   signs were for stormwater education.

16       Q.   I see.  So. . .

17            (Deposition Exhibit Number 37 was marked for

18                              identification.)

19       Q.   I'm showing you a photograph which I've

20   marked as Exhibit 37.  Is that the interpretive sign?

21       A.   Yes.

22       Q.   And does this sign have any stormwater

23   management function?

24       A.   It shows how stormwater's being managed at

25   the site.

000200

1                        MARCIA DAVIS

2        Q.     That's not my question.  Does the sign

3    itself --

4        A.     Oh.

5        Q.     -- have any stormwater management function?

6                  MR. LAND:  And you can still answer

7    that question how you see fit.

8        Q.     (BY MR. GOUTMAN:)  And if your answer is

9    yes, I'm gonna ask you to explain it in detail.

10                  MR. LAND:  And I'll object.  Vague to

11   last question.

12                  THE WITNESS:  I would say for

13   stormwater management at this site, it does have a

14   value.  And --

15       Q.     (BY MR. GOUTMAN:)  I didn't ask whether it

16   has value.

17                  I said what function does it have to either

18   storing or channelling stormwater or preventing

19   constituents of stormwater from entering the Spokane

20   River?

21                  MR. LAND:  Objection.  Vague.

22                  THE WITNESS:  Stormwater management

23   that it does is that it educates people in the area,

24   that if they dump something in this, it infiltrates

25   into the ground.

000202

Page 218

1                          MARCIA DAVIS

2      Q.    (BY MR. GOUTMAN:)  Listen to my question.

3      A.    So that would be a --

4      Q.    It's an educational function.

5            Does it have anything to do with the normal

6  functioning of a stormwater BMP, which would be

7  preventing -- let me ask it this way:  Does this sign

8  retain or store stormwater?

9      A.    No.

10     Q.    Does it direct stormwater away from the

11 Spokane River?

12     A.    No.

13     Q.    Does it prevent any constituent from

14 entering the Spokane River?

15                MR. LAND:  Objection.  Vague.

16                THE WITNESS:  Possibly.

17     Q.    How is that?  Do you think that the

18 constituents would adhere to the sign?

19     A.    No.  It would not.

20     Q.    How does it capture the constituents?

21     A.    It would not.

22            (Deposition Exhibit Number 38 was marked for

23                                identification.)

24     Q.    (BY MR. GOUTMAN:)  Exhibit 38 is another

25 picture of the project that you're the chief engineer

000202

000203

1                          MARCIA DAVIS

2    on.  So I notice a bunch of fancy pavers and so forth.

3    Are those impervious or pervious?

4         A.    They are -- some of the pavers are

5    pervious; some are impervious.  The spaces between

6    them are -- allow infiltration.  So yes.  Most

7    everything here has some way for stormwater to

8    infiltrate through the ground, either through them or

9    between the edges between the gaps.

10        Q.    And this shows the veneer --

11        A.    Yes.

12        Q.    -- of this wall?

13        A.    Yes.

14        Q.    And I think you indicated that that veneer

15   was placed there for aesthetic reasons.  Correct?

16        A.    Yes.  To match the neighborhood character.

17              (Deposition Exhibit Number 39 was marked for

18                                  identification.)

19        Q.    And I'm showing you Exhibit 39 which are

20   flower and bushes and tall grass planted.  Is that

21   correct?

22        A.    The flowers and bushes along the edge, yes.

23   The tall grass is actually inside the bio-retention

24   facility.

25        Q.    Okay.  The flowers and bushes are not

000203

000204

1                    MARCIA DAVIS

2   inside the bio-retention.  Is that correct?

3        A.    No.

4        Q.    And are they placed there because they have

5   some stormwater management function?

6        A.    Um --

7        Q.    Or are they aesthetic?

8        A.    I believe these, the bushes in this area

9   are aesthetic.  They could be taking some runoff that

10  I'm not aware of, but I don't think they do.

11       Q.    And Exhibit 40.

12            (Deposition Exhibit Number 40 was marked for

13                              identification.)

14       Q.    Does this show one of the $4,000 park

15  benches that you're suing Monsanto for?

16       A.    This is one of the park benches.  Yes.

17       Q.    Okay.  I want to go to Erie and Trent.

18       A.    Okay.

19       Q.    A.k.a. Erie Stormwater Facility.

20            Am I correct that your claim, the city's

21  claim is $563,722.91 in past costs?

22       A.    The Erie and Trent.  Yes.  Yes.

23       Q.    In future costs it's $2,214,967.  Is that

24  correct?

25       A.    I'll look that one up.  2,214,967.

000204

000205

Page 221

1                       MARCIA DAVIS

2         Q.    Okay.  Am I correct that you have received

3    a grant in the amount of $1,031,447.50 with respect to

4    this project?

5         A.    1,031,447.50.  Yes.

6                              (Pause in proceedings.)

7              (Deposition Exhibit Number 41 was marked for

8                                    identification.)

9    BY MR. GOUTMAN:

10        Q.    We've marked as Exhibit 41 a document

11   called "Erie Street Stormwater Facility Project, July

12   2015" prepared by the City of Spokane.  Is that

13   correct?

14        A.    Yes.  That's correct.

15        Q.    And this is talking about this Erie Street

16   Stormwater Facility project --

17        A.    Yes.

18        Q.    -- preliminary design.  Correct?

19        A.    Yes.

20        Q.    And if you turn to Page 461?  Bates.

21        A.    461.  Yes.

22        Q.    It says "Required Pollutant Removal

23   Percentages."  Correct?

24        A.    Yes.

25        Q.    And it lists various constituents.

000205

000206

Page 222

1                    MARCIA DAVIS

2         A.    Yes.

3         Q.    And they are total suspended solids.

4         A.    Yes.

5         Q.    Correct?

6         A.    Yes.

7         Q.    Phosphorus removal?

8         A.    Yes.

9         Q.    Zinc removal?

10        A.    Yes.

11        Q.    Copper removal?

12        A.    Yes.

13        Q.    Nitrogen removal?

14        A.    Yes.

15        Q.    Oil and grease?

16        A.    Yes.

17        Q.    PCBs are not listed.

18        A.    Yes.  That's correct.

19        Q.    And just to be clear, we note from that

20   29-gram document, that it is possible to calculate the

21   amount removal of PCBs if one wants to.  Correct?

22               MR. LAND:  Objection.  Vague.

23   Incomplete hypothetical.

24               THE WITNESS:  I don't know.

25        Q.    (BY MR. GOUTMAN:)  Well, you did see your

000206

1                          MARCIA DAVIS

2    engineer's report in which that calculation was set

3    forth?

4         A.    Yes.

5                              (Pause in proceedings.)

6         Q.    Next one is 42.

7              (Deposition Exhibit Number 42 was marked for

8                              identification.)

9         Q.    And Exhibit 42 is "Department of Ecology

10   Water Quality Combined Financial Assistance Agreement

11   between State of Washington, Department of Ecology and

12   City of Spokane."  Is that correct?

13        A.    Yes.

14        Q.    And it pertains to the Erie Street project.

15   It says in "Project short description:  This project

16   will improve water quality in the Spokane River

17   through installation of a bioretention swale with

18   underdrain, storage vault and pump and dry wells on

19   the west side of Erie Street adjacent to the Spokane

20   River in the City of Spokane."  Correct?

21        A.    Yes.

22        Q.    "This project will provide treatment for

23   total suspended solids (TSS), oil (Total Petroleum

24   Hydrocarbons), and dissolved copper and zinc by

25   increasing stormwater infiltration and by providing

1                          MARCIA DAVIS

2     stormwater retention."  Is that what it says?

3          A.   Yes.

4          Q.   Am I correct that they would have gotten

5     this information from the City of Spokane?  They would

6     not have had it independently otherwise?

7          A.   That's correct.

8          Q.   And if you turn to Bates 781.

9          A.   781.

10         Q.   It says "Task expected outcome:

11    Constructed project will provide water quality

12    benefits including reductions in total suspended

13    solids (TSS), Oil (Total Petroleum Hydrocarbons), and

14    dissolved copper and zinc.  Is that what it says?

15         A.   Yes.

16         Q.   And in neither instance does it mention the

17    removal of PCBs as an intended benefit.  Correct?

18         A.   That's correct.

19                              (Pause in proceedings.)

20         Q.   Okay.  Let's go to Rowan Avenue, Phase I.

21         A.   (Complied.)

22         Q.   Rowan Avenue, Phase I is 420,742.59 in past

23    costs.  Is that correct?

24         A.   That's correct.

25         Q.   And that -- the elements involved -- you're

Page 228

1                          MARCIA DAVIS

2        Q.     Oh, Finch.  It's $270,332.32.  Is that

3    correct?

4        A.     Yes.

5        Q.     You received a grant of almost 100,000,

6    $99,600.  Is that correct?

7        A.     Yes, that's correct.

8        Q.     And as I understand it, correct me if I'm

9    wrong, what this involved was essentially expanding

10   the parking lot to accommodate more traffic and paving

11   the parking lot with pervious pavement.  Correct?

12       A.     That --

13       Q.     By "more traffic" I mean increasing the

14   parking capacity of that parking lot.  Correct?

15       A.     That was part of the project.  It also

16   included separation of MS4 from F Street.

17       Q.     And am I correct that one of the reasons

18   why that parking lot had to be -- well, you wanted to

19   increase the size of it, is that the parking lot is

20   well used and often becomes full during events.

21   Correct?

22       A.     Yes.  It became a good choice of a

23   location.

24       Q.     Right.  So among other things, you're suing

25   Monsanto for increased parking capacity that was

Page 229

1                          MARCIA DAVIS

2      otherwise needed.  Correct?

3                     MR. LAND:  Objection.  Misleading.

4      Mischaracterization of the events.

5                     THE WITNESS:  But we also managed the

6      stormwater on that project using permeable pavement.

7                     Yes.  But we also --

8          Q.     (BY MR. GOUTMAN:)  Is your answer yes, that

9      you were increasing the size of the parking lot to

10     accommodate additional parking capacity.  Correct?

11         A.     Yes.

12         Q.     And you are suing Monsanto for the cost of

13     paving that additional parking capacity.  Correct?

14         A.     I believe that's included in the costs.

15     Yes.

16                                   (Pause in proceedings.)

17                (Deposition Exhibit Number 44 was marked for

18                                   identification.)

19         Q.     I've handed you Exhibit -- is it 45?

20         A.     44.

21         Q.     And this is a document titled "Finch

22     Arboretum Parking Lot Stormwater Sampling, 2014, City

23     of Spokane, Wastewater Management Department."  Is

24     that correct?

25         A.     Yes.  That's correct.

000211

Page 230

1                          MARCIA DAVIS

2          Q.    And on page Bates stamped 8-1-8.

3          A.    8-1-8.  Okay.

4          Q.    Again, this is a City of Spokane document?

5          A.    I am not sure.  Yes, it is.

6          Q.    Okay.  And could you read the last

7    paragraph that the city said on page 8-1-8?

8          A.    "The city received," that part.

9          Q.    Yeah.  Just read that to the end of the

10   paragraph.

11         A.    Okay.  This says, "The city received a

12   grant from ecology to construct a coarse asphalt

13   parking lot at Finch Arboretum.  Course asphalt allows

14   stormwater to filter directly through the asphalt

15   layer to a gravel gallery below before it infiltrates

16   to the soil.  Currently ecology does not allow

17   stormwater treatment credit for this porous asphalt

18   itself, rather relying on the organic matter and

19   cation exchange capacity of the soil below for

20   treatment.  Some evidence suggests that porous

21   pavements" do not provide treatment.

22         Q.    "Do provide treatment."

23         A.    I'm sorry.  Let me re-read that sentence.

24   "Some evidence suggests that porous pavements do

25   provide treatment, but not enough data exists to

000211

Page 231

1                          MARCIA DAVIS

2      substantiate full stormwater credit.  The city is

3      interested in gaining a better understanding of

4      treatment through the porous asphalt layer and will

5      install a monitoring system to collect water quality

6      samples.  Analysis will be performed for a suite of

7      standard BMP performance parameters, including total

8      phosphorus, total petroleum hydrocarbons, total

9      suspended solids, total and dissolved metals,

10     (arsenic, cadmium, chromium, lead, copper, and zinc)."

11          Q.   Now, again, with respect -- and we've seen

12     this before, with respect to the constituents of

13     concern that this project is designed to address, you

14     are going to be ordering tests or analyses to see the

15     extent to which these constituents are captured.

16     Correct?

17                    MR. LAND:  Objection.  Misleading.

18                    THE WITNESS:  We said we listed

19     analysis that would be performed.  Yes.

20          Q.   Yes.  Okay.

21          A.   Yes.

22          Q.   And those constituents of concern that the

23     city listed did not include PCBs.  Correct?

24          A.    In this report it did not, and in that list

25     that we would test.

Page 229

1                          MARCIA DAVIS

2    otherwise needed.  Correct?

3                    MR. LAND:  Objection.  Misleading.

4    Mischaracterization of the events.

5                    THE WITNESS:  But we also managed the

6    stormwater on that project using permeable pavement.

7                    Yes.  But we also --

8        Q.    (BY MR. GOUTMAN:)  Is your answer yes, that

9    you were increasing the size of the parking lot to

10   accommodate additional parking capacity.  Correct?

11       A.    Yes.

12       Q.    And you are suing Monsanto for the cost of

13   paving that additional parking capacity.  Correct?

14       A.    I believe that's included in the costs.

15   Yes.

16                              (Pause in proceedings.)

17            (Deposition Exhibit Number 44 was marked for

18                              identification.)

19       Q.    I've handed you Exhibit -- is it 45?

20       A.    44.

21       Q.    And this is a document titled "Finch

22   Arboretum Parking Lot Stormwater Sampling, 2014, City

23   of Spokane, Wastewater Management Department."  Is

24   that correct?

25       A.    Yes.  That's correct.

Page 230

1                              MARCIA DAVIS

2          Q.    And on page Bates stamped 8-1-8.

3          A.    8-1-8.  Okay.

4          Q.    Again, this is a City of Spokane document?

5          A.    I am not sure.  Yes, it is.

6          Q.    Okay.  And could you read the last

7    paragraph that the city said on page 8-1-8?

8          A.    "The city received," that part.

9          Q.    Yeah.  Just read that to the end of the

10   paragraph.

11         A.    Okay.  This says, "The city received a

12   grant from ecology to construct a coarse asphalt

13   parking lot at Finch Arboretum.  Course asphalt allows

14   stormwater to filter directly through the asphalt

15   layer to a gravel gallery below before it infiltrates

16   to the soil.  Currently ecology does not allow

17   stormwater treatment credit for this porous asphalt

18   itself, rather relying on the organic matter and

19   cation exchange capacity of the soil below for

20   treatment.  Some evidence suggests that porous

21   pavements" do not provide treatment.

22         Q.    "Do provide treatment."

23         A.    I'm sorry.  Let me re-read that sentence.

24   "Some evidence suggests that porous pavements do

25   provide treatment, but not enough data exists to

1                          MARCIA DAVIS

2    substantiate full stormwater credit.  The city is

3    interested in gaining a better understanding of

4    treatment through the porous asphalt layer and will

5    install a monitoring system to collect water quality

6    samples.  Analysis will be performed for a suite of

7    standard BMP performance parameters, including total

8    phosphorus, total petroleum hydrocarbons, total

9    suspended solids, total and dissolved metals,

10   (arsenic, cadmium, chromium, lead, copper, and zinc)."

11       Q.    Now, again, with respect -- and we've seen

12   this before, with respect to the constituents of

13   concern that this project is designed to address, you

14   are going to be ordering tests or analyses to see the

15   extent to which these constituents are captured.

16   Correct?

17                 MR. LAND:  Objection.  Misleading.

18                 THE WITNESS:  We said we listed

19   analysis that would be performed.  Yes.

20       Q.    Yes.  Okay.

21       A.    Yes.

22       Q.    And those constituents of concern that the

23   city listed did not include PCBs.  Correct?

24       A.    In this report it did not, and in that list

25   that we would test.

1                     MARCIA DAVIS

2    lawyer time.

3         Q.   (BY MR. GOUTMAN:)  Okay.  And three million

4    in future costs.  Is that correct?  For the Washington

5    stormwater basin, MS4 basin project.

6         A.   Yes.

7         Q.   Am I correct that you received $1,706,250

8    dollars in grants?

9         A.   Um, that's not what we're showing.  We have

10   not actually received that grant yet.  But --

11                MR. LAND:  Look to Appendix B.

12                THE WITNESS:  Oh, what we have.  Oh,

13   okay.  Monroe Street.  Right.  1.7.

14        Q.   (BY MR. GOUTMAN:)  $1,706,250 in grants?

15        A.   Yes.

16        Q.   And. . .

17                          (Pause in proceedings.)

18        Q.   Am I correct that, unlike some of the other

19   projects that we reviewed, QAPP sampling included in

20   this project involved PCBs in addition to other items.

21   Correct?

22        A.   Yes.  That's part of the integrated plan.

23   Yes.

24        Q.   Okay.  It also included total suspended

25   solids.  Correct?

Page 260

1                          Marcia Davis

2    discharges to the Spokane River and reduce the volume

3    of stormwater to be treated."

4              Did I read that correctly?

5         A.  Yes.

6         Q.  Does that refresh your recollection as to the

7    purpose of why the City of Spokane undertook the

8    Broadway SURGE program?

9         A.  Yes.  It looks like we did this for CSO

10   compliance.

11        Q.  And you didn't do it for PCBs, correct?

12        A.  It doesn't look like we did it for PCBs.

13        Q.  I want to go back to page -- the introduction

14   page of this document and the second -- well, I guess

15   the very first sentence on this page:  "West Broadway

16   is the first project chosen for the Spokane Urban

17   Runoff Greenway Experiment (SURGE)."  Okay?

18        A.  Yes.

19        Q.  Were there other projects that were SURGE

20   projects?

21        A.  There was one other project that was a SURGE

22   project.

23        Q.  And which was that?

24        A.  It was the Lincoln, Lincoln SURGE, which --

25        Q.  And -- I'm sorry.  Go ahead.  I didn't mean to

000218

Page 263

1                    Marcia Davis

2         A.   Yes.

3         Q.   -- the document reads -- the first sentence of

4    that first paragraph under 6.2:  "As discussed in

5    Chapter 4, GI" -- and do you understand "GI" to be

6    green infrastructure?

7         A.   Yes.   In this context, it is, yes.

8         Q.   "As discussed in Chapter 4, GI to intercept

9    stormwater runoff before it ends up in the combined

10   sewer system is a key component of the City's efforts

11   to achieve long-term compliance with CSO performance

12   measure" -- "with the CSO performance measure."

13             Did I read that correctly?

14        A.   Yes.

15        Q.   And do you agree with that?

16        A.   Yes.

17        Q.   Now, if we switch to -- so to the extent this

18   document is referencing green infrastructure, it's

19   referring to, for example, the BMPs that were used in

20   the West Broadway SURGE Project, correct?

21        A.   Ones that were similar to that and other BMPS.

22   Other ones were green infrastructure.

23        Q.   And what are some of the other green

24   infrastructure BMPs that this is referring to?

25        A.   They're all bioretention systems.   They're

1                     Marcia Davis

2        A.  Yes.

3        Q.  And the last sentence in that paragraph reads:

4    "Although the proposed CSO reduction projects are

5    expected to control uncontrolled CSO outfalls, the

6    future is uncertain.  And the City needs to plan for

7    how to identify when additional CSO reduction projects

8    are needed and what those new projects would be."

9             Did I read that correctly?

10       A.  What those new projects could be, yes.

11       Q.  Oh, I guess, I didn't read it correctly.

12       A.  Yes, that's correct.

13       Q.  Thank you.

14            So on the next page, the second paragraph

15   down, it identifies -- the sentence reads:  "The City

16   has prepared a variety of 'safety outs' that can be

17   implemented if future flow monitoring data indicate

18   that a CSO outfall remains out of compliance with the

19   CSO performance measure."

20            Correct?

21       A.  Yes.

22       Q.  And one of those "safety outs" is to implement

23   green infrastructure where feasible to reduce the

24   volume of stormwater runoffs sent to the combined sewer

25   system and, ultimately, to Riverside Park Waste Water

000220

Page 272

1                           Marcia Davis

2    Recycling Facility, the RPWRF, correct?

3         A.  Yes.  It's one of those -- one of the

4    alternatives.

5         Q.  And with respect to green infrastructure, if

6    you go to the bottom of this page, 6- -- Section 6.2.1,

7    Implementing Green Infrastructure with Other

8    Infrastructure Projects, in the middle of this

9    paragraph, there's a sentence that reads:  "During the

10   alternative evaluation phase, it was determined that

11   implementing green infrastructure, or GI, solely for

12   the purpose of CSO production is not cost-effective

13   when compared with storage and conveyance facilities.

14        However, if GI can be implemented jointly with

15   other infrastructure improvements, as integrated

16   infrastructure strategy, such as road repaving, water

17   main replacements, and other improvements within the

18   right of way, the incremental costs of implementing

19   green infrastructure can be reduced while producing

20   additional CSO benefits."

21        Did I read that correctly?

22        A.  Yes.

23        Q.  And that's, in fact, what the City has done,

24   right?  They've adopted that process of adding green

25   infrastructure to roadway projects, correct?

000220