000322

# EXHIBIT 7

000322

Page 1

1                  UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF WASHINGTON

3     CITY OF SPOKANE, a municipal          )

4     corporation, located in the          )

5     County of Spokane, State of          )

6     Washington,                          )

7                                          )

8                    Plaintiff,            )

9                                          )

10          vs.                            ) Case No.

11                                         ) 15-cv-00201-SMJ

12    MONSANTO COMPANY, SOLUTIA INC.,      )

13    and PHARMACIA CORPORATION, and       )

14    DOES 1 through 100,                  )

15                                         )

16                    Defendants.          )

17    _____)

18                    **  REVISED  **

19           VIDEO DEPOSITION OF JOEL BOWDAN, III

20                  NOVEMBER 14, 2019

21                  SAN DIEGO, CALIFORNIA

22

23    Reported by:

24    Cynthia J. Vega, RMR, RDR, CSR 6640, CCRR 95

25    Job No.  171797

Page 35

1    CSOs to the river.  The specifics with regard to the

2    ultimate agreement between the State and the City to

3    reduce to, on average, not more than one overflow per

4    CSO outfall over a 20-year running average was adopted,

5    if I recall correctly, sometime -- I want to say late

6    '90s, early 2000s was probably the more appropriate time

7    frame.

8        Q.    Okay.

9        A.    My understanding is that the earlier

10   requirements to begin reducing CSOs did not yet have

11   that provision in it.

12       Q.    Okay.  So with that correction to the timing,

13   you agree with my question?  Having made that correction

14   to the timing, you agree with my question; correct?

15       A.    Having made that correction and ultimately

16   having the requirement to reduce CSOs to not more than

17   one overflow per outfall per year on a 20-year average,

18   that would then be correct.

19       Q.    And isn't it true that even to this day, the

20   City has not been able to meet that obligation with

21   respect to all of the CSO outfalls?

22       A.    With respect to all of the outfalls as it

23   stands today, that question would be -- the answer would

24   be yes.  However, the City has been making progress as

25   it is going through the implementation of its CSO

Page 36

1  minimization program.  And so there are CSOs that now

2  today meet that requirement.  And the expectation is

3  that when the current project is complete and all the

4  work on the CSOs have been completed that the City will

5  then come into compliance with that requirement.  So

6  it's in process.

7      Q.   I understand.  But my question was:  As of

8  today, there is a large majority of those CSO outfalls

9  where the City does not meet compliance with respect to

10  that overflow limitation; correct?

11         MR. LAND:  Objection.  Mischaracterization of

12  his prior question, I guess.  Misrepresentation.

13         But you can answer.

14         THE WITNESS:  Okay.  You used the term a large

15  number, which is vague.  As it stands today, my

16  recollection is that the number has been whittled down

17  to just a relative few of the outfalls.  There is as of

18  today, I believe, only three or four CSO projects that

19  remain that are not yet complete, so out of the 19 or 20

20  CSOs.  So the characterization of the large number would

21  be incorrect.

22  BY MR. HAASE:

23      Q.   What is your best estimate as to the number of

24  CSO outfalls that are still in violation of that one

25  incident requirement?

Page 37

1      A.    My understanding would be that as of today,

2    that number would be about four -- somewhere between

3    four to six at most.

4      Q.    Okay.  So even today there are, by your

5    estimation, from four to six CSO outfalls that are

6    overflowing more than once on a 20-year annualized

7    basis; correct?

8            MR. LAND:  Objection.  Mischaracterization of

9    prior testimony.

10           Go ahead.

11           THE WITNESS:  As of today, my estimation would

12   be that there's about four to six outfalls where the

13   work has not yet been completed that, if they were to

14   overflow today or over the course of this year up to

15   this point, may or may not meet the requirement of

16   reducing overflows to one per year on a 20-year average

17   basis.

18   BY MR. HAASE:

19     Q.    Okay.  And you would agree that the problem

20   with that is then those non-PCB constituents that we

21   discussed earlier -- the phosphorous, the fecal

22   coliform, the BOD, the metals -- are directed

23   immediately into the Spokane River; correct?

24     A.    If those CSOs overflow at this present time,

25   those overflows that -- would occur.

1    not require the approval of the EPA.  So states can set

2    lower requirements on their own.  States have that

3    autonomy to do that.

4           What they cannot do is they cannot set a limit

5    that is higher than what the federal requires.  So the

6    federal sets the baseline, and then each state has the

7    ability to set their own lower requirements apart.  So

8    they can go lower, but they cannot go higher.

9        Q.   You understand that the City of Spokane

10   vehemently objected to the 7 ppq PCB water quality

11   standard; correct?

12       A.   I am aware of that.

13       Q.   Okay.  And, in fact, the mayor of Spokane,

14   Mayor Condon, wrote letters to the Washington State

15   Department of Ecology and to the EPA itself objecting to

16   the application of the 7 ppq PCB water quality standard;

17   correct?

18       A.   I'm not aware of that specific.  I'm only aware

19   of generalities that the City did originally object to

20   the 7 when the 7 was initially proposed by the EPA in

21   earlier correspondence.

22       Q.   And are you aware that the City objected for

23   several reasons, first and foremost, that it was

24   technologically infeasible to even achieve the 7 ppq PCB

25   water quality standard; correct?

000328

Page 82

1        A.    Yes, correct.

2        Q.    And you would agree with that; correct?

3        A.    I would agree with that, yes, based on current

4    available technology.

5        Q.    Right.

6        A.    I actually opine on that in portions of my

7    opinion.

8        Q.    Right.  And just so the record is clear, you

9    would agree that the City raised that as an objection,

10   and separately you, in your capacity in wastewater

11   treatment, agree that it -- with the City's position

12   that it is technologically infeasible to even achieve

13   that 7 ppq standard; correct?

14       A.    I need to pare my response a bit.  You used the

15   term "technologically infeasible."  There are potential

16   technologies that may be available.

17       Q.    Okay.  I'm not talking about potential

18   technologies.

19       A.    But I'm just saying, because you made it a very

20   blanket or a very hard statement, so I just want to make

21   sure that I'm answering.

22       Q.    I'm talking about currently today.  I'm not

23   talking about -- I mean, there are potential

24   technologies out there that could rocket all six of us

25   to Pluto and back in a day.  I'm not talking about those

000328

000329

Page 83

1    potential technologies.  I'm talking about --

2         A.    Neither am I.

3         Q.    Okay.  Okay.

4         A.    So just to set the record straight.

5         Q.    As of today, you agree that it is

6    technologically infeasible to even achieve a 7 ppq PCB

7    water quality standard; correct?

8         A.    I would say that as of today, technologies that

9    are available have not been proven at this project

10   scale.

11        Q.    Okay.

12        A.    That would be my response to that.  So not that

13   it's technologically infeasible, but that at this scale

14   it has not yet been proven to be able to get down to

15   that level consistently.

16        Q.    Okay.  And didn't the City also object to the

17   7 ppq PCB water quality standard on the basis that there

18   was no evidence that the -- that that standard will

19   provide an increased health benefit for its citizens?

20        A.    I can't answer to that.

21        Q.    Okay.  You'll be able to in a moment.

22              I'm going to mark this next document as

23   Exhibit 8.

24              (Exhibit 8 was marked for identification.)

25   ///

000329

000330

Page 88

1   human health criteria or water quality standard for PCBs

2   is set forth in Chapter 173-101A of the Washington

3   Administrative Code; correct?

4        A.   So as you mentioned that specific portion, I

5   don't know if that has currently been modified to the 7.

6        Q.   Okay.  So you don't know whether that portion

7   of the Washington Administrative Code currently reflects

8   7 ppq or 170 ppq; correct?

9        A.   That is correct.

10       Q.   And at the time that you issued your report in

11  this case, you did not know whether that particular

12  section of the Washington Administrative Code set forth

13  a standard of 7 ppq or 170 ppq; correct?

14            MR. LAND:  Objection.  Misleading.

15            Go ahead.

16            THE WITNESS:  As it relates to that specific

17  section of that code --

18  BY MR. HAASE:

19       Q.   That's what I'm asking.

20       A.   Right.  You're asking that specific --

21       Q.   Yes.

22       A.   No, I did not.

23       Q.   Okay.  And you would agree that if the

24  applicable PCB water quality standard for the Spokane

25  River was 170 ppq instead of 7 ppq, that would change

Page 89

1    Dr. Trapp's calculation of the target in-stream PCB load

2    at Nine Mile monitoring location; correct?

3         A.    I would agree it would change that calculation.

4         Q.    Okay.

5         A.    Because it would be a different basis for it.

6    Yes.

7         Q.    Right.  So -- and that's -- you've already said

8    and your report indicates that you've relied on

9    Dr. Trapp's calculation of that target in-stream PCB

10   load based on a human health criteria or PCB water

11   quality standard of 7 ppq; correct?

12        A.    That's correct.

13        Q.    Okay.  And doing a little bit of math, in order

14   to determine how that target in-stream PCB load would be

15   changed, you have to -- you would divide 170 ppq by the

16   7 ppq; correct?  And I will allow you to use a

17   calculator or, you know, sheet of paper if you want as

18   we go here.  But you would --

19             MR. LAND:  You can use a calculator if you

20   need.

21   BY MR. HAASE:

22        Q.    Sure.

23        A.    Go ahead.

24        Q.    Okay.  So you would basically determine that

25   the 170 ppq water quality standard is 24.3 times higher

Page 92

1    significant source of PCBs to the Spokane River

2    contributing to the impairments of the beneficial uses

3    in the river; is that correct?

4        A.   Yes.  I would say I wouldn't use the term

5    "significant."

6        Q.   Okay.  But yes or no to my question:  Is that

7    fair to say?

8        A.   Yes.  In terms of my correction, I would not

9    use that term "significant" to describe that.

10       Q.   Okay.  But if you're not using the term

11   "significant," you would also agree that it is not then

12   contributing to the impairment to the beneficial uses in

13   the river; correct?

14       A.   That's not what I'm saying.

15            MR. LAND:  Objection.

16            THE WITNESS:  I wanted to make sure that's

17   clear that's not what I'm saying.  It doesn't mean it's

18   not contributing to the impairment of the river, but

19   that the term that I would use, I would probably not use

20   "significant."

21   BY MR. HAASE:

22       Q.   Okay.  So you're saying that it's not

23   contributing in a significant way; correct?

24       A.   I would say that -- yes, that would be fair to

25   say.

000333

Page 99

1    BY MR. HAASE:

2        Q.   Okay.  And you have not done that analysis;

3    correct?

4        A.   I have looked at those values before related to

5    the analysis I performed, but, again, I'm going off

6    memory at this point.  I wouldn't be able to, I think,

7    provide you with a answer relative to your question.

8        Q.   So you looked at it in conjunction with the

9    percentages that you came up with of 31.5 percent plus

10   68 percent from the CSOs and the Riverside Park

11   Facility, and you determined that, in your opinion,

12   those were significant sources when combined together to

13   represent 99.5 percent, but you are not prepared today

14   to tell me whether you would consider 2.8 percent to be

15   a significant source of PCBs to the river?  That's what

16   you're telling me under oath here today; correct?

17       A.   That's what I'm saying, yes.

18       Q.   Okay.

19       A.   Okay.

20            MR. LAND:  We should probably take lunch in the

21   next 15 or so.

22            MR. HAASE:  That's fine.

23   BY MR. HAASE:

24       Q.   You're aware, Mr. Bowdan, that the Spokane

25   River currently meets a 170 ppq PCB water quality

000333

000334

Page 100

1    standard; correct?

2         MR. LAND:  Objection.  Mischaracterization of

3    the evidence.

4         Go ahead.

5         THE WITNESS:  I'm going to say that I am not

6    aware that it currently meets that, based on the current

7    loadings.  I'm sure some of the other --

8    BY MR. HAASE:

9         Q.   Okay.

10        A.   -- expert opinions might be able to qualify

11   that.

12        Q.   We will mark -- sure.  We'll mark -- I believe

13   you told me that you read the Mike Coster deposition;

14   correct?

15        A.   Yes, I did read it.

16        MR. HAASE:  We'll mark this as Exhibit 8.

17        THE REPORTER:  9.

18        MR. HAASE:  9.  Thank you.

19        (Exhibit 9 was marked for identification.)

20   BY MR. HAASE:

21        Q.   Okay.  If you'll turn to page 24, lines 2

22   through 8.  Actually, you'll see on page 22 that we

23   are -- I'm reviewing with Mr. Coster the 2016

24   comprehensive plan to reduce PCBs in the Spokane River,

25   which we marked as Coster Exhibit 1.  Do you see that

000334

1    reference?

2        A.   Yes, I do see the reference, line 10 on

3    page 22.

4        Q.   Right.  And then over on page 23, line 4, it

5    starts -- he goes -- we go to page 10, section 2.4.3,

6    and we talk about sampling events conducted by the

7    Spokane River Regional Toxic Task Force in 2014, 2015,

8    and through June of 2016.  Do you see that?

9        A.   Yes.

10       Q.   Okay.  And then we are discussing the results

11   as reported in table 1 over on page 11 of that document.

12   And you'll see at the top of 24, page 24, there's a

13   quote, "Average concentrations at all stations show

14   compliance with the current Washington State water

15   quality standard of 170 ppq."

16           And you will see -- rather than going with

17   Coster's testimony, I'm going to mark as Exhibit 10 the

18   comprehensive plan that we are referring to in the

19   Coster deposition.

20           (Exhibit 10 was marked for identification.)

21   BY MR. HAASE:

22       Q.   All right.  And if you will -- I've handed you

23   this 2016 comprehensive plan to reduce PCBs in the

24   Spokane River produced by LimnoTech at the request of

25   the Spokane River Regional Toxic Task Force; correct?

000336

Page 102

1      A.   Correct.

2      Q.   It indicates that the plan was accepted by the

3   task force November 16, 2016; correct?

4      A.   Correct.

5      Q.   All right.  So we'll go to page 10.  And you'll

6   see in the first sentence under 2.4.3, "Current River

7   Status," that table 1 provides a summary of the ambient

8   surface water PCB concentration data collected from 2014

9   to 2016; correct?

10      A.   I'm sorry.  Where are you at again?

11      Q.   Right here.

12      A.   Okay.  Yes.

13      Q.   Okay.  And you will agree that over on table 1

14   that the average concentrations at all stations show

15   compliant with the Washington State water quality

16   standard of 170 ppq; correct?

17      A.   Okay.  Which -- let's see here.  Okay.  I can

18   see that the values vary, but they appear to be dropping

19   at all of the station locations as we proceed from 2014

20   through 2016.  So in direct answer to your question,

21   there are several sites that in 2014 --

22      Q.   Let me just cut to the chase, because there's

23   an actual sentence in this document.  If you go back to

24   the previous page, on page 10, towards the bottom of

25   this paragraph, does it not say "Average concentrations

000337

Page 103

1    at all stations show compliance with the current

2    Washington State Water Quality Standard of 170 picograms

3    per liter"?  Did I read that correctly?

4        A.   It does say that.

5        Q.   Okay.  And if you will turn to the Lars Hendron

6    deposition that we have previously marked, and if you'll

7    turn to page 304, lines 3 through 10:

8             "Question:  So once again in -- as of

9    February 20, 2019, the Spokane River PCB concentrations

10   are less than 170 ppq; correct?"

11            Mr. Hendron's answer on behalf of the City:

12   "Based on these citations, yes."

13            Next question:  "Are you aware of any test data

14   that would suggest that the average concentrations are

15   greater than 170?"

16            His answer:  "No."

17            Did I read that correctly?

18       A.   Yes, you did.

19       Q.   Okay.  And you don't have any reason to

20   disagree with that; correct?

21       A.   I do not, based upon his response to the

22   question and the date --

23       Q.   Okay.

24       A.   -- noted in the question.

25       Q.   All right.  Thank you.

000337

000338

Page 104

1          And you'll note on the first page of the

2     deposition transcript that he offered testimony on

3     June 7, 2019; correct?

4          A.   Yes, that is correct.

5          Q.   So as of June 7, 2019, Mr. Hendron was not

6     aware on behalf of the City of any test data above the

7     170 ppq water quality standard; correct?

8          A.   That is correct.

9          MR. HAASE:  Okay.  Okay.  I think this would be

10    a good spot for a break.

11          MR. LAND:  Sounds good.

12          THE VIDEOGRAPHER:  This is the end of media

13    number 2.  The time is 12:29 p.m.  We are now off the

14    record.

15          (Lunch recess, 12:29 p.m.)

16

17

18

19

20

21

22

23

24

25

000338

Page 105

1                    SAN DIEGO, CALIFORNIA

2              THURSDAY, NOVEMBER 14, 2019, 1:39 P.M.

3

4              THE VIDEOGRAPHER:  This is the beginning of

5    media number 3 in the deposition of Joel Bowdan, III.

6    Time is 1:39 p.m.  We are back on the record.

7    BY MR. HAASE:

8         Q.   All right.  Mr. Bowdan, you would agree that

9    PCBs are not the subject of any Spokane River TMDLs;

10   correct?

11        A.   That is correct.

12        Q.   But Spokane River TMDLs do, in fact, exist with

13   respect to DO, BOD, ammonia, various metals like zinc

14   and cadmium; correct?

15        A.   I know that the TMDLs include dissolved oxygen,

16   BOD, and also phosphorous, so I can't confirm whether

17   metals are part of that.

18        Q.   And ammonia as well; correct?

19        A.   Ammonia as well, yes.  Ammonia as well.

20        Q.   And will you also confirm for me that there are

21   no numerical PCB discharge limits that apply to the

22   Riverside Park Facility; correct?

23             MR. LAND:  Objection.  Vague and misleading.

24             You can answer.

25             THE WITNESS:  The current plant permit has been

000340

Page 116

1     facility; correct?

2          "Answer:  Yes."

3          You'll agree that that's the sworn testimony

4     that Lars Hendron offered on behalf of the City with

5     respect to construction of the CSO projects and the NLT

6     project; correct?

7     A.   Yes.

8     Q.   Okay.  And I believe you've already agreed that

9     the City is not subject to any quantitative or numerical

10    limit with respect to the discharge of PCBs into the

11    Spokane River; correct?

12    A.   With regard to their current permit that is in

13    place, that would be correct.

14    Q.   And with respect to any TMDLs; correct?

15    A.   Yes.  With respect to the -- with the river

16    dissolved oxygen TMDL, that would be correct.

17    Q.   Okay.  So there's no legal requirement that

18    treated effluent must be below 7 ppq; correct?

19    A.   At this present moment, there's no requirement

20    that the effluent at the plant meet that requirement at

21    this very moment.

22    Q.   Okay.  And that's not just at this very moment,

23    but when you issued your opinions in this case in your

24    report dated October 11, 2019; correct?

25    A.   Yes.

000340

Page 117

1      Q.   And similarly, there is no standard that

2  requires CSO discharges to be below 7 ppq; correct?

3      A.   In terms of PCB?

4      Q.   That's what I meant.  I'm sorry.  That

5  require -- let me rephrase.

6           You'd agree that there is no legal standard

7  requiring CSO PCB discharges to be below 7 ppq; correct?

8      A.   At the moment, specific to the discharge

9  itself, no.

10     Q.   When I say that's correct and you say no, it

11 sounds on the transcript like you're saying that's not

12 correct.  So I'm going to do it --

13     A.   Okay.

14     Q.   -- one more time.  And I don't think you need

15 the qualification that you added, because that's the

16 question I asked.

17          Isn't it true that there is no legal standard

18 that requires CSO PCB discharges to be below 7 ppq?

19 Isn't that true?

20     A.   At the moment, yes.

21     Q.   And that was also true when you issued your

22 opinions in this case in your October 11, 2019, report;

23 correct?

24     A.   Current as of the time of the opinion, that

25 would be correct.

Page 118

1      Q.   Okay.  So that was true in October when you

2  formed and issued your opinions, and it's still true

3  today; correct?

4      A.   Let me clarify that the limits that we're

5  talking about, those are pending.  So as it relates to

6  the specific discharge from the RP -- WRP and the CSOs,

7  that is correct.  As I've mentioned, the limits are not

8  there.

9      Q.   Okay.  There's no clarification necessary.  If

10  you listen to my question, I asked you to confirm that

11  both today and at the time you issued your report

12  opinions to please confirm that it is, in fact, true

13  that there was and is no legal standard requiring CSO

14  PCB discharges to be below 7 ppq.  That's correct?

15      MR. LAND:  Objection.  Asked and answered.

16  BY MR. HAASE:

17      Q.   Right?

18      A.   That would be true based on -- yes.

19      Q.   Yes.  Okay.  That's --

20      A.   I just wanted to make sure I'm clearly

21  understanding the question, which I believe I do.

22      Q.   Okay.  Great.  Well, then you've answered it,

23  and now we can move on.

24      And isn't it true that the City's CSO storage

25  tanks in the MS4 basins were planned before any PCBs

000343

Page 123

1            So with that understanding of the units being

2    listed in micrograms per liter, can you tell me what the

3    listing is for the human health criteria for PCBs

4    reflected in the Washington Administrative Code as of

5    today?

6         A.   That would be equivalent to the 170 picograms

7    per liter.

8         Q.   Okay.  And so you will agree that the

9    7 picograms per liter human health criteria that was the

10   basis for your calculations and underlying your opinions

11   in this case differs from the 170 picograms per liter

12   figure reflected in the Washington State Administrative

13   Code for PCB human health criteria; yes or no?

14        A.   Yes.  Based upon what's shown here, that would

15   be -- rephrase that again.  I want to make sure that I

16   answer this correctly.

17        Q.   Will you please confirm for me, having looked

18   at the Washington Administrative Code provision that I

19   have provided to you, that the calculations underlying

20   your opinions in this case are based on a human health

21   criteria of 7 ppq, or picograms per liter, which is

22   different from the actual human health criteria of

23   170 picograms per liter, or ppq, reflected in the

24   Washington Administrative Code for PCBs; correct?

25        A.   That would be correct, based upon what I'm

000343

Page 124

1    seeing here.

2        Q.    Okay.  And that is also true with respect to

3    Dr. Trapp's calculations, who also relied on the 7 ppq

4    human health criteria; correct?

5        A.    I'll let Dr. Trapp answer that question with

6    regard to his calculation of that and what he used.

7        Q.    Well, you, in fact, reference his calculations

8    throughout your report as incorporated into your

9    opinions; correct?

10       A.    Yes, I did.

11       Q.    Okay.  Well, on that basis then, I would like

12   you to confirm for me that Dr. Trapp, in fact, used a

13   7 ppq, or picograms per liter, human health criteria

14   that is different from what is reflected in the

15   Washington Administrative Code for PCBs, which is

16   170 picograms per liter; correct?

17           MR. LAND:  Objection.  Vague.

18           THE WITNESS:  So his calculations that I

19   utilized that are in my opinion were based on the

20   7 picograms per liter, or ppq.

21   BY MR. HAASE:

22       Q.    Okay.  And that's -- you agree that that's

23   different from what the Washington Administrative Code

24   sets forth; correct?

25       A.    In this instance, yes.  What I'm reading here,

Page 125

1    that would be different, yes.

2        Q.   And you never consulted the Washington

3    Administrative Code for the PCB human health criteria

4    levels before issuing your -- before making your

5    calculations and issuing your opinions based on those

6    calculations; correct?

7        A.   I know that I researched the -- researched this

8    document, because it was referenced.  However, because

9    of the -- as I mentioned before, the pending case with

10   the requirement of the 7 and then the withdrawal from

11   the EPA and the current State of Washington's position

12   that the health and human criteria is 7, I utilized

13   the 7.  So I'm answering this question in the form of a

14   clarification based upon my understanding of why I used

15   the 7.

16       Q.   Well, the Washington -- okay.  So are you

17   saying -- are you now saying -- I thought you -- you

18   testified earlier that you hadn't looked at this

19   specific portion of the code for that number.

20       A.   So what I'm saying -- what I specifically said

21   then is I could not confirm to you that I had -- you

22   listed the number.  I didn't remember or recall the

23   number off of my head with regard to this code.  So what

24   I am saying to you is that I have seen this.  I did

25   research this document.

000346

Page 126

1      Q.    Okay.

2      A.    But I could not recall it.

3      Q.    And having seen this, you decided -- yes or no.

4   You decided not to base your calculations and therefore

5   your opinions on the actual human health criteria set

6   forth in the Washington Administrative Code for PCBs;

7   correct?

8      A.    That would be correct, based on the explanation

9   that I just provided to you a moment ago.

10     Q.    All right.

11     A.    Okay.

12     Q.    You'd agree with me that if, in fact, the

13  Washington State human health criteria for PCBs is 170,

14  your calculations as to the percentages of PCB loadings

15  representing the necessary load to achieve that human

16  health criteria would be unreliable; correct?

17          MR. LAND:  Objection.  Vague.  And misleading.

18          Go ahead.

19          THE WITNESS:  I would say that my opinion,

20  again, was based on the target load calculation at

21  Nine Mile, which was based on the human health criteria

22  of the 7.  And so if, indeed, it is determined that we

23  needed to make adjustment to utilize the 170 as the

24  criteria, it's a matter of recalculation.  So --

25  ///

Page 127

1    BY MR. HAASE:

2        Q.   But if that was --

3            MR. LAND:  Wait one second.  I don't think he's

4    finished.  Let him finish his answer.

5            THE WITNESS:  So as a result of that, the

6    characterization of unreliable, I think, is a question.

7    So that's what I'm questioning right now.

8    BY MR. HAASE:

9        Q.   Okay.  But it's -- you would need to

10   recalculate, because your current calculations based on

11   the 7 ppq would be unreliable.  That was my point;

12   correct?

13       A.   But I'm not saying it is unreliable.

14       Q.   Your math is correct if the human health

15   criteria is 7 ppq.  That's -- I'm not suggesting

16   otherwise.

17       A.   Okay.

18       Q.   What I'm suggesting is you used those -- you

19   made calculations and came up with percentages of

20   loadings against the human health criteria, and if, in

21   fact, the applicable human health criteria is 170 ppq

22   instead of 7 ppq, the existing calculations in your

23   report would be considered unreliable with respect to

24   the 170 ppq; correct?

25           MR. LAND:  Again, objection.  Vague and

000348

Page 128

1    misleading.

2           THE WITNESS:  The calculation only as it

3    relates to the calculation of the percentage of the

4    target.  Beyond that, the calculations are still

5    reliable.  The calculations are still the calculations.

6    BY MR. HAASE:

7           Q.   Right.  But --

8           A.   But it's specific -- so the answer to your

9    question is that I would need to recalculate the

10   percentage based upon the new human health criteria at

11   170 rather than at the 7, but that doesn't affect the

12   remainder of the calculations in the opinion.  There are

13   lots of calculations in here so -- that are still true

14   and that still result ultimately in the outcomes outside

15   of this percentage calculation.  This percentage

16   calculation would need to be recalculated.

17          Q.   And you would agree that any opinion that you

18   have authored in this report that relies in any part on

19   a human health criteria of 7 ppq would, in fact, be

20   unreliable if the human health criteria to be applied is

21   170 ppq; correct?

22          MR. LAND:  Objection.  Vague.

23   BY MR. HAASE:

24          Q.   In that circumstance; correct?

25          MR. LAND:  Objection.  Vague.  Misleading.

000348

Page 129

1          You can answer.

2          THE WITNESS:  Again, only as it relates to the

3   percentage calculation.  You're characterizing

4   calculations throughout the opinion, and many of those

5   calculations do not need the 7 ppq requirement.  But as

6   it relates to the percentage calculation, that would be

7   correct.

8   BY MR. HAASE:

9      Q.   If the applicable human health criteria is

10  170 ppq and you have issued an opinion that relies in

11  part on 7 ppq as the applicable human health criteria,

12  wouldn't you agree that that opinion, to the extent it

13  relies on 7 ppq instead of 170 ppq, would, in fact, be

14  unreliable?

15          MR. LAND:  Objection.  Vague.  Misleading.  And

16  incomplete hypothetical.

17          THE WITNESS:  So, again, my answer will be with

18  regard to the 7 ppq versus the 170, the percentage

19  calculations performed in comparing and providing the

20  comparison of the load from these facilities to the

21  ultimate or the total in-stream load, those calculations

22  would need to be recalculated in light of the 170.  The

23  remaining calculations remain as they are.

24  BY MR. HAASE:

25     Q.   You'd agree that the NLT system is not legally

000350

Page 146

1          Go ahead.

2          THE WITNESS:  Certainly it would be a good

3    thing to remove --

4    BY MR. HAASE:

5        Q.   Right.

6        A.   -- additional contaminants.

7        Q.   And total suspended solids, are they subject to

8    TMDL permit requirements, permit allowances?

9        A.   I'm sorry.  Was that --

10       Q.   Total suspended solids?

11       A.   Is it a part?

12       Q.   Yes.

13       A.   Okay.  That was the question?  Yes.

14       Q.   Okay.  So, therefore, removing an additional

15   330,900 pounds per year of total suspended solids during

16   those additional four months of NLT operation has to be

17   considered a desirable objective for the City; correct?

18          MR. LAND:  Objection.  Vague.  Incomplete

19   hypothetical.

20          Go ahead.

21          THE WITNESS:  Sure.  It would be considered

22   desirable.

23   BY MR. HAASE:

24       Q.   Okay.  And that would also be true for removing

25   an additional 426 pounds of total zinc by operating NLT

000351

Page 148

1       A.    That is correct, as it relates to wastewater.

2       Q.    Okay.  And can you name one municipal

3    wastewater plant that shuts down a tertiary membrane

4    filtration system for as long as four months?

5       A.    I cannot.

6       Q.    Okay.  Can you name one municipal wastewater

7    membrane filtration system that has been specifically

8    designed and engineered as its primary focus to capture

9    PCBs as opposed to some other constituent like

10   phosphorus?

11           MR. LAND:  Objection.  Misleading.

12           You can answer.

13           THE WITNESS:  I will answer that question.  My

14   former firm that I worked with, there is a plant in

15   Bay City, Michigan, that uses membrane -- well, let

16   me strike that.

17           It uses a media-based filtration process for

18   removing PCBs.

19   BY MR. HAASE:

20      Q.    That's different from --

21      A.    It's slightly different --

22      Q.    Okay.

23      A.    -- but it's a filtration process.  But it is

24   slightly different.

25      Q.    Right.  It's not a membrane filtration process?

Page 150

1          MR. HAASE:  Okay.  And we will mark that as

2     Exhibit 15.

3          (Exhibit 15 was marked for identification.)

4     BY MR. HAASE:

5     Q.   What I've handed you is Pall Corporation's

6     microfiltration system operation and maintenance manual

7     for the City of Spokane wastewater management, and the

8     document issuance date was August 2017; is that correct?

9     A.   Yes, it is.

10    Q.   Okay.  And turning to page 104, please, of the

11    manual.  At the very top, do you see that it reads,

12    under category 5.3 "Short, Mid & Long Term Shutdown and

13    System Lay-Up"?

14    A.   Uh-huh.

15    Q.   "A short-term shutdown is a system shutdown

16    that lasts for less than 16 hours.  A mid-term shutdown

17    is a system shutdown that lasts for 16 to 72 hours.  A

18    long-term shutdown is greater than 72 hours.  Pall

19    Corporation recommends avoiding system shutdowns if

20    possible."  Did I read that correctly?

21    A.   Yes, you did.

22    Q.   Okay.  And are you familiar enough with

23    membrane systems to tell me why Pall Corporation would

24    recommend avoiding system shutdowns if possible?

25    A.   Yes, I'm familiar enough with membrane

1   technology.  They are very similar in this regard.

2   Membranes as a whole and on a general -- just from a

3   general level like to be run rather than not run or have

4   periods of shutdown.  Does not eliminate the ability to

5   shut down, but just their general operation character

6   that they like to be run.

7        Q.   Okay.  And is that -- running it, does that

8   help promote longevity of the membranes, that type of

9   thing?

10       A.   It's --

11       Q.   Why do they like to be run?

12       A.   That's difficult to say with regard to the

13   longevity aspect.  When membranes are shut down, there

14   are specific requirements to prevent things like

15   biological growth that could occur.  So there's some

16   maintenance that's required.  So in the cases where

17   shutdown is not necessary, the preference is to keep

18   membranes running so that that way cycles of cleaning,

19   so on and so forth, continue to happen.

20       Q.   Okay.  When you say when shutdown is not

21   necessary, what are the circumstances where shutdown

22   would be necessary?  For example, for a repair or a

23   mandatory cleaning?

24       A.   Repair, cleanings, cases where membranes are

25   sized so that you have units on standby.  You don't need

1   to run all the units consistently at the time, so there

2   are periods of time where those units are shut down.  So

3   it's implementation-specific.  It's just based on the

4   nature of what's needed at a particular plant site in

5   terms of when to run or if there's a reason why not to

6   run a membrane system.

7       Q.   Okay.  And for this particular plant system,

8   are you familiar enough with this membrane technology as

9   confirmed in the Pall operation manual that it is best

10  to avoid shutting down the system if possible; correct?

11      A.   Yes.  Based upon my prior response and

12  knowledge of membranes, if you can keep them running,

13  they tend to run better and you minimize the cleaning

14  aspect of those.

15      Q.   Okay.  Because when you shut down a membrane

16  system for as long as four months, there is a very real

17  danger of biological growth in the membranes, fouling

18  the membranes and ruining the membranes; correct?

19      A.   That would be the case if the specific shutdown

20  and cleaning requirements aren't followed during those

21  long-term periods of shutdown.

22      Q.   Right.  And that -- those protocols are

23  detailed and important in terms of perhaps a chlorine

24  soak, some type of a -- you know, soaking the membranes

25  in some type of a chlorine bath to make sure that there