Page 1

1          UNITED STATES DISTRICT COURT
2          EASTERN DISTRICT OF WASHINGTON
3
4    CITY OF SPOKANE, a              )
     municipal corporation,         )
5    located in the County of       )
     Spokane, State of              )
6    Washington,                    ) No.: 2:15-cv-00201-0
                                    )
7              Plaintiff,           )
                                    )
8      vs.                          )
                                    )
9    MONSANTO COMPANY,              )
     SOLUTIA, INC., and            )
10   PHARMACIA CORPORATION          )
     and DOES 1 through 100,       )
11                                  )
              Defendants.           )
12   _____ )
13
14
             30(B)(6) VIDEOTAPED DEPOSITION
15                      OF
                   MARCIA DAVIS
16
                   VOLUME I
17
         Taken at the instance of the Defendants
18
19
20
21
                         September 10, 2019
22
                         9:09 a.m.
23
                         510 West Riverside Avenue
24
                         Spokane, Washington
25   Job No. 167395

Dec GMV Re: Opposition to Pl MILs 000287

```
 1              BE IT REMEMBERED that the deposition of
 2   MARCIA DAVIS was taken in behalf of the Defendants
 3   pursuant to the Washington Rules of Civil Procedure
 4   before Brenda L. VanderWilde, Certified Shorthand
 5   Reporter for Washington, on Tuesday, the 10th day of
 6   September, 2019, at 510 West Riverside Avenue,
 7   Spokane, Washington, commencing at the hour of
 8   9:09 a.m.
 9                      APPEARANCES:
10
     For the Plaintiff:      BRETT LAND
11                           Attorney at Law
                             Baron & Budd
12                           3102 Oak Lawn Avenue
                             Dallas, Texas 75219
13
14
15                           ELIZABETH SCHOEDEL
                             SAM FAGGIANO
16                           Attorneys at Law
                             Office of the City Attorney
17                           808 West Spokane Falls Boulevard
                             Spokane, Washington 99201
18
19
20
     For the Defendants:     THOMAS GOUTMAN
21                           Attorney at Law
                             Shook, Hardy & Bacon
22                           Two Commerce Square
                             2001 Market Street
23                           Philadelphia, Pennsylvania 19103
24
25
```

```
 1    APPEARANCES (Cont'd)
 2    For the Defendants:     ALAN WONG
                              RICHARD CAMPBELL
 3                            Attorneys at Law
                              Shook, Hardy & Bacon
 4                            101 Federal Street
                              Boston, Massachusetts 02110
 5
 6
 7
 8
                              SUSAN WERSTAK
 9                            Attorney at Law
                              Capes, Sokol, Goodman &
10                            Sarachan
                              7701 Forsyth Boulevard
11                            St. Louis, Missouri 63105
12
13
14
15
16
17
18
19
20
      ALSO PRESENT:          Diana Korneychuk
21
                             Brian Hitchens
22
23
24
25
```

Page 58

MARCIA DAVIS

2          MR. LAND:  Same objections.

3     Q.    (BY MR. GOUTMAN:)  Within that overflow

4  basin.

5     A.    It could.  It depends.

6     Q.    Now, regarding stormwater management, there

7  are numerous constituents that one tries to prevent

8  entering a water body such as the Spokane River by

9  using best management practice, stormwater management.

10 Correct?

11    A.    Yes.

12    Q.    And they would include total suspended

13 solids.  Is that correct?

14    A.    Yes.

15    Q.    From construction sites, erosion from yards

16 and slopes.

17    A.    Yes.

18    Q.    It would include biochemical oxygen demand

19 otherwise known as BOD.  Correct?

20    A.    Yes.  I think so.

21    Q.    Commonly caused by degradable organic

22 material such as animal waste, compost, mulch, and

23 plant debris.  Correct?

24    A.    Yes.

25    Q.    Some of the constituents that one would

1                          MARCIA DAVIS

2    like to remove with an MS4 system includes metals such

3    as zinc, copper, lead, cadmium, chromium, and arsenic.

4    Correct?

5         A.    It could -- it could be.  Yes.

6         Q.    And these can be from auto shops, from wear

7    and tear on brake pads.  Correct?

8              MR. LAND:  Objection.  Calls for

9    speculation.

10        Q.    (BY MR. GOUTMAN:)  Well, do you know?  I

11   mean, you're an engineer who designs stormwater

12   systems.  Correct?

13        A.    Yes, I am.

14        Q.    You know what's in the stormwater.  Right?

15        A.    I know generally what's in the stormwater.

16        Q.    Do you know that metals from wear and tear

17   of brake pads would be a constituent of concern for an

18   MS4 system?

19              MR. LAND:  Objection.  Calls for

20   speculation.

21              MR. GOUTMAN:  Let me finish the

22   question before you object.  Okay.

23              MR. LAND:  Are you done?

24              THE WITNESS:  Yeah.

25              MR. GOUTMAN:  Well, I can't tell.  You

1                        MARCIA DAVIS

2    were talking over me.  I completed my sentence, but

3    you were talking at the same time.  So maybe I'll ask

4    it again.

5              Which is, do you know whether wear and

6    tear from brake pads, which might produce metals,

7    would be constituents of concern for a stormwater

8    management system?

9         A.    It could be.  Yes, it could be.

10        Q.    Would you agree that other constituents of

11   concern would include oils, greases and other organic

12   compounds?

13        A.    Yes.  It could be.

14        Q.    Such as fuel and oil drips and spills.

15   Correct?

16        A.    Yes.

17        Q.    And oils and greases from asphalt and cold

18   tar sealants.  Is that correct?

19        A.    Yes, they could be.

20        Q.    You are also concerned, with respect to

21   stormwater management with such nutrients as

22   phosphorus and ammonia.  Correct?

23              MR. LAND:  Objection.  Vague as to

24   concern.

25              Go ahead.

Page 61

1                         MARCIA DAVIS

2                  THE WITNESS:  Yes, it could be

3      nutrients.  It could be.

4           Q.   (BY MR. GOUTMAN:)  And this would be runoff

5      from lawns and farms, fertilizers, lawn clippings,

6      septic systems.  Correct?

7           A.   Yes.  That could be a source.

8           Q.   Other constituents of concern that MS4

9      systems are designed to address include pathogenic

10     organisms such bacteria, virus' and protozoa from

11     animal waste?

12          A.   Yes.  It could be.  It could be a concern.

13          Q.   Now, with respect to Spokane and its

14     stormwater system, it is operating under a basically

15     Eastern Washington permit.  Correct?

16          A.   That's correct.

17          Q.   And that permit contains TMDL with respect

18     to certain substances or constituents.  Correct?

19          A.   Yes.

20          Q.   And there is no TMDL for PCBs with respect

21     to the Spokane stormwater system.  Correct?

22          A.   Yes.  It's not in the permit.

23          Q.   And do you know what's in the permit?

24                              (Pause in proceedings.)

25          Q.   Do you know what's in the permit?

Dec GMV Re: Opposition to Pl MILs 000293

Page 63

1                    MARCIA DAVIS

2   like every city, has to maintain its infrastructure:

3   roads, pipes, water mains, things like that.  Correct?

4        A.    Yes.

5        Q.    That requires maintenance, repair, and

6   replacement.  Correct?

7        A.    Yes.

8        Q.    And it is now the city policy to

9   incorporate into these capital projects, such as

10  repaving of roads, stormwater management concepts.

11  Correct?

12       A.    Yes.  For integrative projects that --

13  where it's feasible, we include stormwater.

14       Q.    So each time a street construction project

15  is designed, practices to reduce stormwater are

16  prioritized.  Correct?

17       A.    Yes.

18       Q.    With respect to any of the design elements

19  on any MS4 project for which damages are claimed in

20  this case, are any of those designed elements made

21  necessary solely and exclusively by the presence of

22  PCBs in stormwater?

23            MR. LAND:  Objection.  Vague.  And

24  incomplete hypothetical.

25       Q.    (BY MR. GOUTMAN:)  And if your answer is

Dec GMV Re: Opposition to Pl MILs 000294

Page 64

1                           MARCIA DAVIS

2       yes, I'm going to ask you exactly what project and

3       what design element.

4                   Want me to repeat the question?

5           A.    Yes.  I would like you to repeat the

6       question, please.

7           Q.    Okay.  With respect to all the MS4 projects

8       that are being claimed in this case, is there any

9       particular design element that is made necessary

10      solely and uniquely because of the presence of PCBs

11      and that would not be necessary if PCBs were not

12      present?

13                  MR. LAND:  Objection.  Vague.

14      Incomplete hypothetical.  And misleading.

15                  Go ahead.

16                  THE WITNESS:  I'm not sure what a --

17      "design element," what you mean by that.

18          Q.    (BY MR. GOUTMAN:)  What are the design

19      elements of an MS4?  How do you -- what is it -- how

20      about aspects of a design?

21                  Let's step back.

22          A.    Okay.

23          Q.    You're designing, say you're designing a

24      swale, a grass swale, so what are the elements of that

25      design?

1                        MARCIA DAVIS

2              Would one be size?

3        A.    Yes.  Size.  Depth.

4        Q.    Depth.  What else?

5        A.    Planting materials.  Soil.

6        Q.    Planting materials.  Soil.

7        A.    Piping systems, connections to it.

8        Q.    Okay.  With respect to the elements that

9   you just identified, can you identify any MS4 project

10  for which damages are claimed in this case that would

11  be unnecessary if PCBs weren't present, or was added

12  simply to address PCBs and to the exclusion of other

13  constituents?

14              MR. LAND:  Objection.  Vague.

15  Incomplete hypothetical.  And misleading.

16              THE WITNESS:  There's no specific

17  design aspects or elements that are added to or

18  specifically for PCBs.

19              But these projects we're doing because of

20  the PCBs, because we want to get them out of the

21  river, there's no other constituents that we're

22  trying to get out on those projects.

23        Q.    (BY MR. GOUTMAN:)  Well, that's just false,

24  isn't it?

25              MR. LAND:  Objection.  Harassing.

1                          MARCIA DAVIS

2    possible constituents of concern in stormwater?

3                    MR. LAND:  Objection.  Misleading.

4    Asked and answered.

5                    THE WITNESS:  Okay.  Yes.  Every

6    element we design in those aspects are for PCBs

7    because they remove PCBs as well as they do

8    everything else.

9         Q.    (BY MR. GOUTMAN:)  And that wasn't my

10   question, and I think you know that.  My question was

11   are there any design elements of any of these MS4

12   systems that are designed uniquely, "uniquely," you

13   understand what that word means, uniquely to address

14   PCBs?

15                   MR. LAND:  Objection.  Asked and

16   answered.  And misleading.

17                                (Pause in proceedings.)

18                   THE WITNESS:  Can I take a break?

19        Q.    (BY MR. GOUTMAN:)  No.  There's a pending

20   question.

21                   MR. LAND:  You can answer the

22   question, and then you can take a break.

23                                (Pause in proceedings.)

24                   THE WITNESS:  Okay.

25                                (Pause in proceedings.)

Page  75

                          MARCIA DAVIS

1

2                    THE WITNESS:  No.

3         Q.    (BY MR. GOUTMAN:)  Now --

4                    MR. LAND:  Did you want to take a

5    break?

6                    THE WITNESS:  Yeah.  I kind of need

7    one.

8                    THE VIDEOGRAPHER:  Going off the

9    record at 10:51 a.m.

10                   THE VIDEOGRAPHER:  Going back on the

11   record at 10:59 a.m.

12        Q.    (BY MR. GOUTMAN:)  You had mentioned the

13   Union Basin Stormwater Improvement Project as a

14   project which in your mind was related solely to PCBs.

15   Is that fair?

16        A.    Yes.

17             (Deposition Exhibit Number 10 was marked for

18                                  identification.)

19        Q.    I'd like to show you a document prepared by

20   the City of Spokane Integrated Capital Management

21   Department for the Department of Ecology.  It's called

22   "Union Basin Stormwater Improvement Project,

23   preliminary design report," dated August, 2015;

24   revised September, 2015.  Are you familiar with this

25   document?

Page 82

1                          MARCIA DAVIS

2        Q.    And under nonstructural alternatives they

3   talk about -- let's see, nonstructural alternatives

4   with the greatest potential are "impervious surface

5   connections, regulations, and surface housekeeping.

6   Impervious surface regulation consists of minimizing

7   the direct connection of impervious surfaces to the

8   collection system to provide greater opportunities for

9   pollutant reduction through overland flow, surface

10  storage, and percolation."  Right?

11       A.    That's what the document says.  Yes.

12       Q.    And that's essentially what's going on

13  today in MS4 systems, things like surface storage and

14  percolation.  Correct?

15       A.    Yes.

16       Q.    And these were methods that were recognized

17  and developed beginning at least by 1976.  Correct?

18       A.    That's according to the document.

19       Q.    And if you read, if you go to 265, if you

20  can find that.

21       A.    Okay.

22       Q.    And it says under percolation,

23  "percolation" --

24       A.    Oh, here it is.  I found it.

25       Q.    "Percolation can be regarded as both a

Page 87

MARCIA DAVIS

1

2      Q.    I think we had discussed -- we were talking

3  about nonstructural alternatives, which included,

4  among other things, percolation.

5          And in the next paragraph, it says "surface

6  housekeeping, mainly street sweeping, is one of the

7  most effective methods at reducing the URO" that's

8  urban -- what's the URO?  Urban runoff pollution load.

9  And that was recognized by the mid '70s.  Correct?

10         Street sweeping.

11     A.    It's recognized in this document.  Yes.

12     Q.    Well, it was recognized generally.

13  Correct?  As the best management practice to reduce

14  pollutant loads in stormwater systems.

15             MR. LAND:  Objection.  Calls for

16  speculation.  Lack of foundation.

17             THE WITNESS:  Uh, it depends.  Some

18  systems it is and some it doesn't.  Some it counts,

19  and some it doesn't.

20     Q.    (BY MR. GOUTMAN:)  Well, for the City of

21  Spokane it certainly counts.  Right?  That's a

22  significant element of your efforts to reduce

23  pollutant loading in the stormwater system.  Correct?

24  Street sweeping.

25     A.    It is an element.  Yes.  In the City of

Page 88

1                          MARCIA DAVIS

2    Spokane.

3             (Deposition Exhibit Number 13 was marked for

4                                    identification.)

5       Q.    We've marked as Exhibit 13 a document from

6    Spokane County dated April, 1979, called "Spokane

7    Aquifer Water Quality Management Plan."  Is that

8    correct?

9       A.    That's correct.

10      Q.    And in this document, if you -- it talks

11   about runoff management, if you go to page 65.

12                           (Pause in proceedings.)

13      A.    Okay.  Page 65.

14      Q.    And it talks about recommended actions for

15   implementation and one of them, Number 4, is "sweeping

16   for paved surfaces."

17      A.    Okay.  Yes.

18      Q.    Actions recommended for -- uh, to control

19   pollutants in stormwater runoff.  Correct?

20      A.    Yes, it does.

21      Q.    And then on the next page it talks about

22   use of porous pavement.  Right?

23      A.    Oh, yes.  Here it is.  I see that.

24      Q.    Porous pavement is also known as pervious

25   pavement.  Right?

1                    MARCIA DAVIS

2        A.    Yes, that's correct.

3        Q.    As opposed to impervious pavement.

4        A.    That's correct.

5        Q.    And that's incorporated in some of the

6   projects that are part of the damages claimed in this

7   case.  Correct?

8        A.    Yes.

9        Q.    And this was a best management practice

10  recognized in the 1970s.  Correct?

11       A.    Yes, that's what this document says.  Yes.

12       Q.    And it says "problems," next one, "Problems

13  associated with runoff" talks about education programs

14  e.g. problems:  "Use of fertilizers, pesticides,

15  herbicides, solvents and petroleum products."  Is that

16  what it says?

17       A.    Yes.

18       Q.    So, for example, porous pavement was being

19  evaluated in the 1970s as a way to address those

20  constituents.  Correct?

21       A.    This says we should have a pilot project.

22  It wasn't being evaluated.  It was being suggested.

23  It hadn't been used at that point.

24       Q.    Right.  The pilot project would be to

25  evaluate it.  Correct?

Page 98

MARCIA DAVIS

1

2    Q.    But it doesn't list PCBs?

3    A.    That's correct.

4    Q.    And the same can be said for Tables 8 and 9

5    and 10 -- I'm sorry, not 10, 8 and 9 -- 8, 9 and 10,

6    which is evaluating or quantifying contaminant runoff

7    for various years.  Correct?

8    A.    Uh-huh.

9    Q.    Yes?

10    A.    Yes.

11    Q.    And by "same," I mean it lists various

12    contaminants, but not PCBs.  Correct?

13    A.    Yes.

14    Q.    So this grassy or other natural percolation

15    was evaluated in the 1970s and '80s for the removal of

16    contaminants other than PCBs.  Correct?

17    A.    That's correct.

18            MR. LAND:  Quick clarification.

19    Exhibit 14 and 15, both exhibits were produced in

20    October of 2018, not last week.

21            MR. GOUTMAN:  Well, how come I got

22    them last week?

23            MR. LAND:  That's a great question.

24            MR. GOUTMAN:  Well, it seems like just

25    yesterday.

Page 100

                    MARCIA DAVIS

1

2   treatment -- well, for the swales that's the

3   treatment.  There also needs to be a conveyance, a way

4   to get the runoff to the system.  So, it could be

5   pipes, it could be curb cuts; catch basins would be

6   part of that potentially.

7        Q.    Okay.

8        A.    But it depends project by project what's

9   included.

10       Q.    So that -- would you call it "water routing

11  methods"?

12       A.    Yeah.  We call it "conveyance."

13       Q.    Conveyance.  Okay.

14       A.    Yes.

15       Q.    Well, you're the engineer, so I'll call it

16  conveyance?

17       A.    Okay.

18       Q.    These conveyance methods, is there anything

19  specific about these conveyance systems designed just

20  for PCBs, as opposed to just capturing water that

21  might contain many things?

22       A.    No.  They're just to capture water.

23       Q.    Okay.  Are there any other elements of MS4

24  systems that comprise the claims in this case that we

25  haven't discussed?

1                          MARCIA DAVIS

2        A.    I'd like a moment just to refresh myself.

3        Q.    Take your time.

4                              (Pause in proceedings.)

5        A.    The dry wells.  The projects often have dry

6   wells also.

7        Q.    And dry wells certainly date back decades.

8   Right?

9        A.    Right.

10       Q.    And there's nothing unique in the design of

11  dry wells that is devoted solely to PCBs, as opposed

12  to other constituents?

13       A.    Correct.  That's the same drywell we use

14  for everything.

15       Q.    Okay.  Are there any other elements of MS4?

16       A.    Not that I can think of, not anything that

17  comes to mind.

18       Q.    Fair enough.  So just to summarize before

19  we go to the next subject, would it be fair to say,

20  based upon the documents that we've reviewed just now,

21  that the kinds of methods, the best management

22  practices that are incorporated in the MS4 projects

23  that comprise the claim in this case, had been

24  recognized over the years and evaluated for their

25  effectiveness in removal of all kinds of constituents?

Page 102

1                           MARCIA DAVIS

2        A.    Yes.

3        Q.    And none of them, by design, are uniquely

4   devoted to removing PCBs, as opposed to this long list

5   of other constituents?

6        A.    Yes.

7                              (Pause in proceedings.)

8        Q.    So we've got, I guess, about eight minutes.

9              MR. LAND:  Do you need a --

10             THE WITNESS:  No.  I've got eight

11  minutes or whatever.

12       Q.    (BY MR. GOUTMAN:)  We can get this stuff

13  done here.

14       A.    Just want to not be in the middle of a

15  topic.

16             MR. LAND:  We'll stop at --

17       Q.    (BY MR. GOUTMAN:)  We'll stop whenever you

18  want.  Okay?  Whenever you feel comfortable stopping.

19             We're 15?  16.

20             (Deposition Exhibit Number 16 was marked for

21                              identification.)

22       Q.    So I've handed you a PowerPoint

23  presentation by somebody by the name of Marcia Davis.

24  Do you know her?

25       A.    Yes.

Page 125

1                    MARCIA DAVIS

2    you were testing for PCBs.

3         A.    Okay.

4         Q.    So -- but again, in both the document that

5    has the very important QAPP where you're determining

6    whether this thing works with regard to removal of

7    constituents of concern, as well as this PowerPoint,

8    where you were talking about the Sharp Avenue project,

9    there is no mention of testing for PCBs or schematic

10   representation of the product actually removing PCBs.

11   Correct?

12              MR. LAND:  Objection.  Misleading and

13   mischaracterization.  She said that she doesn't know

14   if that QAPP was final.

15              MR. GOUTMAN:  You don't have to --

16   that's a speaking objection.  I think you know better

17   than that.

18              THE WITNESS:  The PowerPoint slides

19   that you showed me do not list those, but I don't

20   know what -- in the presentation those could have

21   been discussed.

22        Q.    (BY MR. GOUTMAN:)  I'm sorry.  Maybe my

23   question wasn't clear.

24              You acknowledge that in the PowerPoint

25   presentation that your department put on for the

MARCIA DAVIS

1

2    public, right?  This is for the public.

3        A.    Right.

4        Q.    For professional engineers and people

5    involved --

6        A.    Right.

7        Q.    -- in stormwater management.  Right?

8              A project that you say was a PCB project.

9    In the PowerPoint presentation that your department

10   put on where it illustrated the contaminants that

11   could be removed with permeable pavement, PCBs are not

12   illustrated.  Correct?

13              MR. LAND:  Objection.  Misleading and

14   mischaracterization of that document.

15       Q.    (BY MR. GOUTMAN:)  Go ahead.  You can

16   answer.

17       A.    There's nothing shown in there.

18       Q.    Is that the answer yes?

19       A.    Yes.

20       Q.    And with respect to the Quality Assurance

21   Plan which showed testing to be performed to determine

22   the effectiveness with which constituents of concern

23   would be removed by using permeable pavement, it lists

24   many constituents of concern, but not PCBs.  Correct?

25       A.    That's right.  This one you showed me does

Page 127

1                           MARCIA DAVIS

2        not include PCBs.

3        Q.    Okay.  So North Monroe.  Monroe, am I

4   correct -- North Monroe according to Exhibit A of your

5   answers to interrogatories, Exhibit 3, consists of a

6   claim for $1,894,127.68 in past costs.  Correct?

7        A.    Sorry.

8        Q.    No problem.  And then I'm gonna ask you to

9   look at Appendix B too.

10       A.    Okay.  We're talking about Monroe.  Is that

11  correct?

12       Q.    North Monroe.

13       A.    Okay.  And we have $1,894,127.68.

14       Q.    Am I correct that according to Appendix B

15  of Exhibit 3 you've received grants in the amount of

16  $749,250 for that project?

17                         (Pause in proceedings.)

18              MR. LAND:  Can you say what the name

19  is under Appendix B?  It might help.

20              THE WITNESS:  He said North Monroe,

21  but I'm not seeing it.  I'm seeing Monroe Street,

22  which is Washington Basin.

23       Q.    (BY MR. GOUTMAN:)  It's Lincoln-Monroe.

24       A.    That's a different project than North

25  Monroe.

Page 131

1                    MARCIA DAVIS

2            THE WITNESS:  The project

3    description.  Okay.

4        Q.    (BY MR. GOUTMAN:)  So North Monroe consists

5    of North Monroe storm, Monroe Street, Lincoln Street,

6    8th Avenue to Main Avenue Phase II.  It's, like, these

7    four projects.  Right?

8        A.    Right.  These four projects.

9        Q.    Okay.  With that in mind, going back to the

10   grant.

11       A.    Yes.  Now we can go back to the grant.

12       Q.    Okay.

13       A.    Now that we know the projects.  Okay.

14       Q.    There is a grant listed for Lincoln-Monroe

15   stormwater.

16       A.    Lincoln-Monroe.  Yes.  There is a grant

17   listed for $749,250.

18       Q.    Can we agree that that grant is related

19   to --

20       A.    One of these projects.

21       Q.    -- to the North Monroe claim which consists

22   of four separate projects?

23       A.    Yes.

24            MR. LAND:  Please make sure to wait

25   for him to ask a question before you answer.

Page 132

1                        MARCIA DAVIS

2              THE WITNESS:  Got it.

3         Q.    (BY MR. GOUTMAN:)  As long as you're gonna

4    say yes, you don't have to wait.

5         A.    Okay.

6         Q.    Now, this consists of roadway pavement

7    replacement and bio-infiltration.  Correct?

8         A.    Yes.

9         Q.    Okay.  And this bio-infiltration is a

10   methodology that was described back in the '70s and

11   '80s to address numerous constituents.  Correct?

12   Stormwater constituents.

13              MR. LAND:  Objection.  Vague.

14              THE WITNESS:  These all use

15   bio-infiltration, which I'm not sure what the

16   documents -- how it describes it.  I would think they

17   are the same thing, but not knowing exactly the whole

18   description, I would say this is bio-filtration.

19              We use bioretention for these projects

20   which is a BMP, which, I think, is what was described

21   in that document.

22         Q.    And was described in the documents going

23   back to the '70s and '80s that we reviewed earlier

24   today.  Correct?

25         A.    Right.

Page 133

1                      MARCIA DAVIS

2        Q.    To remove numerous constituents.   Correct?

3        A.    Right.

4        Q.    Now, uh -- and that's what was used in

5   North Monroe.  Correct?

6        A.    Yes.  These all used bio-retention.  Yes.

7        Q.    Okay.  Third, I'm gonna make our way

8   through these.

9        A.    Now where?

10       Q.    I'm going to the next one.

11       A.    Okay.

12       Q.    River Runoff Reduction.  So go to

13   Appendix A --

14       A.    Okay.

15       Q.    -- because my first question is:  The city

16   is claiming $1,862,489.20.  Correct?

17       A.    Yes, that's correct.

18       Q.    And that consists of installing dry wells

19   on residential streets to reduce the amount of

20   untreated stormwater being conveyed to the Spokane

21   River. Correct?

22       A.    Yes.  That's correct.

23       Q.    And these are the same dry wells that were

24   described in documents we reviewed -- at least one

25   document we reviewed -- from the 1970s that dealt with

1                        MARCIA DAVIS

2    removal of various constituents from stormwater.

3    Correct?

4         A.    Drywell -- well. . .

5         Q.    Well, let me just rephrase it because I

6    understand the problem you might have with how I

7    phrased that question.

8              These dry wells -- the technology is not

9    new.  It goes back decades and decades.  Correct?

10        A.    That's correct.

11        Q.    And that technology is designed to keep

12   stormwater from running off into a body of water.

13   Right?  Just to essentially store it until it

14   infiltrates into the ground.

15                   MR. LAND:  Objection.  Compound.

16                   THE WITNESS:  Dry wells are -- no.

17   Not exactly.  Dry wells are used for different

18   reasons, they're not considered necessarily for

19   treatment.

20              This project we did specifically to remove

21   the runoff from the streets and specifically because

22   we wanted to remove PCBs from the river.

23        Q.    And what document -- what design document

24   can you show us that says that this was designed just

25   for PCBs?  Is there any such document?

1                    MARCIA DAVIS

2    counsel what we'd do with it.  If it's an error,

3    though, I think we are happy to make a correction.

4                    MR. LAND:  And, yeah.  And we can

5    stipulate to that, Tom.  We'll go back and look at

6    it.  If it is double charging for the same exact

7    bill, we'll --

8        Q.    (BY MR. GOUTMAN:)  How did that happen,

9    that you ended up submitting a damages submission to

10   the court where you double counted, I think, over

11   $300,000.  How'd that happen?

12       A.    I don't know.

13       Q.    Well who QA, QC'd this document, Exhibit 3?

14                    MR. LAND:  Objection.  Calls for

15   speculation.

16                    THE WITNESS:  I don't know who did.

17                              (Pause in proceedings.)

18       Q.    (BY MR. GOUTMAN:)  To a reasonable person

19   it might bring into question the reliability of

20   everything in Exhibit 3, doesn't it?

21                    MR. LAND:  Objection.  Calls for

22   speculation.  Misleading.

23                    THE WITNESS:  I don't know.

24       Q.    Okay.  Pettet Drive.  Am I pronouncing that

25   correctly?

Page 141

1                     MARCIA DAVIS

2        A.    Yes, that's correct.

3        Q.    Uh, if you go to Appendix A, the city

4   $1,533,169.62.  Correct?

5                            (Pause in proceedings.)

6        A.    Pettet Drive.  $1,533,169.62.  Yes.

7        Q.    Okay.  Am I correct that if you go to

8   Appendix B, the city has received a grant of 450,000

9   for that project?

10       A.    Oh, sorry.  I'm in the wrong place.

11                           (Pause in proceedings.)

12       A.    Yes.  $450,000.

13       Q.    Am I correct that this project involved

14  standard MS4 BMP such as construction of bio-retention

15  swales?

16       A.    Yes, that's correct.

17       Q.    It also involved construction of a

18  mixed-use trail.  Isn't that right?

19       A.    It was an integrated project, so as part

20  of -- yes.  As part of that we did road, we did street

21  work and a trail as part of that.

22       Q.    Yeah.  With both bike and pedestrian

23  improvements.  Correct?

24       A.    Yes.  That's correct.

25       Q.    And that's all part of your claim in this

Page 142

1                              MARCIA DAVIS

2       case.  Correct?

3              A.     I don't know --

4              Q.     You don't know?

5              A.     I'm not sure.  I'll have to check on that.

6                     I think we just did stormwater costs on

7       this one.

8              Q.     Well, let me ask you this --

9              A.     Well, the part of the street that had the

10      stormwater lines in it would be part of this, the

11      charges included in here.

12             Q.     But in any event -- and I'll get to that in

13      a second -- but in any event the bio-retention swales

14      were the sorts of things that were discussed beginning

15      at least in the the '70s and '80s and were designed to

16      prevent runoff of numerous constituents.  Correct?

17             A.     Yes.  They're bio-retention swales.

18             Q.     And, um -- so this is a question I have for

19      you and this is the invoice backup for this claim that

20      was submitted to the court and we've marked as 22 that

21      invoice.

22                    (Deposition Exhibit Number 22 was marked for

23                                      identification.)

24             Q.     And it has an item, 114,000.  Do you see

25      that?  501?

Page 176

MARCIA DAVIS

1

2            MR. LAND:  I think there are a few
3   pieces of Cochran Basin.
4        Q.    (BY MR. GOUTMAN:)  Well, referring to
5   Cochran Basin, RRR.
6        A.    Yes.
7        Q.    That's 1,040,576.83.  Is that right?
8        A.    Yes.
9        Q.    Okay.  And. . .
10           (Deposition Exhibit Number 30 was marked for
11                               identification.)
12        Q.    And I'd like to show you something that
13   we're marking the new Exhibit 30.
14        A.    Okay.
15        Q.    And just -- this is from the city's
16   environmental contractor CH2M Hill.  Correct?
17        A.    Yes.
18        Q.    And shows receipt by various colleagues of
19   yours at the city.  Right?
20        A.    Yes.
21        Q.    And former colleagues.
22        A.    Yes.
23        Q.    And it says "High level assessment of
24   pollutant removal in the Cochran stormwater basin."
25   Correct?

1                          MARCIA DAVIS

2          A.      Uh --

3          Q.      That's the title.

4          A.      Oh.  Yes.

5          Q.      And it was sent to Rick Romero of the City

6    of Spokane.  Right?

7          A.      Yes, it was.

8          Q.      And it relates to -- well, it discusses CSO

9    volumes and CSO pollutant concentrations.  Is that

10   correct?

11         A.      Yes.  Table 2 here talks about CSO volumes.

12         Q.      Right.

13         A.      And pollutant concentrations.

14         Q.      Okay.  And does it -- the pollutant

15   concentrations that they list are for total suspended

16   solids, zinc, lead, cadmium, total phosphorus, and

17   fecal coliform.  Correct?

18         A.      That's correct.

19         Q.      It does not list PCBs.  Right?

20         A.      It does not list PCBs.

21         Q.      And what this is, is they're -- and the

22   next one is on stormwater.  Right?  And what they're

23   doing is measuring stormwater pollutant concentrations

24   for constituents of concern in the stormwater.

25   Correct?

                                MARCIA DAVIS

1

2      A.    Yes.

3      Q.    So that they can calculate estimated

4   percentage of pollutant removal.  Right?

5      A.    Yes.  That's. . .

6      Q.    For constituents of concern.  Right?

7      A.    Right.

8      Q.    And the constituents of concern are total

9   suspended solids, zinc, lead, cadmium, total

10  phosphorus, and fecal coliform.  That's what they

11  tested for.  Correct?

12     A.    Yes.  That's what's on the list here.

13     Q.    That's what they tested the stormwater for

14  in Cochran Basin.  Right?

15     A.    That's what's recorded here.

16     Q.    And they did not test, according to CH2,

17  CH2M, excuse me, they didn't test for PCBs.  Correct?

18     A.    They don't record that in here.

19           I think they were using the city data and I

20  believe we did test for PCBs.

21     Q.    That wasn't my question.  My question is

22  that --

23     A.    Yes.

24     Q.    Let me rephrase the question.

25     A.    Okay.

Page 179

1                       MARCIA DAVIS

2          Q.    With respect to the city's environmental

3    contractor's assessment of pollutant removal for the

4    Cochran stormwater basin, when they were calculating

5    stormwater pollutant concentrations and estimated

6    percentage of pollutant removals, removal of

7    constituents of concern in stormwater, they did not

8    test for PCBs.  Correct?

9          A.    PCBs is not on this memo.  Yes.

10                              (Pause in proceedings.)

11         Q.    So I'll mark this as Exhibit 31.

12               (Deposition Exhibit Number 31 was marked for

13                              identification.)

14         Q.    And this is -- we're still on Cochran.  And

15   this was an invoice that was included in your damages

16   submission to the court for Clearwater Construction

17   and Management.  Is that correct?

18         A.    Yes.  That's what this invoice is for.

19         Q.    Okay.  And if you go to page, okay, the

20   page that's Bates stamped on the top, 858.  It's the

21   landscape spreadsheet.

22         A.    Okay.

23         Q.    It says "Summary of total costs,"

24   says, "Cochran stormwater $401,261.89 and something

25   called the IO3 Control Facility $6,948,687.25.  So my

Page 215

1                          MARCIA DAVIS

2    combination of the retaining wall and the basalt at

3    this facility.

4         Q.    I guess my question is, what added

5    functionality does the basalt veneer have to a

6    concrete retaining wall?  Isn't the concrete strong

7    enough to retain stormwater?

8         A.    Yes.  But it doesn't match the character

9    and intent of the park.

10        Q.    So it's aesthetics?

11        A.    You could say aesthetics, aesthetics or

12   neighborhood, matching the neighborhood character.

13        Q.    So it also includes, if you flip the page,

14   hydroseeding, almost 2 -- sorry.  $2,381.  It's Item

15   145.

16        A.    Yes.

17        Q.    And are you aware of the presence of

18   by-product or inadvertent PCBs in hydroseeding?

19             MR. LAND:  Objection.  Misleading and

20   beyond the scope.

21             THE WITNESS:  Yes, we are now.  But we

22   weren't at the time.

23        Q.    Okay.  And "at the time" was when?  2014?

24        A.    Yes.

25        Q.    So you actually made a design decision that

Page 216

1                          MARCIA DAVIS

2   added PCB levels to this stormwater system.  Correct?

3                   MR. LAND:  Objection.  Misleading.

4   And beyond the scope.

5                   THE WITNESS:  It may have added.  It

6   may have added that to the project.

7        Q.    (BY MR. GOUTMAN:)  It also includes

8   benches -- a bench and interpretive signs.  Is that

9   correct?

10       A.    Yes, it does have a bench and interpretive

11  signs.

12       Q.    Well, it has three benches at $4,000 each.

13  Correct?

14       A.    Right.  It has benches.  The interpretive

15  signs were for stormwater education.

16       Q.    I see.  So. . .

17                 (Deposition Exhibit Number 37 was marked for

18                              identification.)

19       Q.    I'm showing you a photograph which I've

20  marked as Exhibit 37.  Is that the interpretive sign?

21       A.    Yes.

22       Q.    And does this sign have any stormwater

23  management function?

24       A.    It shows how stormwater's being managed at

25  the site.

1                    MARCIA DAVIS

2        Q.    That's not my question.   Does the sign

3    itself --

4        A.    Oh.

5        Q.    -- have any stormwater management function?

6              MR. LAND:   And you can still answer

7    that question how you see fit.

8        Q.   (BY MR. GOUTMAN:)   And if your answer is

9    yes, I'm gonna ask you to explain it in detail.

10             MR. LAND:   And I'll object.   Vague to

11   last question.

12             THE WITNESS:   I would say for

13   stormwater management at this site, it does have a

14   value.   And --

15       Q.   (BY MR. GOUTMAN:)   I didn't ask whether it

16   has value.

17             I said what function does it have to either

18   storing or channelling stormwater or preventing

19   constituents of stormwater from entering the Spokane

20   River?

21             MR. LAND:   Objection.   Vague.

22             THE WITNESS:   Stormwater management

23   that it does is that it educates people in the area,

24   that if they dump something in this, it infiltrates

25   into the ground.

Dec GMV Re: Opposition to Pl MILs 000323

Page 218

1                    MARCIA DAVIS

2        Q.    (BY MR. GOUTMAN:)   Listen to my question.

3        A.    So that would be a --

4        Q.    It's an educational function.

5              Does it have anything to do with the normal

6   functioning of a stormwater BMP, which would be

7   preventing -- let me ask it this way:   Does this sign

8   retain or store stormwater?

9        A.    No.

10       Q.    Does it direct stormwater away from the

11  Spokane River?

12       A.    No.

13       Q.    Does it prevent any constituent from

14  entering the Spokane River?

15              MR. LAND:   Objection.  Vague.

16              THE WITNESS:   Possibly.

17       Q.    How is that?  Do you think that the

18  constituents would adhere to the sign?

19       A.    No.  It would not.

20       Q.    How does it capture the constituents?

21       A.    It would not.

22             (Deposition Exhibit Number 38 was marked for

23                             identification.)

24       Q.    (BY MR. GOUTMAN:)   Exhibit 38 is another

25  picture of the project that you're the chief engineer

Dec GMV Re: Opposition to Pl MILs 000324

1                       MARCIA DAVIS

2    on.  So I notice a bunch of fancy pavers and so forth.

3    Are those impervious or pervious?

4         A.    They are -- some of the pavers are

5    pervious; some are impervious.  The spaces between

6    them are -- allow infiltration.  So yes.  Most

7    everything here has some way for stormwater to

8    infiltrate through the ground, either through them or

9    between the edges between the gaps.

10        Q.    And this shows the veneer --

11        A.    Yes.

12        Q.    -- of this wall?

13        A.    Yes.

14        Q.    And I think you indicated that that veneer

15   was placed there for aesthetic reasons.  Correct?

16        A.    Yes.  To match the neighborhood character.

17             (Deposition Exhibit Number 39 was marked for

18                                  identification.)

19        Q.    And I'm showing you Exhibit 39 which are

20   flower and bushes and tall grass planted.  Is that

21   correct?

22        A.    The flowers and bushes along the edge, yes.

23   The tall grass is actually inside the bio-retention

24   facility.

25        Q.    Okay.  The flowers and bushes are not

Page 220

MARCIA DAVIS

1

2      inside the bio-retention.   Is that correct?

3          A.     No.

4          Q.     And are they placed there because they have

5      some stormwater management function?

6          A.     Um --

7          Q.     Or are they aesthetic?

8          A.     I believe these, the bushes in this area

9      are aesthetic.   They could be taking some runoff that

10     I'm not aware of, but I don't think they do.

11         Q.     And Exhibit 40.

12             (Deposition Exhibit Number 40 was marked for

13                                      identification.)

14         Q.     Does this show one of the $4,000 park

15     benches that you're suing Monsanto for?

16         A.     This is one of the park benches.   Yes.

17         Q.     Okay.  I want to go to Erie and Trent.

18         A.     Okay.

19         Q.     A.k.a. Erie Stormwater Facility.

20             Am I correct that your claim, the city's

21     claim is $563,722.91 in past costs?

22         A.     The Erie and Trent.  Yes.  Yes.

23         Q.     In future costs it's $2,214,967.  Is that

24     correct?

25         A.     I'll look that one up.  2,214,967.

Page 221

1                          MARCIA DAVIS

2        Q.    Okay.  Am I correct that you have received

3    a grant in the amount of $1,031,447.50 with respect to

4    this project?

5        A.    1,031,447.50.  Yes.

6                               (Pause in proceedings.)

7             (Deposition Exhibit Number 41 was marked for

8                                    identification.)

9    BY MR. GOUTMAN:

10       Q.    We've marked as Exhibit 41 a document

11   called "Erie Street Stormwater Facility Project, July

12   2015" prepared by the City of Spokane.  Is that

13   correct?

14       A.    Yes.  That's correct.

15       Q.    And this is talking about this Erie Street

16   Stormwater Facility project --

17       A.    Yes.

18       Q.    -- preliminary design.  Correct?

19       A.    Yes.

20       Q.    And if you turn to Page 461?  Bates.

21       A.    461.  Yes.

22       Q.    It says "Required Pollutant Removal

23   Percentages."  Correct?

24       A.    Yes.

25       Q.    And it lists various constituents.

1                        MARCIA DAVIS
2        A.    Yes.
3        Q.    And they are total suspended solids.
4        A.    Yes.
5        Q.    Correct?
6        A.    Yes.
7        Q.    Phosphorus removal?
8        A.    Yes.
9        Q.    Zinc removal?
10       A.    Yes.
11       Q.    Copper removal?
12       A.    Yes.
13       Q.    Nitrogen removal?
14       A.    Yes.
15       Q.    Oil and grease?
16       A.    Yes.
17       Q.    PCBs are not listed.
18       A.    Yes.  That's correct.
19       Q.    And just to be clear, we note from that
20   29-gram document, that it is possible to calculate the
21   amount removal of PCBs if one wants to.  Correct?
22            MR. LAND:  Objection.  Vague.
23   Incomplete hypothetical.
24            THE WITNESS:  I don't know.
25       Q.    (BY MR. GOUTMAN:)  Well, you did see your

1                          MARCIA DAVIS

2    engineer's report in which that calculation was set

3    forth?

4         A.    Yes.

5                              (Pause in proceedings.)

6         Q.    Next one is 42.

7              (Deposition Exhibit Number 42 was marked for

8                              identification.)

9         Q.    And Exhibit 42 is "Department of Ecology

10   Water Quality Combined Financial Assistance Agreement

11   between State of Washington, Department of Ecology and

12   City of Spokane."  Is that correct?

13        A.    Yes.

14        Q.    And it pertains to the Erie Street project.

15   It says in "Project short description:  This project

16   will improve water quality in the Spokane River

17   through installation of a bioretention swale with

18   underdrain, storage vault and pump and dry wells on

19   the west side of Erie Street adjacent to the Spokane

20   River in the City of Spokane."  Correct?

21        A.    Yes.

22        Q.    "This project will provide treatment for

23   total suspended solids (TSS), oil (Total Petroleum

24   Hydrocarbons), and dissolved copper and zinc by

25   increasing stormwater infiltration and by providing

Page 224

1                          MARCIA DAVIS

2    stormwater retention."  Is that what it says?

3         A.    Yes.

4         Q.    Am I correct that they would have gotten

5    this information from the City of Spokane?  They would

6    not have had it independently otherwise?

7         A.    That's correct.

8         Q.    And if you turn to Bates 781.

9         A.    781.

10        Q.    It says "Task expected outcome:

11   Constructed project will provide water quality

12   benefits including reductions in total suspended

13   solids (TSS), Oil (Total Petroleum Hydrocarbons), and

14   dissolved copper and zinc.  Is that what it says?

15        A.    Yes.

16        Q.    And in neither instance does it mention the

17   removal of PCBs as an intended benefit.  Correct?

18        A.    That's correct.

19                              (Pause in proceedings.)

20        Q.    Okay.  Let's go to Rowan Avenue, Phase I.

21        A.    (Complied.)

22        Q.    Rowan Avenue, Phase I is 420,742.59 in past

23   costs.  Is that correct?

24        A.    That's correct.

25        Q.    And that -- the elements involved -- you're

Page 228

1                          MARCIA DAVIS

2        Q.    Oh, Finch.  It's $270,332.32.  Is that

3   correct?

4        A.    Yes.

5        Q.    You received a grant of almost 100,000,

6   $99,600.  Is that correct?

7        A.    Yes, that's correct.

8        Q.    And as I understand it, correct me if I'm

9   wrong, what this involved was essentially expanding

10  the parking lot to accommodate more traffic and paving

11  the parking lot with pervious pavement.  Correct?

12       A.    That --

13       Q.    By "more traffic" I mean increasing the

14  parking capacity of that parking lot.  Correct?

15       A.    That was part of the project.  It also

16  included separation of MS4 from F Street.

17       Q.    And am I correct that one of the reasons

18  why that parking lot had to be -- well, you wanted to

19  increase the size of it, is that the parking lot is

20  well used and often becomes full during events.

21  Correct?

22       A.    Yes.  It became a good choice of a

23  location.

24       Q.    Right.  So among other things, you're suing

25  Monsanto for increased parking capacity that was

Page 229

1                           MARCIA DAVIS

2   otherwise needed.  Correct?

3                    MR. LAND:  Objection.  Misleading.

4   Mischaracterization of the events.

5                    THE WITNESS:  But we also managed the

6   stormwater on that project using permeable pavement.

7               Yes.  But we also --

8        Q.   (BY MR. GOUTMAN:)  Is your answer yes, that

9   you were increasing the size of the parking lot to

10  accommodate additional parking capacity.  Correct?

11       A.   Yes.

12       Q.   And you are suing Monsanto for the cost of

13  paving that additional parking capacity.  Correct?

14       A.   I believe that's included in the costs.

15  Yes.

16                            (Pause in proceedings.)

17          (Deposition Exhibit Number 44 was marked for

18                            identification.)

19       Q.   I've handed you Exhibit -- is it 45?

20       A.   44.

21       Q.   And this is a document titled "Finch

22  Arboretum Parking Lot Stormwater Sampling, 2014, City

23  of Spokane, Wastewater Management Department."  Is

24  that correct?

25       A.   Yes.  That's correct.

MARCIA DAVIS

1

2    Q.    And on page Bates stamped 8-1-8.

3    A.    8-1-8.  Okay.

4    Q.    Again, this is a City of Spokane document?

5    A.    I am not sure.  Yes, it is.

6    Q.    Okay.  And could you read the last

7  paragraph that the city said on page 8-1-8?

8    A.    "The city received," that part.

9    Q.    Yeah.  Just read that to the end of the

10  paragraph.

11    A.    Okay.  This says, "The city received a

12  grant from ecology to construct a coarse asphalt

13  parking lot at Finch Arboretum.  Course asphalt allows

14  stormwater to filter directly through the asphalt

15  layer to a gravel gallery below before it infiltrates

16  to the soil.  Currently ecology does not allow

17  stormwater treatment credit for this porous asphalt

18  itself, rather relying on the organic matter and

19  cation exchange capacity of the soil below for

20  treatment.  Some evidence suggests that porous

21  pavements" do not provide treatment.

22    Q.    "Do provide treatment."

23    A.    I'm sorry.  Let me re-read that sentence.

24  "Some evidence suggests that porous pavements do

25  provide treatment, but not enough data exists to

1                          MARCIA DAVIS

2   substantiate full stormwater credit.  The city is

3   interested in gaining a better understanding of

4   treatment through the porous asphalt layer and will

5   install a monitoring system to collect water quality

6   samples.  Analysis will be performed for a suite of

7   standard BMP performance parameters, including total

8   phosphorus, total petroleum hydrocarbons, total

9   suspended solids, total and dissolved metals,

10  (arsenic, cadmium, chromium, lead, copper, and zinc)."

11       Q.   Now, again, with respect -- and we've seen

12  this before, with respect to the constituents of

13  concern that this project is designed to address, you

14  are going to be ordering tests or analyses to see the

15  extent to which these constituents are captured.

16  Correct?

17                 MR. LAND:  Objection.  Misleading.

18                 THE WITNESS:  We said we listed

19  analysis that would be performed.  Yes.

20       Q.   Yes.  Okay.

21       A.   Yes.

22       Q.   And those constituents of concern that the

23  city listed did not include PCBs.  Correct?

24       A.   In this report it did not, and in that list

25  that we would test.

Page 242

1    STATE OF WASHINGTON        )
                                )   ss.
2    COUNTY OF SPOKANE          )

3

4            I, Brenda L. VanderWilde, do hereby certify

5    that at the time and place heretofore mentioned in the

6    caption of the foregoing matter, I was a Certified

7    Shorthand Reporter for Washington; that at said time

8    and place I reported in stenotype all testimony

9    adduced and proceedings had in the foregoing matter;

10   that thereafter my notes were reduced to typewriting

11   and that the foregoing transcript consisting of 232

12   typewritten pages is a true and correct transcript of

13   all such testimony adduced and proceedings had and of

14   the whole thereof.

15           Witness my hand at Spokane, Washington, on

16   this 16th day of September, 2019.

17

18

                     _____

19                   Brenda L. VanderWilde
                     CSR NO. 3424
20                   Certified Shorthand Reporter

21

22

23

24

25

Dec GMV Re: Opposition to Pl MILs 000335

Page 245

1                    Marcia Davis

2             UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF WASHINGTON
3    _____

4    CITY OF SPOKANE, a            )
     municipal corporation,        )
5    located in the County of      )
     Spokane, State of             )
6    Washington,                   )
                                   )
7                    Plaintiff,    )
                                   )
8    vs.                           ) Case No.
                                   ) 15-cv-00201-SMJ
9    MONSANTO COMPANY,             )
     SOLUTIA INC., and             )
10   PHARMACIA CORPORATION,        )
     and DOES I through 100,       )
11                                 )
             Defendants.           )
12   _____

13

14

       VIDEOTAPED DEPOSITION OF MARCIA DAVIS, VOLUME II
15
                      11:01 a.m.
16
                  September 11, 2019
17
                  Spokane, Washington
18

19

20

21

22   Job No: 167396

23

24

25   Reported by: Anna M. Stewart, CCR

Page 260

```
 1                  Marcia Davis

 2   discharges to the Spokane River and reduce the volume

 3   of stormwater to be treated."

 4        Did I read that correctly?

 5        A.  Yes.

 6        Q.  Does that refresh your recollection as to the

 7   purpose of why the City of Spokane undertook the

 8   Broadway SURGE program?

 9        A.  Yes.  It looks like we did this for CSO

10   compliance.

11        Q.  And you didn't do it for PCBs, correct?

12        A.  It doesn't look like we did it for PCBs.

13        Q.  I want to go back to page -- the introduction

14   page of this document and the second -- well, I guess

15   the very first sentence on this page:  "West Broadway

16   is the first project chosen for the Spokane Urban

17   Runoff Greenway Experiment (SURGE)."  Okay?

18        A.  Yes.

19        Q.  Were there other projects that were SURGE

20   projects?

21        A.  There was one other project that was a SURGE

22   project.

23        Q.  And which was that?

24        A.  It was the Lincoln, Lincoln SURGE, which --

25        Q.  And -- I'm sorry.  Go ahead.  I didn't mean to
```

Def GMV RE Opposition to Pl MILs 000337

Page 263

1                    Marcia Davis

2        A.  Yes.

3        Q.  -- the document reads -- the first sentence of

4   that first paragraph under 6.2:  "As discussed in

5   Chapter 4, GI" -- and do you understand "GI" to be

6   green infrastructure?

7        A.  Yes.  In this context, it is, yes.

8        Q.  "As discussed in Chapter 4, GI to intercept

9   stormwater runoff before it ends up in the combined

10  sewer system is a key component of the City's efforts

11  to achieve long-term compliance with CSO performance

12  measure" -- "with the CSO performance measure."

13           Did I read that correctly?

14      A.  Yes.

15      Q.  And do you agree with that?

16      A.  Yes.

17      Q.  Now, if we switch to -- so to the extent this

18  document is referencing green infrastructure, it's

19  referring to, for example, the BMPs that were used in

20  the West Broadway SURGE Project, correct?

21      A.  Ones that were similar to that and other BMPS.

22  Other ones were green infrastructure.

23      Q.  And what are some of the other green

24  infrastructure BMPs that this is referring to?

25      A.  They're all bioretention systems.  They're

Defs MTL Re: Opposition to Pl MILs 000338

1                   Marcia Davis

2        A.  Yes.

3        Q.  And the last sentence in that paragraph reads:

4    "Although the proposed CSO reduction projects are

5    expected to control uncontrolled CSO outfalls, the

6    future is uncertain.  And the City needs to plan for

7    how to identify when additional CSO reduction projects

8    are needed and what those new projects would be."

9            Did I read that correctly?

10       A.  What those new projects could be, yes.

11       Q.  Oh, I guess, I didn't read it correctly.

12       A.  Yes, that's correct.

13       Q.  Thank you.

14           So on the next page, the second paragraph

15   down, it identifies -- the sentence reads:  "The City

16   has prepared a variety of 'safety outs' that can be

17   implemented if future flow monitoring data indicate

18   that a CSO outfall remains out of compliance with the

19   CSO performance measure."

20           Correct?

21       A.  Yes.

22       Q.  And one of those "safety outs" is to implement

23   green infrastructure where feasible to reduce the

24   volume of stormwater runoffs sent to the combined sewer

25   system and, ultimately, to Riverside Park Waste Water

Page 272

1                    Marcia Davis

2    Recycling Facility, the RPWRF, correct?

3         A.  Yes.  It's one of those -- one of the

4    alternatives.

5         Q.  And with respect to green infrastructure, if

6    you go to the bottom of this page, 6- -- Section 6.2.1,

7    Implementing Green Infrastructure with Other

8    Infrastructure Projects, in the middle of this

9    paragraph, there's a sentence that reads:  "During the

10   alternative evaluation phase, it was determined that

11   implementing green infrastructure, or GI, solely for

12   the purpose of CSO production is not cost-effective

13   when compared with storage and conveyance facilities.

14            However, if GI can be implemented jointly with

15   other infrastructure improvements, as integrated

16   infrastructure strategy, such as road repaving, water

17   main replacements, and other improvements within the

18   right of way, the incremental costs of implementing

19   green infrastructure can be reduced while producing

20   additional CSO benefits."

21            Did I read that correctly?

22       A.  Yes.

23       Q.  And that's, in fact, what the City has done,

24   right?  They've adopted that process of adding green

25   infrastructure to roadway projects, correct?

1

2    STATE OF WASHINGTON      )
                             )    ss.
3    COUNTY OF SPOKANE        )

4

5           I, Anna M. Stewart, do hereby certify that at

6    the time and place heretofore mentioned in the caption

7    of the foregoing matter, I was a Certified Court

8    Reporter for Washington; that at said time and place I

9    reported in stenotype all testimony adduced and

10   proceedings had in the foregoing matter; that

11   thereafter my notes were reduced to typewriting and

12   that the foregoing transcript consisting of 103

13   typewritten pages is a true and correct transcript of

14   all such testimony adduced and proceedings had and of

15   the whole thereof.

16          I further certify that I am herewith securely

17   sealing the said original deposition transcript and

18   promptly delivering the same to Mr. Campbell.

19          Witness my hand at Spokane, Washington, on this

20   16th day of September, 2019.

21

22          *Anna Stewart*

23          _____
            Anna M. Stewart
            CCR NO. 3313
24          Certified Court Reporter

25

```
                                                    Page 354
1                        ERRATA SHEET
2    Case Name:
3    Deposition Date:
4    Deponent:
5    Pg.  No. Now Reads      Should Read    Reason
6    255  20 MacInnis        McInnis        Correct Spelling
7    ___  ___ _____    _____    _____
8    ___  ___ _____    _____    _____
9    ___  ___ _____    _____    _____
10   ___  ___ _____    _____    _____
11   ___  ___ _____    _____    _____
12   ___  ___ _____    _____    _____
13   ___  ___ _____    _____    _____
14   ___  ___ _____    _____    _____
15   ___  ___ _____    _____    _____
16   ___  ___ _____    _____    _____
17   ___  ___ _____    _____    _____
18   ___  ___ _____    _____    _____
19   ___  ___ _____    _____    _____
20
21                          Signature of Deponent
22                                        Notary Public
                                          State of Washington
23   SUBSCRIBED AND SWORN BEFORE ME       ROSEMARIE HULVEY
     THIS 14th DAY OF October , 2019.     MY COMMISSION EXPIRES
24   Rosemarie Hulvey                     FEBRUARY 19, 2021
25   (Notary Public)   MY COMMISSION EXPIRES: 2/19/21
```

Dec GMV Re: Opposition to Pl MILs 000342

# ERRATA SHEET

| | | | |
|---|---|---|---|
| Case Name: | City of Spokane v. Monsanto Company, et al | | |
| Deposition Date: | September 10, 2019 | | |
| Deponent: | Marcia Davis<br>Volume I | | |

| Pg. | No. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| 18 | 10 | Kathleen Kack | Kathleen Keck | name spelling |
| 18 | 11 | K-a-c-k | Keck | correct spelling |
| 21 | 20 | judgment of well | judgment as well | wrong word |
| 33 | 23 | the timing | the time | wrong word |
| 34 | 7 | expect, | expert, | wrong word |
| 36 | 5 | 303(b) | 303(d) | correct letter |
| 37 | 22 | MS4 bay | MS4 basins | delete word bay |
| 39 | 25 | moderating | monitoring | wrong word |
| 46 | 3 | Ricky | Rick | correct spelling |
| 78 | 11 | chemistry | chemist | wrong word |
| 103 | 11 | would have been | could have been | correct word |
| 104 | 18 | read for | read were for | missing word |
| 105 | 13 | "DOTMDL" | "DO TMDL" | insert space |
| 105 | 19 | DOTMDL | DO TMDL | insert space |
| 114 | 25 | $1,026,000 | $1,260,000 | correct number |
| 116 | 20 | insulation | installation | correct word |
| 148 | 16 | going doing | doing | remove extra word |

| 183 | 19 | the the | the | remove extra word |
| 194 | 8 | absorbed | adsorbed | wrong word |
| 214 | 2 | splitter | spreader | wrong word |
| 227 | 4 | assure | ensure | wrong word |
| 236 | 8 | gonna | going to | wrong word |

_____
Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME THIS 9th DAY OF October, 2019.

_____
Notary Public

My Commission Expires: _____2/19/21_____

Notary Public
State of Washington
ROSEMARIE HULVEY
MY COMMISSION EXPIRES
FEBRUARY 19, 2021