# EXHIBIT 38

002010

Issuance Date:  March 30, 2000
Effective Date:  April 1, 2000
Expiration Date:  March 29, 2005

# NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM
## WASTE DISCHARGE PERMIT No. WA-002447-3

State of Washington
DEPARTMENT OF ECOLOGY
Spokane, WA  99205

In compliance with the provisions of
The State of Washington Water Pollution Control Law
Chapter 90.48 Revised Code of Washington
and
The Federal Water Pollution Control Act
(The Clean Water Act)
Title 33 United States Code, Section 1251 et seq.

authorizes

City of Spokane
Wastewater Treatment Plant and Combined Sewer Overflows
4401 N. Aubrey L. White Parkway
Spokane, WA  99205

and

Spokane County (Pretreatment Program)
Division of Utilities 1026 W. Broadway Ave.
Spokane, WA  99260-0430

| | |
|---|---|
| Plant Location: N. 4401 A.L. White Pkwy<br>Spokane, WA | Receiving Water<br>Spokane River |
| Water Body I.D. No.:<br>WA-54-1020 (old)<br>QZ45UE (new) | Discharge Location:  River Mile 67.4 (WWTP)<br>Latitude: 47° 41' 43" N<br>Longitude: 117° 28' 26" W<br>CSO Outfalls:  24 outfalls in various locations |
| Plant Type: Activated Sludge | |

to discharge waste water in accordance with the special and general conditions that follow.

EXHIBIT 26
HENDRON
30(B)(6)
6/7/19
Monna Nickeson, CCR 3322

Carl J. Nuechterlein
Water Quality Section Manager
Eastern Regional Office

# TABLE OF CONTENTS

SUMMARY OF PERMIT REPORT SUBMITTALS......................................................................4

**SPECIAL CONDITIONS**

S1.   Discharge LIMITATIONS.............................................................................................6
   A.   Effluent Limitations
   B.   Mixing Zone Descriptions

S2.   MONITORING REQUIREMENTS.................................................................................9
   A.   Monitoring Schedule
   B.   Sampling and Analytical Procedures
   C.   Flow Measurement
   D.   Laboratory Accreditation

S3.   Reporting and recordkeeping requirements ................................................................11
   A.   Reporting
   B.   Records Retention
   C.   Recording of Results
   D.   Additional Monitoring by the Permittee
   E.   Noncompliance Notification
   F.   Reporting unauthorized discharges

S4.   FACILITY LOADING ..................................................................................................13
   A.   Design Criteria
   B.   Plans for Maintaining Adequate Capacity
   C.   Notification of New or Altered Sources
   D.   Wasteload Assessment

S5.   OPERATION AND MAINTENANCE...........................................................................14
   A.   Certified Operator
   B.   O & M Program
   C.   Short-term Reduction
   D.   Electrical Power Failure
   E.   Prevent Connection of Inflow
   F.   Bypass Procedures
   G.   Operations and Maintenance Manual

S6.   PRETREATMENT (City of Spokane) ...........................................................................17
   A.   General Requirements
   B.   Monitoring Requirements
   C.   Reporting of Monitoring Results
   D.   Local Limit Development

S7.   PRETREATMENT (Spokane County)............................................................................23
   A.   General Requirements
   B.   Reporting of Monitoring Results
   C.   Local Limit Development

S8.    RESIDUAL SOLIDS.................................................................................27

S9.    ENGINEERING REPORT (FACILITY PLAN).................................................28
    A.    Plans and Specifications
    B.    Construction Quality Assurance Plan

S10.    SPILL PLAN .................................................................................28

S11.    ACUTE TOXICITY .................................................................................29
    A.    Testing Requirements
    B.    Sampling and Reporting Requirements

S12.    CHRONIC TOXICITY.................................................................................30
    A.    Effluent Characterization
    B.    Effluent Limit for Chronic Toxicity
    C.    Monitoring for Compliance With an Effluent Limit for Chronic Toxicity
    D.    Response to Noncompliance With an Effluent Limit for Chronic Toxicity
    E.    Monitoring When There Is No Permit Limit for Chronic Toxicity
    F.    Sampling and Reporting Requirements

S13.    COMBINED SEWER OVERFLOWS .................................................................34
    A.    Discharge Locations
    B.    Combined Sewer Overflow Report
    C.    Combined Sewer Overflow Reduction Plan
    D.    Prohibition of Discharge From Combined Sewers during Dry Weather
    E.    Compliance Schedule

## GENERAL CONDITIONS

G1.    SIGNATORY REQUIREMENTS.................................................................38
G2.    RIGHT OF ENTRY .................................................................................38
G3.    PERMIT ACTIONS .................................................................................39
G4.    REPORTING A CAUSE FOR MODIFICATION .............................................39
G5.    PLAN REVIEW REQUIRED .................................................................39
G6.    COMPLIANCE WITH OTHER LAWS AND STATUTES .................................39
G7.    DUTY TO REAPPLY .................................................................................40
G8.    REMOVED SUBSTANCES .................................................................40
G9.    TOXIC POLLUTANTS.................................................................................40
G10.    OTHER REQUIREMENTS OF 40 CFR.................................................40
G11.    ADDITIONAL MONITORING.................................................................40
G12.    PAYMENT OF FEES.................................................................................40
G13.    PENALTIES FOR VIOLATING PERMIT CONDITIONS .............................40

## APPENDIX

SPRING INITIATION OF CHEMICAL PHOSPHORUS REMOVAL.......................................41

FALL TERMINATION OF CHEMICAL PHOSPHORUS REMOVAL....................................42

Permit No. WA-002447-3
Page 4 of 43

## SUMMARY OF PERMIT REPORT SUBMITTALS

Refer to the Special and General Conditions of this permit for additional submittal requirements.

| Permit Section | Submittal | Frequency | First Submittal Date |
|---|---|---|---|
| S3. | Discharge Monitoring Report | Monthly | May 15, 2000 |
| S3.E | Noncompliance Notification | As necessary | |
| S4.B. | Plans for Maintaining Adequate Capacity | As necessary | |
| S4.C. | Notification of New or Altered Sources | As necessary | |
| S4.D. | Wasteload Assessment | Annually | July 1, 2000 |
| S5.G. | Operations and Maintenance Manual Update or Review Confirmation Letter | Annually | October 1, 2000 |
| S6.A.2. | Accidental Spill Prevention Program Plan Update (City) | 1/permit cycle | October 1, 2001 |
| S6.A.5. | Pretreatment Report (City) | 1/year | March 31, 2000 |
| S7.A.2. | Accidental Spill Prevention Program Plan Update (County) | 1/permit cycle | October 1, 2001 |
| S7.A.5. | Pretreatment Report (County) | 1/year | March 15, 2001 |
| S9. | Facility Plan (amendment) | once | May 1, 2000 |
| S10. | Spill Plan Update | 1/permit cycle | July 1, 2000 |
| S11.A.1 | Acute Toxicity Effluent Characterization with Permit Renewal Application | 2/permit cycle | August 1, 2004: Once in the Last Summer & Once in the Last Winter Prior to Submission of the Renewal Application |
| S12.A | Chronic Toxicity Characterization Data | | 60 days after each sampling event |
| S12.A | Chronic Toxicity Tests Characterization Summary Report | 1/permit cycle | 90 days following the last characterization sampling event |
| S12.C | Chronic Toxicity Compliance Monitoring Reports | As necessary | 60 days after each sampling event |
| S12.D | Chronic Toxicity: "Causes and Preventative Measures for Transient Events." | As necessary | |
| S12.D | Chronic Toxicity TI/TRE Plan | As necessary | |

| Permit Section | Submittal | Frequency | First Submittal Date |
|---|---|---|---|
| S12.E | Chronic Toxicity Effluent Characterization with Permit Renewal Application | 2/permit cycle | Once in the Last Summer & Once in the Last Winter Prior to Submission of the Renewal Application |
| S13.B | Combined Sewer Overflow Report | Annually | July 1, 2000 |
| S13.C | Combined Sewer Overflow Reduction Plan Amendment | At permit renewal | |
| S13.E.3. | O&M Plan for CSO weirs and outfalls | once | April 30, 2000 |
| S13.E.5. | CSO Impact Monitoring Plan | once | May 1, 2000 |
| S13.E.6. | CSO Public Notification Plan | once | May 1, 2000 |
| G1. | Notice of Change in Authorization | as necessary | |
| G4. | Permit Application for Substantive Changes to the Discharge | As necessary | |
| G5. | Engineering Report for Construction or Modification Activities | As necessary | |
| G7. | Application for permit renewal | 1/permit cycle | September 1, 2004 |

Permit No. WA-002447-3
Page 6 of 43

## SPECIAL CONDITIONS

### S1.    DISCHARGE LIMITATIONS

A.    <u>Effluent Limitations</u>

All discharges and activities authorized by this permit shall be consistent with the terms and conditions of this permit. The discharge of any of the following pollutants more frequently than, or at a concentration in excess of, that authorized by this permit shall constitute a violation of the terms and conditions of this permit.

Beginning on the effective date of this permit and lasting through the expiration date the Permittee is authorized to discharge municipal wastewater at the permitted location subject to the following limitations:

| LOW FLOW SEASON (JULY – OCT) EFFLUENT LIMITATIONS[a]:  OUTFALL # 005A | | |
|---|---|---|
| Parameter | Average Monthly | Average Weekly |
| Biochemical Oxygen Demand[b] (5 day) | 30 mg/L, 12,600 lbs/day | 45 mg/L, 18,900 lbs/day |
| Total Suspended Solids[b] | 30 mg/L, 10,530 lbs/day | 45 mg/L, 15,795 lbs/day |
| Fecal Coliform Bacteria | 200 /100 mL | 400 /100 mL |
| pH[c] | Daily minimum is equal to or greater than 6 and the daily maximum is less than or equal to 7.8. | |
| Parameter | Average Monthly | Maximum Daily[d] |
| Total Ammonia (as $NH_3$-N)[e] | 1.61 mg/L, 591 lbs/day | 6.33 mg/L, 2,323 lbs/day |
| Total Residual Chlorine | 8.5 µg/L, 3.12 lbs/day[1,2] | 22.2 µg/L, 14.26 lbs/day[1,2] |
| Phosphorus (total as P) | Monthly average of 85 % minimum removal during the removal season[f] | |
| Cadmium (tot. recoverable) | 0.188 µg/L | 0.327 µg/L |
| Lead (tot. recoverable) | 1.98 µg/L | 3.18 µg/L |
| Zinc (tot. recoverable) | 60.55 µg/L | 82.20 µg/L |
| HIGH FLOW SEASAON (NOV- JUNE) EFFLUENT LIMITATIONS[a]:  OUTFALL # 005A | | |
| Parameter | Average Monthly | Average Weekly |
| Biochemical Oxygen Demand[b] (5 day) | 30 mg/L, 12,600 lbs/day | 45 mg/L, 18,900 lbs/day |
| Total Suspended Solids[b] | 30 mg/L, 10,530 lbs/day | 45 mg/L, 15,795 lbs/day |
| Fecal Coliform Bacteria | 200 /100 mL | 400 /100 mL |
| pH[c] | Daily minimum is equal to or greater than 6 and the daily maximum is less than or equal to 7.8. | |

| Parameter | Average Monthly | Maximum Daily[d] |
|---|---|---|
| Ammonia (total as NH$_3$-N)[e] | 5.30 mg/L, 2,290 lbs/day | 13.4 mg/L, 13,522 lbs/day |
| Residual Chlorine (total) | 8.9 µg/L, 3.86 lbs/day[1,2] | 23.4 µg/L, 23.61 lbs/day[1,2] |
| Phosphorus (total as P) | Monthly average of 85 % minimum removal during the removal season[f] | |
| Cadmium (tot. recoverable) | 0.188 µg/L | 0.327 µg/L |
| Lead (tot. recoverable) | 1.98 µg/L | 3.18 µg/L |
| Zinc (tot. recoverable) | 60.55 µg/L | 82.20 µg/L |

[a]The average monthly and weekly effluent limitations are based on the arithmetic mean of the samples taken with the exception of fecal coliform, which is based on the geometric mean.

[b]The average monthly effluent concentration for BOD$_5$ and Total Suspended Solids shall not exceed 30 mg/L or 15 percent of the respective monthly average influent concentrations, whichever is more stringent. When precipitation induced combined sewer flow to the plant exceeds the maximum capacity of the secondary treatment portion of the plant for more than eight hours and results in the need for partial plant bypass, the influent and effluent values for that day may be excluded from the calculation of the average monthly percent removal. The daily values during the same event may also be excluded from the average weekly and monthly calculation for pounds of effluent BOD$_5$ and TSS. This exemption only applies under the conditions that all flow must receive at least primary treatment, all other permit conditions are met, and the plant discharge does not cause any violation of Water Quality Standards.

[c]Indicates the range of permitted values. When pH is continuously monitored, excursions between 5.0 and 6.0, or 7.8 and 8.5 shall not be considered violations provided no single excursion exceeds 60 minutes in length and total excursions do not exceed 7 hours and 30 minutes per month. Any excursions below 5.0 and above 8.5 are violations. The instantaneous maximum and minimum pH shall be reported monthly.

[d]The maximum daily effluent limitation is defined as the highest allowable daily discharge. The daily discharge means the discharge of a pollutant measured during a calendar day. For pollutants with limitations expressed in units of mass, the daily discharge is calculated as the total mass of the pollutant discharged over the day. For other units of measurement, the daily discharge is the average measurement of the pollutant over the day.

[e]There are no ammonia toxicity-based effluent limits when the Spokane River's 7-day average flow is greater than 5000 cfs as measured at the Monroe Street Gage. As with all limits, new information can be cause for modification.

[f]Seasonal chemical phosphorus removal must be initiated by no later than June 1, or terminate no earlier than October 15. The determination of variable spring initiation or fall termination of phosphorus removal outside the June1 – October 15 time period shall be made in accordance with approved methodology and procedural guidelines contained in the Appendix. The monthly average shall be calculated using only the days when chemical removal is required.

Footnotes:

(1) The method detection (MDL) for Total Residual Chlorine is 10 µg/L. The respective quantitation level (QL) is obtained by multiplying the MDL by 5 (50 µg/L).

The method detection level (MDL) for cadmium, lead, and zinc, are 0.013 µg/L, 0.015 µg/L, and 0.14 µg/L respectively using EPA method 1638. The respective quantitation levels (QL) are obtained by multiplying each MDL by 5 (0.065 µg/L, 0.080 µg/L, and 0.70 µg/L).

These QLs will be used for assessment of compliance with these effluent limits. If the Permittee is unable to attain the MDL and QL in its effluent due to matrix effects, the Permittee shall submit a matrix specific MDL and QL to the Department by (nine months after the effective date). The matrix specific MDL and QL shall be calculated as follows:

> MDL = 3.14 x (standard deviation of 7 replicate spiked samples). This corresponds to the calculation of the method detection limit, as defined in 40 CFR Part 136, Appendix B, with the provision that the MDL be calculated for a specific effluent matrix.

> The QL = 5 x MDL

Check standards at concentrations equal to the QL shall be analyzed alongside all compliance monitoring samples. Check standards shall be produced independently of calibration standards and maintained as a part of the Permittee's records. All check standard recovery data and duplicate measurements shall be submitted to the Department in the discharge monitoring report. The Department's precision goal is +/- 20%.

[2] If the measured effluent concentration is below the QL as determined in Footnote #1 above, the Permittee shall report NQ for non-quantifiable.

Average values shall be calculated as follows: measurements below the MDL = 0; measurements greater than the MDL = the measurement.

When sample measurements for compliance with mass-based limits fall below the MDL, the average loading shall be calculated using a concentration value of zero.

When sample measurements for compliance with mass-based limits fall above the MDL, the average loading shall be calculated using the measured concentration.

B.   Mixing Zone Descriptions

The maximum boundaries of the mixing zones are defined as follows:

The mixing zone dimensional boundary shall be variable as defined by the effluent plume where the percent effluent is equivalent to that calculated from the maximum dilution factor. The dilution factor will be derived based on the maximum fraction of the river flow authorized for acute (2.5%) and chronic (25%) mixing zones at the established critical conditions (seasonal 7Q20). At no time shall the mixing zone cause a loss of sensitive or important habitat, substantially interfere with the existing or characteristic uses of the water body, result in damage to the ecosystem, or adversely affect public health. The calculated dilution factors at critical conditions are as follows:

| Dilution Factors (% effluent = 100 x 1/dil. factor) | Low River Flow Period (July – October) | | High River Flow Period (November – June) | |
|---|---|---|---|---|
| | Acute | Chronic | Acute | Chronic |
| Aquatic Life | 1.17 (85%) | 3.96 (25%) | 1.23 (81%) | 6.40 (16%) |
| Human Health, Carcinogen | 12.75 (8%, annually based) | | | |
| Human Health, Non-carcinogen | 5.19 (19%, annually based) | | | |

## S2.   MONITORING REQUIREMENTS

### A.   Monitoring Schedule

| MAIN PLANT DISCHARGE AT OUTFALL 005A | | | |
|---|---|---|---|
| Parameter | SAMPLE POINT | SAMPLING FREQUENCY | SAMPLE TYPE |
| Flow | raw sewage<br>final effluent | continuous[1]<br>continuous[1] | metered<br>metered |
| pH | raw sewage<br>final effluent | continuous[1]<br>continuous[1] | metered<br>metered |
| Temp | raw sewage<br>final effluent | daily<br>daily | grab<br>grab |
| BOD$_5$ | raw sewage<br>final effluent | daily<br>daily | 24 hr. comp.<br>24 hr. comp. |
| TSS | raw sewage<br>final effluent | daily<br>daily | 24 hr. comp.<br>24 hr. comp. |
| Immediate Oxygen Demand | final effluent | 2/week | grab |
| Dissolved Oxygen | final effluent | daily | grab |
| Total Residual Chlorine[2] | final effluent | 2/day | grab |
| Chlorine Usage | --- | daily | report |
| Fecal Coliform | final effluent | 3/week | grab |
| Total Organic Nitrogen (TON as N) | raw sewage<br>final effluent | 1/week<br>1/week | 24 hr. comp.<br>24 hr. comp. |

| MAIN PLANT DISCHARGE AT OUTFALL 005A | | | |
|---|---|---|---|
| **Parameter** | **SAMPLE POINT** | **SAMPLING FREQUENCY** | **SAMPLE TYPE** |
| Nitrate + Nitrite ($NO_3 + NO_2$ as N) | raw sewage<br>final effluent | 1/week<br>1/week | 24 hr. comp.<br>24 hr. comp. |
| Total Ammonia ($NH_4$ as N) | raw sewage<br>final effluent | 3/week<br>daily | 24 hr. comp.<br>24 hr. comp. |
| Alkalinity, (total as $CaCO_3$) | final effluent | 3/week | grab |
| Total Phosphorus (as P) | raw sewage<br>final effluent | daily (Apr. – Oct.)<br>daily (Apr. – Oct.) | 24 hr. comp.<br>24 hr. comp. |
| Aluminum (total recoverable.) | final effluent | 1/ 2 weeks when using Alum | 24 hr. comp. |
| Arsenic (total recov.)[3] | final effluent | 1/ 2 weeks | 24 hr. comp |
| Cadmium (total recov.)[3] | final effluent | 1/ 2 weeks | 24 hr. comp |
| Copper (total recov.)[3] | final effluent | 1/ 2 weeks | 24 hr. comp |
| Lead (total recoverable)[3] | final effluent | 1/ 2 weeks | 24 hr. comp |
| Zinc (total recoverable)[3] | final effluent | 1/ 2 weeks | 24 hr. comp |
| Mercury (total)[3] | final effluent | 1/month | 24 hr. comp. |
| Silver (total recoverable)[3] | final effluent | 1/month | 24 hr. comp. |
| Priority Pollutants | SEE SPECIAL CONDITION S6 | | |
| Biomonitoring | SEE SPECIAL CONDITIONS S12 and S13 | | |
| CSO Monitoring | SEE SPECIAL CONDITION S14.E.5 | | |

[1] Continuous means uninterrupted except for brief lengths of time for calibration, for power failure, or for unanticipated equipment repair or maintenance. Sampling shall be taken by hourly grab samples when continuous monitoring is not possible.

[2] Total Residual Chlorine analyses using the spectrophotometric DPD method.

[3] Sampling and analyses shall be performed using the appropriate methods from the EPA 1600 series.

B.  Sampling and Analytical Procedures

Samples and measurements taken to meet the requirements of this permit shall be representative of the volume and nature of the monitored parameters, including representative sampling of any unusual discharge or discharge condition, including bypasses, upsets and maintenance-related conditions affecting effluent quality.

Sampling and analytical methods used to meet the water and wastewater monitoring requirements specified in this permit shall conform to the latest revision of the *Guidelines Establishing Test Procedures for the Analysis of Pollutants* contained in 40 CFR Part 136 or to the latest revision of *Standard Methods for the Examination of Water and Wastewater* (APHA), unless otherwise specified in this permit or approved in writing by the Department of Ecology (Department).

C.  Flow Measurement

Appropriate flow measurement devices and methods consistent with accepted scientific practices shall be selected and used to ensure the accuracy and reliability of measurements of the quantity of monitored flows.  The devices shall be installed, calibrated, and maintained to ensure that the accuracy of the measurements are consistent with the accepted industry standard for that type of device.  Frequency of calibration shall be in conformance with manufacturer's recommendations and at a minimum frequency of at least one calibration per year. Calibration records shall be maintained for at least three years.

D.  Laboratory Accreditation

All monitoring data required by the Department shall be prepared by a laboratory registered or accredited under the provisions of, *Accreditation of Environmental Laboratories*, Chapter 173-50 WAC.  Flow, temperature, settleable solids, conductivity, pH, and internal process control parameters are exempt from this requirement.  Conductivity and pH shall be accredited if the laboratory must otherwise be registered or accredited. Crops, soils and hazardous waste data are exempted from this requirement pending accreditation of laboratories for analysis of these media by the Department.

# S3.  REPORTING AND RECORDKEEPING REQUIREMENTS

The Permittee shall monitor and report in accordance with the following conditions.  The falsification of information submitted to the Department shall constitute a violation of the terms and conditions of this permit.

A.  Reporting

The first monitoring period begins on the effective date of the permit.  Monitoring results shall be submitted monthly.  Monitoring data obtained during the previous month shall be summarized and reported on a form provided, or otherwise approved, by the Department, and be received no later than the 15th day of the

month following the completed monitoring period, unless otherwise specified in this permit. Priority pollutant analysis data shall be submitted no later than 45 days following the monitoring period. The report(s) shall be sent to the Department of Ecology, Eastern Regional Office, 4601 North Monroe, Suite 202, Spokane, Washington 99205-1295.

All lab reports providing data for organic and metal parameters shall include the following information: sampling date, sample location, date of analysis, parameter name, CAS number, analytical method/ number, method detection limit (MDL), lab practical quantitation limit (PQL), reporting units and concentration detected.

Discharge Monitoring Report forms must be submitted monthly whether or not the facility was discharging. If there was no discharge or the facility was not operating during a given monitoring period, submit the form as required with the words "no discharge" entered in place of the monitoring results.

B.    Records Retention

The Permittee shall retain records of all monitoring information for a minimum of three years. Such information shall include all calibration and maintenance records and all original recordings for continuous monitoring instrumentation, copies of all reports required by this permit, and records of all data used to complete the application for this permit. This period of retention shall be extended during the course of any unresolved litigation regarding the discharge of pollutants by the Permittee or when requested by the Director.

C.    Recording of Results

For each measurement or sample taken, the Permittee shall record the following information: (1) the date, exact place, method, and time of sampling; (2) the individual who performed the sampling or measurement; (3) the dates the analyses were performed; (4) who performed the analyses; (5) the analytical techniques or methods used; and (6) the results of all analyses.

D.    Additional Monitoring by the Permittee

If the Permittee monitors any pollutant more frequently than required by this permit using test procedures specified by Condition S2. of this permit, then the results of this monitoring shall be included in the calculation and reporting of the data submitted in the Permittee's self-monitoring reports.

E.    Noncompliance Notification

In the event the Permittee is unable to comply with any of the permit terms and conditions due to any cause, the Permittee shall:

1.    Immediately take action to stop, contain, and cleanup unauthorized discharges or otherwise stop the violation, and correct the problem;

2.    Repeat sampling and analysis of any violation and submit the results to the Department within 30 days after becoming aware of the violation;

3.    Immediately notify the Department of the failure to comply; and

4.    Submit a detailed written report to the Department within thirty days (5 days for upsets and bypasses), unless requested earlier by the Department.

The report should describe the nature of the violation, corrective action taken and/or planned, steps to be taken to prevent a recurrence, results of the resampling, and any other pertinent information.

Compliance with these requirements does not relieve the Permittee from responsibility to maintain continuous compliance with the terms and conditions of this permit or the resulting liability for failure to comply.

F.    Reporting unauthorized discharges

Unauthorized discharges such as collection system overflows, plant bypasses, or failure of the disinfection system, shall be reported immediately to the Department of Ecology and the Spokane Regional Health District. The Department of Ecology's Eastern Regional Office 24-hr. number is 509-456-2926, and the Spokane Regional Health District 24-hr. number is 509-324-1519.

## S4.    FACILITY LOADING

A.    Design Criteria

Flows or waste loadings of the following design criteria for the permitted treatment facility shall not be exceeded:

| | |
|---|---|
| Average dry weather flow for the maximum month: | 44 MGD |
| Annual average $BOD_5$ loading: | 70,000 lb./day |
| Annual average TSS loading : | 58,000 lb./day |
| Design population equivalent | 205,000 |

B.    Plans for Maintaining Adequate Capacity

When the actual flow or wasteload reaches 85 percent of any one of the design criteria in S4.A. for three consecutive months, or when the projected increases would reach design capacity within five years, whichever occurs first, the Permittee shall submit to the Department, a plan and a schedule for continuing to maintain capacity at the facility sufficient to achieve the effluent limitations and other conditions of this permit. This plan shall address any of the following actions or any others necessary to meet this objective.

1.    Analysis of the present design including the introduction of any process modifications that would establish the ability of the existing facility to achieve the effluent limits and other requirements of this permit at specific levels in excess of the existing design criteria specified in paragraph A above.

2.    Reduction or elimination of excessive infiltration and inflow of uncontaminated ground and surface water into the sewer system.

3.    Limitation on future sewer extensions or connections or additional wasteloads.

002023

4. Modification or expansion of facilities necessary to accommodate increased flow or wasteload.

5. Reduction of industrial or commercial flows or waste loads to allow for increasing sanitary flow or wasteload.

Engineering documents associated with the plan must meet the requirements of WAC 173-240-060, "Engineering Report". The plan shall specify any contracts, ordinances, methods for financing, or other arrangements necessary to achieve this objective.

C.    Notification of New or Altered Sources

The Permittee shall submit written notice to the Department whenever any new discharge or increase in volume or change in character of an existing discharge into the sewer is proposed which: (1) would interfere with the operation of, or exceed the design capacity of, any portion of the collection or treatment system; (2) is not part of an approved general sewer plan or approved plans and specifications; or would be subject to pretreatment standards under 40 CFR Part 403 and Section 307(b) of the Clean Water Act. This notice shall include an evaluation of the system's ability to adequately transport and treat the added flow and/or wasteload.

D.    Wasteload Assessment

The Permittee shall conduct an annual assessment of their flow and waste load and submit a report to the Department annually by July 1st. The report shall contain the following: an indication of compliance or noncompliance with the permit effluent limitations; a comparison between the existing and design monthly average dry weather and wet weather flows, peak flows, BOD, and total suspended solids loadings and the percentage increase in these parameters since the last annual report. The report shall also state the present and design population or population equivalent, projected population growth rate, and the estimated date upon which the design capacity is projected to be reached, according to the most restrictive of the parameters above.

## S5.  OPERATION AND MAINTENANCE

The Permittee shall at all times be responsible for the proper operation and maintenance of any facilities or systems of control installed to achieve compliance with the terms and conditions of the permit.

A.    Certified Operator

An operator certified for at least a Class 4 plant by the State of Washington shall be in responsible charge of the day-to-day operation of the wastewater treatment plant. An operator certified for at least a Class 3 plant shall be in charge during all regularly scheduled shifts.

B.    O & M Program

The Permittee shall institute an adequate operation and maintenance program for their entire sewage system. Maintenance records shall be maintained on all major electrical and mechanical components of the treatment plant, as well as the sewage system and pumping stations. Such records shall clearly specify the frequency and type of maintenance recommended by the manufacturer and shall show the frequency and type of maintenance performed. These maintenance records shall be available for inspection at all times.

C.    Short-term Reduction

If a Permittee contemplates a reduction in the level of treatment that would cause a violation of permit discharge limitations on a short-term basis for any reason, and such reduction cannot be avoided, the Permittee shall give written notification to the Department, if possible, 30 days prior to such activities, detailing the reasons for, length of time of, and the potential effects of the reduced level of treatment. This notification does not relieve the Permittee of their obligations under this permit.

D.    Electrical Power Failure

The Permittee is responsible for maintaining adequate safeguards to prevent the discharge of untreated wastes or wastes not treated in accordance with the requirements of this permit during electrical power failure at the treatment plant and/or sewage lift stations either by means of alternate power sources, standby generator, or retention of inadequately treated wastes. The Permittee shall maintain Reliability Class II (EPA 430-99-74-001) at the wastewater treatment plant, which requires primary sedimentation and disinfection.

E.    Prevent Connection of Inflow

The Permittee shall strictly enforce their sewer ordinances and not allow the connection of inflow (roof drains, foundation drains, etc.) to the sanitary sewer system.

F.    Bypass Procedures

The Permittee shall immediately notify the Department of any spill, overflow, or bypass from any portion of the collection or treatment system.

The bypass of wastes from any portion of the treatment system is prohibited unless one of the following conditions (1, 2, or 3) applies:

1.    Unavoidable Bypass -- Bypass is unavoidable to prevent loss of life, personal injury, or severe property damage. "Severe property damage" means substantial physical damage to property, damage to the treatment facilities which would cause them to become inoperable, or substantial and permanent loss of natural resources which can reasonably be expected to occur in the absence of a bypass.

If the resulting bypass from any portion of the treatment system results in noncompliance with this permit the Permittee shall notify the Department in accordance with condition S3.E "Noncompliance Notification."

2.  Anticipated Bypass That Has the Potential to Violate Permit Limits or Conditions -- Bypass is authorized by an administrative order issued by the Department. The Permittee shall notify the Department at least 30 days before the planned date of bypass. The notice shall contain (1) a description of the bypass and its cause; (2) an analysis of all known alternatives which would eliminate, reduce, or mitigate the need for bypassing; (3) a cost-effectiveness analysis of alternatives including comparative resource damage assessment; (4) the minimum and maximum duration of bypass under each alternative; (5) a recommendation as to the preferred alternative for conducting the bypass; (6) the projected date of bypass initiation; (7) a statement of compliance with SEPA; (8) if a water quality criteria exceedence is unavoidable, a request for modification of water quality standards as provided for in WAC 173-201A-110, and (9) steps taken or planned to reduce, eliminate, and prevent reoccurrence of the bypass.

For probable construction bypasses, the need to bypass is to be identified as early in the planning process as possible. The analysis required above shall be considered during preparation of the engineering report or facilities plan and plans and specifications and shall be included to the extent practical. In cases where the probable need to bypass is determined early, continued analysis is necessary up to and including the construction period in an effort to minimize or eliminate the bypass.

The Department will consider the following prior to issuing an administrative order:

a.  If the bypass is necessary to perform construction or maintenance-related activities essential to meet the requirements of the permit.

b.  If there are feasible alternatives to bypass, such as the use of auxiliary treatment facilities, retention of untreated wastes, maintenance during normal periods of equipment down time, or transport of untreated wastes to another treatment facility.

c.  If the bypass is planned and scheduled to minimize adverse effects on the public and the environment.

After consideration of the above and the adverse effects of the proposed bypass and any other relevant factors, the Department will approve or deny the request. The public shall be notified and given an opportunity to comment on bypass incidents of significant duration, to the extent feasible. Approval of a request to bypass will be by administrative order issued by the Department under RCW 90.48.120.

3. Bypass For Essential Maintenance Without the Potential to Cause Violation of Permit Limits or Conditions -- Bypass is authorized if it is for essential maintenance and does not have the potential to cause violations of limitations or other conditions of the permit, or adversely impact public health as determined by the Department prior to the bypass.

G. Operations and Maintenance Manual

The approved Operations and Maintenance Manual shall be kept available at the treatment plant and all operators shall follow the instructions and procedures of this Manual.

An Operations and Maintenance (O&M) Manual shall be prepared by the Permittee in accordance with WAC 173-240-080. The O&M Manual shall be reviewed by the Permittee at least annually and the Permittee shall confirm this review by letter to the Department (first submitted by October 1, 2000). Substantial changes or updates to the O&M Manual shall be submitted to the Department whenever they are incorporated into the Manual.

The O&M Manual shall include:

1. Emergency procedures for plant shutdown and cleanup in event of wastewater system upset or failure;

2. Plant maintenance procedures;

3. The treatment plant process control monitoring schedule;

4. Operation of the plant during and after significant CSO events.

## S6. PRETREATMENT (CITY OF SPOKANE)

A. General Requirements

1. The Permittee (City of Spokane) shall implement the Industrial Pretreatment Program in accordance with the legal authorities, policies, procedures, and financial provisions described in the Permittee's approved pretreatment program submittal entitled "Industrial Pretreatment Program" and dated September 1987; any approved revisions thereto; and the General Pretreatment Regulations (40 CFR Part 403). At a minimum, the following pretreatment implementation activities shall be undertaken by the Permittee:

a. Locate and identify all possible industrial users which might be subject to the pretreatment program requirements and within 30 days notify all significant industrial users of their status as such and all requirements applicable to it as result of such status.

b.  Enforce categorical pretreatment standards promulgated pursuant to Section 307(b) and (c) of the Federal Clean Water Act (hereinafter, the Act), prohibited discharge standards as set forth in 40 CFR 403.5, local limitations specified in Section 13.03.0416 of Ordinance 13.03 (adopted January 19, 1993), or state standards, which ever are most stringent or apply at the time of issuance or modification of a local industrial waste discharge permit. Locally derived limitations shall be defined as pretreatment standards under Section 307(d) of the Act and shall not be limited to categorical industrial facilities.

c.  Issue industrial waste discharge permits to all significant industrial users (SIUs), as defined in 40 CFR 403.3(t)(i)(ii) contributing to the treatment system, including those from other jurisdictions connected to the sewer system but, do not have an approved pretreatment program. Industrial waste discharge permits shall contain as a minimum, all the requirements of 40 CFR 403.8 (f)(l)(iii). The Permittee shall coordinate the permitting process with the Department regarding any industrial facility, which may possess a state waste discharge permit issued by the Department. Once issued, an industrial waste discharge permit will take precedence over a state-issued waste discharge permit.

d.  Maintain and update annually, records identifying the nature, character, and volume of pollutants contributed by industrial users to the POTW. Records shall be maintained for at least a three-year period and be made available to the pubic at least to the extent provided by 40 CFR Part 403.14.

e.  Perform inspections, surveillance, and monitoring activities on industrial users to determine and/or confirm compliance with applicable pretreatment standards and requirements. A thorough inspection of SIUs shall be conducted annually. Frequency of regular local monitoring of SIU wastewaters shall normally be commensurate with the character and volume of the wastewater but shall not be less than once per year. Sample collection and analysis shall be performed in accordance with 40 CFR Part 403.12(b)(5)(ii)-(v) and 40 CFR Part 136.

f.  Enforce and obtain remedies for noncompliance by any industrial users with applicable pretreatment standards and requirements. Once violations have been identified, the Permittee shall take timely and appropriate enforcement action to address the noncompliance. The Permittee's action shall follow its enforcement response procedures and any amendments, thereof.

g.  Publish, at least annually in the largest daily newspaper in the Permittee's service area, a list of all nondomestic users which, at any time in the previous 12 months, were in significant noncompliance as defined in 40 CFR 403.8(f)(2)(vii).

h. If the Permittee elects to conduct sampling of a SIU's discharge in lieu of the user self-monitoring, it shall sample and analyze for all regulated pollutants in accordance with 40 CFR Part 403.12(b)(5)(ii)-(v), 40 CFR 403.12(g), and 40 CFR Part 136. The character and volume of the samples shall be representative of the discharge and shall provide adequate data to determine compliance, but in no case should sampling occur less than two (2) times per year.

i. Develop and maintain a data management system designed to track the status of the Permittee's industrial user inventory, industrial user discharge characteristics, and compliance status.

j. Maintain adequate staff, funds, and equipment to implement its pretreatment program.

k. Establish, where necessary, contracts or legally binding agreements with contributing jurisdictions to ensure compliance with applicable pretreatment requirements by commercial or industrial users within these jurisdictions. These contracts or agreements shall identify the agency responsible for the various implementation and enforcement activities to be performed in the contributing jurisdiction. In addition, the Permittee shall be required to develop a Memorandum of Understanding (or Interlocal Agreement) that outlines the specific roles, responsibilities and pretreatment activities of each jurisdiction.

2. The Permittee shall develop and submit to the Department for approval, no later than October 1, 2001, an updated Accidental Spill Prevention Program. The program, as approved by the Department, shall include a schedule for implementation, and shall become an enforceable part of these permit conditions.

3. The Permittee shall evaluate, at least once every two years, whether each Significant Industrial User needs a plan to control slug discharges. For purposes of this subsection, a slug discharge is any discharge of a nonroutine, episodic nature, including but not limited to an accidental spill or noncustomary batch discharge. The results of such activities shall be available to the Department upon request. If the Permittee decides that a slug control plan is needed, the plan shall contain, at a minimum, the following elements:

a. Description of discharge practices, including nonroutine batch discharges.

b. Description of stored chemicals.

c. Procedures for immediately notifying the Permittee of slug discharges, including any discharge that would violate a prohibition under 40 CFR 403.5(b), with procedures for follow-up written notification within five days.

d. If necessary, procedures to prevent adverse impact from accidental spills, including inspection and maintenance of storage areas, handling and transfer of materials, loading and unloading operations, control of plant site run-off, worker training, building of containment structures or equipment, measures for containing toxic organic pollutants (including solvents), and/or measures and equipment necessary for emergency response.

4. Whenever it has been determined, on the basis of information provided to or obtained by the Department, that any waste source contributes pollutants to the Permittee's treatment works in violation of Subsection (b), (c), or (d) of Section 307 of the Act, and the Permittee has not taken adequate corrective action, the Department shall notify the Permittee of this determination. Failure by the Permittee to commence an appropriate enforcement action within 30 days of this notification may result in appropriate enforcement action by the Department against the source and/or the Permittee.

5. Pretreatment Report

The Permittee shall provide to the Department an annual report that briefly describes its program activities during the previous calendar year. This report shall be submitted annually no later than March 31st of each year to: Washington Department of Ecology, Eastern Regional Office, 4601 North Monroe, Suite 202, Spokane, Washington 99205-1295.

The report shall include the following information:

a. An annually updated nondomestic inventory.

b. Results of wastewater sampling at the treatment plant as specified in S6.B of this permit. The Permittee shall calculate removal rates for each pollutant and evaluate the adequacy of the existing local limitations in Section 13.03.0416 of Ordinance 13.03 in prevention of treatment plant interference, pass through of pollutants that could affect receiving water quality, and sludge contamination.

c. Status of program implementation, including:

1. Any substantial modifications to the pretreatment program as originally approved by the Department, including staffing and funding levels.

2. Any interference, upset, or permit violations experienced at the POTW that are directly attributable to wastes from industrial users.

3. Listing of industrial users inspected and/or monitored, and a summary of the results.

    4.    Listing of industrial users scheduled for inspection and/or monitoring for the next year, and expected frequencies.

    5.    Listing of industrial users notified of promulgated pretreatment standards and/or local standards as required in 40 CFR 403.8(f)(2)(iii). Indicate which industrial users are on compliance schedules and the final date of compliance for each.

    6.    Listing of industrial users issued industrial waste discharge permits.

    7.    Planned changes in the pretreatment program implementation plan. (See subsection A.6. below.)

  d.    Status of compliance activities, including:

    1.    Listing of industrial users that failed to submit baseline monitoring reports or any other reports required under 40 CFR 403.12.

    2.    Listing of industrial users that were at any time during the reporting period not complying with federal, state, or local pretreatment standards or with applicable compliance schedules for achieving those standards, and the duration of such noncompliance.

    3.    Summary of enforcement activities and other corrective actions taken or planned against noncomplying industrial users. The Permittee shall supply to the Department a copy of the public notice of facilities that were in significant noncompliance.

  5.    The Permittee shall request and obtain approval from the Department prior to implementing any significant changes to the local pretreatment program as approved. The procedure of 40 CFR 403.18 (b) & (c) shall be followed.

B.    <u>Monitoring Requirements</u>

The Permittee shall monitor its influent, effluent, and sludge for the priority pollutants identified in Tables II and III of Appendix D of 40 CFR Part 122 as amended, any compounds identified as a result of Condition S6.B.4., and any other pollutants expected from nondomestic sources using U.S. EPA-approved procedures for collection, preservation, storage and analysis. Influent, effluent, and sludge samples shall be tested for the priority pollutant metals (Table III, 40 CFR 122, Appendix D) on a quarterly basis throughout the term of this permit. Influent, effluent, and sludge samples shall be tested for the organic priority pollutants (Table II, 40 CFR 122, Appendix D) on an annual basis.

1.  The POTW influent and effluent shall be sampled on a day when industrial discharges are occurring at normal to maximum levels. Samples for the analysis of acid and base/neutral extractable compounds and metals shall be 24-hour composites. Samples for the analysis of volatile organic compounds shall be collected using grab sampling techniques at equal intervals for the total of four grab samples per day.

    A single analysis for volatile pollutants (Method 624) may be run for each monitoring day by compositing equal volumes of each grab sample directly in the GC purge and trap apparatus in the laboratory, with no less than 1 ml of each grab included in the composite.

    Unless otherwise indicated, all reported test data for metals shall represent the total amount of the constituent present in all phases, whether solid, suspended, or dissolved, elemental or combined including all oxidation states.

    Wastewater samples must be handled, prepared, and analyzed by GC/MS in accordance with the U.S. EPA Methods 624 and 625 (October 26, 1984).

2.  A sludge sample shall be collected concurrent with a wastewater sample and may be taken as a single grab of residual sludge. Sampling and analysis shall conform to U.S. EPA Methods 624 and 625 unless the Permittee requests an alternate method and it has been approved by the Department.

3.  Cyanide, phenols and oils shall be taken as grab samples. Oils shall be hexane soluble or equivalent, and should be measured in the influent and effluent only.

4.  In addition to quantifying pH, oil and grease, and all priority pollutants, a reasonable attempt should be made to identify all other substances and quantify all pollutants shown to be present by gas chromatograph/mass spectrometer (GC/MS) analysis per 40 CFR 136, Appendix. A, Methods 624 and 625. Determinations of pollutants should be attempted for each fraction which produces identifiable spectra on total ion plots (reconstructed gas chromatograms). Determinations should be attempted from all peaks with responses 5% or greater than the nearest internal standard. The 5% value is based on internal standard concentrations of 30 μg/l, and must be adjusted downward if higher internal standard concentrations are used or adjusted upward if lower internal standard concentrations are used. Non-substituted aliphatic compounds may be expressed as total hydrocarbon content. Identification shall be attempted by a laboratory whose computer data processing programs are capable of comparing sample mass spectra to a computerized library of mass spectra, with visual confirmation by an experienced analyst. For all detected substances which are determined to be pollutants, additional sampling and appropriate testing shall be conducted to determine concentration and variability, and to evaluate trends.

C.    Reporting of Monitoring Results

The Permittee shall include a summary of monitoring results in the Annual Pretreatment Report.

D.    Local Limit Development

The Permittee shall, in consultation with the Department, reevaluate their local limits in order to prevent pass through or interference. Upon determination by the Department that any pollutant present causes pass through or interference, or exceeds established sludge standards, the Permittee shall establish new local limits or revise existing local limits as required by 40 CFR 403.5. In addition, the Department may require revision or establishment of local limits for any pollutant discharged from the POTW that has a reasonable potential to exceed the Water Quality Standards, Sediment Standards, or established effluent limits, or causes whole effluent toxicity. The determination by the Department may be in the form of an Administrative Order.

The Department may modify this permit to incorporate additional requirements relating to the establishment and enforcement of local limits for pollutants of concern. Any significant permit modification is subject to formal due process procedures pursuant to state and federal law and regulation.

## S7.    PRETREATMENT (SPOKANE COUNTY)

A.    General Requirements

1.    The Permittee (Spokane County) shall implement the Industrial Pretreatment Program and City/County Inter Local Agreement in accordance with the legal authorities, policies, procedures, and financial provisions described in the Permittee's approved pretreatment program submittal entitled "Pretreatment Program" and dated June 5, 1998; any approved revisions thereto; and the General Pretreatment Regulations (40 CFR Part 403). At a minimum, the following pretreatment implementation activities shall be undertaken by the Permittee:

a.    Locate and identify all possible industrial users which might be subject to the pretreatment program requirements and within 30 days notify all significant industrial users of their status as such and all requirements applicable to it as result of such status.

b.    Enforce categorical pretreatment standards promulgated pursuant to Section 307(b) and (c) of the Federal Clean Water Act (hereinafter, the Act), prohibited discharge standards as set forth in 40 CFR 403.5, local limitations specified in Section 8.03.4000 of Ordinance 8.03 (adopted January 19, 1993), or state standards, which ever are most stringent or apply at the time of issuance or modification of a local industrial waste discharge permit. Locally derived limitations shall be defined as pretreatment standards under Section 307(d) of the Act and shall not be limited to categorical industrial facilities.

c. Issue industrial waste discharge permits to all significant industrial users (SIUs), as defined in 40 CFR 403.3(t)(i)(ii)) contributing to the treatment system, including those from other jurisdictions connected to the sewer system but, do not have an approved pretreatment program. Industrial waste discharge permits shall contain as a minimum, all the requirements of 40 CFR 403.8 (f)(l)(iii). The Permittee shall coordinate the permitting process with the Department regarding any industrial facility which may possess a state waste discharge permit issued by the Department. Once issued, an industrial waste discharge permit will take precedence over a state-issued waste discharge permit.

d. Maintain and update annually records identifying the nature, character, and volume of pollutants contributed by industrial users to the POTW. Records shall be maintained for at least a three-year period and be made available to the pubic at least to the extent provided by 40 CFR. Part 403.14.

e. Perform inspections, surveillance, and monitoring activities on industrial users to determine and/or confirm compliance with applicable pretreatment standards and requirements. A thorough inspection of SIUs shall be conducted annually. Frequency of regular local monitoring of SIU wastewaters shall normally be commensurate with the character and volume of the wastewater but shall not be less than once per year. Sample collection and analysis shall be performed in accordance with 40 CFR Part 403.12(b)(5)(ii)-(v) and 40 CFR Part 136.

f. Enforce and obtain remedies for noncompliance by any industrial users with applicable pretreatment standards and requirements. Once violations have been identified, the Permittee shall take timely and appropriate enforcement action to address the noncompliance. The Permittee's action shall follow its enforcement response procedures and any amendments, thereof.

g. Publish, at least annually in the largest daily newspaper in the Permittee's service area, a list of all nondomestic users which, at any time in the previous 12 months, were in significant noncompliance as defined in 40 CFR 403.8(f)(2)(vii).

h. If the Permittee elects to conduct sampling of a SIU's discharge in lieu of the user self-monitoring, it shall sample and analyze for all regulated pollutants in accordance with 40 CFR Part 403.12(b)(5)(ii)-(v), 40 CFR 403.12(g), and 40 CFR Part 136. The character and volume of the samples shall be representative of the discharge and shall provide adequate data to determine compliance, but in no case should sampling occur less than two (2) times per year.

002034

i.    Develop and maintain a data management system designed to track the status of the Permittee's industrial user inventory, industrial user discharge characteristics, and compliance status.

j.    Maintain adequate staff, funds, and equipment to implement its pretreatment program.

k.    Establish, where necessary, contracts or legally binding agreements with contributing jurisdictions to ensure compliance with applicable pretreatment requirements by commercial or industrial users within these jurisdictions. These contracts or agreements shall identify the agency responsible for the various implementation and enforcement activities to be performed in the contributing jurisdiction. In addition, the Permittee shall be required to develop a Memorandum of Understanding (or Interlocal Agreement) that outlines the specific roles, responsibilities and pretreatment activities of each jurisdiction.

2.    The Permittee shall develop and submit to the Department for approval, no later than October 1, 2001, an updated Accidental Spill Prevention Program. The program, as approved by the Department, shall include a schedule for implementation, and shall become an enforceable part of these permit conditions.

3.    The Permittee shall evaluate, at least once every two years, whether each Significant Industrial User needs a plan to control slug discharges. For purposes of this subsection, a slug discharge is any discharge of a nonroutine, episodic nature, including but not limited to an accidental spill or noncustomary batch discharge. The results of such activities shall be available to the Department upon request. If the Permittee decides that a slug control plan is needed, the plan shall contain, at a minimum, the following elements:

a.    Description of discharge practices, including nonroutine batch discharges.

b.    Description of stored chemicals.

c.    Procedures for immediately notifying the Permittee of slug discharges, including any discharge that would violate a prohibition under 40 CFR 403.5(b), with procedures for follow-up written notification within five days.

d.    If necessary, procedures to prevent adverse impact from accidental spills, including inspection and maintenance of storage areas, handling and transfer of materials, loading and unloading operations, control of plant site run-off, worker training, building of containment structures or equipment, measures for containing toxic organic pollutants (including solvents), and/or measures and equipment necessary for emergency response.

Permit No. WA-002447-3
Page 26 of 43

4.    Whenever it has been determined, on the basis of information provided to or obtained by the Department, that any waste source contributes pollutants to the Permittee's treatment works in violation of Subsection (b), (c), or (d) of Section 307 of the Act, and the Permittee has not taken adequate corrective action, the Department shall notify the Permittee of this determination.  Failure by the Permittee to commence an appropriate enforcement action within 30 days of this notification may result in appropriate enforcement action by the Department against the source and/or the Permittee.

5.    Pretreatment Report

The Permittee shall provide to the Department an annual report that briefly describes its program activities during the previous calendar year.  This report shall be submitted annually no later than March 15th of each year to: Washington Department of Ecology, Eastern Regional Office, 4601 North Monroe, Suite 202, Spokane, Washington 99205-1295.

The report shall include the following information:

a.    An annually updated nondomestic inventory.

b.    Status of program implementation, including:

1.    Any substantial modifications to the pretreatment program as originally approved by the Department, including staffing and funding levels.

2.    Any interference, upset, or permit violations experienced at the POTW that are directly attributable to wastes from industrial users.

3.    Listing of industrial users inspected and/or monitored, and a summary of the results.

4.    Listing of industrial users scheduled for inspection and/or monitoring for the next year, and expected frequencies.

5.    Listing of industrial users notified of promulgated pretreatment standards and/or local standards as required in 40 CFR 403.8(f)(2)(iii).  Indicate which industrial users are on compliance schedules and the final date of compliance for each.

6.    Listing of industrial users issued industrial waste discharge permits.

7.    Planned changes in the pretreatment program implementation plan.  (See subsection A.6. below.)

c.    Status of compliance activities, including:

1. Listing of industrial users that failed to submit baseline monitoring reports or any other reports required under 40 CFR 403.12.

2. Listing of industrial users that were at any time during the reporting period not complying with federal, state, or local pretreatment standards or with applicable compliance schedules for achieving those standards, and the duration of such noncompliance.

3. Summary of enforcement activities and other corrective actions taken or planned against noncomplying industrial users. The Permittee shall supply to the Department a copy of the public notice of facilities that were in significant noncompliance.

6. The Permittee shall request and obtain approval from the Department prior to implementing any significant changes to the local pretreatment program as approved. The procedure of 40 CFR 403.18 (b) & (c) shall be followed.

B.   Reporting of Monitoring Results

The Permittee shall include a summary of influent, effluent, and sludge monitoring results obtained by the City in the Annual Pretreatment Report.

C.   Local Limit Development

The Permittee shall establish and implement any changes in local limits consistent with those developed by the City necessary to prevent pass through or interference as required by 40 CFR 403.5. In addition, the Department may require revision or establishment of local limits for any pollutant discharged from the POTW that has a reasonable potential to exceed the Water Quality Standards, Sediment Standards, or established effluent limits, or causes whole effluent toxicity. The determination by the Department shall be in the form of an Administrative Order.

The Department may modify this permit to incorporate additional requirements relating to the establishment and enforcement of local limits for pollutants of concern. Any permit modification is subject to formal due process procedures pursuant to state and federal law and regulation.

## S8.   RESIDUAL SOLIDS

Residual solids include screenings, grit, scum, primary sludge, waste activated sludge and other solid waste. The Permittee shall store and handle all residual solids in such a manner so as to prevent their entry into state ground or surface waters. The Permittee shall not discharge leachate from residual solids to state surface or ground waters.

## S9.    ENGINEERING REPORT (FACILITY PLAN)

No later than May 1, 2000, two copies of an approvable amendment to the conditionally approved Facility Plan shall be prepared by the Permittee in accordance with WAC 173-240 and submitted to the Department for review and approval.

The amendment shall adequately address the items outlined in the conditional approval of the Facility Plan and a specific timeline for implementation of the sewer and treatment plant upgrades necessary to maintain adequate wastewater treatment capacity, which will become an enforceable compliance schedule of this permit. Any amendments to the implementation schedule must be made as an addendum to the Facility Plan and submitted to Ecology for review and approval. The Facility Plan shall also include any appropriate requirements as described in the "Water Reclamation and Reuse Standards" (Washington State Department of Ecology and Department of Health, 1997). As required by RCW 90.48.112, the document must address the feasibility of using reclaimed water as defined in RCW 90.46.010.

A.    Plans and Specifications

The Permittee has been delegated engineering review authority for plans and specifications (excluding Facility Plans) of the wastewater treatment and collection system. The Permittee shall ensure that all plans and specifications are consistent with the requirements for engineering reports contained in WAC 173-240.

B.    Construction Quality Assurance Plan

Prior to the start of construction, the Permittee shall have in place, a reviewed and approved construction quality assurance plan as required by WAC 173-240.

## S10.    SPILL PLAN

The Permittee shall by July 1, 2000, submit to the Department an update to the existing Spill Control Plan.

The Permittee shall review the Plan at least annually and update as needed. Changes to the Plan shall be sent to the Department. The Plan and any supplements shall be followed throughout the term of the permit.

The updated Spill Control Plan shall include the following:

- A description of operator training to implement the Plan.

- A description of the reporting system which will be used to alert responsible managers and legal authorities in the event of a spill.

- A description of preventive measures and facilities (including an overall facility plot showing drainage patterns) which prevent, contain, or treat spills of these materials.

- A list of all oil and petroleum products, materials, which when spilled, or otherwise released into the environment, are designated Dangerous (DW) or Extremely Hazardous Waste (EHW) by the procedures set forth in WAC 173-303-070, or other materials which may become pollutants or cause pollution upon reaching state's waters.

- Plans and manuals required by 40 CFR Part 112, contingency plans required by Chapter 173-303 WAC, or other plans required by other agencies which meet the intent of this section may be submitted.

## S11.   ACUTE TOXICITY

A.   Testing Requirements

1.   The Permittee shall test final effluent once in the last summer no later than August 1, 2004 and once in the last winter prior to submission of the application for permit renewal.  The two species listed below shall be used on each sample and the results submitted to the Department as a part of the permit renewal application process.   The Permittee shall conduct acute toxicity testing on a series of five concentrations of effluent and a control in order to be able to determine appropriate point estimates and NOEC.  The percent survival in 100% effluent shall also be reported.

Acute toxicity tests shall be conducted with the following species and protocols:

1)  Fathead minnow, *Pimephales promelas* (96 hour static-renewal test, method: EPA/600/4-90/027F)

2)  Daphnid, *Ceriodaphnia dubia*, *Daphnia pulex*, or *Daphnia magna* (48 hour static test, method: EPA/600/4-90/027F).

B.   Sampling and Reporting Requirements

1.   All reports for effluent characterization or compliance monitoring shall be submitted in accordance with the most recent version of Department of Ecology Publication # WQ-R-95-80, *Laboratory Guidance and Whole Effluent Toxicity Test Review Criteria* in regards to format and content. Reports shall contain bench sheets and reference toxicant results for test methods.  If the lab provides the toxicity test data on floppy disk for electronic entry into the Department's database, then the Permittee shall send the disk to the Department along with the test report, bench sheets, and reference toxicant results.

2.   Testing shall be conducted on 24-hour composite effluent.  Samples taken for toxicity testing shall be cooled to 4 degrees Celsius while being collected and shall be sent to the lab immediately upon completion.  The lab shall begin the toxicity testing as soon as possible but no later than 36 hours after sampling was ended.

3. All samples and test solutions for toxicity testing shall have water quality measurements as specified in Department of Ecology Publication # WQ-R-95-80, *Laboratory Guidance and Whole Effluent Toxicity Test Review Criteria* or most recent version thereof.

4. All toxicity tests shall meet quality assurance criteria and test conditions in the most recent versions of the EPA manual listed in subsection A. and the Department of Ecology Publication # WQ-R-95-80, *Laboratory Guidance and Whole Effluent Toxicity Test Review Criteria.* If test results are determined to be invalid or anomalous by the Department, testing shall be repeated with freshly collected effluent.

5. Control water and dilution water shall be laboratory water meeting the requirements of the EPA manual listed in subsection A or pristine natural water of sufficient quality for good control performance.

6. The whole effluent toxicity tests shall be run on an unmodified sample of final effluent.

7. The Permittee may choose to conduct a full dilution series test during compliance monitoring in order to determine dose response. In this case, the series must have a minimum of five effluent concentrations and a control. The series of concentrations must include the July – October ACEC (85% effluent) regardless of when the sample was taken.

8. All whole effluent toxicity tests, effluent screening tests, and rapid screening tests that involve hypothesis testing and do not comply with the acute statistical power standard of 29% as defined in WAC 173-205-020 must be repeated on a fresh sample with an increased number of replicates to increase the power.

## S12. CHRONIC TOXICITY

A. <u>Effluent Characterization</u>

The Permittee shall conduct chronic toxicity testing on the final effluent. The two chronic toxicity tests listed below shall be conducted on each sample taken for effluent characterization. The July- October ACEC (85% effluent) and CCEC (25% effluent) shall apply to all toxicity test regardless of when the sample was taken.

Testing shall begin within 60 days of the permit effective date. A written report shall be submitted to the Department within 60 days after the sample date. A final effluent characterization summary report shall be submitted to the Department within 90 days after the last monitoring test results are final. This summary report shall include a tabulated summary of the individual test results and any information on sources of toxicity, toxicity source control, correlation with effluent data, and toxicity treatability which is developed during the period of testing.

Effluent testing for chronic toxicity shall be conducted every other month, for one year. The Permittee shall conduct chronic toxicity testing during effluent characterization on a series of at least five concentrations of effluent in order to determine appropriate point estimates. This series of dilutions shall include the July – October ACEC (85% effluent). The Permittee shall compare the ACEC to the control using hypothesis testing at the 0.05 level of significance as described in Appendix H, EPA/600/4-89/001.

Chronic toxicity tests shall be conducted with the following species and the most recent version of the following protocols:

| Freshwater Chronic Toxicity Test Species | | Method |
|---|---|---|
| Fathead minnow | *Pimephales promelas* | EPA/600/4-91/002 |
| Water flea | *Ceriodaphnia dubia* | EPA/600/4-91/002 |

B. Effluent Limit for Chronic Toxicity

After completion of effluent characterization, the Permittee has an effluent limit for chronic toxicity if any test conducted for effluent characterization shows a significant difference between the control and the ACEC at the 0.05 level of significance using hypothesis testing (Appendix H, EPA/600/4-89/001) and shall complete all applicable requirements in subsections C, D, and F.

If no significant difference is shown between the ACEC and the control in any of the chronic toxicity tests, the Permittee has no effluent limit for chronic toxicity and only subsections E and F apply.

**The effluent limit for chronic toxicity is no toxicity detected in a test concentration representing the July – October chronic critical effluent concentration (CCEC).**

In the event of failure to pass the test described in subsection C. of this section for compliance with the effluent limit for chronic toxicity, the Permittee is considered to be in compliance with all permit requirements for chronic whole effluent toxicity as long as the requirements in subsection D. are being met to the satisfaction of the Department.

The CCEC (July – October) means the maximum concentration of effluent allowable at the boundary of the mixing zone assigned in Section S1.B pursuant to WAC 173-201A-100. The CCEC (July – October) equals 25 % effluent and shall be applied to all toxicity tests.

C. Monitoring for Compliance With an Effluent Limit for Chronic Toxicity

Monitoring to determine compliance with the effluent limit shall be conducted every other month for the remainder of the permit term using each of the species listed in subsection A above on a rotating basis and performed using at a minimum the CCEC, the ACEC, and a control. The Permittee shall schedule the toxicity tests in the order listed in the permit unless the Department notifies the Permittee in writing of another species rotation schedule.

Compliance with the effluent limit for chronic toxicity means no statistically significant difference in response between the control and the test concentration representing the CCEC. The Permittee shall immediately implement subsection D. if any chronic toxicity test conducted for compliance monitoring determines a statistically significant difference in response between the control and the CCEC using hypothesis testing at the 0.05 level of significance (Appendix H, EPA/600/4-89/001). If the difference in response between the control and the CCEC is less than 20%, the hypothesis test shall be conducted at the 0.01 level of significance.

In order to establish whether the chronic toxicity limit is eligible for removal from future permits, the Permittee shall also conduct this same hypothesis test (Appendix H, EPA/600/4-89/001) to determine if a statistically significant difference in response exists between the ACEC and the control.

D.      Response to Noncompliance With an Effluent Limit for Chronic Toxicity

If a toxicity test conducted for compliance monitoring under subsection C. determines a statistically significant difference in response between the CCEC and the control, the Permittee shall begin additional compliance monitoring within one week from the time of receiving the test results. This additional monitoring shall be conducted monthly for three consecutive months using the same test and species as the failed compliance test. Testing shall be conducted using a series of at least five effluent concentrations and a control in order to be able to determine appropriate point estimates. One of these effluent concentrations shall equal the CCEC and be compared statistically to the nontoxic control in order to determine compliance with the effluent limit for chronic toxicity as described in subsection C. The discharger shall return to the original monitoring frequency in subsection C. after completion of the additional compliance monitoring.

If the Permittee believes that a test indicating noncompliance will be identified by the Department as an anomalous test result, the Permittee may notify the Department that the compliance test result might be anomalous and that the Permittee intends to take only one additional sample for toxicity testing and wait for notification from the Department before completing the additional monitoring required in this subsection. The notification to the Department shall accompany the report of the compliance test result and identify the reason for considering the compliance test result to be anomalous. The Permittee shall complete all of the additional monitoring required in this subsection as soon as possible after notification by the Department that the compliance test result was not anomalous. If the one additional sample fails to comply with the effluent limit for chronic toxicity, then the Permittee shall proceed without delay to complete all of the additional monitoring required in this subsection. The one additional test result shall replace the compliance test result upon determination by the Department that the compliance test result was anomalous.

If all of the additional compliance monitoring conducted in accordance with this subsection complies with the permit limit, the Permittee shall search all pertinent and recent facility records (operating records, monitoring results, inspection records, spill reports, weather records, production records, raw material purchases, pretreatment records, etc.) and submit a report to the Department on possible causes and preventive measures for the transient toxicity event which triggered the additional compliance monitoring.

If toxicity occurs in violation of the chronic toxicity limit during the additional compliance monitoring, the Permittee shall submit a Toxicity Identification/Reduction Evaluation (TI/RE) plan to the Department within 60 days after test results are final. The TI/RE plan shall be based on WAC 173-205-100(2) and shall be implemented in accordance with WAC 173-205-100(3).

E.    <u>Monitoring When There Is No Permit Limit for Chronic Toxicity</u>

The Permittee shall test final effluent once in the last summer and once in the last winter prior to submission of the application for permit renewal. All species used in the initial chronic effluent characterization or substitutes approved by the Department shall be used and results submitted to the Department as a part of the permit renewal application process.

F.    <u>Sampling and Reporting Requirements</u>

1.    All reports for effluent characterization or compliance monitoring shall be submitted in accordance with the most recent version of Department of Ecology Publication # WQ-R-95-80, *Laboratory Guidance and Whole Effluent Toxicity Test Review Criteria* in regards to format and content. Reports shall contain bench sheets and reference toxicant results for test methods. If the lab provides the toxicity test data on floppy disk for electronic entry into the Department's database, then the Permittee shall send the disk to the Department along with the test report, bench sheets, and reference toxicant results.

2.    Testing shall be conducted on 24-hour composite effluent. Samples taken for toxicity testing shall be cooled to 4 degrees Celsius while being collected and shall be sent to the lab immediately upon completion. The lab shall begin the toxicity testing as soon as possible but no later than 36 hours after sampling was ended.

3.    All samples and test solutions for toxicity testing shall have water quality measurements as specified in Department of Ecology Publication # WQ-R-95-80, *Laboratory Guidance and Whole Effluent Toxicity Test Review Criteria* or most recent version thereof.

4.    All toxicity tests shall meet quality assurance criteria and test conditions in the most recent versions of the EPA manual listed in subsection A. and the Department of Ecology Publication # WQ-R-95-80, *Laboratory Guidance and Whole Effluent Toxicity Test Review Criteria*. If test results are determined to be invalid or anomalous by the Department, testing shall be repeated with freshly collected effluent.

5.    Control water and dilution water shall be laboratory water meeting the requirements of the EPA manual listed in subsection A or pristine natural water of sufficient quality for good control performance.

6.    The whole effluent toxicity tests shall be run on an unmodified sample of final effluent.

7.    The Permittee may choose to conduct a full dilution series test during compliance monitoring in order to determine dose response. In this case, the series must have a minimum of five effluent concentrations and a control. The series of concentrations must include the ACEC and the CCEC.

8.    All whole effluent toxicity tests, effluent screening tests, and rapid screening tests that involve hypothesis testing and do not comply with the chronic statistical power standard of 39% as defined in WAC 173-205-020 must be repeated on a fresh sample with an increased number of replicates to increase the power.

## S13.   COMBINED SEWER OVERFLOWS

A.    <u>Discharge Locations</u>

The following is a list of combined sewer overflows (CSOs), which are occasional point sources of pollutants as a result of precipitation events. Discharges from these sites are prohibited except as a result of and during precipitation events. No authorization is given by this permit for discharge from a CSO that causes adverse impacts that threaten characteristic uses of the receiving water as identified in the Water Quality Standards, Chapter 173-201A WAC.

| OUTFALL NUMBER | OVERFLOW STRUCTURE DESCRIPTION | OUTFALL DESCRIPTION |
|---|---|---|
| **Spokane River Discharges (North Bank)** | | |
| 002 | Hartley @ NW Blvd. | 0.5 miles downstream of WWTP |
| 003 | Assembly @ NW Blvd – Albi Assembly @ NW Blvd – Royal Ct | 0.2 miles downstream of WWTP |
| 006 | Kiernan @ NW Blvd | 0.25 miles upstream of WWTP |
| 007 | Columbia Circle @ NW Blvd | 0.4 miles upstream of WWTP |
| 010 | Cochran @ Buckeye | At Downriver Bridge |
| 012 | Nora @ Pettet Dr | 0.55 miles Upstream of Bridge |
| 014 | Sherwood @ Summit | 2.0 miles upstream of Bridge |
| 015 | Ohio @ Nettleton | 2.5 miles upstream of Bridge |
| **Discharges to Spokane River (South Bank)** | | |
| 016 | First @ "A" – High Bridge Pk "A" @ Linton – Westgrove "A" @ Linton – Geiger | 1.45 miles downstream of Monroe St Dam |
| 018 | "A" @ Linton – Federal | 1.45 miles downstream of Dam |
| **Discharges to Hangman Creek** | | |
| 019 | Seventh @ Cannon | At High Bridge (East Side) |
| 020 | S. Manito Relief Sewer | 2.65 miles upstream of High Bridge |
| **Discharges to Spokane River (South Bank)** | | |
| 022 | Main @ Oak | 0.7 miles downstream at Monroe St. Dam |
| **Discharges to Spokane River (North Bank)** | | |
| 023 | Cedar @ Ide | 0.3 miles downstream of Monroe St. Dam |
| **Discharges to Spokane River (South Bank)** | | |
| 024 | Cedar @ Riverside | 0.3 miles downstream of Monroe St. Dam |
| 025 | Cedar @ Main | 0.3 miles downstream of Monroe St. Dam |
| 026 | Lincoln @ Spokane Falls Blvd | At Monroe St. Dam |
| 033 | Fifth @ Arthur Third @ Perry Third @ Arthur First @ Arthur | 0.15 miles upstream of J. Keefe Bridge |
| 034 | Crestline @ Riverside | At Trent Bridge |
| 038 | Magnolia @ S. Riverton | 0.15 miles upstream of Mission |
| 039 | Altamont @ S. Riverton | 0.5 miles downstream of Greene |
| 040 | Regal @ S. Riverton | 0.25 miles downstream of Greene |
| **Discharge to Spokane River (North Bank)** | | |
| 041 | Rebecca @ Upriver Dr | 0.5 miles upstream of Greene |
| **Discharge to Spokane River (South Bank)** | | |
| 042 | Surro Dr | 0.5 miles downstream of Upriver Dam |

B.    <u>Combined Sewer Overflow Report</u>

By July 1, 2000, and annually thereafter, the Permittee shall submit a CSO Report to the Department for review and approval, which complies with the requirements of WAC 173-245-090(1).

C.    <u>Combined Sewer Overflow Reduction Plan</u>

In conjunction with the application for renewal of this permit, the Permittee shall submit, as necessary, an amendment of its CSO Reduction Plan to the Department for review and approval.  The amendment shall comply with the requirements of WAC 173-245-090(2).

D.    <u>Prohibition of Discharge From Combined Sewers during Dry Weather</u>

Discharges caused by overflows of the combined sewer system that are unrelated to precipitation are prohibited.  All such discharges shall be reported in accordance with S3.E and F.

E.    <u>CSO Compliance Schedule</u>

In order to achieve the greatest reasonable reduction of combined sewer overflows at the earliest possible date, the City shall implement all portions of the approved CSO reduction plan and amendments dated December 4, 1998, March 10, 2000 and any subsequent amendments as approved by Ecology.  The following elements of the approved combined sewer overflow reduction plan shall be accomplished in accordance with the following schedule of milestone dates.

1.   Implementation of the approved schedule shall begin immediately.*

2.   No later than December 31, 2017, any discharge of CSO shall meet all final State and Federal requirements applicable to such discharges.

3.   No later than April 30, 2000, the City shall submit to Ecology, an updated operation and maintenance plan for CSO weirs and outfalls with an increased frequency of inspection, preventative maintenance, and record keeping.  The plan shall identify the minimum inspection and maintenance frequency for each CSO weir and specifically list resources budgeted to carry out the plan.

4.   Immediately begin CSO discharge monitoring as approved in the March 10, 2000 amendments.*

5.   No later than May 1, 2000, the City shall submit a monitoring plan to Ecology, for review and approval, which will effectively characterize CSO impacts and efficacy of CSO controls.  Upon approval, the plan shall become required monitoring of this permit and implemented by no later than June 30, 2000.

6.  No later than May 1, 2000, the City shall submit to Ecology for review and approval, a public notification system to ensure the public receives adequate notification of CSO occurrences and CSO impacts. The plan shall be developed, in conjunction with Ecology and the Spokane Regional Health Authority and implemented by no later than June 30, 2000.  At a minimum, the plan shall include the following:

    a)  Posting of public notice signs in conspicuous locations near each CSO outfall with pertinent information.

    b)  A mechanism to alert persons using all receiving water bodies affected by CSOs during and following CSO events.

    c)  A system to determine the nature and duration of conditions that are potentially harmful to users of the receiving water bodies due to CSOs.

*When infrastructure funding issues associated with I-695 are resolved and if the City can raise sewer fees to finance a bond, the City will revise the schedule to accelerate installation of flow monitoring for the remaining CSO basins and accelerate the schedule for actual implementation of CSO control projects.

## GENERAL CONDITIONS

**G1.    SIGNATORY REQUIREMENTS**

All applications, reports, or information submitted to the Department shall be signed and certified.

A.    All permit applications shall be signed by either a principal executive officer or a ranking elected official.

B.    All reports required by this permit and other information requested by the Department shall be signed by a person described above or by a duly authorized representative of that person. A person is a duly authorized representative only if:

1.    The authorization is made in writing by a person described above and submitted to the Department, and

2.    The authorization specifies either an individual or a position having responsibility for the overall operation of the regulated facility, such as the position of plant manager, superintendent, position of equivalent responsibility, or an individual or position having overall responsibility for environmental matters. (A duly authorized representative may thus be either a named individual or any individual occupying a named position.)

C.    Changes to authorization. If an authorization under paragraph B.2. above is no longer accurate because a different individual or position has responsibility for the overall operation of the facility, a new authorization satisfying the requirements of B.2. must be submitted to the Department prior to or together with any reports, information, or applications to be signed by an authorized representative.

D.    Certification. Any person signing a document under this section shall make the following certification:

"I certify under penalty of law, that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gathered and evaluated the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

**G2.    RIGHT OF ENTRY**

The Permittee shall allow an authorized representative of the Department, upon the presentation of credentials and such other documents as may be required by law:

A.    To enter upon the premises where a discharge is located or where any records must be kept under the terms and conditions of this permit;

B.      To have access to and copy at reasonable times any records that must be kept under the terms of the permit;

C.      To inspect at reasonable times any monitoring equipment or method of monitoring required in the permit;

D.      To inspect at reasonable times any collection, treatment, pollution management, or discharge facilities; and

E.      To sample at reasonable times any discharge of pollutants.

**G3.    PERMIT ACTIONS**

This permit shall be subject to modification, suspension, or termination, in whole or in part by the Department for any of the following causes:

A.      Violation of any permit term or condition;

B.      Obtaining a permit by misrepresentation or failure to disclose all relevant facts;

C.      A material change in quantity or type of waste disposal;

D.      A material change in the condition of the waters of the state; or

E.      Nonpayment of fees assessed pursuant to RCW 90.48.465.

The Department may also modify this permit, including the schedule of compliance or other conditions, if it determines good and valid cause exists, including promulgation or revisions of regulations or new information.

**G4.    REPORTING A CAUSE FOR MODIFICATION**

The Permittee shall submit a new application, or a supplement to the previous application, along with required engineering plans and reports, whenever a material change in the quantity or type of discharge is anticipated which is not specifically authorized by this permit. This application shall be submitted at least 60 days prior to any proposed changes. Submission of this application does not relieve the Permittee of the duty to comply with the existing permit until it is modified or reissued.

**G5.    PLAN REVIEW REQUIRED**

Prior to constructing or modifying any wastewater control facilities, an engineering report and detailed plans and specifications shall be submitted to the Department for approval in accordance with Chapter 173-240 WAC. Engineering reports, plans, and specifications should be submitted at least 180 days prior to the planned start of construction. Facilities shall be constructed and operated in accordance with the approved plans.

**G6.    COMPLIANCE WITH OTHER LAWS AND STATUTES**

Nothing in the permit shall be construed as excusing the Permittee from compliance with any applicable federal, state, or local statutes, ordinances, or regulations.

## G7. DUTY TO REAPPLY

The Permittee must apply for permit renewal at least 180 days prior to the specified expiration date of this permit.

## G8. REMOVED SUBSTANCES

Collected screenings, grit, solids, sludges, filter backwash, or other pollutants removed in the course of treatment or control of wastewaters shall not be resuspended or reintroduced to the final effluent stream for discharge to state waters.

## G9. TOXIC POLLUTANTS

If any applicable toxic effluent standard or prohibition (including any schedule of compliance specified in such effluent standard or prohibition) is established under Section 307(a) of the Clean Water Act for a toxic pollutant and that standard or prohibition is more stringent than any limitation upon such pollutant in the permit, the Department shall institute proceedings to modify or revoke and reissue the permit to conform to the new toxic effluent standard or prohibition.

## G10. OTHER REQUIREMENTS OF 40 CFR

All other requirements of 40 CFR 122.41 and 122.42 are incorporated in this permit by reference.

## G11. ADDITIONAL MONITORING

The Department may establish specific monitoring requirements in addition to those contained in this permit by administrative order or permit modification.

## G12. PAYMENT OF FEES

The Permittee shall submit payment of fees associated with this permit as assessed by the Department. The Department may revoke this permit if the permit fees established under Chapter 173-224 WAC are not paid.

## G13. PENALTIES FOR VIOLATING PERMIT CONDITIONS

Any person who is found guilty of willfully violating the terms and conditions of this permit shall be deemed guilty of a crime, and upon conviction thereof shall be punished by a fine of up to ten thousand dollars and costs of prosecution, or by imprisonment in the discretion of the court. Each day upon which a willful violation occurs may be deemed a separate and additional violation.

Any person who violates the terms and conditions of a waste discharge permit shall incur, in addition to any other penalty as provided by law, a civil penalty in the amount of up to ten thousand dollars for every such violation. Each and every such violation shall be a separate and distinct offense, and in case of a continuing violation, every day's continuance shall be and be deemed to be a separate and distinct violation.

# APPENDIX

## SPRING INITIATION OF CHEMICAL PHOSPHORUS REMOVAL

<u>February 15 (1st April – July Forecast)</u>

Preliminary decision is made if adequate runoff will be available to meet the required volume of water that must pass through Long Lake prior to June.

March 1

Notify the Washington State Department of Ecology (Ecology) as to the preliminary findings.

<u>March 15 (2nd April – July Forecast)</u>

Final decision is made regarding availability of runoff:

a)      Excess runoff if <u>NOT</u> available – alum addition will be initiated on <u>or before</u> April 1, as estimated.

b)      Excess runoff <u>IS</u> available – an estimation is made as to the date when alum addition will be initiated after April 1.

<u>April 1 (3rd April – July Forecast)</u>

Report to Ecology if and when alum addition was initiated after March 15.

or

Report to Ecology the projected date for the initiation of chemical phosphorus removal:

a)      Commence collecting from Avista, total daily discharges for the Spokane River at Post Falls, Idaho.

<u>April 15 (4th April – July Forecast)</u>

Report to Ecology if and when alum addition was initiated after April 1.

or

Report to Ecology a revised estimate for the initiation date of chemical phosphorus removal and include:

a)      daily discharges of the Spokane River since April 1;

b)      total runoff since April

Obtain <u>weekly</u> updated information from WWP regarding proposed operation of Post Falls Dam that would result in controlled flows of the Spokane River.

### May 1 (1st May – July Forecast)

Report to Ecology if and when alum addition was initiated after April 15.

or

Report to Ecology a revised estimate for the initiation date of chemical phosphorus removal and include:

a)    daily discharges of the Spokane River since April 15;

b)    total runoff since April 1.

### May 15 (2nd May – July Forecast)

Report to Ecology if and when alum addition was initiated after May 1.

or

Report to Ecology a revised estimate for the initiation date of chemical phosphorus removal and include:

a)    total daily discharges of the Spokane River since May 1;

b)    total runoff since April 1.

### June 1

Report to Ecology if and when alum addition was initiated after May 15 and include:

a)    total daily discharges of the Spokane River since May 15;

b)    total runoff since April 1.

[1]The Computer Program (Table 9) will have to be modified.

## FALL TERMINATION OF CHEMICAL PHOSPHORUS REMOVAL

### September 1

Begin collecting daily surface water samples at Fort Wright Bridge (F.W.) and analyze for total phosphorus concentration.   All samples should be run in triplicate.

Continue to take 24-hour composite samples of treatment plant influent and effluent wastewaters and analyze for total phosphorus concentrations.   All samples should be run in triplicate.

### October 1

Obtain daily inflow to Long Lake for the month of September from Avista.

Calculate the mean daily total phosphorus concentration at F.W. during September.

Establish the date for the termination of alum addition after October 15. In the event the calculated Long Lake response time is zero or negative, termination of alum addition will be on or after November 1[2].

October 15

Report to Ecology the predicted alum termination date and include:

a) daily F.W. total phosphorus concentrations for September;

b) mean daily influent total phosphorus concentrations for the treatment plant during September;

c) mean daily effluent total phosphorus concentration for the treatment plant during September;

d) mean daily inflows to the treatment plant during September; and

e) daily inflows to Long Lake during September.

[1]It may be to the City's advantage to continue TP analyses of daily surface water samples taken at F.W. during the month of October. In time, this additional data may allow for future adjustments in the model (i.e., decreased TP load from F.W. and/or wastewater treatment plant without impacting Long Lake water quality and possibly decreasing the number of days that alum addition is required in October.

[2]The Computer Program (Table 10) will have to be modified.

002053

### 3) Combined Sewer Overflows:

In accordance with the requirements of the City of Spokane's NPDES Permit for combined sewer overflow discharges, summarized below are the frequencies, volumes and durations of CSO events recorded between January 2001 and December 2001. It is estimated that a **total of 29.3 million gallons** of wet weather induced combined sewage discharged to local receiving waters in these twelve months. These discharges were all associated with snowmelt/rain events and were distributed across twenty-one (21) permitted CSO outfalls. However, discharges at the ten (10) priority CSO regulator sites accounted for 81 percent of the total overflow volume measured. *Detailed information on individual CSO events is provided in an Appendix "A" to this report.*



In response to public inquiries of potential CSO events during dry weather, the City responded to one (1) **false event** in September 2001 at CSO outfall #10. The outfall was immediately checked and found to be hydrant water used to flush a storm line into an outfall downstream of a CSO regulator during routine maintenance. No CSO was observed at regulator #10 during the field check.

In addition to the one (1) public complaint, there were five (5) separate minor overflow events as a result of routine maintenance (balling) on collection system lines just upstream of CSO Regulators. *(See Appendix "B")*  Additionally, there was one (1) event observed on March 30, 2001 as a result of minor ragging at CSO #33c. This was reported to the DOE in a letter dated April 16, 2001. *(See Appendix "C")*

Tracking of these very minor upsets has given the collection system staff valuable information toward providing future protection of the regulator structures during routine maintenance operations. All total, there has been approximately 12,000 gallons of overflows as a result of unforeseeable system response to routine maintenance and typical ragging (partial blockage from debris/rags) in the collection system during dry weather conditions in FY 2001.

In the fall of 2001, the City of Spokane initiated an in river CSO sampling program. The program was predicated on the requirements to try and characterize the impacts to the receiving streams (Spokane River & Latah Creek) from CSO overflows. This information was provided to the Department of Ecology and Spokane Regional Health District. *(See Appendix "D")*

### Summary of Monitored
### CSO Frequencies & Volumes

*January 2001 through December 2001*

| CSO OUTFALL | UPSTREAM REGULATOR ID[2] | MONITORED CSO VOLUME (gallons) | MONITORED CSO FREQUENCY (No. of Occurrences) | MONITORED CSO DURATION (minutes) |
|---|---|---|---|---|
| 02 | **02** | 27,817 | 3 | 685 |
| 03 | 03B | Not monitored in 2001 – See Note #3 | | |
| | **03C** | 53,938 | 8 | 1,180 |
| | Total: | 53,938 | 8 | |
| 06 | **06** | 2,267,589 | 17 | 4,585 |
| 07 | 07 | 150,343 | 8 | 1,515 |
| 10 | 10 | 130,388 | 8 | 1,125 |
| 12 | **12** | 2,484,886 | 23 | 6,740 |
| 14 | 14 | Not monitored in 2001 – See Note #3 | | |
| 15 | **15** | 175,422 | 5 | 1,010 |
| 16 | 16A | No overflows observed – chalk mark in tact | | |
| | 16B | All flow diverted to 16A | | |
| | Total: | 0 | 0 | |
| 18 | 18 | All flow diverted to 16A | | |
| 19 | 19 | No overflows observed – chalk mark in tact | | |
| 20 | 20 | No overflows observed – chalk mark in tact | | |
| 22 | 22B | 13,276 | 1 | 65 |
| 23 | 23 | 1,087,791 | 16 | 2,795 |
| 24 | 24A | 3,633,960 | 11 | 3,820 |
| | 24B | 37,331 | 4 | 725 |
| | Total: | 3,671,291 | 15 | |
| 25 | 25 | 0 | 0 | 0 |

| CSO OUTFALL | UPSTREAM REGULATOR ID[2] | MONITORED CSO VOLUME (gallons) | MONITORED CSO FREQUENCY (No. of Occurrences) | MONITORED CSO DURATION (minutes) |
|---|---|---|---|---|
| 26 | **26** | 12,326,548 | 16 | 3,735 |
| 33 | 33A | 11,326 | 2 | 365 |
| | 33B* | 359,584 | 4 | 170 |
| | 33C | 119,439 | 10 | 1,240 |
| | **33D** | 463,755 | 18 | 6,950 |
| | Total: | 954,104 | 34 | |
| 34 | **34** | 5,356,016 | 15 | 2,295 |
| 38 | 38 | 54,525 | 9 | 7,870 |
| 39 | **39** | 26,583 | 3 | 75 |
| 40 | **40** | 568,903 | 17 | 10,270 |
| 41 | 41 | 0 | 0 | 0 |
| 42 | 42 | 179 | 1 | 80 |
| **TOTAL:** | | **29,349,599** | **199** | |

1.  *Tabulated information compiled from flow monitoring data collected between January 2001 and December 2001. Real time monitoring installed on ten (10) priority sites as of July of 2001. City Website with CSO information started on November 29th, 2001.*
2.  *Ten (10) priority flow monitoring sites identified in **BOLDFACE** type.*

002056