# EXHIBIT 42

002328

Issuance Date:    August 1, 2012
Effective Date:    August 1, 2014
Expiration Date: July 31, 2019

# Eastern Washington Phase II Municipal Stormwater Permit

National Pollutant Discharge Elimination System and
State Waste Discharge General Permit for Discharges
from Small Municipal Separate Storm Sewers
in Eastern Washington

**State of Washington**
**Department of Ecology**
Olympia, Washington 98504-7600

In compliance with the provisions of
The State of Washington Water Pollution Control Law
Chapter 90.48 Revised Code of Washington
and
The Federal Water Pollution Control Act
(The Clean Water Act)
Title 33 United States Code, Section 1251 et seq.

Until this permit expires, is modified, or revoked, Permittees that have properly obtained
coverage under this permit are authorized to discharge to waters of the state in accordance with
the special and general conditions which follow.

Kelly Susewind, P.E., P.G.
Water Quality Program Manager
Department of Ecology

THIS PAGE INTENTIONALLY LEFT BLANK

SPOKANE-PRR-0049923
002330

# TABLE OF CONTENTS

SPECIAL CONDITIONS .................................................................................................. 1
S1.  PERMIT COVERAGE AREA AND PERMITTEES ........................................... 1
S2.  AUTHORIZED DISCHARGES .......................................................................... 6
S3.  RESPONSIBILITIES OF PERMITTEES ........................................................... 6
S4.  COMPLIANCE WITH STANDARDS ................................................................ 7
S5.  STORMWATER MANAGEMENT PROGRAM FOR CITIES, TOWNS AND
COUNTIES ................................................................................................................... 10
S6.  STORMWATER MANAGEMENT PROGRAM FOR SECONDARY PERMITTEES . 30
S7.  COMPLIANCE WITH TOTAL MAXIMUM DAILY LOAD REQUIREMENTS ......... 38
S8.  MONITORING AND PROGRAM EVALUATION ........................................... 38
S9.  REPORTING AND RECORDKEEPING ........................................................... 40
GENERAL CONDITIONS ............................................................................................ 42
G1.  DISCHARGE VIOLATIONS ........................................................................... 42
G2.  PROPER OPERATION AND MAINTENANCE .............................................. 42
G3.  NOTIFICATION OF DISCHARGE INCLUDING SPILLS ............................. 42
G4.  BYPASS PROHIBITED .................................................................................... 42
G5.  RIGHT OF ENTRY ........................................................................................... 43
G6.  DUTY TO MITIGATE ...................................................................................... 43
G7.  PROPERTY RIGHTS ........................................................................................ 43
G8.  COMPLIANCE WITH OTHER LAWS AND STATUTES .............................. 43
G9.  MONITORING AND ASSESSMENT ............................................................... 43
G10.   REMOVED SUBSTANCES ............................................................................. 44
G11.   SEVERABILITY .............................................................................................. 45
G12.   REVOCATION OF COVERAGE ..................................................................... 45
G13.   TRANSFER OF COVERAGE ........................................................................... 45
G14.   GENERAL PERMIT MODIFICATION AND REVOCATION .......................... 45
G15.   REPORTING A CAUSE FOR MODIFICATION OR REVOCATION ..................... 46
G16.   APPEALS .......................................................................................................... 46
G17.   PENALTIES ...................................................................................................... 46
G18.   DUTY TO REAPPLY ....................................................................................... 46
G19.   CERTIFICATION AND SIGNATURE ............................................................. 46
G20.   NON-COMPLIANCE NOTIFICATION ........................................................... 47
G21.   UPSETS ............................................................................................................ 48
DEFINITIONS AND ACRONYMS .............................................................................. 49

## APPENDICES

Appendix 1 – Minimum Technical Requirements for Stormwater Management at New Development and Redevelopment Sites

Appendix 2 – Total Maximum Daily Load Requirements

Appendix 3 – Annual Report Questions for Cities, Towns and Counties

Appendix 4 – Annual Report Questions for Secondary Permittees

Appendix 5 – Notice of Intent for Coverage under a National Pollutant Discharge Elimination System Municipal Stormwater General Permit

Appendix 6 – Street Waste Disposal

## SPECIAL CONDITIONS

### S1.    PERMIT COVERAGE AND PERMITTEES

A.    Geographic Area of Permit Coverage

This permit is applicable to owners or operators of regulated small municipal separate storm sewer systems (MS4s) located in eastern Washington State, which is bounded on the western side by the Cascade Mountains crest except in Yakima and Klickitat counties which are, in their entireties, included.

1.    For all Cities required to obtain coverage under this permit, the geographic area of coverage is the entire incorporated area of the City.

2.    For all Counties required to obtain coverage under this permit, the geographic area of coverage is the urbanized areas and the unincorporated urban growth areas associated with permitted Cities within the urbanized areas that are under the jurisdictional control of the County. The geographic area of coverage also includes any urban growth areas that are contiguous to permitted urbanized areas that are under the jurisdictional control of the County.

For Walla Walla County, the geographic area of coverage also includes the unincorporated urban growth areas associated with the Cities of Walla Walla and College Place.

For Yakima County, the geographic area of coverage also includes the unincorporated urban growth area associated with the City of Sunnyside.

3.    For Secondary Permittees required to obtain coverage under this permit, the minimum geographic area of coverage includes all areas identified under S1.A.1. and S1.A.2., above. At the time of permit coverage, Ecology may establish a geographic area of coverage specific to an individual Secondary Permittee.

4.    All regulated small MS4s owned or operated by the Permittees named in S1.D.2.a.(i) and (ii) and located in another city or county area requiring coverage under either this permit or the *Western Washington Phase II Municipal Stormwater Permit* or the *Phase I Municipal Stormwater Permit* are also covered under this permit.

B.    Regulated small municipal separate storm sewer systems (MS4s)

All operators of regulated small MS4s are required to apply for and obtain coverage under this permit or be permitted under a separate individual or general permit, unless waived or exempted in accordance with condition S1.C.

1.    A regulated small MS4:

a.    Is a "small MS4" as defined in the Definitions and Acronyms section at the end of this permit; and

*Eastern Washington Phase II Municipal Stormwater Permit – August 1, 2014*
*Page 1*

b.   Is located within, or partially located within, an urbanized area as defined by the latest decennial census conducted by the U.S. Bureau of Census or is designated by Ecology pursuant to either 40 CFR 122.35(b) or 40 CFR 122.26(f); and

c.   Discharges stormwater from the MS4 to a surface water of Washington State; and

d.   Is not eligible for a waiver or exemption under S1.C below.

2.   All other operators of MS4s, including special purpose districts which meet the criteria for a regulated small MS4, shall obtain coverage under this permit. Other operators of MS4s may include, but are not limited to: flood control, or diking and drainage districts, schools including universities and correctional facilities which own or operate a small MS4 serving non-agricultural land uses.

3.   Any other operators of small MS4s may be required by Ecology to obtain coverage under this permit or an alternative NPDES permit if Ecology determines the small MS4 is a significant source of pollution to surface waters of the state. Notification of Ecology's determination that permit coverage is required will be through the issuance of an Administrative Order issued in accordance with RCW 90.48.

4.   The owner or operator of a regulated small MS4 may obtain coverage under this permit as a Permittee, Co-Permittee, or Secondary Permittee as defined in S1.D.1 below.

5.   Pursuant to 40 CFR 122.26(f), any person or organization may petition Ecology to require that additional MS4s obtain coverage under this permit. The process for petitioning Ecology is:

a.   The person or organization shall submit a complete petition in writing to Ecology. A complete petition shall address each of the relevant factors for petitions outlined on Ecology's website.

b.   In making its determination on the petition, Ecology may request additional information from either the petitioner or the entity that is the subject of the petition.

c.   Ecology will make a final determination on a complete petition within 180 days after receipt of the petition and inform both the petitioner and the MS4 of the decision, in writing.

d.   If Ecology's final determination is that the candidate MS4 will be regulated, Ecology will issue an order to the MS4 requiring them to obtain coverage under this permit. The order will specify:

i.   The geographic area of permit coverage for the MS4;

SPOKANE-PRR-0049927
002334

       ii.    Any modified dates or deadlines for developing and implementing this permit, as appropriate to the MS4, and for submitting their first annual report; and

       iii.   A deadline for the MS4 to submit a complete Notice of Intent (see Appendix 5) to Ecology.

C.   Owners and operators of an otherwise regulated small MS4 are <u>not</u> required to obtain coverage under this permit if:

   1.   The small MS4 is operated by:

       a.   A federal entity, including any department, agency or instrumentality of the executive, legislative, and judicial branches of the Federal government of the United States; or

       b.   Federally recognized Indian Tribes located within Indian Country, including all trust or restricted lands within the 1873 Survey Area of the Puyallup Tribe of Indians; or

       c.   The Washington State Department of Transportation.

Or,

   2.   The portions of the small MS4 located within the census-defined urban area(s) serve a total population of less than 1,000 people <u>and</u> a, b, and c below all apply:

       a.   The small MS4 is not contributing substantially to the pollutant loadings of a physically interconnected MS4 that is regulated by the NPDES stormwater program.

       b.   The discharge of pollutants from the small MS4 has not been identified as a cause of impairment of any water body to which the MS4 discharges.

       c.   In areas where an EPA approved TMDL has been completed, stormwater controls on the MS4 have not been identified as being necessary.

       In determining the total population served by the small MS4, both resident and commuter populations shall be included. For example:

- For publicly operated school complexes including universities and colleges, the total population served would include the sum of the average annual student enrollment plus staff.

- For flood control, diking, and drainage districts the total population served would include residential population and any non-residents regularly employed in the areas served by the small MS4.

SPOKANE-PRR-0049928
002335

D.    Obtaining coverage under this permit

All operators of regulated small MS4s are required to apply for and obtain coverage in accordance with this section, unless waived or exempted in accordance with section S1.C.

1.    Unless otherwise noted, the term "Permittee" includes a city, town or county Permittee, New Permittee, Co-Permittee, Secondary Permittee, and New Secondary Permittee, as defined below:

   a.    A "Permittee" is a City, Town or County owning or operating a regulated small MS4 and receiving a permit as a single entity.

   b.    A "New Permittee" is a City, Town or County that is subject to the *Eastern Washington Phase II Municipal Stormwater General Permit* and was not subject to the permit prior to August 1, 2014.

   c.    A "Co-Permittee" is any owner or operator of a regulated small MS4 that is applying in a cooperative agreement with at least one other applicant for coverage under this permit. A Co-Permittee owns or operates a regulated small MS4 located within or in proximity to another regulated small MS4.

   d.    A "Secondary Permittee" is an operator of a regulated small MS4 that is not a City, Town or County. Secondary Permittees include special purpose districts and other MS4s that meet the criteria for a regulated small MS4 in S1.B above.

   e.    A "New Secondary Permittee" is a Secondary Permittee that is covered under a municipal stormwater general permit and was not covered by the permit prior to August 1, 2014.

2.    Operators of regulated small MS4s have submitted or shall submit an application to Ecology by either the *Notice of Intent (NOI) for Coverage under National Pollutant Discharge Elimination System (NPDES) Municipal Stormwater General Permit* provided in Appendix 5; or the *Duty to Reapply – NOI.*

   a.    The following Permittees and Secondary Permittees  submitted  a *Duty to Reapply- NOI* to Ecology prior to August 19, 2011:

      i.    Cities and Towns: Asotin, Clarkston, East Wenatchee, Ellensburg, Kennewick, Moses Lake, Pasco, Pullman, Richland, Selah, Spokane, Spokane Valley, Sunnyside, Union Gap, Walla Walla, Wenatchee, West Richland, Yakima

      ii.    Counties: Asotin County, Chelan County, Douglas County, Spokane County, Walla Walla County, Yakima County

      iii.    Secondary Permittees: Central Washington University, Eastmont Metropolitan Park District, Port of Benton, Selah School District #119, Sunnyside Valley Irrigation District, Washington State

SPOKANE-PRR 0049929
002336

University Pullman, Washington State University Spokane, Washington State University Tri-Cities, and Yakima Valley Community College.

b. Operators of regulated small MS4s listed in S1.D.2.a do not need to submit a new application to be covered under this permit.

c. For operators of regulated small MS4s listed in S1.D.2.a, coverage under this permit is automatic and begins on the effective date of this permit, unless the operator chooses to opt out of this General Permit. Any operator of a regulated small MS4 that is opting out of this permit shall submit an application for an individual MS4 permit in accordance with 40 CFR 122.33(b)(2)(ii) no later than the effective date of this permit.

d. Operators of regulated small MS4s which want to be covered under this permit as Co-Permittees shall each submit a NOI to Ecology.

e. Operators of regulated small MS4s which are relying on another entity to satisfy all of their permit obligations shall submit a NOI to Ecology.

f. Operators of small MS4s designated by Ecology pursuant to S1.B.3 of this permit shall submit a NOI to Ecology within 120 days of receiving notification from Ecology that permit coverage is required.

3. Application requirements

a. For NOIs submitted after the issuance date of this Permit, the applicant shall include a certification that the public notification requirements of WAC 173-226-130(5) have been satisfied. Ecology will notify applicants in writing of their status concerning coverage under this permit within 90 days of Ecology's receipt of a complete NOI.

b. Each Permittee applying as a Co-Permittee shall submit a NOI provided in Appendix 5. The NOI will clearly identify the areas of the MS4 for which the Co-Permittee is responsible.

c. Permittees which are relying on another entity or entities to satisfy one or more of their permit obligations shall include with the NOI a summary of the permit obligations that will be carried out by another entity. The summary shall identify the other entity or entities and shall be signed by the other entity or entities. During the term of the permit, Permittees may terminate or amend shared responsibility arrangements by notifying Ecology, provided this does not alter implementation deadlines.

d. Secondary Permittees required to obtain coverage under this permit, and the *Western Washington Phase II Municipal Stormwater Permit* or the *Phase I Municipal Stormwater Permit* may obtain coverage by submitting a single NOI.

SPOKANE-PRR-0049930
002337

## S2.    AUTHORIZED DISCHARGES

A.    This permit authorizes the discharge of stormwater to surface waters and to ground waters of the state from MS4s owned or operated by each Permittee covered under this permit, in the geographic area covered pursuant to S1.A.  These discharges are subject to the following limitations:

1.    Discharges to ground waters of the state through facilities regulated under the Underground Injection Control (UIC) program, Chapter 173-218 WAC, are not authorized under this permit.

2.    Discharges to ground waters not subject to regulation under the federal Clean Water Act are authorized in this permit only under state authorities, Chapter 90.48 RCW, the Water Pollution Control Act

B.    This permit authorizes discharges of non-stormwater flows to surface waters and to ground waters of the state from MS4s owned or operated by each Permittee covered under this permit, in the geographic area covered pursuant to S1.A, only under the following conditions:

1.    The discharge is authorized by a separate NPDES permit or State Waste Discharge Permit.

2.    The discharge is from emergency fire fighting activities.

3.    The discharge is from another illicit or non-stormwater discharge that is managed by the Permittee as provided in Special Condition S5.B.3 or S6.D.3.

These discharges are also subject to the limitations in S2.A.1 and S2.A.2, above.

C.    This permit does not relieve entities that cause illicit discharges, including spills of oil or hazardous substances, from responsibilities and liabilities under state and federal laws and regulations pertaining to those discharges.

D.    Discharges from MS4s constructed after the effective date of this permit shall receive all applicable state and local permits and use authorizations, including compliance with Chapter 43.21C RCW (the State Environmental Policy Act).

E.    This permit does not authorize discharges of stormwater to waters within Indian Country or to waters subject to water quality standards of Indian Tribes, including portions of the Puyallup River and other waters on trust or restricted lands within the 1873 Survey Area of the Puyallup Tribe of Indians Reservation, except where authority has been specifically delegated to Ecology by the U.S. Environmental Protection Agency. The exclusion of such discharges from this permit does not waive any rights the State may have with respect to the regulation of the discharges.

## S3.    RESPONSIBILITIES OF PERMITTEES

A.    Each Permittee covered under this Permit is responsible for compliance with the terms of this permit for the regulated small MS4s which they operate. Compliance with (1) or (2) below is required as applicable to each Permittee, whether the

*Eastern Washington Phase II Municipal Stormwater Permit – August 1, 2014*
*Page 6*

Permittee has applied for coverage as a Permittee, a Co-Permittee or a Secondary Permittee..

1.  All city, town and county Permittees are required to comply with all conditions of this permit, including any appendices referenced therein, except for section S6 Stormwater Management Program for Secondary Permittees.

2.  All Secondary Permittees are required to comply with all conditions of this permit, including any appendices referenced therein, except for sections S5 Stormwater Management Program for Cities, Towns and Counties and S8.B and S8.C.

B.  Permittees may rely on another entity to satisfy one or more of the requirements of this permit. Permittees that are relying on another entity to satisfy one or more of their permit obligations remain responsible for permit compliance if the other entity fails to implement the permit conditions. Permittees may rely on another entity provided all of the requirements of 40 CFR 122.35(a) are satisfied, including but not limited to:

1.  The other entity, in fact, implements the permit requirements.

2.  The other entity agrees to take on responsibility for implementation of the permit requirement(s) as indicated in the NOI.

## S4.  COMPLIANCE WITH STANDARDS

A.  In accordance with RCW 90.48.520, the discharge of toxicants to waters of the State of Washington which would violate any water quality standard, including toxicant standards, sediment criteria, and dilution zone criteria is prohibited. The required response to such discharges is defined in section S4.F, below.

B.  This permit does not authorize a discharge which would be a violation of Washington State Surface Water Quality Standards (WAC 173-201A), Ground Water Quality Standards (chapter 173-200 WAC), Sediment Management Standards (chapter 173-204 WAC), or human health-based criteria in the national Toxics Rule (Federal Register, Vol. 57, NO. 246, Dec. 22, 1992, pages 60848-60923). The required response to such discharges is defined in section S4.F, below.

C.  The Permittee shall reduce the discharge of pollutants to the maximum extent practicable (MEP).

D.  The Permittee shall use all known, available, and reasonable methods of prevention, control and treatment (AKART) to prevent and control pollution of waters of the State of Washington.

E.  In order to meet the goals of the Clean Water Act, and comply with S4.A, S4.B, S4.C and S4.D, each Permittee shall comply with all of the applicable requirements of this permit as defined in S3 Responsibilities of Permittees.

SPOKANE-PRR 0049932
002339

F.   A Permittee remains in compliance with S4 despite any discharges prohibited by S4.A or S4.B, when the Permittee undertakes the following response toward long-term water quality improvement:

1.   A Permittee shall notify Ecology in writing within 30 days of becoming aware, based on credible site-specific information that a discharge from the MS4 owned or operated by the Permittee is causing or contributing to a known or likely violation of Water Quality Standards in the receiving water. Written notification provided under this subsection shall, at a minimum, identify the source of the site-specific information, describe the nature and extent of the known or likely violation in the receiving water, and explain the reasons why the MS4 discharge is believed to be causing or contributing to the problem. For ongoing or continuing violations, a single written notification to Ecology will fulfill this requirement.

2.   In the event that Ecology determines, based on a notification provided under S4.F.1 or through any other means, that a discharge from a MS4 owned or operated by the Permittee is causing or contributing to a violation of Water Quality Standards in a receiving water, Ecology will notify the Permittee in writing that an adaptive management response outlined in S4.F.3 below is required, unless:

a.   Ecology determines that the violation of Water Quality Standards is already being addressed by a Total Maximum Daily Load (TMDL) or other enforceable water quality cleanup plan; or

b.   Ecology concludes the MS4 contribution to the violation will be eliminated through implementation of other permit requirements.

3.   Adaptive Management Response

a.   Within 60 days of receiving a notification under S4.F.2, or by an alternative date established by Ecology, the Permittee shall review its Stormwater Management Program (SWMP) and submit a report to Ecology. The report shall include:

i.   A description of the operational and/or structural Best Management Practices (BMPs) that are currently being implemented to prevent or reduce any pollutants that are causing or contributing to the violation of Water Quality Standards, including a qualitative assessment of the effectiveness of each best management practice (BMP).

ii.   A description of potential additional operational and/or structural BMPs that will or may be implemented in order to apply AKART on a site-specific basis to prevent or reduce any pollutants that are causing or contributing to the violation of Water Quality Standards.

iii.   A description of the potential monitoring or other assessment and evaluation efforts that will or may be implemented to monitor, assess, or evaluate the effectiveness of the additional BMPs.

SPOKANE-PRR-0049933
002340

        iv.    A schedule for implementing the additional BMPs including, as appropriate: funding, training, purchasing, construction, monitoring, and other assessment and evaluation components of implementation.

    b.    Ecology will, in writing, acknowledge receipt of the report within a reasonable time and notify the Permittee when it expects to complete its review of the report. Ecology will either approve the additional BMPs and implementation schedule or require the Permittee to modify the report as needed to meet AKART on a site-specific basis. If modifications are required, Ecology will specify a reasonable time frame in which the Permittee shall submit and Ecology will review the revised report.

    c.    The Permittee shall implement the additional BMPs, pursuant to the schedule approved by Ecology, beginning immediately upon receipt of written notification of approval.

    d.    The Permittee shall include with each subsequent annual report the results of any monitoring, assessment or evaluation efforts conducted during the reporting period. If, based on the information provided under this subsection, Ecology determines that modification of the BMPs or implementation schedule is necessary to meet AKART on a site-specific basis, the Permittee shall make such modifications as Ecology directs. In the event there are ongoing violations of water quality standards despite the implementation of the BMP approach of this section, the Permittee may be subject to compliance schedules to eliminate the violation under WAC 173-201A-510(4) and WAC 173-226-180 or other enforcement orders as Ecology deems appropriate during the term of this permit.

    e.    A TMDL or other enforceable water quality cleanup plan that has been approved and is being implemented to address the MS4's contribution to the Water Quality Standards violation supersedes and terminates the S4.F.3 implementation plan.

    f.    Provided the Permittee is implementing the approved adaptive management response under this section, the Permittee remains in compliance with Condition S4, despite any on-going violations of Water Quality Standards identified under S4.A or B above.

    g.    The adaptive management process provided under Section S.4.F is not intended to create a shield for the Permittee from any liability it may face under 42 U.S.C. 9601 *et seq.* or RCW 70.105D.

G.    Ecology may modify or revoke and reissue this General Permit in accordance with G14 General Permit Modification and Revocation if Ecology becomes aware of additional control measures, management practices or other actions beyond what is required in this permit, that are necessary to:

    1.    Reduce the discharge of pollutants to the MEP;

    2.    Comply with the state AKART requirements; or

SPOKANE-PRR-0049934
00234

3.    Control the discharge of toxicants to waters of the State of Washington.

## S5.    STORMWATER MANAGEMENT PROGRAM FOR CITIES, TOWNS AND COUNTIES

This section applies to all Cities, Towns and Counties covered under this permit. Where the term "Permittee" is used in this section, the requirements apply to any City, Town or County, whether permit coverage is obtained as a Permittee or as a Co-Permittee.

New Permittees obtaining coverage after the issuance date of this permit shall fully meet the requirements in S5 as specified in an alternate schedule as a condition of coverage by Ecology.

A.    All Permittees shall implement a Stormwater Management Program (SWMP) during the term of this permit. The SWMP shall be implemented, at a minimum, throughout the geographic area described for the Permittee in S1.A.

1.    A SWMP is a set of actions and activities comprising the components listed in S5 and any additional actions necessary to meet the requirements of applicable TMDLs pursuant to S7 *Compliance with TMDL Requirements*, and S8 *Monitoring and Assessment*. The SWMP shall be designed to reduce the discharge of pollutants from the regulated small MS4 to the MEP, to satisfy the state requirement under Chapter 90.48 RCW to apply AKART prior to discharge, and to protect water quality.

2.    Permittees shall continue implementation of existing stormwater management programs until they begin implementation of the updated stormwater management program in accordance with the terms of this permit, including implementation schedules.

3.    Each Permittee shall prepare written documentation of the SWMP, called the SWMP Plan. The SWMP Plan shall be organized according to the program components in S5.B below or a format approved by Ecology, and shall be updated at least annually for submittal with the Permittee's annual reports to Ecology (see S9 Reporting and Recordkeeping). The SWMP Plan shall be written to inform the general public of planned SWMP activities for the upcoming calendar year, and shall include a description of:

a.    Planned activities for each of the program components included in S5.B.1 through S5.B.6, and

b.    Any additional planned actions to meet the requirements of applicable TMDLs pursuant to S7 *Compliance with Total Maximum Daily Load Requirements*.

c.    Any additional planned actions to meet the requirements of S8 *Monitoring*.

SPOKANE-PRR 0049935
002342

4.    Gathering, maintaining, and using information

    a.    Each Permittee shall have an ongoing program for gathering, tracking, maintaining, and using information to evaluate SWMP development and implementation and permit compliance, and to set priorities.

        i.    Each Permittee shall track the number of inspections performed, official enforcement actions taken, and types of public education activities implemented as required for each SWMP component. This information shall be included in the annual report.

        ii.   Each Permittee shall track the estimated cost of development and implementation of each component of the SWMP. This information shall be provided to Ecology upon request.

5.    Coordination among Permittees

    a.    Coordination among entities covered under this permit is encouraged. The SWMP should include coordination mechanisms to encourage coordinated stormwater-related policies, programs and projects within adjoining or shared areas, including:

        i.    Coordination mechanisms clarifying roles and responsibilities for the control of pollutants between physically interconnected MS4s covered by a municipal stormwater permit.

        ii.   Coordinating stormwater management activities for shared water bodies among Permittees, to avoid conflicting plans, policies and regulations.

    b.    The SWMP shall also include coordination mechanisms among departments within each jurisdiction to eliminate barriers to compliance with the terms of this permit. Permittees shall include a written description of internal coordination mechanisms in the Annual Report due no later than March 31, 2016.

B.    The SWMP shall include the components listed below. To the extent allowable under state and federal law, all components are mandatory for each City, Town, and County covered under this permit, whether covered as an individual Permittee or as a Co-Permittee.

1.    Public Education and Outreach

Permittees shall implement a public education and outreach program to distribute educational materials to the community or conduct equivalent outreach activities about the impacts of stormwater discharges to water bodies and the steps the public can take to reduce pollutants in stormwater. Outreach and educational efforts should include a multimedia approach and shall be targeted and presented to specific audiences for increased effectiveness. The education program may be developed and implemented locally or regionally.

SPOKANE-PRR-0049936
002343

The minimum performance measures are:

a.   All Permittees shall continue to implement a public education and outreach program designed to achieve improvements in the target audience's understanding of the problem and what they can do to solve it. The program shall, at a minimum, include the following, based on the land uses and target audiences found within the community:

  i.   Information for the general public, including school-age children, about: the importance of improving water quality and protecting beneficial uses of waters of the state; potential impacts from stormwater discharges; methods for avoiding, minimizing, reducing and/or eliminating the adverse impacts of stormwater discharges; and actions individuals can take to improve water quality, including encouraging participation in local environmental stewardship activities and programs.

  ii.   Information for businesses and the general public about: preventing illicit discharges, including what constitutes illicit discharges, the impacts of illicit discharges, and promoting the proper management and disposal of waste. Targeted business education should include topics appropriate to the type of business, such as the management of restaurant dumpsters and wastewater, and the use and storage of automotive chemicals, hazardous cleaning supplies, carwash soaps, and other hazardous materials.

  iii.   Information for engineers, construction contractors, developers, development review staff, and land use planners about: technical standards, the development of stormwater site plans and erosion control plans, low impact development (LID) when it becomes available, and stormwater Best Management Practices (BMPs) for reducing adverse impacts from stormwater runoff from development sites.

b.   All Permittees shall continue to implement a public education and outreach strategy.  The strategy shall be designed to reach all of the target audiences identified within the geographic area of the Permittee's jurisdiction covered under this permit to meet the education and outreach goals listed in (a) above.

2.   Public Involvement and Participation

Permittees shall provide ongoing opportunities for public involvement and participation such as advisory panels, public hearings, watershed committees, participation in developing rate-structures, or other similar activities. Permittees shall comply with applicable state and local public notice requirements when developing elements of the SWMP.

The minimum performance measures are:

a. Permittees shall implement a program or policy directive to create opportunities for the public to provide input during the decision making processes involving the development, implementation and update of the SWMP, including development and adoption of all required ordinances and regulatory mechanisms.

b. No later than May 31 each year, Permittees shall post on their website and make the latest version of the annual report and SWMP Plan available to the public. All other submittals should be available to the public upon request. Co-Permittees and other groups of Permittees that are developing the SWMP in a cooperative effort may post the updated SWMP Plan on a single entity's website. To comply with the posting requirement, a Permittee that does not maintain a website may submit the updated SWMP Plan in electronic format to Ecology for posting on its website.

3. Illicit Discharge Detection and Elimination

Each Permittee shall implement and enforce a program designed to prevent, detect, characterize, trace and eliminate illicit connections and illicit discharges into the MS4.

The minimum performance measures are:

a. Each Permittee shall continue to maintain a map of the MS4, showing the location of all known and new connections to the MS4 authorized or approved by the Permittee; all known outfalls; the names and locations of all waters of the state that receive discharges from those outfalls; and areas served by discharges to ground.

   i. Field surveys conducted pursuant to the requirements of S5.B.3.c.iii. shall verify outfall locations and identify previously unknown outfalls on priority water bodies. Permittees shall, upon request and to the extent consistent with national security laws and directives, provide maps and mapping information to Ecology, other entities covered under this permit, other municipalities, and/or federally-recognized Indian Tribes. This permit does not preclude Permittees from recovering reasonable costs associated with fulfilling mapping information requests by other municipalities, federally-recognized Indian Tribes, Co-Permittees and Secondary Permittees.

   ii. The preferred, but not required, format for mapping is an electronic format with fully described mapping standards. An example description is provided on Ecology's website.

   iii. The Permittee shall maintain documentation of the information included in the map, and the map shall be updated periodically.

b. Each Permittee shall effectively prohibit, through ordinance or other regulatory mechanism, non-stormwater discharges into the MS4.

SPOKANE-PRR-0049938
002345

i.  Each Permittee shall implement an ordinance or other regulatory mechanism that prohibits illicit discharges and authorizes enforcement actions, including on private property.

ii. Allowable discharges. The ordinance or other regulatory mechanism does not need to prohibit the following categories of non-stormwater discharges:

- Diverted stream flows.

- Rising ground waters.

- Uncontaminated ground water infiltration (as defined at 40 CFR 35.2005(20)).

- Uncontaminated pumped ground water.

- Foundation drains.

- Air conditioning condensation.

- Irrigation water from agricultural sources that is commingled with urban stormwater.

- Springs.

- Uncontaminated water from crawl space pumps.

- Footing drains.

- Flows from riparian habitats and wetlands.

- Discharges from emergency fire fighting activities in accordance with S2 *Authorized Discharges*.

- Non-stormwater discharges authorized by another NPDES permit or state waste discharge permit.

iii. Conditionally allowable discharges. The ordinance or other regulatory mechanism may allow the following categories of non-stormwater discharges only if the stated conditions are met:

- Discharges from potable water sources, including but not limited to water line flushing, hyperchlorinated water line flushing, fire hydrant system flushing, and pipeline hydrostatic test water. Planned discharges shall be dechlorinated to a total residual chlorine concentration of 0.1 ppm or less, pH-adjusted if necessary, and volumetrically and velocity controlled to prevent resuspension of sediments in the MS4.

SPOKANE-PRR-0049939
002348

- Discharges from lawn watering and other irrigation runoff. These discharges shall be minimized through, at a minimum, public education activities (see S5.B.1.) and water conservation efforts.

- Dechlorinated swimming pool, spa and hot tub discharges. The discharges shall be dechlorinated to a total residual chlorine concentration of 0.1 ppm or less, pH-adjusted and reoxygenated if necessary, and volumetrically and velocity controlled to prevent resuspension of sediments in the MS4. Discharges shall be thermally controlled to prevent an increase in temperature of the receiving water. Swimming pool cleaning wastewater and filter backwash shall not be discharged to the MS4.

- Street and sidewalk wash water, water used to control dust, and routine external building washdown that does not use detergents. The Permittee shall reduce these discharges through, at a minimum, public education activities (see S5.B.1) and/or water conservation efforts. To avoid washing pollutants into the MS4, Permittees shall minimize the amount of street wash and dust control water used.

- Other non-stormwater discharges. Other non-stormwater discharges shall be in compliance with the requirements of a pollution prevention plan reviewed by the Permittee which addresses control of such discharges.

iv. The ordinance or other regulatory mechanism shall further address any category of discharges in (ii) or (iii) above if the discharge is identified as a significant source of pollutants to waters of the state.

v. The ordinance or other regulatory mechanism shall include escalating enforcement procedures and actions.

vi. The Permittee shall implement a compliance strategy that includes informal compliance actions such as public education and technical assistance, as well as the enforcement provisions of the ordinance or other regulatory mechanism. To implement an effective compliance strategy, the Permittee's ordinance or other regulatory mechanism may need to include the following tools:

- The application of operational and/or structural source control BMPs for pollutant generating sources associated with existing land uses and activities where necessary to prevent illicit discharges. The source control BMPs referenced in this subsection are in Volume IV of the 2004 *Stormwater Management Manual for Eastern Washington* or another technical manual approved by Ecology.

SPOKANE-PRR-0049940
002347

- The maintenance of stormwater facilities which discharge into the Permittee's MS4 in accordance with maintenance standards established under S5.B.5 where necessary to prevent illicit discharges.

vii. The Permittee's ordinance or other regulatory mechanism in effect as of the effective date of this permit shall be revised if necessary to meet the requirements of this section, no later than February 2, 2019.

c. Each Permittee shall implement an ongoing program designed to detect and identify illicit discharges and illicit connections into the Permittee's MS4. The program shall include the following components:

i. Procedures for conducting investigations of the Permittee's MS4, including field screening to identify potential sources.

ii. Procedures for locating priority areas likely to have illicit discharges, including at a minimum: evaluating land uses and associated business/industrial activities present; areas where complaints have been registered in the past; and areas with storage of large quantities of materials that could result in illicit discharges, including spills.

iii. Field assessment activities, including outfalls, or facilities serving priority areas identified in (ii) above, during dry weather and for the purposes of verifying outfall locations and detecting illicit discharges.

Compliance with this provision shall be achieved by: field assessing at least 40 of the MS4 within the Permittee's coverage area no later than December 31, 2018 and on average 12% each year thereafter to verify outfall locations and detect illicit discharges.

iv. A publicly listed and publicized hotline or other telephone number for public reporting of spills and other illicit discharges.

v. Permittees shall provide adequate training for all municipal field staff which, as part of their normal job responsibilities, might come into contact with or otherwise observe an illicit discharge or illicit connection to the storm sewer system, on the identification of an illicit discharge/connection, and on the proper procedures for reporting and responding, as appropriate, to the illicit discharge/connection. Follow-up training shall be provided as needed to address changes in procedures, techniques, requirements, or staffing. Permittees shall document and maintain records of the trainings provided and the staff trained.

vi. Permittees shall inform public employees, businesses, and the general public of hazards associated with illicit discharges and improper disposal of waste.

SPOKANE-PRR-0049941
002348

d. Permittees shall implement an ongoing program designed to address illicit discharges, including spills, and illicit connections into the MS4. The plan shall include:

   i. Procedures for characterizing the nature of, and potential public or environmental threat posed by, any illicit discharges found by or reported to the Permittee. Procedures shall address the evaluation of whether the discharge shall be immediately contained and steps to be taken for containment of the discharge.

   ii. Procedures for tracing the source of an illicit discharge; including visual inspections, and when necessary, opening manholes, using mobile cameras, collecting and analyzing water samples, and/or other detailed inspection procedures.

   iii. Procedures for eliminating the discharge, including notification of appropriate authorities; notification of the property owner; technical assistance; follow-up inspections; and use of the compliance strategy developed pursuant to S5.B.3.b.vi including escalating enforcement and legal actions if the discharge is not eliminated.

   iv. Compliance with the provisions in (i), (ii), and (iii) above, shall be achieved by meeting the following timelines:

- Immediately respond to all illicit discharges, including spills, which are determined to constitute a threat to human health, welfare, or the environment, consistent with General Condition G3.

- Investigate (or refer to the appropriate agency with the authority to act) within 7 days, any complaints, reports, or monitoring information that indicates a potential illicit discharge.

- Initiate an investigation within 21 days of any report or discovery of a suspected illicit connection to determine the source of the connection, the nature and volume of discharge through the connection, and the party responsible for the connection.

  Upon confirmation of an illicit connection, use the compliance strategy outlined in S5.B.3.b.vi in a documented effort to eliminate the illicit connection within 6 months. All known illicit connections to the MS4 shall be eliminated.

e. Permittees shall train staff who are responsible for identification, investigation, termination, cleanup, and reporting of illicit discharges, including spills, and illicit connections to conduct these activities. Follow-up training shall be provided as needed to address changes in procedures,

SPOKANE-PRR-0049942
002349

techniques, requirements, or staff. Permittees shall document and maintain records of the training provided and the staff trained.

f.    Recordkeeping: Permittees shall track and maintain records of the activities conducted to meet the requirements of this section.

4.    Construction Site Stormwater Runoff Control

All Permittees shall implement and enforce a program to reduce pollutants in any stormwater runoff to the MS4 from construction activities that disturb one acre or more, and from construction projects of less than one acre that are part of a larger common plan of development or sale.

Public and private projects, including projects proposed by the Permittee's own departments and agencies, shall comply with these requirements. The Permittee shall implement an ongoing process for ensuring proper project review, inspection, and compliance by its own departments and agencies.

The minimum performance measures are:

a.    Permittees shall implement an ordinance or other regulatory mechanism to require erosion and sediment controls, and other construction-phase stormwater pollution controls at new development and redevelopment projects.  The ordinance or other regulatory mechanism shall include sanctions to ensure compliance.

 i.    The ordinance or other regulatory mechanism shall apply, at a minimum, to construction sites disturbing  one acre or more and to construction projects of less than one acre that are part of a larger common plan of development or sale.

 ii.    The ordinance or other regulatory mechanism shall require construction operators to adhere, at a minimum, to the requirements of Appendix 1, Core Element #2, including preparation of Construction Stormwater Pollution Prevention Plans (Construction SWPPPs) and application of BMPs as necessary to protect water quality, reduce the discharge of pollutants to the MEP, and satisfy state AKART requirements.

  •    The ordinance or other regulatory mechanism shall include requirements for construction site operators to implement appropriate erosion and sediment control BMPs.  The ordinance or other regulatory mechanism shall include requirements for construction site operators to control waste such as discarded building materials, concrete truck washout, chemicals, litter, and sanitary waste at the construction site that may cause adverse impacts to water quality.

  •    Permittees shall document how the requirements of the ordinance or other regulatory mechanism protect water quality,

SPOKANE-PRR-0049943
002350

reduce the discharge of pollutants to the MEP, and satisfy state AKART requirements.  Documentation shall include:

o   How stormwater BMPs were selected;

o   The pollutant removal expected from the selected BMPs;

o   The technical basis which supports the performance claims for the selected BMPs; and

o   How the selected BMPs will comply with applicable state water quality standards and satisfy the state requirement to apply AKART prior to discharge.

Permittees who choose to use the BMP selection, design, installation, operation and maintenance standards in the *Stormwater Management Manual for Eastern Washington* (2004), or another technical stormwater manual approved by Ecology, may cite this reference as the sole documentation that the ordinance or regulatory mechanism is protecting water quality, reducing the discharge of pollutants to the MEP, and satisfying state AKART requirements.

iii.   The ordinance or other regulatory mechanism shall include appropriate, escalating enforcement procedures and actions.

iv.   The Permittee shall implement an enforcement strategy and the enforcement provisions of the ordinance or other regulatory mechanism.

v.   The ordinance shall include a provision for access by qualified personnel to inspect construction-phase stormwater BMPs on private properties that discharge to the MS4.

b.   Permittees shall implement procedures for site plan review which incorporate consideration of potential water quality impacts.

i.   Prior to construction, Permittees shall review Construction SWPPPs for, at a minimum, all construction sites that disturb one acre or more, or are less than one acre and are part of a larger common plan of development or sale, to ensure that the plans are complete pursuant to the requirements of Appendix 1, Core Element #2.  The Construction SWPPP review shall be performed by qualified personnel and shall be performed in coordination with S5.B.5.b.i review of Stormwater Site Plans.

•   To comply with this provision, Permittees shall keep records of all projects disturbing one acre or more, and all projects of any size that are part of a common plan of development or sale that is one acre or more, that are approved after the effective date of

SPOKANE-PRR-0049944
00235

this permit. Permittees shall keep records of these projects for five years or until construction is completed, whichever is longer.

- If the Permittee chooses to allow construction sites to apply the "Erosivity Waiver" in Appendix 1, Core Element #2, the Permittee is not required to review Construction SWPPPs for individual sites applying the waiver.

ii. Permittees shall provide adequate training for all staff involved in permitting, planning, and review to carry out these provisions. The training records to be kept include dates, activities or course descriptions, and names and positions of staff in attendance.

c. Permittees shall implement procedures for site inspection and enforcement of construction stormwater pollution control measures.

i. Each Permittee shall implement a procedure for keeping records of inspections and enforcement actions by staff, including inspection reports, warning letters, notices of violations, and other enforcement records.

ii. Permittees shall provide adequate training for all staff involved in plan review, field inspection and enforcement to carry out the provisions of this SWMP component. The training records to be kept include dates, activities or course descriptions, and names and positions of staff in attendance.

iii. All new construction sites that disturb one acre or more, or are part of a larger common plan of development or sale, shall be inspected at least once by qualified personnel.

- To comply with this provision, Permittees shall keep records of all projects disturbing one acre or more, and all projects of any size that are part of a common plan of development or sale that is one acre or more, that are approved after the effective date of this permit.

- Permittees shall keep project records for five years or until construction is completed, whichever is longer.

- Compliance with this inspection requirement will be determined by the Permittee having and maintaining records of an inspection program that is designed to inspect all sites. Compliance during this permit term will be determined by the Permittee achieving an inspection rate of at least 80% of the sites.

d. Permittees shall provide information to construction site operators about training available on how to install and maintain effective erosion and

SPOKANE-PRR 0049945
002352

sediment controls and how to comply with the requirements of Appendix 1 and apply the BMPs described in Chapter 7 of the *Stormwater Management Manual for Eastern Washington (2004)*, or another technical stormwater manual approved by Ecology.

Permittees shall keep copies of information provided to construction site operators, and if information is distributed to a large number of design professionals at once, the dates of the mailings and lists of recipients.

e.   If the Permittee chooses to allow construction sites to apply the "Erosivity Waiver" in Appendix 1, Core Element #2, the Permittee shall keep a record of all construction sites that provide notice to the Permittee of their intention to apply the waiver. The Permittee shall investigate complaints about these sites in the same manner as it will investigate complaints about sites that have submitted Construction SWPPPs for review pursuant to S5.B.4.b.i. above.

5.   Post-Construction Stormwater Management for New Development and Redevelopment

All Permittees shall implement and enforce a program to address post-construction stormwater runoff to the MS4 from new development and redevelopment projects that disturb one acre or more, and from projects of less than one acre that are part of a larger common plan of development or sale. The program shall ensure that controls to prevent or minimize water quality impacts are in place.

Public and private projects, including projects proposed by the Permittee's own departments and agencies, shall comply with these requirements. The Permittee shall implement an ongoing process for ensuring proper project review, inspection, and compliance by its own departments and agencies.

The minimum performance measures are:

a.   Permittees shall implement an ordinance or other regulatory mechanism that requires post-construction stormwater controls at new development and redevelopment projects. The ordinance or other regulatory mechanism shall include sanctions to ensure compliance. The local program adopted to meet the requirements of S5.B.5.a.ii(a) and (b)(2) below shall apply to all applications[1] submitted after December 31, 2017 and shall apply to projects approved prior to January 1, 2018, which have not started construction[2] by December 31, 2023.

---

[1] In this context, "application" means, at a minimum a complete project description, site plan, and, if applicable, SEPA checklist. Permittees may establish additional elements of a complete application.

[2] In this context, "started construction" means at a minimum the site work associated with, and directly related to the approved project has begun. For example: grading the project site to final grade or utility installation. Simply

SPOKANE-PRR 0049946
002353

i. The ordinance or other regulatory mechanism shall apply, at a minimum, to new development and redevelopment sites that discharge to the MS4 and that disturb one acre or more or are less than one acre and are part of a larger common plan of development or sale.

ii. The ordinance or other regulatory mechanism shall require project proponents and property owners to adhere to the minimum technical requirements in Appendix 1 and shall include BMP selection, design, installation, operation, and maintenance standards necessary to protect water quality, reduce the discharge of pollutants to the MEP, and satisfy state AKART requirements.

(a) All Permittees shall implement a policy of encouraging project proponents to maintain natural drainages to the maximum extent possible, including reducing the total amount of impervious surfaces created by the project.

No later than December 31, 2017, Permittees shall allow non-structural preventive actions and source reduction approaches such as Low Impact Development (LID) techniques, measures to minimize the creation of impervious surfaces and measures to minimize the disturbance of native soils and vegetation. Provisions for LID should take into account site conditions and long term maintenance.

(b) The ordinance or other regulatory mechanism shall include requirements for project proponents and property owners to implement appropriate runoff treatment, flow control, and source control BMPs considering the proposed land use at the site to minimize adverse impacts to water quality.

(1) Each Permittee shall implement a specific hydrologic method or methods for calculating runoff volumes and flow rates to ensure consistent sizing of structural BMPs in their jurisdiction and to facilitate plan review. Permittees may allow proponents of unique or complex projects to use other methodologies.

(2) No later than December 31, 2017, Permittees must require projects approved under S5.B.5 to retain runoff generated on-site for, at a minimum, the 10-year, 24-hour rainfall event or a local equivalent. Permittees may meet this requirement using on-site or regional stormwater facilities. Permittees that are not already meeting this

---

clearing the project site does not constitute the start of construction. Permittees may establish additional requirements related to the start of construction.

SPOKANE-PRR-0049947
002354

requirement in existing ordinances shall develop and implement criteria to determine when it is infeasible for a project to meet this requirement[3], including but not limited to:

- Site/Engineering-based conditions such as soils that do not allow for infiltration of the required volume of stormwater runoff; proximity to a known hazardous waste site or landfill; proximity to a drinking water well or spring; proximity to an onsite sewage system or underground storage tank; setbacks from structures; landslide hazard areas or slopes; seasonal high groundwater; incompatibility with the surrounding drainage system from elevation or location; areas prone to erosion.

- Incompatibility with uses related to concerns such as public safety, protection from spills, contaminated sites, or frequently flooded areas.

- Incompatibility with state or federal laws.

- Permittees shall submit to Ecology with the Annual Report due no later than March 31, 2018 a summary of the criteria defining infeasibility, or a citation for the criteria adopted pursuant to a regional LID manual.

(3)    To meet the requirements of Appendix 1, Core Element #5 (Runoff Treatment) and Core Element #6 (Flow Control), Permittees may choose to apply the definitions and requirements in Chapter 2.2.5 and 2.2.6 of the *Stormwater Management Manual for Eastern Washington* (2004), or portions thereof, and the methods described in Chapters 4 and 6 of the *Stormwater Management Manual for Eastern Washington* (2004), or another technical stormwater manual approved by Ecology.

(c)    The ordinance or other regulatory mechanism shall include requirements to ensure adequate ongoing long-term operation and maintenance of the BMPs approved by the Permittee.

(d)    Permittees shall document how the requirements of the ordinance or other regulatory mechanism protect water quality,

---

[3] Ecology issued a grant in 2012 to work with Permittees to develop an Eastern Washington LID Manual. Permittees may choose to meet this requirement by adopting the criteria developed in that process.

SPOKANE-PRR-0049948
002355

reduce the discharge of pollutants to the MEP, and satisfy state AKART requirements. Documentation shall include:

(1)    How stormwater BMPs were selected;

(2)    The pollutant removal expected from the selected BMPs;

(3)    The technical basis which supports the performance claims for the selected BMPs; and

(4)    How the selected BMPs will comply with applicable state water quality standards and satisfy the state requirement to apply AKART prior to discharge.

Permittees who choose to use the BMP selection, design, installation, operation and maintenance standards in the *Stormwater Management Manual for Eastern Washington* (2004), or another technical stormwater manual approved by Ecology, may cite this reference as the sole documentation that the ordinance or regulatory mechanism is protecting water quality, reducing the discharge of pollutants to the MEP, and satisfying state AKART requirements.

iii.    The ordinance or other regulatory mechanism shall include provisions for both construction-phase and post-construction access for Permittees to inspect stormwater BMPs on private properties that discharge to the MS4. If deemed necessary for post-construction access, the ordinance or other regulatory mechanism may, in lieu of requiring that continued access be granted to the Permittee's staff or qualified personnel, instead require private property owners to provide annual certification by a qualified third party that adequate maintenance has been performed and the facilities are operating as designed to protect water quality.

iv.    The ordinance or other regulatory mechanism shall include appropriate, escalating enforcement procedures and actions.

v.    The Permittee shall implement an enforcement strategy and the enforcement provisions of the ordinance or other regulatory mechanism.

b.    Permittees shall implement procedures for site plan review which incorporate consideration of potential water quality impacts.

i.    Prior to construction, Permittees shall review Stormwater Site Plans for, at a minimum, all new development and redevelopment sites that meet the thresholds in S5.B.5.a.i to ensure that the plans include stormwater pollution prevention measures that meet the requirements in S5.B.5.a.ii.

SPOKANE-PRR-0049949
002356

To comply with this provision, Permittees shall keep records of all projects disturbing more than one acre, and all projects of any size that are part of a common plan of development or sale that is one acre or more, that are approved after the effective date of this permit. Permittees shall keep records of these projects for five years or until construction is completed, whichever is longer.

ii. The site plan review shall be performed by qualified personnel and shall include review of Construction Stormwater Pollution Prevention Plans where required pursuant to S5.B.4.b.i.

c. Permittees shall implement procedures for site inspection and enforcement of post-construction stormwater control measures.

i. The program shall include a procedure for keeping records of inspections and enforcement actions by staff, including inspection reports, warning letters, notices of violations, and other enforcement records. At a minimum, inspection and enforcement procedures shall be applied to all new development and redevelopment sites that meet the thresholds in S5.B.5.a.i.

ii. Structural BMPs shall be inspected at least once during installation by qualified personnel.

iii. Structural BMPs shall be inspected at least once every five years after final installation, or more frequently as determined by the Permittee to be necessary to prevent adverse water quality impacts, to ensure that adequate maintenance is being performed. The inspection shall be performed by qualified personnel.

iv. Recommended operation and maintenance standards for structural BMPs in the *Stormwater Management Manual for Eastern Washington* (2004), or another technical stormwater manual approved by Ecology, shall be met. If a BMP is not inspected, the Permittee is not in violation of this provision unless a violation of water quality standards occurs due to lack of operation and maintenance of the facility.

v. If a site is inspected and problems are identified, the Permittee is not in violation of this provision, provided the Permittee requires and confirms that necessary operation, maintenance and/or repair to correct the problem is performed as soon as practicable.

d. Permittees shall provide adequate training for all staff involved in permitting, planning, review, inspection, and enforcement to carry out the provisions of this SWMP component.

e. Permittees shall provide information to design professionals about training available on how to comply with the requirements of Appendix 1 and apply the BMPs described in the *Stormwater Management Manual for*

SPOKANE-PRR-0049950
002357

*Eastern Washington* (2004), or another technical stormwater manual approved by Ecology.

f.  To comply with these provisions, Permittees shall keep records of all projects disturbing one acre or more, and all projects of any size that are part of a common plan of development or sale that is one acre or more, that are approved after the effective date of this permit.

    i.  Permittees shall keep project records for five years or until construction is completed, whichever is longer, with the following exceptions: approved site plans and O&M plans shall be kept as needed to comply with the ongoing inspection requirements of this permit.

    ii.  The training records to be kept (for d, above) include dates, activities or course descriptions, and names and positions of staff in attendance.

    iii.  Permittees shall keep copies of information that is provided to design professionals (for e, above); and, if information is distributed to a large number of design professionals at once, the dates of the mailings and lists of recipients.

6.  <u>Municipal Operations and Maintenance</u>

Permittees shall implement an operation and maintenance program that includes a training component and has the ultimate goal of preventing or reducing pollutant runoff from municipal operations.

The minimum performance measures are:

a.  Permittees shall implement a schedule of municipal Operation and Maintenance activities (an O&M Plan). Permittees shall review and, if needed, update the O&M Plan no later than August 1, 2017. The schedule shall include BMPs that, when applied to the municipal activity or facility, will protect water quality, reduce the discharge of pollutants to the MEP, and satisfy state AKART requirements. Chapter 8 of the *Stormwater Management Manual for Eastern Washington* provides a selection of appropriate BMPs that meet these requirements for various types of facilities. Operation and maintenance standards in the O&M Plan shall be at least as protective as those included in Chapters 5, 6, and 8 of the *Stormwater Management Manual for Eastern Washington* (2004), or another technical stormwater manual approved by Ecology. Record keeping shall be done pursuant to the requirements in S9 *Reporting and Recordkeeping*.

    i.  The O&M Plan shall include appropriate pollution prevention and good housekeeping procedures for all of the following types of facilities and/or activities listed below.

SPOKANE-PRR-0049951
002358

(a) Stormwater collection and conveyance system, including catch basins, stormwater sewer pipes, open channels, culverts, structural stormwater controls, and structural runoff treatment and/or flow control facilities. The O&M Plan shall address, but is not limited to: regular inspections, cleaning, proper disposal of waste removed from the system in accordance with Appendix 6 *Street Waste Disposal*, and record keeping. Permittees shall implement catch basin cleaning, stormwater system maintenance, scheduled structural BMP inspections and maintenance, and pollution prevention/good housekeeping practices. Decant water shall be disposed of in accordance with Appendix 6 *Street Waste Disposal*.

(b) Roads, highways, and parking lots. The O&M Plan shall address, at a minimum: deicing, anti-icing, and snow removal practices; snow disposal areas and runoff from snow storage areas; material (e.g. salt, sand, or other chemical) storage areas; and all-season BMPs to reduce road and parking lot debris and other pollutants from entering the MS4. Permittees shall implement all pollution prevention/good housekeeping practices established in the O&M Plan for all roads, highways, and parking lots with more than 5,000 square feet of pollutant generating impervious surface that are owned, operated, or maintained by the Permittee.

(c) Vehicle fleets. The O&M Plan shall address, at a minimum: storage, washing, maintenance, repair, and fueling of municipal vehicle fleets. Permittees shall conduct all vehicle and equipment washing and maintenance in a self-contained covered building or in designated wash and/or maintenance areas operated to separate wash water from stormwater.

(d) Municipal buildings. The O&M Plan shall address, at a minimum: cleaning, washing, painting and other maintenance activities. Permittees shall implement all pollution prevention/good housekeeping practices established in the O&M Plan for buildings owned, operated, or maintained by the Permittee.

(e) Parks and open space. The O&M Plan shall address, at a minimum: proper application of fertilizer, pesticides, and herbicides; pet waste BMPs; sediment and erosion control; BMPs for landscape maintenance and vegetation disposal; trash and dumpster management; and BMPs for building exterior cleaning and maintenance. Permittees shall implement park and open space maintenance pollution prevention/good housekeeping practices at all park areas and other open spaces owned or operated by the Permittee.

(f) Construction Projects. Public construction projects shall comply with the requirements applied to private projects. All construction

SPOKANE-PRR-0049952
002359

projects owned or operated by the Permittee that are required to have an NPDES permit shall be covered under either the *General NPDES Permit for Stormwater Discharges Associated with Construction Activities* or another NPDES permit that authorizes stormwater discharges associated with the activity. All public projects shall include construction and post-construction controls selected and implemented pursuant to the requirements in Appendix 1.

(g) Industrial Activities. All facilities owned or operated by the Permittee that are required to have NPDES permit coverage shall be covered under the *General NPDES Permit for Stormwater Discharges Associated with Industrial Activities* or another NPDES permit that authorizes stormwater discharges associated with the activity.

(h) Material storage areas, heavy equipment storage areas and maintenance areas. Permittees shall implement a Stormwater Pollution Prevention Plan to protect water quality at each of these facilities owned or operated by the Permittee and not required to have coverage under the *General NPDES Permit for Stormwater Discharges Associated with Industrial Activities* or another NPDES permit that authorizes stormwater discharges associated with the activity. Generic Stormwater Pollution Prevention Plans that can be applied at multiple sites may be used to comply with this requirement.

(i) Flood management projects. Permittees shall assess water quality impacts in the design of all new flood management projects that are associated with the MS4 or that discharge to the MS4, including considering use of controls that minimize impacts to site hydrology and still meet project objectives.

(j) Other facilities that would reasonably be expected to discharge contaminated runoff. Permittees shall implement BMPs to protect water quality from discharges from these sites in the O&M Plan.

ii. The O&M plan shall include a schedule of inspections and requirements for record keeping pursuant to S9 *Reporting and Recordkeeping.*

(a) A minimum of 95% of all known stormwater treatment and flow control facilities (except catch basins) owned, operated or maintained by the Permittee shall be inspected at least once every two years, with problem facilities identified during inspections to be inspected more frequently.

(b) All catch basins and inlets owned or operated by the Permittee shall be inspected at least once by December 31, 2018 and every two years thereafter. Clean catch basins if the inspection indicates

SPOKANE-PRR-0049953
002360

cleaning is needed to comply with the maintenance standards adopted pursuant to S5.B.6.a.

The following alternatives to the standard approach of inspecting catch basins once by December 31, 2018 and every two years thereafter may be applied to all or portions of the system:

- The catch basin inspection schedule of once by December 31, 2018 and every two years thereafter may be changed as appropriate to meet the maintenance standard based on maintenance records of double the length of time of the proposed inspection frequency. In the absence of maintenance records for catch basins, the Permittee may substitute written statements to document a specific, less frequent inspection schedule. Written statements shall be based on actual inspection and maintenance experiences and shall be certified in accordance with G19 *Certification and Signature.*
  - Inspections at least once by December 31, 2018 and every two years thereafter may be conducted on a "circuit basis" whereby 25% of catch basins and inlets within each circuit are inspected to identify maintenance needs. Include in the inspection the catch basin immediately upstream of any system outfall, if applicable. Clean all catch basins within a given circuit for which the inspection indicates cleaning is needed to comply with maintenance standards established under S5.B.4.a, above.
  - The Permittee may clean all pipes, ditches, catch basins, and inlets within a circuit once during the permit term. Circuits selected for this alternative must drain to a single point.

(c) Spot checks for potentially damaged stormwater treatment and flow control facilities will be conducted after major storm events (24 hour storm event with a 10-year or greater recurrence interval). Any needed repair or maintenance shall be performed as soon as practicable pursuant to the findings of a regular inspection or spot check.

iii. The O&M plan shall identify the department (and where appropriate, the specific staff) responsible for performing each activity.

b. Permittees shall provide training for all employees who have primary construction, operations, or maintenance job functions that are likely to impact stormwater quality. Training shall address the importance of protecting water quality,  operation and maintenance requirements, inspection procedures, and ways to perform their job activities to prevent or

SPOKANE-PRR-0049954
00236

minimize impacts to water quality. Follow-up training shall be provided as needed to address changes in procedures, methods or staffing.

## S6.  STORMWATER MANAGEMENT PROGRAM FOR SECONDARY PERMITTEES

A.  This section applies to all Secondary Permittees, whether coverage under this Permit is obtained individually or as a Co-Permittee with a City and/or Town and/or County and/or another Secondary Permittee.

New Secondary Permittees subject to this Permit shall fully meet the requirements of this section as modified in footnotes in S6.D below, or as established as a condition of coverage by Ecology.

1.  To the extent allowable under state, federal and local law, all components are mandatory for each Secondary Permittee covered under this permit, whether covered as an individual Permittee or as a Co-Permittee.

2.  Each Secondary Permittee shall develop and implement a stormwater management program (SWMP). A SWMP is a set of actions and activities comprising the components listed in S6 and any additional actions necessary to meet the requirements of applicable TMDLs pursuant to S7 *Compliance with TMDL Requirements,* and S8 *Monitoring and Assessment.* The SWMP shall be designed to reduce the discharge of pollutants from regulated small MS4s to the MEP and protect water quality.

3.  Unless an alternate implementation schedule is established by Ecology as a condition of permit coverage, the SWMP shall be developed and implemented in accordance with the schedules contained in this section and shall be fully developed and implemented no later than four and one-half years from initial permit coverage date. Secondary Permittees that are already implementing some or all of the required SWMP components shall continue implementation of those components.

4.  Secondary Permittees may implement parts of their SWMP in accordance with the schedule for cities, towns and counties in S5, provided they have signed a memorandum of understanding or other agreement to jointly implement the activity or activities with one or more jurisdictions listed in S1.D.2.a, and submitted a copy of the agreement to Ecology.

5.  Each Secondary Permittee shall prepare written documentation of the SWMP, called the SWMP Plan. The SWMP Plan shall include a description of program activities for the upcoming calendar year.

B.  Coordination
Secondary Permittees shall coordinate stormwater-related policies, programs and projects within a watershed and with interconnected MS4s. Where relevant and appropriate, the SWMP shall coordinate among departments of the Secondary Permittee to ensure compliance with the terms of this Permit.

SPOKANE-PRR-0049955
002362

C.    Legal Authority

To the extent allowable under state law and federal law, each Secondary Permittee shall be able to demonstrate that they can operate pursuant to legal authority which authorizes or enables the Secondary Permittee to control discharges to and from MS4s owned or operated by the Secondary Permittee.

This legal authority may be a combination of statutes, ordinances, permits, contracts, orders, interagency agreements, or similar instruments.

D.    Stormwater Management Program for Secondary Permittees

Permittees that are already implementing some or all of the SWMP components in this section shall continue implementation of those components of their SWMP.

The SWMP for Secondary Permittees shall include the following components:

1.    Public Education and Outreach

Each Secondary Permittee shall implement the following stormwater education strategies:

a.    Storm drain inlets owned or operated by the Secondary Permittee that are located in maintenance yards, in parking lots, along sidewalks, and at pedestrian access points shall be clearly labeled with a message similar to "Dump no waste – Drains to water body".[4]

As identified during visual inspection and regular maintenance of storm drain inlets per the requirements of S6.D.3.d and S6.D.6.a.i below, or as otherwise reported to the Secondary Permittee, any inlet having a label that is no longer clearly visible and/or easily readable shall be re-labeled within 90 days.

b.    Each year beginning no later than three years from the initial date of permit coverage, public ports, colleges and universities shall distribute educational information to tenants and residents on the impact of stormwater discharges on receiving waters, and steps that can be taken to reduce pollutants in stormwater runoff. Distribution may be by hard copy or electronic means. Appropriate topics may include:

i.    How stormwater runoff affects local waterbodies.

ii.    Proper use and application of pesticides and fertilizers.

iii.    Benefits of using well-adapted vegetation.

---

[4] New Secondary Permittees shall label all inlets as described in S5.D.1.a no later than four years from the initial date of permit coverage.

*Eastern Washington Phase II Municipal Stormwater Permit – August 1, 2014*
*Page 31*

SPOKANE-PRR-0049956
002363

iv.    Alternative equipment washing practices including cars and trucks that minimize pollutants in stormwater.

v.    Benefits of proper vehicle maintenance and alternative transportation choices; proper handling and disposal of wastes, including the location of hazardous waste collection facilities in the area.

vi.    Hazards associated with illicit connections and illicit discharges.

vii.    Benefits of litter control and proper disposal of pet waste.

2.    <u>Public Involvement and Participation</u>

Each year no later than May 31, each Secondary Permittee shall:

a.    Make the annual report available on the Secondary Permittee's website.

b.    Make the latest updated version of the SWMP Plan available on the Secondary Permittee's website.

c.    To comply with the posting requirement, a Secondary Permittee that does not maintain a website may submit the updated SWMP Plan in electronic format to Ecology for posting on Ecology's website.

3.    <u>Illicit Discharge Detection and Elimination</u>

Each Secondary Permittee shall:

a.    From the initial date of permit coverage, comply with all relevant ordinances, rules, and regulations of the local jurisdiction(s) in which the Secondary Permittee is located that govern non-stormwater discharges.

b.    Implement appropriate policies prohibiting illicit discharges[5] and an enforcement plan to ensure compliance with illicit discharge policies.[6] These policies shall address, at a minimum: illicit connections; non-stormwater discharges, including spills, of hazardous materials; and improper disposal of pet waste and litter.

i.    Allowable discharges. The policies do not need to prohibit the following categories of non-stormwater discharges:

- Diverted stream flows.

- Rising ground waters.

---

[5] New Secondary Permittees shall develop and implement appropriate policies prohibiting illicit discharges, and identify possible enforcement mechanisms as described in S6.D.3.b no later than one year from the initial date of permit coverage.

[6] New Secondary Permittees shall develop and implement an enforcement plan as described in S6.D.3.b no later than 18 months from the initial date of permit coverage.

SPOKANE-PRR-0049957
002364

- Uncontaminated ground water infiltration (as defined at 40 CFR 35.2005(20)).

- Uncontaminated pumped ground water.

- Foundation drains.

- Air conditioning condensation.

- Irrigation water from agricultural sources that is commingled with urban stormwater.

- Springs.

- Uncontaminated water from crawl space pumps.

- Footing drains.

- Flows from riparian habitats and wetlands.

- Discharges from emergency fire fighting activities in accordance with S2 *Authorized Discharges*.

- Non-stormwater discharges authorized by another NPDES or state waste discharge permit.

ii.   Conditionally allowable discharges. The policies may allow the following categories of non-stormwater discharges only if the stated conditions are met and such discharges are allowed by local codes:

- Discharges from potable water sources, including but not limited to water line flushing, hyperchlorinated water line flushing, fire hydrant system flushing, and pipeline hydrostatic test water.  Planned discharges shall be dechlorinated to a total residual chlorine concentration of 0.1 ppm or less, pH-adjusted if necessary, and volumetrically and velocity controlled to prevent resuspension of sediments in the MS4.

- Discharges from lawn watering and other irrigation runoff. These discharges shall be minimized through, at a minimum, public education activities and water conservation efforts conducted by the Secondary Permittee and/or the local jurisdiction.

- Dechlorinated swimming pool, spa and hot tub discharges. The discharges shall be dechlorinated to a total residual chlorine concentration of 0.1 ppm or less, pH-adjusted and

SPOKANE-PRR 0049958
002365

reoxygenated if necessary, and volumetrically and velocity controlled to prevent resuspension of sediments in the MS4. Discharges shall be thermally controlled to prevent an increase in temperature of the receiving water. Swimming pool cleaning wastewater and filter backwash shall not be discharged to the MS4.

- Street and sidewalk wash water, water used to control dust, and routine external building wash-down that does not use detergents. The Secondary Permittee shall reduce these discharges through, at a minimum, public education activities and/or water conservation efforts conducted by the Secondary Permittee and/or the local jurisdiction. To avoid washing pollutants into the MS4, the Secondary Permittee shall minimize the amount of street wash and dust control water used.

- Other non-stormwater discharges shall be in compliance with the requirements of a pollution prevention plan reviewed by the Permittee which addresses control of such discharges.

iii. The Secondary Permittee shall address any category of discharges in (ii) or (iii) above if the discharge is identified as a significant source of pollutants to waters of the State.

c. Maintain a storm sewer system map showing the locations of all known storm drain outfalls, labeling the receiving waters, other than ground water, and delineating the areas contributing runoff to each outfall. Make the map (or completed portions of the map) available on request to Ecology and to the extent appropriate, to other Permittees. The preferred format for mapping is an electronic format with fully described mapping standards. An example description is provided on Ecology's website.[7]

d. Conduct field inspections and visually inspect for illicit discharges at all known MS4 outfalls. Visually inspect at least one third (on average) of all known outfalls each year beginning no later than two years from the initial date of permit coverage. Implement procedures to identify and remove any illicit discharges. Keep records of inspections and follow-up activities.[8]

---

[7] New Secondary Permittees shall meet the requirements of S6.D.4.c no later than four and one-half years from the initial date of permit coverage.

[8] New Secondary Permittees shall develop and implement procedures described in S6.D.3.d no later than two years from the initial date of permit coverage.

SPOKANE-PRR-0049959
002366

      e.    Implement a spill response plan that includes coordination with a qualified spill responder.[9]

      f.    No later than two years from the initial date of permit coverage, provide staff training or coordinate with existing training efforts to educate staff on proper best management practices for preventing illicit discharges. Train all Permittee staff who, as part of their normal job responsibilities, have a role in preventing such illicit discharges.

4.    Construction Site Stormwater Runoff Control

From the initial date of permit coverage, each Secondary Permittee shall:

      a.    Comply with all relevant ordinances, rules, and regulations of the local jurisdiction(s) in which the Secondary Permittee is located that govern construction phase stormwater pollution prevention measures.

      b.    Ensure that all construction projects under the functional control of the Secondary Permittee which require a construction stormwater permit obtain coverage under the NPDES *General Permit for Stormwater Discharges Associated with Construction Activities,* or an individual NPDES permit prior to discharging construction related stormwater.

      c.    Coordinate with the local jurisdiction regarding projects owned or operated by other entities which discharge into the Secondary Permittee's MS4, to assist the local jurisdiction with achieving compliance with all relevant ordinances, rules, and regulations of the local jurisdiction(s).

      d.    Provide training or coordinate with existing training efforts to educate relevant staff in erosion and sediment control BMPs and requirements, or hire trained contractors to perform the work.

      e.    Coordinate as requested with Ecology or the local jurisdiction to provide access for inspection of construction sites or other land disturbances, which are under the functional control of the Secondary Permittee during the land disturbing activities and/or construction period.

5.    Post-Construction Stormwater Management for New Development and Redevelopment

From the initial date of permit coverage, each Secondary Permittee shall:

      a.    Comply with all relevant ordinances, rules and regulations of the local jurisdiction(s) in which the Secondary Permittee is located that govern post-construction stormwater pollution prevention measures.

---

[9] New Secondary Permittees shall develop and implement a spill response plan as described in S6.D.3.e no later than four and one-half years from the initial date of permit coverage.

SPOKANE-PRR-0049960
002367

b. Coordinate with the local jurisdiction regarding projects owned or operated by other entities which discharge into the Secondary Permittee's MS4, to assist the local jurisdiction with achieving compliance with all relevant ordinances, rules, and regulations of the local jurisdiction(s).

6. Pollution Prevention and Good Housekeeping for Municipal Operations

Each Secondary Permittee shall:

a. Implement a municipal operation and maintenance (O&M) plan to minimize stormwater pollution from activities conducted by the Secondary Permittee. The O&M Plan shall include appropriate pollution prevention and good housekeeping procedures for all of the following operations, activities, and/or types of facilities that are present within the Secondary Permittee's boundaries and under the functional control of the Secondary Permittee.[10]

i. Stormwater collection and conveyance systems, including catch basins, stormwater pipes, open channels, culverts, and stormwater treatment and/or flow control BMPs and facilities. The O&M Plan shall address, at a minimum: scheduled inspections and maintenance activities, including cleaning and proper disposal of waste removed from the system. Secondary Permittees shall properly maintain stormwater collection and conveyance systems owned or operated by the Secondary Permittee and regularly inspect and maintain all stormwater facilities to ensure facility function.

Secondary Permittees shall establish maintenance standards that are as protective or more protective of facility function than those specified in Chapters 5, 6 and 8 of the 2004 *Stormwater Management Manual for Eastern Washington*.

Secondary Permittees shall review their maintenance standards to ensure they are consistent with the requirements of this section.

Secondary Permittees shall conduct spot checks of potentially damaged permanent stormwater treatment and flow control facilities following major storm events (24 hour storm event with a 10 year or greater recurrence interval).

ii. Roads, highways, and parking lots. The O&M Plan shall address, but is not limited to: deicing, anti-icing, and snow removal practices; snow disposal areas; material (e.g. salt, sand, or other chemical) storage areas; all-season BMPs to reduce road and parking lot debris and other pollutants from entering the MS4.

---

[10] New Secondary Permittees shall develop and implement the operation and maintenance plan described in S6.D.6.a no later than three years from the initial date of permit coverage.

SPOKANE-PRR-0049961
002368

    iii.   <u>Vehicle fleets</u>. The O&M Plan shall address, but is not limited to: storage, washing, and maintenance of Secondary Permittee vehicle fleets; and fueling facilities. Secondary Permittees shall conduct all vehicle and equipment washing and maintenance in a self-contained covered building or in designated wash and/or maintenance areas.

    iv.   <u>External building maintenance</u>. The O&M Plan shall address, building exterior cleaning and maintenance including cleaning, washing, painting; and maintenance and management of dumpsters; and other maintenance activities.

    v.   <u>Parks and open space</u>. The O&M Plan shall address, but is not limited to: proper application of fertilizer, pesticides, and herbicides; sediment and erosion control; BMPs for landscape maintenance and vegetation disposal; and trash and pet waste management.

    vi.   <u>Material storage facilities and heavy equipment maintenance or storage yards</u>. Secondary Permittees shall develop and implement a Stormwater Pollution Prevention Plan to protect water quality at each of these facilities owned or operated by the Secondary Permittee and not covered under the *General NPDES Permit for Stormwater Discharges Associated with Industrial Activities* or under another NPDES permit that authorizes stormwater discharges associated with the activity.

    vii.   <u>Other facilities that would reasonably be expected to discharge contaminated runoff</u>. The O&M Plan shall address proper stormwater pollution prevention practices for each facility.

b.   From the initial date of permit coverage, Secondary Permittees shall also have permit coverage for all facilities operated by the Secondary Permittee that are required to be covered under the *General NPDES Permit for Stormwater Discharges Associated with Industrial Activities* or another NPDES permit that authorizes surface water discharges associated with the activity.

c.   The O&M Plan shall include sufficient documentation and records as necessary to demonstrate compliance with the O&M Plan requirements in S6.D.6.a.(i) through (vii) above.

d.   No later than three years from the initial date of permit coverage, Secondary Permittees shall implement a program designed to train all employees whose construction, operations, or maintenance job functions may impact stormwater quality. The training shall address:

    i.   The importance of protecting water quality.

    ii.   The requirements of this Permit.

    iii.   Operation and maintenance requirements.

SPOKANE-PRR-0049962
002369

    iv.   Inspection procedures.

    v.   Ways to perform their job activities to prevent or minimize impacts to water quality.

    vi.   Procedures for reporting water quality concerns, including potential illicit discharges, including spills.

## S7.  COMPLIANCE WITH TOTAL MAXIMUM DAILY LOAD REQUIREMENTS

The following requirements apply if an applicable TMDL is approved for stormwater discharges from MS4s owned or operated by the Permittee.   Applicable TMDLs are TMDLs which have been approved by EPA on or before the issuance date of this permit, or prior to the date that Ecology issues coverage, whichever is later.

A.   For applicable TMDLs listed in Appendix 2, affected Permittees shall comply with the specific requirements identified in Appendix 2. Each Permittee shall keep records of all actions required by this permit that are relevant to applicable TMDLs within their jurisdiction. The status of the TMDL implementation shall be included as part of the annual report submitted to Ecology. Each annual report shall include a summary of relevant SWMP and Appendix 2 activities conducted in the TMDL area to address the applicable TMDL parameter(s).

B.   For applicable TMDLs not listed in Appendix 2, compliance with this permit shall constitute compliance with those TMDLs.

C.   For TMDLs that are approved by EPA after this permit is issued, Ecology may establish TMDL-related permit requirements through future permit modification if Ecology determines implementation of actions, monitoring or reporting necessary to demonstrate reasonable further progress toward achieving TMDL waste load allocations, and other targets, are not occurring and shall be implemented during the term of this permit or when this permit is reissued. Permittees are encouraged to participate in development of TMDLs within their jurisdiction and to begin implementation.

## S8.  MONITORING AND ASSESSMENT

A.   All Permittees including Secondary Permittees shall provide, in each annual report, a description of any stormwater monitoring or stormwater-related studies conducted by the Permittee during the reporting period. If other stormwater monitoring or stormwater-related studies were conducted on behalf of the Permittee during the reporting period, or if stormwater-related investigations conducted by other entities were reported to the Permittee during the reporting period, a brief description of the type of information gathered or received shall be included in the annual report.

SPOKANE-PRR 0049963
002370

Annual reporting of any monitoring, studies, or analyses conducted as part of S8.B below must follow the requirements specified in the approved Quality Assurance Project Plans (QAPPs).

B.    Stormwater Management Program Effectiveness Studies. Each city and county Permittee listed in S1.D.2.a.i and S1.D.2.a.ii shall collaborate with other Permittees to select, propose, develop, and conduct Ecology-approved studies to assess, on a regional or sub-regional basis, effectiveness of permit-required stormwater management program activities and best management practices. Permittees shall:

1.    Review the individual study ideas that were proposed in Permittees' annual reports due March 31, 2010 and add new ideas for collaborative studies of permit-required programmatic, operational, or structural best management practices. For each study idea, discuss: what data are needed to evaluate the effectiveness of the practice; how Permittees' stormwater management programs might be improved based on the findings of a study; and potential partnerships between Permittees whereby data can be collected efficiently and effectively.

2.    Rank the study ideas and compile a final list of twelve to fifteen study ideas for Eastern Washington. For each of these twelve to fifteen study ideas, identify a single Permittee as lead entity and also identify the sub-region or other grouping of Permittees that will participate.

3.    On or before June 30, 2016, submit the ranked list of twelve to fifteen study ideas for Eastern Washington to Ecology. Include a brief summary of the data collection that will be necessary to evaluate the effectiveness of the practice. For each study idea, list the lead entity and the other Permittees that will participate.

4.    Lead entities shall develop detailed study design proposals for a combined total of no fewer than eight and no more than twelve of the top-ranked ideas. For each study, describe the purpose, objectives, design, and methods; list the Permittees that will participate, and their roles and responsibilities; describe anticipated outcomes; identify methods to report the results; and describe expected modifications to the Permittees' stormwater management programs.

5.    On or before June 30, 2017, lead entities shall submit the detailed proposals to Ecology in both electronic and paper form.

6.    Lead entities shall submit a Quality Assurance Project Plan (QAPP) for each study within six months of Ecology's written approval of each detailed proposal. A combined total of no fewer than eight and no more than twelve QAPPs shall be submitted from all lead entities. All QAPPs shall be submitted in both electronic and paper form. If Ecology does not request changes or provide written approval within 90 days of the QAPP submittal, the QAPP is considered approved as submitted.

7.    Lead entities of a minimum of four studies shall begin to implement each study no later than six months following approval of the QAPP. Lead entities for the

SPOKANE-PRR 0049964
00237

> remainder of the studies shall begin to implement each study no later than fifteen months following approval of the QAPP.

8.  For all studies, lead entities shall describe interim results and status of the study in their annual reports throughout the duration of the study.

9.  For all studies, lead entities and/or participating Permittees shall enter all applicable data collected as part of conducting the study into Ecology's Environmental Information Management (EIM) database before the end of the water year in which it is collected, or within six months of collecting the sample, whichever is later.

10. All participating Permittees shall report the final results of each study and recommend future actions based on the findings. Reports and recommendations shall be submitted to Ecology no later than six months after completion of the study and by other means and timelines identified in the approved QAPPs.

C.  Each city and county Permittee listed in S1.D.2.a.i and S1.D.2.a.ii shall provide, in each annual report, a description of the Permittee's participation in Eastern Washington Stormwater Management Program Effectiveness Studies planning efforts, and related outcomes.

## S9.  REPORTING AND RECORDKEEPING

A.  No later than March 31 of each year beginning in 2016, each Permittee shall submit an annual report.  The reporting period for the first annual report will be January 1, 2015 through December 31, 2015.  The reporting period for all subsequent annual reports will be the previous calendar year unless otherwise specified.

Permittees shall submit annual reports electronically using Ecology's WQWebDMR program available on Ecology's website at http://www.ecy.wa.gov/programs/wq/permits/paris/webdmr.html unless otherwise directed by Ecology.

Permittees unable to submit electronically through Ecology's WQWebDMR must contact Ecology to request a waiver and obtain instructions on how to submit an annual report in an alternative format.

B.  Each Permittee is required to keep all records related to this permit for at least five years.

C.  Each Permittee shall make all records related to this permit and the Permittee's SWMP available to the public at reasonable times during business hours.  The Permittee will provide a copy of the most recent annual report to any individual or entity, upon request.

1.  A reasonable charge may be assessed by the Permittee for making photocopies of records.

2.  The Permittee may require reasonable advance notice of intent to review records related to this permit.

SPOKANE-PRR-0049965
002372

D.  Annual report for Cities, Towns and Counties

Each annual report shall include the following:

1.  A copy of the Permittee's current Stormwater Management Program Plan (SWMP Plan) as required by S5.A.2.

2.  Submittal of the annual report form as provided by Ecology pursuant to S9.A, describing the status of implementation of the requirements of this permit during the reporting period.

3.  Attachments to the annual report form including summaries, descriptions, reports, and other information as required, or as applicable, to meet the conditions of this permit during the reporting period. Refer to Appendix 3 for annual report questions.

4.  If applicable, notice that the MS4 is relying on another governmental entity to satisfy any of the obligations under this permit.

5.  Certification and signature pursuant to G19.D, and notification of any changes to authorization pursuant to G19.C.

6.  Permittees shall include with the annual report, notification of any annexations, incorporations or jurisdictional boundary changes resulting in an increase or decrease in the Permittee's geographic area of permit coverage during the reporting period.

E.  Annual report for Secondary Permittees

.Each annual report shall include the following:

1.  Submittal of the annual report form as provided by Ecology pursuant to S9.A, describing the status of implementation of the requirements of this permit during the reporting period.

2.  Attachments to the annual report form including summaries, descriptions, reports, and other information as required, or as applicable, to meet the conditions of this permit during the reporting period. Refer to Appendix 4 for annual report questions.

3.  Certification and signature pursuant to G19.D, and notification of any changes to authorization pursuant to G19.C.

4.  If applicable, notice that the MS4 is relying on another governmental entity to satisfy any of the obligations under this permit.

5.  Secondary Permittees shall include with the annual report notification of any jurisdictional boundary changes resulting in an increase or decrease in the Permittee's geographic area of permit coverage during the reporting period.

SPOKANE-PRR-0049966
002373

## GENERAL CONDITIONS

### G1. DISCHARGE VIOLATIONS

All discharges and activities authorized by this permit shall be consistent with the terms and conditions of this permit.

### G2. PROPER OPERATION AND MAINTENANCE

The Permittee shall at all times properly operate and maintain all facilities and systems of collection, treatment, and control (and related appurtenances) which are installed or used by the Permittee for pollution control to achieve compliance with the terms and conditions of this permit.

### G3. NOTIFICATION OF DISCHARGE INCLUDING SPILLS

If a Permittee has knowledge of a discharge, including spills, into or from a MS4 which could constitute a threat to human health, welfare, or the environment, the Permittee shall:

A.  Take appropriate action to correct or minimize the threat to human health, welfare, and/or the environment.

B.  Notify the Ecology regional office and other appropriate spill response authorities immediately but in no case later than within 24 hours of obtaining that knowledge. The Ecology Central Regional Office 24-hour number is 509-575-2490, and for the Eastern Regional Office the 24-hour number is 509-329-3400.

C.  Immediately report spills or discharges of oils or hazardous substances to the Ecology regional office and to the Washington Emergency Management Division, 1-800-258-5990.

### G4. BYPASS PROHIBITED

The intentional bypass of stormwater from all or any portion of a stormwater treatment BMP whenever the design capacity of the treatment BMP is not exceeded, is prohibited unless the following conditions are met:

A.  Bypass is: (1) unavoidable to prevent loss of life, personal injury, or severe property damage; or (2) necessary to perform construction or maintenance-related activities essential to meet the requirements of the Clean Water Act (*CWA*); and

B.  There are no feasible alternatives to bypass, such as the use of auxiliary treatment facilities, retention of untreated stormwater, or maintenance during normal dry periods.

"Severe property damage" means substantial physical damage to property, damage to the treatment facilities which would cause them to become inoperable, or substantial and permanent loss of natural resources which can reasonably be expected to occur in the absence of a bypass.

SPOKANE-PRR-0049967
002374

## G5. RIGHT OF ENTRY

The Permittee shall allow an authorized representative of Ecology, upon the presentation of credentials and such other documents as may be required by law at reasonable times:

A.  To enter upon the Permittee's premises where a discharge is located or where any records shall be kept under the terms and conditions of this permit;

B.  To have access to, and copy at reasonable cost and at reasonable times, any records that shall be kept under the terms of the permit;

C.  To inspect at reasonable times any monitoring equipment or method of monitoring required in the permit;

D.  To inspect at reasonable times any collection, treatment, pollution management, or discharge facilities; and

E.  To sample at reasonable times any discharge of pollutants.

## G6. DUTY TO MITIGATE

The Permittee shall take all reasonable steps to minimize or prevent any discharge in violation of this permit which has a reasonable likelihood of adversely affecting human health or the environment.

## G7. PROPERTY RIGHTS

This permit does not convey any property rights of any sort, or any exclusive privilege.

## G8. COMPLIANCE WITH OTHER LAWS AND STATUTES

Nothing in this permit will be construed as excusing the Permittee from compliance with any other applicable federal, state, or local statutes, ordinances, or regulations.

## G9. MONITORING

A.  Representative Sampling: Samples and measurements taken to meet the requirements of this permit shall be representative of the volume and nature of the monitored discharge, including representative sampling of any unusual discharge or discharge condition, including bypasses, upsets, and maintenance-related conditions affecting effluent quality.

B.  Records Retention: The Permittee shall retain records of all monitoring information, including all calibration and maintenance records and all original recordings for continuous monitoring instrumentation, copies of all reports required by this permit, and records of all data used to complete the application for this permit, for a period of at least five years.  This period of retention shall be extended during the course of any unresolved litigation regarding the discharge of pollutants by the Permittee or when requested by Ecology. On request, monitoring data and analysis shall be provided to Ecology.

SPOKANE-PRR-0049968
002375

C.  Recording of Results: For each measurement or sample taken, the Permittee shall record the following information: (1) the date, exact place and time of sampling; (2) the individual who performed the sampling or measurement; (3) the dates the analyses were performed; (4) who performed the analyses; (5) the analytical techniques or methods used; and (6) the results of all analyses.

D.  Test Procedures: All sampling and analytical methods used to meet the monitoring requirements specified in this permit shall conform to the Guidelines Establishing Test Procedures for the Analysis of Pollutants contained in 40 CFR Part 136, unless otherwise specified in this permit or approved in writing by Ecology.

E.  Flow Measurement: Appropriate flow measurement devices and methods consistent with accepted scientific practices shall be selected and used to ensure the accuracy and reliability of measurements of the volume of monitored discharges.  The devices shall be installed, calibrated, and maintained to ensure that the accuracy of the measurements is consistent with the accepted industry standard for that type of device.  Frequency of calibration shall be in conformance with manufacturer's recommendations or at a minimum frequency of at least one calibration per year. Calibration records should be maintained for a minimum of three years.

F.  Lab Accreditation: All monitoring data, except for flow, temperature, conductivity, pH, total residual chlorine, and other exceptions approved by Ecology, shall be prepared by a laboratory registered or accredited under the provisions of, Accreditation of Environmental Laboratories, Chapter 173-50 WAC.  Soils and hazardous waste data are exempted from this requirement pending accreditation of laboratories for analysis of these media by Ecology. Quick methods of field detection of pollutants including nutrients, surfactants, salinity, and other parameters are exempted from this requirement when the purpose of the sampling is identification and removal of a suspected illicit discharge.

G.  Additional Monitoring: Ecology may establish specific monitoring requirements in addition to those contained in this permit by permit modification.

## G10. REMOVED SUBSTANCES

With the exception of decant from street waste vehicles, the Permittee shall not allow collected screenings, grit, solids, sludges, filter backwash, or other pollutants removed in the course of treatment or control of stormwater to be re-suspended or reintroduced to the storm sewer system or to waters of the state.  Decant from street waste vehicles resulting from cleaning stormwater facilities may be reintroduced only when other practical means are not available and only in accordance with the Street Waste Disposal Guidelines in Appendix 6.  Solids generated from maintenance of the MS4 may be reclaimed, recycled, or reused when allowed by local codes and ordinances. Soils that are identified as contaminated pursuant to Chapter 173-350 WAC shall be disposed at a qualified solid waste disposal facility (see Appendix 6).

SPOKANE-PRR-0049969
002376

## G11. SEVERABILITY

The provisions of this permit are severable, and if any provision of this permit, or the application of any provision of this permit to any circumstance, is held invalid, the application of such provision to other circumstances, and the remainder of this permit will not be affected thereby.

## G12. REVOCATION OF COVERAGE

The director may terminate coverage under this General Permit in accordance with Chapter 43.21B RCW and Chapter 173-226 WAC.  Cases where coverage may be terminated include, but are not limited to the following:

A.  Violation of any term or condition of this General Permit;

B.  Obtaining coverage under this General Permit by misrepresentation or failure to disclose fully all relevant facts;

C.  A change in any condition that requires either a temporary or permanent reduction or elimination of the permitted discharge;

D.  A determination that the permitted activity endangers human health or the environment, or contributes significantly to water quality standards violations;

E.  Failure or refusal of the Permittee to allow entry as required in RCW 90.48.090;

F.  Nonpayment of permit fees assessed pursuant to RCW 90.48.465;

Revocation of coverage under this General Permit may be initiated by Ecology or requested by any interested person.

## G13. TRANSFER OF COVERAGE

The director may require any discharger authorized by this General Permit to apply for and obtain an individual permit in accordance with Chapter 43.21B RCW and Chapter 173-226 WAC.

## G14. GENERAL PERMIT MODIFICATION AND REVOCATION

This General Permit may be modified, revoked and reissued, or terminated in accordance with the provisions of WAC 173-226-230.  Grounds for modification, revocation and re-issuance, or termination include, but are not limited to the following:

A.  A change occurs in the technology or practices for control or abatement of pollutants applicable to the category of dischargers covered under this General Permit;

B.  Effluent limitation guidelines or standards are promulgated pursuant to the CWA or chapter 90.48 RCW, for the category of dischargers covered under this General Permit;

C.  A water quality management plan containing requirements applicable to the category of dischargers covered under this General Permit is approved;

D.  Information is obtained which indicates that cumulative effects on the environment from dischargers covered under this General Permit are unacceptable; or

E.  Changes made to State law reference this permit.

## G15. REPORTING A CAUSE FOR MODIFICATION OR REVOCATION

A Permittee who knows or has reason to believe that any activity has occurred or will occur which would constitute cause for modification or revocation and re-issuance under Condition G12, G14, or 40 CFR 122.62 shall report such plans, or such information, to Ecology so that a decision can be made on whether action to modify, or revoke and reissue this permit will be required. Ecology may then require submission of a new or amended application. Submission of such application does not relieve the Permittee of the duty to comply with this permit until it is modified or reissued.

## G16. APPEALS

A.  The terms and conditions of this General Permit, as they apply to the appropriate class of dischargers, are subject to appeal within thirty days of issuance of this general permit, in accordance with Chapter 43.21B RCW, and Chapter 173-226 WAC.

B.  The terms and conditions of this General Permit, as they apply to an individual discharger, can be appealed in accordance with Chapter 43.21B RCW within thirty days of the effective date of coverage of that discharger. Consideration of an appeal of general permit coverage of an individual discharger is limited to the general permit's applicability or non-applicability to that individual discharger.

C.  The appeal of general permit coverage of an individual discharger does not affect any other dischargers covered under this General Permit. If the terms and conditions of this general permit are found to be inapplicable to any individual discharger(s), the matter will be remanded to Ecology for consideration of issuance of an individual permit or permits.

D.  Modifications of this permit can be appealed in accordance with Chapter 43.21B RCW and Chapter 173-226 WAC.

## G17. PENALTIES

40 CFR 122.41(a)(2) and (3), 40 CFR 122.41(j)(5), and 40 CFR 122.41(k)(2) are hereby incorporated into this permit by reference.

## G18. DUTY TO REAPPLY

The Permittee shall apply for permit renewal at least 180 days prior to the specified expiration date of this permit.

## G19. CERTIFICATION AND SIGNATURE

All formal submittals to Ecology shall be signed and certified.

SPOKANE-PRR 0049971
002378

A. All permit applications shall be signed by either a principal executive officer or ranking elected official.

B. All formal submittals required by this permit shall be signed by a person described above or by a duly authorized representative of that person. A person is a duly authorized representative only if:

    1. The authorization is made in writing by a person described above and submitted to Ecology, and

    2. The authorization specifies either an individual or a position having responsibility for the overall development and implementation of the stormwater management program. (A duly authorized representative may thus be either a named individual or any individual occupying a named position.)

C. Changes to authorization. If an authorization under General Condition G19.B.2 is no longer accurate because a different individual or position has responsibility for the overall development and implementation of the stormwater management program, a new authorization satisfying the requirements of General Condition G19.B.2 shall be submitted to Ecology prior to or together with any reports, information, or applications to be signed by an authorized representative.

D. Certification. Any person signing a formal submittal under this permit shall make the following certification:

"I certify under penalty of law, that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that Qualified Personnel properly gathered and evaluated the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for willful violations."

## G20. NON-COMPLIANCE NOTIFICATION

In the event it is unable to comply with any of the terms and conditions of this permit, the Permittee must:

A. Notify Ecology of the failure to comply with the permit terms and conditions in writing within 30 days of becoming aware that the non-compliance has occurred. The written notification must include all of the following:

    1. A description of the non-compliance, including dates.

    2. Beginning and ending dates of the non-compliance, and if the non-compliance has not been corrected, the anticipated date of correction.

    3. Steps taken or planned to reduce, eliminate, or prevent reoccurrence of the non-compliance.

SPOKANE-PRR-0049972
002379

B.  Take appropriate action to stop or correct the condition of non-compliance.

## G21. UPSETS

Permittees shall meet the conditions of 40 CFR 122.41(n) regarding "Upsets." The conditions are as follows:

A.  Definition. "Upset" means an exceptional incident in which there is unintentional and temporary noncompliance with technology-based permit effluent limitations because of factors beyond the reasonable control of the Permittee. An upset does not include noncompliance to the extent caused by operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventive maintenance, or careless or improper operation.

B.  Effect of an upset. An upset constitutes an affirmative defense to an action brought for noncompliance with such technology-based permit effluent limitations if the requirements of paragraph (C) of this condition are met. Any determination made during administrative review of claims that noncompliance was caused by upset, and before an action for noncompliance, will not constitute final administrative action subject to judicial review.

C.  Conditions necessary for demonstration of upset. A Permittee who wishes to establish the affirmative defense of upset shall demonstrate, through properly signed contemporaneous operating logs, or other relevant evidence that:

1.  An upset occurred and that the Permittee can identify the cause(s) of the upset;

2.  The permitted facility was at the time being properly operated; and

3.  The Permittee submitted notice of the upset as required in 40 CFR 122.41(l)(6)(ii)(B) (24-hour notice of noncompliance).

4.  The Permittee complied with any remedial measures required under 40 CFR 122.41(d) (Duty to Mitigate).

D.  Burden of proof. In any enforcement proceeding, the Permittee seeking to establish the occurrence of an upset has the burden of proof.

SPOKANE-PRR_0049973
002380

## DEFINITIONS AND ACRONYMS

"40 CFR" means Title 40 of the Code of Federal Regulations, which is the codification of the general and permanent rules published in the Federal Register by the executive departments and agencies of the federal government.

"ADT" means Average Daily Traffic.

"AKART" means All Known, Available, and Reasonable methods of prevention, control, and Treatment.  See also the State Water Pollution Control Act, sections 90.48.010 RCW and 90.48.520 RCW.

"All known, available, and reasonable methods of prevention, control, and treatment" refers to the state Water Pollution Control Act, RCW 90.48.010 and 90.48.520.

"Applicable TMDL" means a TMDL which has been approved by EPA on or before the issuance date of this permit, or prior to the date that Ecology issues coverage under this permit, whichever is later..

"Average Daily Traffic" means the expected number of vehicles using a roadway.  Projected average daily traffic volumes are considered in designing a roadway or roadway improvement.  ADT volumes shall be estimated using "Trip Generation" published by the *Institute of Transportation Engineers* or from a traffic study prepared by a professional engineer or transportation specialist with expertise in traffic volume estimation. ADT volumes shall be estimated for the design year or expected life of the project (the intent is for treatment facilities to be added in the soonest period of disruptive construction).  For project sites with seasonal or varied use, evaluate the highest period of expected traffic impacts.

"Beneficial Uses" means uses of waters of the state, which include but are not limited to  use for domestic, stock watering, industrial, commercial, agricultural, irrigation, mining, fish and wildlife maintenance and enhancement, recreation, generation of electric power and preservation of environmental and aesthetic values, and all other uses compatible with the enjoyment of the public waters of the state.

"Best Management Practices" are the schedules of activities, prohibitions of practices, maintenance procedures, and structural and/or managerial practices approved by Ecology that, when used singly or in combination, prevent or reduce the release of pollutants and other adverse impacts to waters of Washington State.

"BMP" means Best Management Practice.

"Bypass" means the diversion of stormwater from any portion of a stormwater treatment facility.

"Census urban area" means Urbanized Area.

"Certified Erosion and Sediment Control Lead" means an individual who is knowledgeable in the principles and practices of erosion and sediment control.  The CESCL shall have the skills to assess: the site conditions and construction activities that could impact the quality of stormwater; and the effectiveness of erosion and sediment control measures used to control the quality of stormwater discharges. The CESCL shall have current certification through an

SPOKANE-PRR-0049974
00238

approved erosion and sediment control training program that meets the minimum training standards established by Ecology (see BMP C160 in the *Stormwater Management Manual for Eastern Washington* (2004)).

"CESCL" means Certified Erosion and Sediment Control Lead.

"Circuit" means a portion of a MS4 discharging to a single point or serving a discrete area determined by, traffic volumes, land use, topography, or the configuration of the MS4.

"Common plan of development or sale" means a site where multiple separate and distinct construction activities may be taking place at different times on different schedules and/or by different contractors, but still under a single plan. Examples include: 1) phased projects and projects with multiple filings or lots, even if the separate phases or filings/lots will be constructed under separate contract or by separate owners (*e.g.* a development where lots are sold to separate builders); 2) a development plan that may be phased over multiple years, but is still under a consistent plan for long-term development; and 3) projects in a contiguous area that may be unrelated but still under the same contract, such as construction of a building extension and a new parking lot at the same facility. If the project is part of a common plan of development or sale, the disturbed area of the entire plan shall be used in determining permit requirements.

"Component" or "Program Component" means an element of the Stormwater Management Program listed in S5 Stormwater *Management Program for Cities, Towns, and Counties* or S6 *Stormwater Management Program for Secondary Permittees,* S7 *compliance with Total Maximum Daily Load Requirements,* or S8 *Monitoring* of this permit.

"Co-Permittee" means any owner or operator of a regulated small MS4 that is in a cooperative agreement with at least one other applicant for coverage under this permit. A Co-Permittee owns or operates a regulated small MS4 located within or in proximity to another regulated MS4. A Co-Permittee is only responsible for complying with the conditions of this permit relating to discharges from the MS4 the Co-Permittee owns or operates. See also 40 CFR 122.26(b)(1)

"CWA" means the federal Clean Water Act (formerly referred to as the Federal Water Pollution Control Act or Federal Water Pollution Control Act Amendments of 1972) Pub. L. 92-500, as amended in Pub. L. 95-217, Pub. L. 95-576, Pub. L. 96-483, and Pub. L. 97-117, 33 U.S.C. 1251 *et. seq.*

"Director" means the Director of the Washington State Department of Ecology, or an authorized representative.

"Entity" means a governmental body or a public or private organization.

"EPA" means the U.S. Environmental Protection Agency

"Existing conditions" are the impervious surfaces, drainage systems, land cover, native vegetation and soils that exist at a site prior to any changes associated with achieving the proposed development conditions. Approved permits and engineering plans may be required. If sites have impervious areas and drainage systems that were built without approved permits, then the existing condition is defined as those that existed prior to the issue date of this

SPOKANE-PRR-0049975
002382

Permit. Existing conditions may be verified by using aerial photography or other records. Existing conditions are used for hydrologic analysis at the site unless a City or County imposes other requirements.

"General Permit" means a permit which covers multiple dischargers of a point source category within a designated geographical area, in lieu of individual permits being issued to each discharger.

"Ground water" means water in a saturated zone or stratum beneath the surface of the land or below a surface water body. Refer to chapter 173-200 WAC.

"Hazardous substance" means any liquid, solid, gas, or sludge, including any material, substance, product, commodity, or waste, regardless of quantity, that exhibits any of the physical, chemical, or biological properties described in WAC 173-303-090 or WAC 173-303-100.

"Heavy equipment maintenance or storage yard" means an uncovered area where any heavy equipment, such as mowing equipment, excavators, dump trucks, backhoes, or bulldozers are washed or maintained, or where at least five pieces of heavy equipment are stored on a long term basis.

"High ADT Roadways and Parking Areas" are any road with ADT greater than 30,000 vehicles per day; and parking areas with more than 100 trip ends per 1,000 SF of gross building area or greater than 300 total trip ends are considered to be high-use traffic areas. Examples include commercial buildings with a frequent turnover of customers and other visitors.

"High-Use Sites" generate high concentrations of oil due to high traffic turnover or the frequent transfer of oil and/or other petroleum products. High-use sites are land uses where sufficient quantities of free oil are likely to be present such that they can be effectively removed with special treatment. A high-use site is any one of the following:

- A road intersection with expected ADT of 25,000 vehicles or more on the main roadway and 15,000 vehicles or more on any intersecting roadway, excluding projects proposing primarily pedestrian or bicycle use improvements; or

- A commercial or industrial site with an expected trip end count equal to or greater than 100 vehicles per 1,000 square feet of gross building area (best professional judgment should be used in comparing this criterion with the following criterion); or

- A customer or visitor parking lot with an expected trip end count equal to or greater than 300 vehicles (best professional judgment should be used in comparing this criterion with the preceding criterion); or

- Commercial on-street parking areas on streets with an expected total ADT count equal to or greater than 7,500; or

- Fueling stations and facilities; or

- A commercial or industrial site subject to petroleum storage and transfer in excess of 1,500 gallons per year (not including locations where heating fuel is routinely delivered to end users and the annual amount of heating oil used at the site is the sole basis for the

SPOKANE-PRR-0049976
002383

site meeting this definition; heating fuel handling and storage facilities are subject to this definition); or

- A commercial or industrial site subject to use, storage, or maintenance of a fleet of 25 or more diesel vehicles that are over 10 tons gross weight (trucks, buses, trains, heavy equipment, etc.); or

- Maintenance and repair facilities for vehicles, aircraft, construction equipment, railroad equipment or industrial machinery and equipment; or

- Outdoor areas where hydraulic equipment is stored; or

- Log storage and sorting yards and other sites subject to frequent use of forklifts and/or other hydraulic equipment; or

- Railroad yards.

"Hydrologic modification of a wetland" means, for the purpose of stormwater management, that the wetland will receive a greater total volume of surface runoff following the proposed development than it receives in the current condition.

"Hyperchlorinated" means water that contains more than 10 mg/Liter chlorine.

"Illicit connection" means any infrastructure connection to the MS4 that is not intended, permitted or used for collecting and conveying stormwater or non-stormwater discharges allowed as specified in this permit (S5.B.3 and S6.D.3). Examples include sanitary sewer connections, floor drains, channels, pipelines, conduits, inlets, or outlets that are connected directly to the MS4.

"Illicit discharge" means any discharge to a MS4 that is not composed entirely of storm water or of non-stormwater discharges allowed as specified in this permit (S5.B.3 and S6.D.3).

LID means Low Impact Development.

"Low ADT Roadways and Parking Areas" are urban roads with ADT fewer than 7,500 vehicles per day; rural roads and freeways with ADT less than 15,000 vehicles per day; and parking areas with less than 40 trip ends per 1,000 SF of gross building area or fewer than 100 total trip ends per day are considered to be low-use traffic areas. Examples include most residential parking, and employee-only parking areas for small office parks or other commercial buildings. Urban roads are located within designated Urban Growth Management Areas; rural roads are located outside designated Urban Growth Management Areas. Freeways, defined as fully controlled and partially controlled limited access highways, may be located either inside or outside of Urban Growth Management Areas.

"Low Density Residential Land Use" means, for the purpose of permit section S8 *Monitoring and Assessment*, one dwelling unit per 1 to 5 acres.

"Low Impact Development" means a stormwater and land use management strategy that strives to mimic pre-disturbance hydrologic processes of infiltration, filtration, storage, evaporation and transpiration by emphasizing conservation, use of on-site natural features, site planning, and distributed stormwater management practices that are integrated into a project design.

SPOKANE-PRR-0049977
002384

"Material Storage Facilities" means an uncovered area where bulk materials (liquid, solid, granular, etc.) are stored in piles, barrels, tanks, bins, crates, or other means.

"Maximum Extent Practicable" refers to paragraph 402(p)(3)(B)(iii) of the federal Clean Water Act, which reads as follows  "Permits for discharges from municipal storm sewers shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques, and system, design, and engineering methods, and other such provisions as the Administrator or the State determines appropriate for the control of such pollutants."

"MEP" means Maximum Extent Practicable.

"Moderate ADT Roadways and Parking Areas" are urban roads with ADT between 7,500 and 30,000 vehicles per day; rural roads and freeways with ADT between 15,000 and 30,000 vehicles per day; and parking areas with between 40 and 100 trip ends per 1,000 SF of gross building area or between 100 and 300 total trip ends per day are considered to be moderate-use traffic areas. Examples include visitor parking for small to medium commercial buildings with a limited number of daily customers. Urban roads are located within designated Urban Growth Management Areas; rural roads are located outside designated Urban Growth Management Areas. Freeways, defined as fully controlled and partially controlled limited access highways, may be located either inside or outside of Urban Growth Management Areas.

"Moderate-Use Sites" include moderate ADT roadways and parking areas (see definition above); primary access points for high-density residential apartments; most intersections controlled by traffic signals; and transit center bus stops. These sites are expected to generate sufficient concentrations of metals that additional runoff treatment is needed to protect water quality in non-exempt surface waters.

"MS4" means Municipal Separate Storm Sewer System.

"Municipal Separate Storm Sewer" means a conveyance, or system of conveyances (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, manmade channels, or storm drains):

    (i)      owned or operated by a state, city, town, borough, county, parish, district, association, or other public body (created by or pursuant to State Law) having jurisdiction over disposal of wastes, storm water, or other wastes, including special districts under State Law such as a sewer district, flood control district or drainage district, or similar entity, or an Indian tribe or an authorized Indian tribal organization, or a designated and approved management agency under section 208 of the CWA that discharges to waters of Washington State;

    (ii)     designed or used for collecting or conveying stormwater;

    (iii)    which is not a combined sewer; and

    (iv)    which is not part of a Publicly Owned Treatment Works (POTW) as defined at 40 CFR 122.2.

    (v)     which is defined as "large" or "medium" or "small" or otherwise designated by Ecology pursuant to 40 CFR 122.26.

SPOKANE-PRR-0049978
002385

"National Pollutant Discharge Elimination System" means the national program for issuing, modifying, revoking, and reissuing, terminating, monitoring and enforcing permits, and imposing and enforcing pretreatment requirements, under sections 307, 402, 318, and 405 of the Federal Clean Water Act, for the discharge of pollutants to surface waters of the state from point sources. These permits are referred to as NPDES permits and, in Washington State, are administered by the Washington State Department of Ecology.

"New development" is the conversion of previously undeveloped or pervious surfaces to impervious surfaces and managed landscape areas not specifically exempt in the "Exemptions" or "Partial Exemptions" sections of Appendix 1. Projects that add new lanes on an existing roadway or otherwise expand the pavement edge are included in the definition of new development because they create new impervious surfaces; these projects are subject to the thresholds and requirements for new development as set forth in Appendix 1.

"New Permittee" means a City, Town or County that is subject to the *Eastern Washington Phase II Municipal Stormwater General Permit* and was not subject to the permit prior to August 1, 2014.

"New Secondary Permittee" means a Secondary Permittee that is covered under a municipal stormwater general permit and was not covered by the permit prior to August 1, 2014.

"NOI" means Notice of Intent.

"Non-Pollutant Generating Impervious Surfaces" are considered to be insignificant sources of pollutants in stormwater runoff.  Roofs that are subject only to atmospheric deposition or normal heating, ventilation, and air conditioning vents are considered NPGIS, unless the roofing material is uncoated metal. The following may also be considered NPGIS: paved bicycle pathways and pedestrian sidewalks that are separated from and not subject to drainage from roads for motor vehicles, fenced fire lanes, infrequently used maintenance access roads, and "in-slope" areas of roads. Sidewalks that are regularly treated with sand, salt or other de-icing/anti-icing agents are not considered NPGIS.

"Notice of Intent" means an application or request for coverage under a General NPDES Permit pursuant to WAC 173-226-200.

"NPDES" means National Pollutant Discharge Elimination System.

"NPGIS" means Non-Pollutant Generating Impervious Surfaces.

"Outfall" means point source as defined by 40 CFR 122.2 at the point where a discharge leaves the MS4 and discharges to waters of the State. Outfall does not include pipes, tunnels, or other conveyances which connect segments of the same stream or other surface waters and are used to convey primarily surface waters (i.e. culverts).

"Permittee" unless otherwise noted, includes Co-Permittee,  Secondary Permittee, and New Secondary Permittee.

"PGIS" means Pollutant Generating Impervious Surfaces.

SPOKANE-PRR-0049979
002386

"Physically interconnected" means that one MS4 is connected to another storm sewer system in such a way that it allows for direct discharges to the second system. For example, the roads with drainage systems and municipal streets of one entity are physically connected directly to a storm sewer system belonging to another entity.

"Pollutant Generating Impervious Surfaces" are surfaces that are considered to be significant sources of pollutants in stormwater runoff. Such surfaces include those that are subject to vehicular use, industrial activities, or storage of erodible or leachable materials that receive direct rainfall or run-on or blow-in of rainfall. Metal roofs are considered to be PGIS unless coated with an inert, non-leachable material. Roofs that are subject to venting of indoor pollutants from manufacturing, commercial or other operations or processes are also considered PGIS. A surface, whether paved or not, will be considered PGIS if it is regularly used by motor vehicles. The following are considered regularly-used surfaces: roads, unvegetated road shoulders, bike lanes within the traveled lane of a roadway, driveways, parking lots, unfenced fire lanes, vehicular equipment storage yards, and airport runways.

"Proposed development conditions" are the impervious surfaces, drainage systems, land cover, native vegetation and soils that are proposed to exist at the site at the completion of the project (complete build-out). Also called "post-developed conditions."

"QAPP" means Quality Assurance Project Plan.

"Qualified Personnel" means someone who has had professional training in the aspects of stormwater management for which they are responsible and are under the functional control of the Permittee. Qualified Personnel may be staff members, contractors, and/or volunteers.

"Quality Assurance Project Plan" means a document that describes the objectives of an environmental study and the procedures to be followed to achieve those objectives.

"RCW" means the Revised Code of Washington State.

"Redevelopment" is the replacement or improvement of impervious surfaces on a developed site. The project proponent shall identify what Core Elements in Appendix 1 apply to all of the new and replaced impervious surfaces created by the project. All new impervious surfaces added during a redevelopment project are subject to the Core Elements in Appendix 1. The requirements for redevelopment projects set forth in the Core Elements in Appendix 1 apply to the impervious surfaces altered or replaced by a redevelopment project. Impervious surface replacements defined as exempt activities in the "Exemptions" section of Appendix 1 and at other projects identified in the "Partial Exemptions" section of Appendix 1 have reduced requirements.

"Regulatory Threshold" refers to the one-acre size, including the exception noted below, of new development and redevelopment projects that shall be regulated under this permit. The threshold includes construction site activities and new development and redevelopment projects that result in a land disturbance of equal to or greater than one acre and construction activities and projects less than one acre that are part of a larger common plan of development or sale. This threshold is a minimum requirement that may be exceeded by a local jurisdiction.

SPOKANE-PRR-0049980
002387

"Replaced impervious surfaces" means, for structures, the removal and replacement of any exterior impervious surfaces or foundation; or, for other impervious surfaces, the removal down to bare soil, or base course, and replacement. Exemptions and partial exemptions are defined in Appendix 1 of this permit.

"Runoff" is water that travels across the land surface, or laterally through the ground near the land surface, and discharges to water bodies either directly or through a collection and conveyance system. See also "Stormwater."

"Rural roads" are roads located outside designated Urban Growth Management Areas.

"Secondary Permittee" is an operator of a MS4 that is not a city, town or county. Secondary Permittees include special purpose districts and other public entities that meet the criteria in S1.B.

"Shared water bodies" means water bodies, including downstream segments, lakes and estuaries that receive discharges from more than one Permittee.

"Short Duration Storm" means the 3-hour duration design storm distribution, described in Chapter 4.2.1 of the *Stormwater Management Manual for Eastern Washington* (2004), which represents the short durations, high intensities, and smaller volumes that characterize summer thunderstorms in eastern Washington.

"Significant contributor" means a discharge that contributes a loading of pollutants considered to be sufficient to cause or exacerbate the deterioration of receiving water quality or instream habitat conditions.

Small Municipal Separate Storm Sewer System" or "Small MS4" is a conveyance or system of conveyances including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, man-made channels, and/or storm drains which is not defined as a "large" or "medium" MS4 pursuant to 40 CFR 122.26(b)(4)    (7) or designated under  40 CFR 122.26 (a)(1)(v).

"Stormwater" means runoff during and following precipitation and snowmelt events, including surface runoff, drainage or interflow.

"Stormwater Associated with Industrial and Construction Activity" means the discharge from any conveyance used for collecting and conveying stormwater directly related to manufacturing, processing or raw materials storage areas at an industrial plant, or associated with clearing, grading and/or excavation, and required to have an NPDES permit in accordance with 40 CFR 122.26.

"Stormwater Management Manual for Eastern Washington" means the technical manual (Publication No. 04-10-076) published by the Department of Ecology in September 2004.

"Stormwater Management Program" means a set of actions and activities designed to reduce the discharge of pollutants from the MS4 to the MEP and to protect water quality, and comprising the components listed in S5 or S6 of this permit and any additional actions necessary to meet the requirements of applicable TMDLs pursuant to S7 *Compliance with TMDL Requirements* and S8 *Monitoring and Assessment*.

SPOKANE-PRR 0049981
002388

"SWMMEW" means the *Stormwater Management Manual for Eastern Washington* (2004).

"SWMP" means Stormwater Management Program.

"SWMP Plan" means Stormwater Management Program Plan.

"TMDL" means Total Maximum Daily Load.

"TMDL waste load allocation" means the allowable load of a single pollutant from a single contributing point source.

"Total Maximum Daily Load" means a water cleanup plan. A TMDL is a calculation of the maximum amount of a pollutant that a water body can receive and still meet water quality standards, and an allocation of that amount to the pollutant's sources. A TMDL is the sum of the allowable loads of a single pollutant from all contributing point and nonpoint sources. The calculation shall include a margin of safety to ensure that the water body can be used for the purposes the state has designated.  The calculation shall also account for seasonal variation in water quality. Water quality standards are set by states, territories, and tribes. They identify the uses for each water body, for example, drinking water supply, contact recreation (swimming), and aquatic life support (fishing), and the scientific criteria to support that use. The Clean Water Act, section 303, establishes the water quality standards and TMDL programs.

"Trip Ends" means the expected number of vehicles using a parking area. Projected trip end counts for a parking area are associated with the proposed land use. Trip end counts shall be estimated using "Trip Generation" published by the Institute of Transportation Engineers or from a traffic study prepared by a professional engineer or transportation specialist with expertise in traffic volume estimation. Trip end counts shall be made for the design year or expected life of the project (the intent is for treatment facilities to be added in the soonest period of disruptive construction). For project sites with seasonal or varied use, evaluate the highest period of expected traffic impacts.

"UA" means Urbanized Area.

"Urban Growth Area" means the designated area within which urban growth shall be encouraged and outside of which growth can occur only if it is not urban in nature, as defined at chapter 36.70A.110 RCW (Growth Management Act).

"Urbanized Area" is a federally-designated land area comprising one or more places and the adjacent densely settled surrounding area that together have a residential population of at least 50,000 and an overall population density of at least 1,000 people per square mile. Urbanized Areas are designated by the U.S. Census Bureau based on the most recent decennial census.

"Urban roads" are roads located within designated Urban Growth Areas. Partially controlled limited access highways located inside of Urban Growth Management Areas are considered urban roads. Freeways, as defined above, are not considered urban roads for the purpose of applying the Core Elements in Appendix 1.

SPOKANE-PRR-0049982
002389

"Waters of the state" includes those waters as defined as "waters of the United States" in 40 CFR 122.2 within the geographic boundaries of Washington State and "waters of the state" as defined in Chapter 90.48 RCW which includes: lakes, rivers, ponds, streams, inland waters, underground waters, salt waters and all other surface waters and water courses within the jurisdiction of the State of Washington.

"Waters of the United States" is as defined in 40 CFR 122.2.

"Water quality standards" means Surface Water Quality Standards, Chapter 173-201A WAC; Ground Water Quality Standards, Chapter 173-200 WAC; and Sediment Management Standards, Chapter 173-204 WAC.

SPOKANE-PRR-0049983
002390

*Eastern Washington Phase II Municipal Stormwater Permit*

# APPENDIX 2 – Total Maximum Daily Load (TMDL) Requirements

Additional permit requirements are based on applicable TMDLs in accordance with Special Condition S7 *Compliance with Total Maximum Daily Load Requirements.*

**Index**

1. WRIA 34  South Fork Palouse River                      Page 1

2. WRIA 39  Selah Ditch                                   Page 5

3. WRIA 39  Wilson Creek                                  Page 6

4. WRIA 54  Spokane River and Lake Spokane                Page 7

PCB-SPOKANE-04281228

002391

| Name of TMDL | South Fork Palouse River Fecal Coliform Bacteria TMDL: Water Quality Improvement Report |
|---|---|
| EPA Approved Document(s) for TMDL | South Fork Palouse River Fecal Coliform Bacteria Total Maximum Daily Load - Water Quality Improvement Report<br>October 2009<br>Publication No. 09-10-060 |
| Location of Original 303(d) Listings | Paradise Creek 10443 (WA-34-1025)<br>Paradise Creek 10439 (WA-34-1025)<br>Paradise Creek 10444 (WA-34-1025)<br>South Fork Palouse River 6712 (WA-34-1020)<br>South Fork Palouse River 6711 (WA-34-1020)<br>South Fork Palouse River 6710 (WA-34-1020)<br>South Fork Palouse River 6707 (WA-34-1020)<br>Dry Fork Creek 46406<br>Missouri Flat Creek 6713 (WA-34-1024) |
| Area Where TMDL Requirements Apply | These requirements apply to areas served by MS4s within the City of Pullman, including the Washington State University Campus that is within the City of Pullman. |
| Parameter(s) | Fecal Coliform Bacteria |
| MS4 Permittee: | City of Pullman  WAR04-6504<br>Washington State University  WAR04-6700 |

**Actions Required**

City of Pullman

A. The City of Pullman, within the permit coverage area, shall:
1. Inventory and inspect the stormwater system to develop a map and descriptions of known illicit connections and potential sources of fecal coliform to the MS4 by December 31, 2015.
2. Develop and implement a pet waste education program for residents of Pullman.
3. The City of Pullman Planning and Public Works Departments will consider during SEPA review the potential for projects to increase runoff and sources of fecal coliform, and the need for mitigation measures to reduce these adverse impacts to the MS4 and surface waters.
4. Conduct all monitoring to assess changes in water quality and progress toward elimination of stormwater related bacteria discharges to surface water under an Ecology-approved Quality Assurance Project Plan (QAPP).  Ecology must be given a minimum of 3 months prior to sampling to review and approve the QAPP.

PCB-SPOKANE-04281229

002392

    5.  Enter monitoring data collected into Ecology's Environmental Information Management (EIM) database. The database can be accessed at: www.ecy.wa.gov/science/data.html.

B.  Beginning no later than the effective date of this permit, the City of Pullman shall, implement an illicit discharge detection and elimination program for stormwater outfalls within the area under its jurisdiction. The outfalls shall be prioritized in the following order:

    1.  The area draining to the outfall identified as 34MissSD120.

    2.  The area draining to multiple outfalls draining to the compliance point identified as 34Dry00.4.

    3.  For the areas draining to the remaining stormwater basins under its jurisdiction, Pullman shall by December 31, 2015:

        • Submit to Ecology a plan outlining subsequent focus areas for the illicit discharge detection and elimination program.

        • Focus areas will be prioritized based on the TMDL, more recent monitoring findings, and consultation with Ecology's TMDL and Stormwater leads.

C.  For each outfall drainage area investigated under the IDDE program, the City of Pullman shall submit to Ecology a report 18 months after initiating the investigation summarizing:

    1.  Actions taken to reduce fecal coliform pollution.

    2.  Results of any outfall monitoring completed up to issuance of this permit that include a comparison of monitoring data to the TMDL Waste Load Allocation to evaluate progress toward meeting the percent reduction needed at the outfall. Because the water quality standard for fecal coliform is concentration based, progress will be assessed by examining concentrations at the outfall and making progress toward the percent reductions and not on a specific bacteria load.

    3.  Portions of this report may be submitted prior to permit issuance and will be considered to fulfill this requirement.

D.  For any outfall that has not achieved a 40% toward the WLA target (percent reduction) by December 31, 2016, submit to Ecology a four-year Action Plan outlining actions and monitoring intended to achieve targeted reductions. The Action Plan shall include:

    1.  The specific purpose of the plan

    2.  A description of key actions and who will conduct them

    3.  Implementation schedule, including milestones, deadlines, and how frequently the plan should be updated

    4.  Discussion of legal authority to implement actions

    5.  Process and schedule for how to evaluate appropriateness of actions in the plan and how frequently to update it

    6.  The specific type of monitoring that will be used to evaluate the effectiveness of the plan

E.  Within 90 days of Ecology approval, begin implementing the Ecology-approved Action Plan.

PCB-SPOKANE-04281230

Washington State University

A. Washington State University, within the area under its jurisdiction, shall from the effective date of this permit:

1. Conduct education and outreach with an emphasis on animal waste disposal practices to reduce potential bacteria-laden runoff.

2. The Capital Planning Department will consider during SEPA review the potential for projects to increase runoff and sources of fecal coliform, and the need for mitigation measures to reduce these adverse impacts to the MS4 and surface waters.

3. Conduct all monitoring to assess changes in water quality and progress toward elimination of stormwater related bacteria discharges to surface water under an Ecology approved QAPP. Ecology must be given a minimum of 3 months prior to sampling to review and approve the QAPP.

4. Enter monitoring data collected into Ecology's Environmental Information Management (EIM) database. The database can be accessed at: www.ecy.wa.gov/science/data.html.

B. Beginning no later than the date this permit becomes effective, Washington State University shall implement an illicit discharge detection and elimination program for stormwater outfalls within the area under its jurisdiction. The outfalls should be prioritized in the following order:

1. The area draining to the outfall identified as 34SFPRWSU1.

2. The next basin for further monitoring and investigation will be based on the findings of the City of Pullman's investigation of the 34MissSD120 drainage.

   a. If the City of Pullman finds that Washington State University contributes greater fecal coliform bacteria loads to the 34MissSD120 system than the loading found during the TMDL study to the South Fork Palouse River from 34SFPRWSU2 then 34MissSD120 will be the next drainage basin for WSU investigation.

   b. If the City of Pullman finds that Washington State University contributes less fecal coliform bacteria loads to the 34MissSD120 system than the loading found during the TMDL study to the South Fork Palouse River from 34SFPRWSU2 then the 34SFPRWSU2 basin will be the next drainage basin for investigation.

3. The basin not selected in B.2 above.

C. For each outfall drainage area investigated under the IDDE program submit to Ecology a report 18 months after initiating the investigation summarizing:

1. Actions taken to reduce fecal coliform pollution.

2. Results of any outfall monitoring completed up to issuance of this permit that include a comparison of monitoring data to the TMDL Waste Load Allocation to evaluate progress toward meeting the percent reduction needed at the outfall. Because the

water quality standard for fecal coliform is concentration based, progress will be assessed by examining concentrations at the outfall and making progress toward the percent reductions and not on a specific bacteria load.

3. Portions of this report may be submitted prior to permit issuance and will be considered to fulfill this requirement.

D. For any outfall that has not achieved a 40% toward the WLA target (percent reduction) by December 31, 2016, submit to Ecology a three-year Action Plan outlining actions and monitoring intended to achieve targeted reductions. The Action Plan shall include:

1. The specific purpose of the plan
2. A description of key actions and who will conduct them
3. Implementation schedule, including milestones, deadlines, and how frequently the plan should be updated
4. Discussion of legal authority to implement actions
5. Process and schedule for how to evaluate appropriateness of actions in the plan and how frequently to update it
6. The specific type of monitoring that will be used to evaluate the effectiveness of the plan

E. Within 90 days of Ecology approval, implement the Ecology-approved Action Plan.

| Name of TMDL | Selah Ditch Multiparameter Total Maximum Daily Load |
|---|---|
| EPA Approved Document(s) for TMDL | Selah Ditch Multiparameter Total Maximum Daily Load, Technical Assessment Report, January 2005, Publication Number 05-10-020<br><br>Selah Ditch Multiparameter Total Maximum Daily Load, Water Quality Improvement Report, June 2006, Publication No. 06-10-040 |
| Location of Original 303(d) Listings | Selah Ditch, Water Resource Inventory Area (WRIA) 39, Selah Ditch is a short (0.83 mile), straight, man-made drainage canal that is classified as a Class A water body. |
| Area Where TMDL Requirements Apply | City of Selah |
| Parameter(s) | Fecal Coliform Bacteria, and Temperature |
| EPA Approval Date | Water Quality Improvement Plan – June 2006 |
| MS4 Permittee | City of Selah |

PCB-SPOKANE-04281232

002395

**Actions Required:**

City of Selah

- Implement the schedule and activities in S5.B.1 for Public Education and Outreach to include education and outreach to target the reduction of fecal coliform bacteria discharges into the stormwater system to include the following:
  - Targeted education regarding the effects of pet waste on stormwater and inform pet owners about proper management of pet waste.
  - Installation of pet waste pick-up bags in city parks, and on city-owned open spaces, where appropriate.

| Name of TMDL | Wilson Creek Sub-Basin Bacteria Total Maximum Daily Load |
|---|---|
| EPA Approved Document(s) for TMDL | Wilson Creek Sub-Basin Bacteria Total Maximum Daily Load (Water Cleanup Plan), Submittal Report, June 2005 Publication Number 05-10-041 |
| Location of Original 303(d) Listings | Wilson Creek (WA-39-1020) PY59BF (inside city limits) Mercer Creek EY18WK, Whiskey Creek SO19BM |
| Area Where TMDL Requirements Apply | City of Ellensburg |
| Parameter(s) | Fecal Coliform Bacteria |
| EPA Approval Date | TMDL – June 2005 |
| MS4 Permittee | City of Ellensburg, Central Washington University |

**Actions Required:**

City of Ellensburg

- Implement the schedules and activities  for Public Education and Outreach identified in S5.B.1  include the following:
  - A targeted education program for pet waste, including installing pet waste pick-up bags in city parks and/or on city property and/or open spaces where pets may be present.
  - Provide information to the general public about the relationship between feeding wildlife water fowl and fecal coliform bacteria in stormwater.

PCB-SPOKANE-04281233

Central Washington University

- Implement the schedules and activities for public education and outreach identified in S6.D.1.b.vii. Part of this program shall include installing pet waste pick-up bags on university owned spaces where people might walk their pets.

| Name of TMDL | Spokane River and Lake Spokane Dissolved Oxygen Total Maximum Daily Load |
|---|---|
| EPA Approved Document(s) for TMDL | Spokane River and Lake Spokane Dissolved Oxygen Total Maximum Daily Load Water Quality Improvement Report Revised February 2010 Publication No. 07-10-073 |
| Location of Original 303(d) Listings | Lake Spokane 40939 Spokane River 17523 (WA-54-1010) Spokane River 15188 (WA-54-1010) Spokane River 15187 (WA-54-1010) Spokane River 11400 (WA-57-1010) Spokane River 6373 (WA-54-1020) |
| Area Where TMDL Requirements Apply | These requirements apply to areas served by MS4s owned or operated by the Permittees within the TMDL coverage area. |
| Parameter(s) | Total Phosphorus, Ammonia, $CBOD_5$ |
| MS4 Permittee: | City of Spokane WAR04-6505, City of Spokane Valley WAR04-6507 Spokane County WAR04-6506 |

**Actions Required**

The City of Spokane and Spokane County shall each develop and implement monitoring programs for phosphorus, ammonia, and CBOD according to the schedules outlined below. Flow rates shall also be measured in order to calculate volumes of stormwater to determine pollutant loadings.

PCB-SPOKANE-04281234

002397

City of Spokane

1. No later than August 31, 2015, the City of Spokane shall prepare a monitoring plan. The outfalls for the Cochrane Basin shall be monitored for phosphorus, ammonia, CBOD, and flow rates. A QAPP that follows *Quality Assurance Project Plans for Environmental Studies,* July 2004, Ecology Publication No. 04-03-030 shall be prepared and submitted to Ecology for review and approval.
2. Ecology will review and provide written comments on the monitoring plan by November 30, 2014.
3. The City of Spokane shall submit an updated QAPP to Ecology responding to Ecology's comments by February 28, 2016. If Ecology provides comments later than November 30, 2015, the updated QAPP submittal deadline will be extended by the number of calendar days that Ecology exceeds past the November 30, 2015 date.
4. No later than August 31, 2016 the City of Spokane shall implement the Ecology-approved monitoring plan. The monitoring plan shall be conducted until the expiration of the Permit. The results of the monitoring shall be entered into Ecology's EIM database.
5. No later than August 31, 2017 the City of Spokane shall begin evaluating the results of the monitoring plan with respect to the city's share of the stormwater Waste Load Allocations in the TMDL. If the monitoring results indicate that stormwater Waste Load Allocations are being exceeded then an adaptive management response to reduce pollutant loading shall be initiated. The City of Spokane shall prepare an Action Plan. The Action Plan must include:
   a. The specific purpose and objective of the plan
   b. A description of key actions and who will conduct them
   c. Implementation schedule, including milestones, deadlines, and how frequently the plan should be updated
   d. Discussion of legal authority to implement actions
   e. Process and schedule for how to evaluate appropriateness of actions in the plan and how frequently to update it
   f. Any additional monitoring that may be necessary to evaluate the effectiveness of the plan

Spokane County

1. No later than August 31, 2015, Spokane County shall prepare a monitoring plan to evaluate its stormwater discharges to the Spokane River in order to determine pollutant loading for total phosphorus, ammonia, and CBOD. Sampling shall be conducted at the Ella Road outfall. Sampling shall be representative of the total quantity of flows and shall be conducted at least once per month during the months of March through October during the first precipitation event in a month that produces adequate stormwater for analysis. Discharge volume estimates shall be calculated for all events sampled. A QAPP that follows *Quality Assurance Project Plans for Environmental Studies,* July 2004, Ecology Publication No. 04-03-030 shall be prepared and submitted to Ecology for review and approval by August 31, 2015. The monitoring shall be conducted using Ecology approved Standard Operating Procedures. If the QAPP needs to be modified, Spokane County will provide the updated QAPP for review and approval within 90 days of receiving Ecology comments.

PCB-SPOKANE-04281235

002398

2. No later than August 31, 2016 Spokane County shall start sampling and implement the Ecology-approved monitoring plan. All applicable seasonal results of the monitoring shall be entered into Ecology's EIM database by December 31st of each year. A summary and discussion of the monitoring results shall be included with the appropriate annual report. Sampling shall continue until the expiration of the permit, or until the discharge has been eliminated.

3. No later than December 31, 2017 Spokane County shall, in consultation with Ecology, evaluate the results of the monitoring plan in order to evaluate pollutant loading with respect to Spokane County's share of the Stormwater Waste Load Allocations in the TMDL. If the monitoring results indicate that Stormwater Waste Load Allocations are being exceeded then an adaptive management response to reduce pollutant loading shall be initiated. Spokane County shall submit an Action Plan for Ecology approval by March 31, 2018. The Action Plan must include:
   a. The specific purpose and objective of the plan
   b. A description of key actions and who will conduct them
   c. Implementation schedule, including milestones, deadlines, and how frequently the plan should be updated
   d. Discussion of legal authority to implement actions
   e. Process and schedule for how to evaluate appropriateness of actions in the plan and how frequently to update it
   f. Any additional monitoring that may be necessary to evaluate the effectiveness of the plan

<u>City of Spokane Valley</u>

1. No later than August 31, 2015, the City of Spokane Valley shall prepare a monitoring plan to evaluate all of its remaining stormwater discharges to the Spokane River in order to determine pollutant loading for total phosphorus, ammonia, and CBOD. Sampling shall be representative of the total quantity of flows and shall be conducted at least once per month during the months of March through October during the first precipitation event in a month that produces adequate stormwater for analysis. Discharge volume estimates shall be calculated for all events sampled. A QAPP that follows *Quality Assurance Project Plans for Environmental Studies,* July 2004, Ecology Publication No. 04-03-030 shall be prepared and submitted to Ecology for review and approval by August 31, 2015. The monitoring shall be conducted using Ecology approved Standard Operating Procedures. If the QAPP needs to be modified, the City of Spokane Valley will provide the updated QAPP for review and approval within 90 days of receiving Ecology comments.

2. No later than August 31, 2016 the City of Spokane Valley shall start sampling and implement the Ecology-approved monitoring plan. All applicable seasonal results of the monitoring shall be entered into Ecology's EIM database by December 31st of each year. A summary and discussion of the monitoring results shall be included with the appropriate annual report. Sampling shall continue until the expiration of the permit, or until the discharges have been eliminated.

3. No later than December 31, 2017 the City of Spokane Valley shall, in consultation with Ecology, evaluate the results of the monitoring plan in order to evaluate pollutant loading

PCB-SPOKANE-04281236

with respect to the city's share of the Stormwater Waste Load Allocations in the TMDL. If the monitoring results indicate that Stormwater Waste Load Allocations are being exceeded then an adaptive management response to reduce pollutant loading shall be initiated. The City of Spokane Valley shall submit an Action Plan for Ecology approval by March 31, 2018. The Action Plan must include:

    a. The specific purpose and objective of the plan
    b. A description of key actions and who will conduct them
    c. Implementation schedule, including milestones, deadlines, and how frequently the plan should be updated
    d. Discussion of legal authority to implement actions
    e. Process and schedule for how to evaluate appropriateness of actions in the plan and how frequently to update it
    f. Any additional monitoring that may be necessary to evaluate the effectiveness of the plan

PCB-SPOKANE-04281237

002400

*Eastern Washington Phase II Municipal Stormwater Permit*

# APPENDIX 2 – Total Maximum Daily Load (TMDL) Requirements

Additional permit requirements are based on applicable TMDLs in accordance with Special Condition S7 *Compliance with Total Maximum Daily Load Requirements.*

**Index**

1.  WRIA 34  South Fork Palouse River          Page 1

2.  WRIA 39  Selah Ditch          Page 5

3.  WRIA 39  Wilson Creek          Page 6

4.  WRIA 54  Spokane River and Lake Spokane          Page 7

PCB-SPOKANE-04281228

002401

| Name of TMDL | South Fork Palouse River Fecal Coliform Bacteria TMDL: Water Quality Improvement Report |
|---|---|
| EPA Approved Document(s) for TMDL | South Fork Palouse River Fecal Coliform Bacteria Total Maximum Daily Load - Water Quality Improvement Report<br>October 2009<br>Publication No. 09-10-060 |
| Location of Original 303(d) Listings | Paradise Creek 10443 (WA-34-1025)<br>Paradise Creek 10439 (WA-34-1025)<br>Paradise Creek 10444 (WA-34-1025)<br>South Fork Palouse River 6712 (WA-34-1020)<br>South Fork Palouse River 6711 (WA-34-1020)<br>South Fork Palouse River 6710 (WA-34-1020)<br>South Fork Palouse River 6707 (WA-34-1020)<br>Dry Fork Creek 46406<br>Missouri Flat Creek 6713 (WA-34-1024) |
| Area Where TMDL Requirements Apply | These requirements apply to areas served by MS4s within the City of Pullman, including the Washington State University Campus that is within the City of Pullman. |
| Parameter(s) | Fecal Coliform Bacteria |
| MS4 Permittee: | City of Pullman  WAR04-6504<br>Washington State University  WAR04-6700 |

**Actions Required**

<u>City of Pullman</u>

A. The City of Pullman, within the permit coverage area, shall:
   1. Inventory and inspect the stormwater system to develop a map and descriptions of known illicit connections and potential sources of fecal coliform to the MS4 by December 31, 2015.
   2. Develop and implement a pet waste education program for residents of Pullman.
   3. The City of Pullman Planning and Public Works Departments will consider during SEPA review the potential for projects to increase runoff and sources of fecal coliform, and the need for mitigation measures to reduce these adverse impacts to the MS4 and surface waters.
   4. Conduct all monitoring to assess changes in water quality and progress toward elimination of stormwater related bacteria discharges to surface water under an Ecology-approved Quality Assurance Project Plan (QAPP).  Ecology must be given a minimum of 3 months prior to sampling to review and approve the QAPP.

PCB-SPOKANE-04281229

002402

5. Enter monitoring data collected into Ecology's Environmental Information Management (EIM) database. The database can be accessed at: www.ecy.wa.gov/science/data.html.

B. Beginning no later than the effective date of this permit, the City of Pullman shall, implement an illicit discharge detection and elimination program for stormwater outfalls within the area under its jurisdiction. The outfalls shall be prioritized in the following order:

1. The area draining to the outfall identified as 34MissSD120.
2. The area draining to multiple outfalls draining to the compliance point identified as 34Dry00.4.
3. For the areas draining to the remaining stormwater basins under its jurisdiction, Pullman shall by December 31, 2015:
   - Submit to Ecology a plan outlining subsequent focus areas for the illicit discharge detection and elimination program.
   - Focus areas will be prioritized based on the TMDL, more recent monitoring findings, and consultation with Ecology's TMDL and Stormwater leads.

C. For each outfall drainage area investigated under the IDDE program, the City of Pullman shall submit to Ecology a report 18 months after initiating the investigation summarizing:

1. Actions taken to reduce fecal coliform pollution.
2. Results of any outfall monitoring completed up to issuance of this permit that include a comparison of monitoring data to the TMDL Waste Load Allocation to evaluate progress toward meeting the percent reduction needed at the outfall. Because the water quality standard for fecal coliform is concentration based, progress will be assessed by examining concentrations at the outfall and making progress toward the percent reductions and not on a specific bacteria load.
3. Portions of this report may be submitted prior to permit issuance and will be considered to fulfill this requirement.

D. For any outfall that has not achieved a 40% toward the WLA target (percent reduction) by December 31, 2016, submit to Ecology a four-year Action Plan outlining actions and monitoring intended to achieve targeted reductions. The Action Plan shall include:

1. The specific purpose of the plan
2. A description of key actions and who will conduct them
3. Implementation schedule, including milestones, deadlines, and how frequently the plan should be updated
4. Discussion of legal authority to implement actions
5. Process and schedule for how to evaluate appropriateness of actions in the plan and how frequently to update it
6. The specific type of monitoring that will be used to evaluate the effectiveness of the plan

E. Within 90 days of Ecology approval, begin implementing the Ecology-approved Action Plan.

PCB-SPOKANE-04281230

002403

Washington State University

A.  Washington State University, within the area under its jurisdiction, shall from the effective date of this permit:
1.  Conduct education and outreach with an emphasis on animal waste disposal practices to reduce potential bacteria-laden runoff.
2.  The Capital Planning Department will consider during SEPA review the potential for projects to increase runoff and sources of fecal coliform, and the need for mitigation measures to reduce these adverse impacts to the MS4 and surface waters.
3.  Conduct all monitoring to assess changes in water quality and progress toward elimination of stormwater related bacteria discharges to surface water under an Ecology approved QAPP. Ecology must be given a minimum of 3 months prior to sampling to review and approve the QAPP.
4.  Enter monitoring data collected into Ecology's Environmental Information Management (EIM) database. The database can be accessed at: www.ecy.wa.gov/science/data.html.

B.  Beginning no later than the date this permit becomes effective, Washington State University shall implement an illicit discharge detection and elimination program for stormwater outfalls within the area under its jurisdiction. The outfalls should be prioritized in the following order:
1.  The area draining to the outfall identified as 34SFPRWSU1.
2.  The next basin for further monitoring and investigation will be based on the findings of the City of Pullman's investigation of the 34MissSD120 drainage.
    a. If the City of Pullman finds that Washington State University contributes greater fecal coliform bacteria loads to the 34MissSD120 system than the loading found during the TMDL study to the South Fork Palouse River from 34SFPRWSU2 then 34MissSD120 will be the next drainage basin for WSU investigation.
    b.  If the City of Pullman finds that Washington State University contributes less fecal coliform bacteria loads to the 34MissSD120 system than the loading found during the TMDL study to the South Fork Palouse River from 34SFPRWSU2 then the 34SFPRWSU2 basin will be the next drainage basin for investigation.
3.  The basin not selected in B.2 above.

C.  For each outfall drainage area investigated under the IDDE program submit to Ecology a report 18 months after initiating the investigation summarizing:
1.  Actions taken to reduce fecal coliform pollution.
2.  Results of any outfall monitoring completed up to issuance of this permit that include a comparison of monitoring data to the TMDL Waste Load Allocation to evaluate progress toward meeting the percent reduction needed at the outfall. Because the

water quality standard for fecal coliform is concentration based, progress will be assessed by examining concentrations at the outfall and making progress toward the percent reductions and not on a specific bacteria load.

3. Portions of this report may be submitted prior to permit issuance and will be considered to fulfill this requirement.

D. For any outfall that has not achieved a 40% toward the WLA target (percent reduction) by December 31, 2016, submit to Ecology a three-year Action Plan outlining actions and monitoring intended to achieve targeted reductions. The Action Plan shall include:

1. The specific purpose of the plan
2. A description of key actions and who will conduct them
3. Implementation schedule, including milestones, deadlines, and how frequently the plan should be updated
4. Discussion of legal authority to implement actions
5. Process and schedule for how to evaluate appropriateness of actions in the plan and how frequently to update it
6. The specific type of monitoring that will be used to evaluate the effectiveness of the plan

E. Within 90 days of Ecology approval, implement the Ecology-approved Action Plan.

| Name of TMDL | Selah Ditch Multiparameter Total Maximum Daily Load |
|---|---|
| EPA Approved Document(s) for TMDL | Selah Ditch Multiparameter Total Maximum Daily Load, Technical Assessment Report, January 2005, Publication Number 05-10-020 <br><br> Selah Ditch Multiparameter Total Maximum Daily Load, Water Quality Improvement Report, June 2006, Publication No. 06-10-040 |
| Location of Original 303(d) Listings | Selah Ditch, Water Resource Inventory Area (WRIA) 39, Selah Ditch is a short (0.83 mile), straight, man-made drainage canal that is classified as a Class A water body. |
| Area Where TMDL Requirements Apply | City of Selah |
| Parameter(s) | Fecal Coliform Bacteria, and Temperature |
| EPA Approval Date | Water Quality Improvement Plan – June 2006 |
| MS4 Permittee | City of Selah |

PCB-SPOKANE-04281232

**Actions Required:**

City of Selah

- Implement the schedule and activities in S5.B.1 for Public Education and Outreach to include education and outreach to target the reduction of fecal coliform bacteria discharges into the stormwater system to include the following:
  - Targeted education regarding the effects of pet waste on stormwater and inform pet owners about proper management of pet waste.
  - Installation of pet waste pick-up bags in city parks, and on city-owned open spaces, where appropriate.

| Name of TMDL | Wilson Creek Sub-Basin Bacteria Total Maximum Daily Load |
|---|---|
| EPA Approved Document(s) for TMDL | Wilson Creek Sub-Basin Bacteria Total Maximum Daily Load (Water Cleanup Plan), Submittal Report, June 2005 Publication Number 05-10-041 |
| Location of Original 303(d) Listings | Wilson Creek (WA-39-1020) PY59BF (inside city limits) Mercer Creek EY18WK, Whiskey Creek SO19BM |
| Area Where TMDL Requirements Apply | City of Ellensburg |
| Parameter(s) | Fecal Coliform Bacteria |
| EPA Approval Date | TMDL – June 2005 |
| MS4 Permittee | City of Ellensburg, Central Washington University |

**Actions Required:**

City of Ellensburg

- Implement the schedules and activities  for Public Education and Outreach identified in S5.B.1  include the following:
  - A targeted education program for pet waste, including installing pet waste pick-up bags in city parks and/or on city property and/or open spaces where pets may be present.
  - Provide information to the general public about the relationship between feeding wildlife water fowl and fecal coliform bacteria in stormwater.

PCB-SPOKANE-04281233

<u>Central Washington University</u>

- Implement the schedules and activities for public education and outreach identified in S6.D.1.b.vii.  Part of this program shall include installing pet waste pick-up bags on university owned spaces where people might walk their pets.

| Name of TMDL | Spokane River and Lake Spokane Dissolved Oxygen Total Maximum Daily Load |
|---|---|
| EPA Approved Document(s) for TMDL | Spokane River and Lake Spokane Dissolved Oxygen Total Maximum Daily Load Water Quality Improvement Report Revised February 2010 Publication No. 07-10-073 |
| Location of Original 303(d) Listings | Lake Spokane 40939 Spokane River 17523 (WA-54-1010) Spokane River 15188 (WA-54-1010) Spokane River 15187 (WA-54-1010) Spokane River 11400 (WA-57-1010) Spokane River 6373 (WA-54-1020) |
| Area Where TMDL Requirements Apply | These requirements apply to areas served by MS4s owned or operated by the Permittees within the TMDL coverage area. |
| Parameter(s) | Total Phosphorus, Ammonia, $CBOD_5$ |
| MS4 Permittee: | City of Spokane  WAR04-6505, City of Spokane Valley  WAR04-6507 Spokane County  WAR04-6506 |

**Actions Required**

The City of Spokane and Spokane County shall each develop and implement monitoring programs for phosphorus, ammonia, and CBOD according to the schedules outlined below. Flow rates shall also be measured in order to calculate volumes of stormwater to determine pollutant loadings.

PCB-SPOKANE-04281234

City of Spokane

1. No later than August 31, 2015, the City of Spokane shall prepare a monitoring plan. The outfalls for the Cochrane Basin shall be monitored for phosphorus, ammonia, CBOD, and flow rates. A QAPP that follows *Quality Assurance Project Plans for Environmental Studies,* July 2004, Ecology Publication No. 04-03-030 shall be prepared and submitted to Ecology for review and approval.
2. Ecology will review and provide written comments on the monitoring plan by November 30, 2014.
3. The City of Spokane shall submit an updated QAPP to Ecology responding to Ecology's comments by February 28, 2016. If Ecology provides comments later than November 30, 2015, the updated QAPP submittal deadline will be extended by the number of calendar days that Ecology exceeds past the November 30, 2015 date.
4. No later than August 31, 2016 the City of Spokane shall implement the Ecology-approved monitoring plan. The monitoring plan shall be conducted until the expiration of the Permit. The results of the monitoring shall be entered into Ecology's EIM database.
5. No later than August 31, 2017 the City of Spokane shall begin evaluating the results of the monitoring plan with respect to the city's share of the stormwater Waste Load Allocations in the TMDL. If the monitoring results indicate that stormwater Waste Load Allocations are being exceeded then an adaptive management response to reduce pollutant loading shall be initiated. The City of Spokane shall prepare an Action Plan. The Action Plan must include:
   a. The specific purpose and objective of the plan
   b. A description of key actions and who will conduct them
   c. Implementation schedule, including milestones, deadlines, and how frequently the plan should be updated
   d. Discussion of legal authority to implement actions
   e. Process and schedule for how to evaluate appropriateness of actions in the plan and how frequently to update it
   f. Any additional monitoring that may be necessary to evaluate the effectiveness of the plan

Spokane County

1. No later than August 31, 2015, Spokane County shall prepare a monitoring plan to evaluate its stormwater discharges to the Spokane River in order to determine pollutant loading for total phosphorus, ammonia, and CBOD. Sampling shall be conducted at the Ella Road outfall. Sampling shall be representative of the total quantity of flows and shall be conducted at least once per month during the months of March through October during the first precipitation event in a month that produces adequate stormwater for analysis. Discharge volume estimates shall be calculated for all events sampled. A QAPP that follows *Quality Assurance Project Plans for Environmental Studies,* July 2004, Ecology Publication No. 04-03-030 shall be prepared and submitted to Ecology for review and approval by August 31, 2015. The monitoring shall be conducted using Ecology approved Standard Operating Procedures. If the QAPP needs to be modified, Spokane County will provide the updated QAPP for review and approval within 90 days of receiving Ecology comments.

2. No later than August 31, 2016 Spokane County shall start sampling and implement the Ecology-approved monitoring plan. All applicable seasonal results of the monitoring shall be entered into Ecology's EIM database by December 31st of each year. A summary and discussion of the monitoring results shall be included with the appropriate annual report. Sampling shall continue until the expiration of the permit, or until the discharge has been eliminated.

3. No later than December 31, 2017 Spokane County shall, in consultation with Ecology, evaluate the results of the monitoring plan in order to evaluate pollutant loading with respect to Spokane County's share of the Stormwater Waste Load Allocations in the TMDL. If the monitoring results indicate that Stormwater Waste Load Allocations are being exceeded then an adaptive management response to reduce pollutant loading shall be initiated. Spokane County shall submit an Action Plan for Ecology approval by March 31, 2018. The Action Plan must include:

   a. The specific purpose and objective of the plan
   b. A description of key actions and who will conduct them
   c. Implementation schedule, including milestones, deadlines, and how frequently the plan should be updated
   d. Discussion of legal authority to implement actions
   e. Process and schedule for how to evaluate appropriateness of actions in the plan and how frequently to update it
   f. Any additional monitoring that may be necessary to evaluate the effectiveness of the plan

City of Spokane Valley

1. No later than August 31, 2015, the City of Spokane Valley shall prepare a monitoring plan to evaluate all of its remaining stormwater discharges to the Spokane River in order to determine pollutant loading for total phosphorus, ammonia, and CBOD. Sampling shall be representative of the total quantity of flows and shall be conducted at least once per month during the months of March through October during the first precipitation event in a month that produces adequate stormwater for analysis. Discharge volume estimates shall be calculated for all events sampled. A QAPP that follows *Quality Assurance Project Plans for Environmental Studies,* July 2004, Ecology Publication No. 04-03-030 shall be prepared and submitted to Ecology for review and approval by August 31, 2015. The monitoring shall be conducted using Ecology approved Standard Operating Procedures. If the QAPP needs to be modified, the City of Spokane Valley will provide the updated QAPP for review and approval within 90 days of receiving Ecology comments.

2. No later than August 31, 2016 the City of Spokane Valley shall start sampling and implement the Ecology-approved monitoring plan. All applicable seasonal results of the monitoring shall be entered into Ecology's EIM database by December 31st of each year. A summary and discussion of the monitoring results shall be included with the appropriate annual report. Sampling shall continue until the expiration of the permit, or until the discharges have been eliminated.

3. No later than December 31, 2017 the City of Spokane Valley shall, in consultation with Ecology, evaluate the results of the monitoring plan in order to evaluate pollutant loading

PCB-SPOKANE-04281236

with respect to the city's share of the Stormwater Waste Load Allocations in the TMDL. If the monitoring results indicate that Stormwater Waste Load Allocations are being exceeded then an adaptive management response to reduce pollutant loading shall be initiated. The City of Spokane Valley shall submit an Action Plan for Ecology approval by March 31, 2018. The Action Plan must include:

a. The specific purpose and objective of the plan
b. A description of key actions and who will conduct them
c. Implementation schedule, including milestones, deadlines, and how frequently the plan should be updated
d. Discussion of legal authority to implement actions
e. Process and schedule for how to evaluate appropriateness of actions in the plan and how frequently to update it
f. Any additional monitoring that may be necessary to evaluate the effectiveness of the plan

PCB-SPOKANE-04281237

002410