# EXHIBIT 61

003728

910/9-78-053

EPA-WA-790841-F

| United States | Region 10 |
| Environmental Protection | 1200 Sixth Avenue |
| Agency | Seattle WA 98101 |

| Water | July 1979 | EPA - 10 - Wa - City & Co Spokane - CSO - 79 |

**EPA**

# Environmental Impact Statement

## Final

## City of Spokane Combined Sewer Overflow Abatement Project



EXHIBIT 18
HENDRON
30(B)(6)
6/7/19
Monna Nickerson, CCR 3322

NEPA COLLECTION
Transportation Library
Northwestern University Library
Evanston, IL 60201

Google Books

Digitized by Google

003729



Digitized by Google

3 5556 031 040835

FINAL ENVIRONMENTAL IMPACT STATEMENT

City of Spokane, Washington
Combined Sewer Overflow
Abatement Project

Prepared By:

U. S. Environmental Protection Agency
Region X
Seattle, Washington

With Technical Assistance From:

Jones & Stokes Associates, Inc.
2321 P Street
Sacramento, CA  95816

In Association With:

Culp-Wesner-Culp

Responsible Official:

Donald P. Dubois
Regional Administrator

AUG  1 1979
_____
Date

Digitized by Google

003731

Digitized by Google

TABLE OF CONTENTS

                                                        Page

Table of Contents                                          i
List of Figures                                          iii
Summary                                                   iv

CHAPTER 1 - INTRODUCTION                                   1

     History and Purpose of Proposed Project               1
     Purpose and Content of the Final EIS                  1

CHAPTER 2 - SUMMARY OF PROPOSED ACTION                     3

     Sewer Separation                                      3
     Project Timing and Funding                            3
     Relationship of Proposed Action to
       Spokane's NPDES Permit Requirements                 6
     Mitigation of Proposed Action Impacts                 6

CHAPTER 3 - GENERAL RESPONSES TO COMMENTS                  9

     Introduction                                          9
     Wastewater Regionalization at the
       Spokane Treatment Plant                             9
     Stormwater Treatment                                 10
     Export of Wastewater to Crab Creek                   12
     Phasing of the Proposed Action                       13

CHAPTER 4 - RESPONSES TO SPECIFIC COMMENTS                15

     Introduction                                         15
     Written Comments                                     15
          U. S. Department of Agriculture,
            Soil Conservation Service                     17
          U. S. Department of Army, Corps
            of Engineers                                  20
          U. S. Department of Housing and
            Urban Development                             22
          U. S. Department of the Interior               26
          U. S. Department of Transportation -
            Coast Guard                                   30
          Advisory Council on Historic Preservation      33
          Washington Department of Ecology               36
          Washington Department of Fisheries             38
          Washington Department of Game                  41
          Washington Office of Archeology and
            Historic Preservation                         43
          Washington Office of Financial Management      46
          Washington State Parks and Recreation
            Commission                                   50
          Spokane Regional Planning Conference           54

i

Digitized by Google

Spokane County Engineers                              57
Spokane County Health District                       61
City of Spokane Finance Department                   65
City of Spokane Department of Public Works           67
City of Spokane Plan Commission                 .    69
City of Spokane Public Utilities                     75
City of Spokane Traffic Engineering
    Department                                       78
Bovay Engineering, Inc.                              85
Jake Klicker                         .               90
Oral Comments                                        91
    Roger James                                      91
    James Schasre                                    91
    Robert Smith                                     91

BIBLIOGRAPHY                                    .    93

TRANSCRIPTS OF PUBLIC HEARINGS ON DRAFT EIS          95

Digitized by Google

003734

## List of Figures

                                                                Page

Figure 2-1 - Proposed Action - Phase 1                           4

iii

Digitized by Google

003735

SUMMARY

FINAL ENVIRONMENTAL STATEMENT -- CITY OF SPOKANE

COMBINED SEWER OVERFLOW ABATEMENT PROJECT

Environmental Protection Agency
Region 10
1200 Sixth Avenue
Seattle, Washington  98101

1.  Type of Statement:      Draft (   )      Final ( x )

2.  Type of Action:      Administrative ( x )      Legislative (   )

3.  Description of the Action:

The waste water conveyance system of the City of Spokane
currently discharges untreated sewage to the Spokane River
with almost every rainfall or snowmelt.  This happens because
the city conveyance and collection system carries both raw
sewage and stormwater, and the pipes in the system are too
small to carry the entire flow of sewage and stormwater to
the sewage treatment plant.  To relieve the flooding problems
which would be caused by pipes overflowing during such conditions,
the combined sewage and stormwater or melt-water is discharged
directly to the Spokane River with no treatment.  Such occurrences
are commonly referred to as a Combined Sewer Overflow or CSO.
Currently in Spokane during a rainstorm which would cause
a CSO to occur, some of the flow in the conveyance system
is treated by the City's advanced waste treatment plant,
some is discharged as a CSO directly to the river prior to
reaching any type of treatment facility.  The system overflows
directly into the river at more than 30 points throughout
the city.  CSO's contain raw sewage and therefore can cause
public health hazards and other water pollution and aesthetic
problems.  The goal of the city's proposal is to remove the
stormwater from the sewage collection system so that the
sewage conveyance system will not overflow and discharge
untreated sewage to the Spokane River.

On March 5, 1979, the Environmental Protection Agency
(EPA) released a draft Environmental Impact Statement (EIS)
on the city's facility plan proposal to control and abate
CSO's.  All of the alternatives in the city's facility plan
plus several others from outside sources were evaluated in

Digitized by Google

003736

the draft EIS.  A number of public meetings were held during
the preparation of the draft EIS and public hearings were
held on April 19, 1979 although the agency accepted comments
after that date.  Comments and EPA's responses to these
comments are included in this final EIS.

4.  The preferred Alternative:

     The preferred alternative is Alternative 3, construction
of a separate stormwater conveyance system.  This would
separate stormwater from sewage; the sewage would continue
to be conveyed to the city's waste treatment plant but would
no longer enter the river untreated.  The stormwater would
receive no treatment prior to discharge to the river.

     To facilitate planning and funding of this alternative,
the proposed plan has been divided into two phases.  Phase I
would commence this year and would involve eventual construc-
tion of a storm sewer system in the two drainage basins
which contribute the largest of the city's CSO's.  Phase II,
separation of stormwater and sewage flows in other areas of
the city, would not commence until Phase I has been completed
and the results evaluated.  Future city and county facility
planning would also be necessary prior to detailed desing
of Phase II.  EPA will provide 75% and the State 15% of the
grant eleigible costs in Phase I.  The city will provide the
remaining needed Phase I funds.

     The major impacts of Phase I include construction of
about 120 miles of pipeline and removal of an estimated 84%
of the current annual volume of CSO to the Spokane River.
Disruption of traffic patterns could be a significant impact
during construction, however the city is committed to carrying
out construction in a manner to minimize such impacts.  The
actual plans for such mitigation will be developed during the
design stage of this project.  Removal of raw sewage from the
flows directly entering the river should reduce harmful
pathogenic material in the Spokane River and should improve
the aesthetical enjoyment of the river.  The state will
require monitoring to determine the effectiveness of Phase I
and, with the city, will develop a schedule for future phases
of the project.

     Removal of storm water from the treatment plant in Phase I
and II would allow the city to treat more sewage than it could
otherwise treat.  This could allow the regionalization of
the plant.  Use of the City of Spokane facility as a regional
facility will be evaluated at the appropriate state and local
levels.  Decisions concerning timing and manner of regionali-
zation require more detailed design information than is currently
available.  Information refined and developed during desigh
of Phase I will be used in the regionalization evaluation.

Digitized by Google

003737

5.  Additional Alternatives Considered:

    A variety of approaches which could control and abate
the CSO problem were evaluated for varying degrees of
control of CSO's.  Some of these alternatives were originally
evaluated by the city in their facility plan while others
were proposed later by private citizens.

    The storage basin concepts (Alternative 1, the Klicker
Plan and several of the combination alternatives) would
still allow CSO's to occur, although not as frequently as
present.  The storage basins would retain some of the combined
stormwater and sewage instead of directly discharging to the
river.  The combined stormwater and sewage in the storage
basins would be gradually released back into the existing
conveyance system for eventual treatment at the city's
facility.  As a result, neither the conveyance system nor
the plant would have the capacity to function as a regional
facility.  In addition, the treatment of a relatively dilute
influent at a phosphorous removal facility is an inefficient
use of that facility.

    Another approach investigated by the city was small
satellite treatment plants located throughout the city.  CSO's
would receive primary treatment and chlorination at the satel-
lite facilities and would be discharged directly to the river.
Primary treatment of sewage would likely cause water quality
violations.  The effectiveness of chlorination under these
circumstances is unknown.  At the larger overflow points,
it could be extremely difficult to adequately disinfect the
large volumes of water that would have to be treated in high
runoff situations.  Proper mixing and contact time may not
be available in the small satellite facilities.  Also, the
capital and operation and maintenance costs are considerably
higher than with some of the other options.

    A complete wastewater and stormwater export plan, the
Latenser plan, was considered.  The system would have potentially
significant environmental impacts on the receiving stream
and would violate state water quality guidelines and policy.
This plan is also the most costly of the alternatives.  Impacts
on the receiving water would include changing an intermittent
stream to a perennial stream, possible contamination of ground
water, possible contamination of drinking water supplies and
possible adverse impacts on the downstream fisheries.

Digitized by Google

6. List of Agencies and Individuals that commented on the Draft EIS:

<u>Written Comments</u>

<u>Federal</u>

U. S. Department of Agriculture, Soil Conservation Service
U. S. Department of Army, Corps of Engineers
U. S. Department of Housing and Urban Development
U. S. Department of the Interior, Office of the Secretary
U. S. Department of Transportation, Coast Guard
Advisory Council on Historic Preservation

<u>State</u>

Washington Department of Ecology
Washington Department of Fisheries
Washington Department of Game
Washington Office of Archeology and Historic Preservation
Washington Office of Financial Management
Washington State Parks and Recreation Commission

<u>Local</u>

Spokane Regional Planning Conference
Spokane County Engineers
Spokane County Health District
Spokane City Finance Department
Spokane City Public Works Department
Spokane City Plan Commission
Spokane City Public Utilities
Spokane City Traffic Engineering Department

<u>Individuals</u>

Bovay Engineers
Jake Klicker

<u>Oral Comments</u>

Roger James - Spokane City Public Utilities
James Schasre - Lake Spokane Environmental Association
Robert Smith - Bovay Engineers



Digitized by Google

7.  List of Preparers of the Final EIS:

Jones and Stokes Associates, Inc.
Dr. Charles Hazel
Michael Rushton

Culp/Wesner/Culp
Dr. Robert Gumerman, P.E.

8.  The following agencies and individuals were sent
    copies of the final EIS:

### FEDERAL AGENCIES

U. S. Department of Defense
U. S. Department of Housing & Urban Development
U. S. Department of Agriculture
U. S. Department of the Interior
U. S. Department of Health, Education, and Welfare
U. S. Department of Transportation
National Oceanic & Atmospheric Administration
Advisory Council on Historic Preservation

### STATE AGENCIES

State of Washington Department of Fisheries
State of Washington Department of Game
State of Washington Office of Archaelogical and Historical
  Preservation
State of Washington Department of Ecology
State of Washington Office of Financial Management
Washington State Parks & Recreation Commission

### LOCAL AGENCIES

Spokane County Engineering Office
Spokane County Health District
Spokane County Planning Commission
Spokane Traffic Engineering Office
Spokane Planning, Programming, and Community
  Development Department
Spokane Regional Planning Conference
Mayor of Spokane
Spokane City Manager
Spokane City Engineer

### INDIVIDUALS AND OTHER GROUPS

Spokane Daily Chronical
Gonzaga Environmental Law Caucus

Digitized by Google

003740

League of Women Voters
Bovay Engineers
Spokane Public Library
We the People
Spokesman Review
National Wildlife Federation
Washington Archaeological Research
Dan Neal
James A. Schasre
Carl Maxey
Bob Eisenbart
Ray Aoltero
Jake Klicker
Larry Esvelt
William Dunmire

Digitized by Google

Digitized by Google

Digitized by Google

003743



Digitized by Google

Chapter 1

INTRODUCTION

History and Purpose of Proposed Project

The City of Spokane has applied to the State of Washington
and the federal government for grant funds to design and
construct improvements to its wastewater system.  The city
recently constructed a new advanced waste treatment plant
on the Spokane River, but its combined sanitary and stormwater
collection system is not sufficiently sized to convey peak
wastewater and storm flows to the plant.  As a result, un-
treated combined sewer overflows (CSOs) are discharged to
the Spokane River 80 to 110 times a year.  The continuation
of CSOs is contrary to requirements of the city's National
Pollutant Discharge Elimination System (NPDES) permit, and
creates a public health threat to persons using the river.
The Washington Department of Ecology (DOE) which administers
NPDES permits, has ordered Spokane to eliminate CSOs.  The
grant funds, made available through the Federal Water Pollution
Control Act (FWPCA, PL 92-500) and its successor, the Clean
Water Act of 1977 (PL 95-217), are being sought to design
and construct wastewater system improvements capable of bringing
the city into compliance with its NPDES permit and relieving the
public health threat.

Spokane initiated action in this regard by preparing
a facilities plan for wastewater system improvements.  This
planning effort, completed in 1977, was funded in part by
state and federal grants.  In order to comply with the man-
dates of the National Environmental Policy Act (NEPA), the
U. S. Environmental Protection Agency (EPA) was required
to prepare an environmental impact statement (EIS) on the
project before allocating grant monies to project design
and construction.  The EIS was begun in May 1978 and the
Draft EIS was distributed for public review in January 1979.
Two public hearings on the draft were subsequently held in
Spokane on April 4, 1979.  The EIS evaluated the project
proposed by the city and a variety of alternatives developed
in the planning process.

Purpose and Content of the Final EIS

This Final EIS has been prepared to respond to comments
and discuss environmental issues raised with regard to the
Draft EIS, as required by NEPA and its implementing guidelines.

1

Digitized by Google

003745

Recent changes to the Council on Environmental Quality (CEQ)
guidelines for preparing EISs allow the Final EIS to take
several forms.  The Draft EIS can be revised in its entirety
to reflect project changes and/or public comment, or a supple-
mental document may be prepared that includes only comments,
responses to comments and changes in the Draft EIS.  Because
it is felt that comment on the Spokane CSO Draft EIS did
not raise substantive new issues or create major changes
in the approach to solving the CSO problem, this Final EIS
has been prepared as a supplement to the Draft EIS.

     This introduction is followed by a summary of the proposed
action and a number of issue-oriented statements that respond
to comments on the project's major environmental impacts.
A separate section responds to specific comments that could
not be readily categorized into general topics.  All letters
of comment are included and transcripts of the public hearings
are attached at the back of the report.

     Copies of the full Draft EIS may be obtained by:  writing
to Mr. Roger Mochnick, U. S. Environmental Protection Agency,
Region X, 1200 Sixth Avenue, Seattle, Washington 98101; or
contacting Mr. Dan Robison, Director of Environmental Programs
City Hall, Room 303, Spokane Washington 99201.  Copies of
the report are also on file at the main branch of the Spokane
City Library, West 906 Main in Spokane.

Digitized by Google

003746

Digitized by Google

Digitized by Google

003748

Chapter 2

## SUMMARY OF PROPOSED ACTION

### Sewer Separation

The proposed project to abate the sewer overflow problem
is to construct new storm sewer lines throughout the city.
These new lines will separate storm runoff from sanitary
sewerage and thereby reduce the hydraulic overloading
of existing lines.  After construction, stormwater will flow
directly to the river rather than through the wastewater
treatment plant, and mainly sanitary sewage will flow through
the treatment plant.

The construction is expected to occur in two phases.
Phase 1 will include about 120 miles of pipeline construction
in the northern one-third of the city (see Figure 2-1).  This
will eliminate the two largest CSOs, at Meenach Drive and
Hollywood.  The city estimates about 84 percent of the current
annual CSO in Spokane comes from these two overflow points.
It will take about 5 years to complete Phase 1 construction.
The remaining 100 miles of new pipe will be installed in
following years.  The exact time frame and location of sub-
sequent construction has not been established; the Phase 2
project will be reevaluated after the Phase 1 improvements
are completed and evaluated.  At the appropriate time, the
Phase 2 project will receive additional engineering, economic
and environmental analysis as part of the planning process.
DOE will reevaluate the entire CSO project in terms of continued
commitment of federal and state funds at the completion of
Phase 1 (see their letter of comment in Chapter 4).

### Project Timing and Funding

The sewer separation project has been divided into two
phases because funding is not immediately available for the
entire effort.  This initial planning effort has sought to
remedy the public health threat created by overflows and
at the same time assess the Spokane treatment plant's ability
to function as a regional wastewater facility.  Phase 1 of
the proposed action should result in an improvement in waste-
water contamination of the Spokane River, and at the same
time it starts the process of separating storm flows from
the sanitary wastewater conveyance and treatment system.
This will eventually free capacity in the system for transport
and treatment of additional wastewater sources.

Digitized by Google

003749

# FIGURE 2-1
# PROPOSED ACTION - PHASE 1



-LEGEND-

---·--- CITY LIMITS

▨    PHASE 1 SEPARATE
     SEWER CONSTRUCTION
     AREA

12   MEENACH DR. OVERFLOW
     DRAINAGE AREA

15   HOLLYWOOD OVERFLOW
     DRAINAGE AREA

SOURCE: BASEMAP
MODIFIED FROM SPOKANE CITY DEPARTMENT
OF PUBLIC WORKS, 1977, EXHIBITS

Digitized by Google

003750

Step I of the construction grants process consists of facilities planning. In this project, the facilities planning process considered the scope and nature of the CSO problem, a variety of approaches which could be used for relieving this problem, and the manner in which EPA could participate. The proposed action is the approach judged to be the most suitable for this project. The magnitude and extent of the CSOs were estimated by the city in their facilities plan. These figures will be reevaluated as detailed design begins. Any decision concerning the scope of Phase 2 and any final decisions on regionalization of treatment for areas not currently served by the city system will be subject to that reevaluation. Step II in the process of implementation will be design of the facilities. According to the state priority list, grant funds are available for this in fiscal year 1979. Funds for Step III, actual construction of facilities, will be available in fiscal years 1980 through 1983.

The Draft EIS provided a relatively detailed explanation of how Phase 1 costs were developed and allocated to federal, state and local entities. The allocation of Phases 1 and 2 costs between the EPA, the state and the city was based on EPA rules for funding of multipurpose projects, which are defined as projects which solve more than just a water quality problem. In the City of Spokane project, the storm sewers would, in addition to solving the CSO problem, also solve local sewer backup problems, drainage problems, and allow regionalization of sewage treatment and disposal. Based upon the allocation rules for multipurpose projects, the Draft EIS presented a possible allocation of Phase 1 and Phase 2 costs between EPA, the State of Washington, and the City of Spokane. This allocation is presented in the following table.

SUMMARY OF CONSTRUCTION COST SHARING*—PROPOSED ACTION

| | Total Construction Cost | EPA | State of Washington | City of Spokane |
|---|---|---|---|---|
| Phase 1 | $24,980,000 | $18,740,000 | $3,750,000 | $2,490,000 |
| Phase 2 | 39,070,000 | 23,430,000 | 4,680,000 | 10,960,000 |
| Total | $64,050,000 | $42,170,000 | $8,430,000 | $13,450,000 |

*Allocations for Phase 1 were made assuming 75 percent federal funding, 15 percent state funding and 10 percent local funding because this first phase was determined to be 100 percent eligible for grant funding. The entire project was determined to be 87.8 percent grant fundable; this accounts for the less than 75 percent federal participation in Phase 2. It is important to note that Phase 2 sharing is only speculative at this time because grant fund availability and priority for grant money distribution is not known more than 1 year in advance.



003751

The timing and funding for Phase 2 has not been developed
in detail because the availability of federal and state grant
money cannot be determined far enough in advance.  It is
estimated that Phase 1 construction will not be complete
for approximately 5 years, and grant allocations are not
established for more than 2 to 3 years in advance.  Therefore,
a specific time frame and cost allocation cannot be predicted
at this time.  In the interim, the effectiveness of Phase 1
construction can be monitored and more planning can be conducted
to clarify the effect of subsequent sewer separation on inter-
ceptor and treatment plant capacity.  Proposed regional 201
planning can also further explore the timing and extent of
tying unsewered county areas into the city wastewater system.

## Relationship of Proposed Action to
## Spokane's NPDES Permit Requirements

The Washington DOE, which has issued and is responsible
for enforcing the city's waste discharge permit, has agreed
that sewer separation "is the most desirable option for abating
the problem of combined sewer overflows in Spokane" (see
their letter of comment on the EIS in Chapter 4).  Also,
they remain committed to ensuring that all CSOs are eliminated
regardless of the availability of federal and state grants.
However, they are not committed to funding Phase 2 of the
separation at this time because of the uncertainty of grant
money in the future.  The DOE indicates in their comments
on the Draft EIS that a schedule for sewer separation must
be developed.  This schedule would become a part of the city's
NPDES permit.

## Mitigation of Proposed Action Impacts

Many of the proposed project's potential impacts can
be reduced or eliminated by some mitigative action.  Efforts
should be made by the city to minimize short-term construction
problems by adopting some of the following construction practices;
fugitive dust should be controlled by watering disturbed
surfaces, especially during windy periods; excavation, pipe-
laying and backfilling should occur in a continuous sequence,
avoiding long, open ditches and exposed spoil piles; excava-
tion along or across major traffic corridors should be planned
well in advance with the city traffic department and police
so that lane closures and blocking of access do not result
in major traffic congestion or create unnecessary safety
hazards; citizens should be notified prior to any utility
disruptions (gas, electricity, water) that might be necessary;
construction in the city's main commercial areas should be
scheduled to avoid peak business periods (e.g., major holidays)
whenever possible.

Digitized by Google

003752

Once a system of separate storm sewers is in operation, stormwater runoff will be flowing directly to the Spokane River without treatment. This will reduce hydraulic overloading of the treatment plant and avoid costly treatment of nonsanitary flows, but this runoff will contain a variety of materials washed from yards, streets, and various paved areas. There are a variety of measures which could be taken by the city to help reduce the introduction of these types of materials. This includes more frequent street cleaning, dry weather flushing of catch basins, improved litter control, screening of storm outfall points, diversion of runoff for percolation and recharge, use of porous asphalt in new construction areas, improved control over used oil disposal, and investigation of alternative deicing methods. EPA encourages the city to consider such measures since presently there are no treatment requirements for stormwater runoff. However, it is possible that federal treatment requirements may be established at some future date. This may include issuance of a general NPDES permit for stormwater discharges and required implementation of certain Best Management Practices (BMPs). Currently EPA and DOE encourage voluntary adoption of control practices.

Digitized by Google

003753

Digitized by Google

Digitized by Google



Digitized by Google

Chapter 3

GENERAL RESPONSES TO COMMENTS

<u>Introduction</u>

The following pages restate and/or augment discussions of major environmental issues presented in the Draft EIS. The material has been kept as brief as possible while responding to some of the more prevalent questions raised on the Draft EIS. Only those issues stimulating significant comment or requiring additional clarification are included. Individual comments requiring less response are included in the following chapter.

<u>Wastewater Regionalization at the
Spokane Treatment Plant</u>

It was intended that this EIS on Spokane's CSO abatement plans would evaluate the technical and economic feasibility of using the Spokane treatment plant as a regional wastewater treatment facility. Each of the CSO control alternatives was analyzed in this regard. It was not intended that the precise timing of regionalization would be determined, nor would it be decided which outlying areas might be first connected to the plant. An analysis of data presented in the city's CSO facilities plan (Spokane City Department of Public Works, 1977) and information obtained from other wastewater planning documents (U. S. Department of Army, Corps of Engineers, 1976; Kennedy Engineers, Inc., 1978 and 1978a; Esvelt and Saxton-Bovay Engineers, Inc., 1972; Bovay Engineers, Inc., 1973 and 1977) suggest that the city's plan to construct separate storm sewers would eventually eliminate all CSOs, remedy local sewer backup and flooding, and free capacity in the city interceptor and treatment plant for service to presently unsewered areas. The other alternatives considered would reduce or eliminate CSOs but would not be as effective at reducing stormwater flows in the city's interceptor system. Therefore, they would not be as amenable to future regionalization schemes as the proposed project.

9


Digitized by Google

003757

Separate sewers constructed in the Hollywood and Meenach drainage areas during Phase 1 will remove stormwater from the existing sanitary sewer system.  Should treatment capacity become available as a result of Phase 1, regionalization possibilities could be explored at the appropriate state and local government levels.  Before any such available capacity can be used to service new areas, DOE requires that a schedule for complete separation be developed (see DOE letter in Chapter 4). At that time it would be possible to contemplate regionalization but an expansion of the service area would involve several important trade-offs.  Even though there may be sufficient dry weather capacity in both the interceptors and the treatment plant, during storm conditions (80-100 days per year) there would continue to be insufficient capacity in the secondary treatment and phosphorus removal facilities during most storms. As an example, if sewer separation reduced stormwater flows by 7-8 mgd and a new service area expansion took on 3-4 mgd of sanitary flows, there would only be a net reduction of 3-4 mgd in water diverted through the stormwater treatment system.  Therefore, flows from newly-annexed regions would directly contribute to continued bypassing of flows through the stormwater treatment system, which provides only primary treatment and chlorination prior to river discharge.  This must be balanced against the potential groundwater quality and public health benefits of sewering outlying areas that now rely on on-site waste disposal.  It must also be weighed against the fact that the two stormwater clarifiers must be made available for conversion to secondary clarifiers before the ultimate planned capacity of the treatment plant can be utilized.

The decision to expand Spokane's service area prior to complete stormwater separation (Phase 2) will be made by DOE and the appropriate local agencies.  Prior to making that decision, it would be valuable to obtain further information on the amount of stormwater that may remain in the sanitary sewer system even after Phase 2 is completed.

### Stormwater Treatment

The proposed CSO control action includes construction of a separate storm sewer system throughout the city, with discharge of all collected stormwater runoff directly to

10

Digitized by Google

003758

the Spokane River without the benefit of treatment.  This
has led to several concerned responses to the Draft EIS.
The primary concern is over impact on water quality.

Data collected for the stormwater discharge analysis
were obtained primarily from city treatment plant staff.  The
measurements were taken in existing Spokane stormwater facilities.
To make comparisons of existing and post-project impact on
the river, the water quality parameters listed in Table B-10
of the Draft EIS were applied to the flow estimates recorded
in Table B-11.  The proposed action (Alternative 3) and the
other alternatives were compared to the existing situation
(no action) by totalling the pollutant inputs from each of
the flow components.  The results of the analysis are presented
on pages 98 to 106 of the Draft EIS.  The proposed action
would reduce flows through the treatment plant, reduce CSOs
and increase direct stormwater runoff to the river.

The stormwater runoff can contain a variety of undesirable
substances as noted in Table B-1 of the Draft EIS.  Our analysis
indicated that suspended solids would show the most significant
increase under the proposed action.  With an average suspended
solids content of 172 mg/l and a projected storm flow of
5,120 mgd, approximately 2,800 tons of suspended solids would
reach the river through stormwater outfalls.  This compares
to a total of 1,720 tons being discharged by the city through
its present wastewater system.  This analysis considers only
the point-source discharges to the river; direct runoff that
is not carried in the wastewater system has not been measured.
There are insufficient data to analyze some of the other
potentially harmful stormwater components such as oil, salts
metals and pesticides.  With an increase in untreated
direct runoff, it is likely that more of these deleterious
materials will reach the river.  However, the city could
mitigate this problem by implementing a variety of control
practices for urban runoff.  Screening of all stormwater
outfalls, more vigorous street cleaning efforts and paving
of dirt roads are logical first steps toward reducing stormwater
discharge impacts on water quality.  This can be combined
with a variety of other actions including but not limited
to the following:  dry weather flushing of storm drain catch-
ment basins, investigation of different deicing techniques,
diversion of storm flows to percolation/groundwater recharge
basins, tighter control over used oil disposal, and initiation
of a public education program to keep toxic materials used
at home out of the storm drain system.

It is possible that there will eventually be federal
or state treatment requirements for stormwater discharges,
but at this time EPA and DOE are simply encouraging adoption
of suitable control measures.  If treatment requirements
do become a reality, the separated stormwater and sanitary

Digitized by Google

wastewater systems should facilitate treatment.  Without
implementation of control practices, stormwater discharges
will carry an unnecessarily large amount of suspended solids,
debris and a variety of chemical compounds into the river;
this will be especially true when storms follow an extended
dry period.

### Export of Wastewater to Crab Creek

The Latenser Plan for CSO control, analyzed in the Draft
EIS, calls for export of all Spokane wastewater from the
Spokane River drainage basin.  The wastewater would be given
secondary treatment and piped to upper Crab Creek, where
it would be discharged to the natural stream bed for transport
to farmland in the Odessa area.  This plan is not being pursued
by the City of Spokane or EPA for a variety of reasons, some
financial and some strictly environmental.

The financial implications were presented in Chapters 2 and 4
of the Draft EIS.  The Latenser Plan presents both the highest
capital cost and highest average annual cost of all the alter-
natives considered.  The city's share of construction costs
are estimated to be about $68 million; this is more than
the entire anticipated cost of both phases of the proposed
action.

The environmental implications of the Latenser Plan
are also significant.  First, the storage and feed-back method
of controlling CSOs does not completley eliminate the dis-
charge of untreated sanitary wastes to the Spokane River.
Due to the sizing of storage facilities, CSOs would still
occur about once a year.  Second, all stormwater entering
the Spokane collector system would still be funneled through
the treatment plant; this eliminates chances of turning the
Spokane system into a regional wastewater facility.

Use of Crab Creek as a conveyance for secondary effluent
poses some serious water quality and public health questions.
The dry season discharge of effluent to Crab Creek would
not only violate state water quality guidelines and policy,
it could create a serious hazard to the stream's fishery
and public use of the stream.  This includes potential ground-
water contamination where Crab Creek flow becomes subterranean,
downstream from Odessa.  These concerns were discussed in
Chapter 4 of the Draft EIS and are reiterated in letters
of comment from the U. S. Soil Conservation Service and the
Washington Department of Game.

Finally, construction of the open 50 million gallon
CSO storage reservoir envisioned in Riverside State Park
(across the river from the treatment plant) would have several

Digitized by Google

003760

significant conflicts.  The planned site is on state park property that is planned for use as an equestrian center beginning in the summer of 1979.  As such, the open reservoir would not be acceptable to the Washington State Parks and Recreation Commission (see their letter of comment on the Draft EIS).  Also, this area of Riverside State Park contains potentially significant historic and archeological resources in the form of Indian encampments and Fort George Wright military trash dumps.

### Phasing of the Proposed Action

As stated in Chapter 2, the proposed action was divided into two phases because there are not sufficient state and federal grant funds available to finance the entire project at this time.  Phase 1 is expected to receive 75 percent federal, 15 percent state and 10 percent local funding.  Sewer separation in the Hollywood and Meenach drainage areas is estimated to cut annual CSOs in Spokane by about 84 percent.

Phase 2 timing and funding will receive further evaluation after Phase 1 has been completed and analyzed.  The Phase 2 planning should be conducted after more information is made available on the effectiveness of the planned sewer separation in other parts of the city.  Additional areawide 201 planning for unincorporated areas surrounding Spokane should also be completed by the end of Phase 1; this should aid in developing a schedule for Phase 2 separation and eventual connection of outlying areas to the city system.

Because the initiation of Phase 2 CSO control is at least 5 years in the future, it is expected that additional engineering, economic and environmental evaluation will be warranted before design of the project is undertaken.  Additional public input into Phase 2 planning will also be sought prior to any final action.  Funding and scheduling of Phase 2 cannot be determined until Phase 1 is complete and a reevaluation has occurred.  Both EPA and DOE are unable to commit specific funding levels to Phase 2 because it is impossible to determine the overall level of funding that will be available to these agencies 5 years from now.

Digitized by Google

003761

Digitized by Google

003762

Digitized by Google

003763

Digitized by Google

Chapter 4

RESPONSES TO SPECIFIC COMMENTS

## Introduction

The following pages are devoted to responding to individual comments received on the Draft EIS.  Individual letters are included and the comments in each letter have been given numbers.  Responses, numbered to correspond to the comments, immediately follow each letter.  Oral comments received at the EIS public hearings are also included in this chapter. Only those oral comments requiring a response are included. Each comment is followed by a response.  For a complete version of the oral testimony see the attached public hearing transcripts.

## Written Comments

Digitized by Google

003765

**UNITED STATES DEPARTMENT OF AGRICULTURE**

SOIL CONSERVATION SERVICE

Room 360, U.S. Courthouse, Spokane, Washington 99201

March 20, 1979

Donald P. Dubois
Regional Administrator
U.S. Environmental Protection Agency
Region 10
Seattle, WA 98101

Dear Mr. Dubois:

The Soil Conservation Service has reviewed the draft environmental impact statement for City of Spokane Combined Sewer Overflow Abatement Project.

Our comments are applicable to the "Latenser Plan" alternative only.

1. We believe the draft environmental impact statement should address action to be taken following construction of the pipe from the treatment plant to Crab Creek regarding reestablishment of vegetation. Disturbed soils are susceptible to both wind and water erosion and protection should be assured.

2. The draft environmental impact statement does not appear to address the impact of the flow of effluent down Crab Creek. Sections of the creek contain porous soils which may allow substantial seepage into surrounding ground water.

3. We believe the draft environmental impact statement should address the potential impact of irrigating the land near Odessa with the effluent.

Thank you for the opportunity to review this draft environmental impact statement. If we can be of further assistance, feel free to contact our office.

Sincerely,

Galen S. Bridge
State Conservationist

RECEIVED
MAR 2 6 1979

RECEIVED
MAR 2 8 1979
OFFICE OF
REGIONAL ADMINISTRATOR

16

U. S. Department of Agriculture, Soil Conservation Service

1.    As noted in Chapter 2 of this report, the proposed CSO
control action does not include export of wastewater to Crab
Creek.  Therefore, the project should not affect Crab Creek
or the surrounding agricultural land.  If this export scheme
were to be implemented, steps would have to be taken to protect
disturbed areas from soil erosion.  This would undoubtedly
include regrading, disposal of excess spoil and revegetation.
Contact with the Soil Conservation Service would be necessary
to identify any additional control techniques that have proved
to be effective in the area.

     The potential for contamination of groundwater and erosion
of irrigated areas was discussed briefly in the Draft EIS
on pages 133 and 134.  Additional analysis is not deemed
necessary at this time because the Latenser CSO control option
is not being proposed for action.

Digitized by Google

003767



**DEPARTMENT OF THE ARMY**
SEATTLE DISTRICT, CORPS OF ENGINEERS
P.O. BOX C-3755
SEATTLE, WASHINGTON  98124

NPSEN-PL-ER

23 MAR 1979

Roger K. Mochnick, M/S 443
201 EIS Coordinator
U.S. Environmental Protection
  Agency, Region X
1200 Sixth Avenue
Seattle, Washington  98101



RECEIVED
MAR 26 1979
ENVIRONMENTAL EVALUATION
BRANCH

Dear Mr. Mochnick:

We have reviewed the draft environmental impact statement (EIS) for the
City of Spokane Combined Sewer Overflow Project, Spokane, Washington,
with respect to the U.S. Army Corps of Engineers' areas of responsibility
for flood control, navigation, hydropower, and regulatory functions.  We
have the following comments:

    a.  Chapter 3, titled "Laws, Rules and Policies Affecting the CSO
Abatement Project," should include the following statement:

        "A Department of the Army permit may be required for the dis-
    charge of fill in and/or on wetlands adjacent to waters of the
    United States under the provisions of Section 404 of the Clean
    Water Act as implemented by 33 CFR, Part 323."

    b.  Page 206, section titled "Flooding:"

    (1)  The report referred to in the second paragraph is now completed.

    (2)  The EIS should address the impacts of the proposal and the
alternatives on flooding.  In addition, no aggravation of flooding should
be generated.

18

Digitized by Google

003768

NPSEN-PL-ER
Roger K. Mochnick, M/S 443

Thank you for the opportunity to comment on this statement.  If you have
any questions, please feel free to contact Dr. Steven F. Dice, telephone
(206) 764-3624, of my staff.

                        Sincerely yours,

                        SIDNEY KNUTSON, P.E.
                        Asst. Chief, Engineering Division

19

Digitized by Google

003769

## U. S. Department of Army, Corps of Engineers

1.   The statement included under a. in the Corps of Engineers
letter is acknowledged and incorporated into the Final EIS.

2.   Completion of the Corps of Engineers report on flooding
in Spokane is acknowledged.

3.   The impact of the proposed project and its alternatives
on local street and basement flooding is described on pages
115-117 of the Draft EIS.  None of the alternatives would
have a significant effect on flooding along the Spokane River
or Hangman Creek.  The amount of stormwater either stored
or passed directly to the Spokane River by the CSO projects
is insignificant compared to the river's flood flows.  There
are no structures planned that would encroach on the river
floodplain and thereby increase the threat of flooding in the
vicinity.

Digitized by Google

003770



DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
ARCADE PLAZA BUILDING, 1321 SECOND AVENUE
SEATTLE, WASHINGTON 98101

April 10, 1979

REGION X
Office of Community
Planning & Development

IN REPLY REFER TO:

10C



Mr. Roger K. Mochnick
201 EIS Coordinator, M/S 443
U.S. Environmental Protection
  Agency, Region X
1200 Sixth Avenue
Seattle, Washington 98101

Dear Mr. Mochnick:

Re:  Draft Environmental Impact Statement
     Combined Sewer Overflow - City of Spokane

We have reviewed the statement submitted with Mr. Dubois'
February 20 letter.

Following are our comments:

1)  We suggest the impact in the sole source aquifer be
    noted under each alternative.  Specifically, wouldn't
    a no action alternative have a high potential for
    impacting the aquifer in the future?

2)  Under the National Urban Policy EPA projects should be
    planned to minimize or prevent urban sprawl.  Shouldn't
    local governments be alerted to this policy so that
    appropriate future plans can be made in regards to
    regionalization of treatment facilities?

3)  Will relocation plans be prepared to assist the residents
    in Peaceful Valley that may be affected by this proposed
    action?

Your consideration of the above in the final statement will
be appreciated.

Sincerely,

Robert C. Scalia
Director, Regional Office
of CPD

21

Digitized by Google

003771

## U. S. Department of Housing and Urban Development

1.    The regionalization discussion in the Draft EIS (pages 158 to 170) states that only Alternative 3 (proposed action) is capable of making Spokane wastewater service available to outlying areas.  Therefore, only Alternative 3 can have a positive influence on wastewater contamination of the aquifer. By eventually providing wastewater service to currently unsewered areas of the county, on-site disposal systems can be removed from land overlying the aquifer.  As growth continues in these suburban areas, the importance of this sewering will increase.  If any of the other Spokane CSO options were implemented, including "no-action", removal of on-site disposal systems would be left to other facilities planning action by the county or other appropriate agency.  There would definitely be the potential for increased impact on the aquifer if no-action is taken.

2.    The local and regional planning agencies of the Spokane area have been contacted and have taken part in the Spokane CSO planning effort.  They should therefore be aware of the implications of regionalization in terms of future growth in the area.  There is considerable effort now underway to coordinate city and county development plans, especially with regard to wastewater treatment service.

     As indicated in the comment, the National Urban Policy discourages continued urban sprawl.  Regionalization of wastewater treatment service through the Spokane facilities should encourage infill in those outlying areas connected to the system.

3.    Residents in Peaceful Valley would not be displaced by the proposed action, therefore no relocation plans are proposed.  Only if storage or satellite treatment were implemented would there be residential displacement.  If storage or satellite treatment facilities were to be placed in the Peaceful Valley area, the city would have some obligation to aid in relocation efforts.

Digitized by Google

003772



# United States Department of the Interior

## OFFICE OF THE SECRETARY

PACIFIC NORTHWEST REGION

500 N.E. Multnomah Street, Suite 1692, Portland, Oregon 97232

RECORD

April 18, 1979    APR 19 1979

ENVIRONMENTAL EVALUATION
BRANCH

ER-79/189

Mr. Roger K. Mochnick
201 EIS Coordinator
Environmental Protection Agency
1200 Sixth Avenue
Seattle, Washington  98101

Dear Mr. Mochnick:

We have reviewed the draft environmental statement for Spokane
Combined Sewer Overflow Project, Spokane County, Washington.  The
following comments are provided for your consideration when pre-
paring the final document.

*1* | Analysis of the effects of the project on ground water should in-
clude assessing the significance of reduced local recharge of
ground water from septic tanks and other onsite wastewater dis-
posal systems.

*2* | The DES does not discuss mineral resources such as sand and gravel.
This lack of discussion may mean there are no impacts or it may
be an oversight.  Sand and gravel deposits would be impacted if
pipelines, storage facilities, or treatment plants were to be con-
structed across them.  Construction would require supplies of sand
and gravel which would probably be mined from nearby deposits.

One feature that might be considered is use of mined-out sand or
gravel pits for storage or treatment facilities.

Despite the foregoing comments, mineral involvement and impacts are
not expected to be of major importance in the choice of alternatives.

*3* | On page 5, damages caused by installation are mentioned, but the
statement fails to specify adverse environmental impacts.  In
Chapter 6 <u>Affected Environment</u> and Appendix A on page 233, the
setting and relative degree of project impacts are treated, but
relationships of those effects on biota are ignored.  The state-
ment fails to discuss the types of habitat and dependent wildlife
which will be damaged or destroyed, or what will be done to miti-
gate those losses.  Significant fish and wildlife resources exist
in the project area of impact.

23

Digitized by Google

003773

4  A main function of the new plant is described as phosphorus removal.
Beneficial uses of the Spokane River that would be enhanced by re-
duced phosphorus loading with resultant algae reduction are fish and
wildlife.   In view of this emphasis on nutrient removal as a major
project objective for water quality enhancement, it is difficult to
reconcile lack of planning coordination with construction of the up-
river Liberty Lake wastewater treatment facility which does not plan
to have phosphorus removal.

As stated on page 208, the reach upstream from Millwood, to be impacted
by the Liberty Lake facility, is rated by the Washington Department of
Game as one of the top ten unique ecosystems in Spokane County.  Yet
the only protection provided by the Liberty Lake project for the
unique natural trout fishery is dechlorination.  Anticipated heavy
phosphorus loading under low flows would severely degrade this aquatic
ecosystem and reduce the benefits of the proposed project.

Considering the wide area and diversity of values stated as being
served by the project, the document should discuss relationships of
those upstream impacts to the project function and design.

Regionalization aspects of waste treatment are described on pages 166-170,
but that discussion fails to address the immediacy of Liberty Lake and
other upriver developments as related to Spokane River water quality.

5  The principal concern of this Department's National Park Service re-
lating to this project is the effect upon water quality in the Spokane
Arm of Lake Roosevelt.  Water quality in the Arm, of course, is gov-
erned largely by the quality of the Spokane River which feeds the Arm
via Long Lake and Little Falls reservoirs.

As has been noted in the draft statement (page 125), the Spokane Arm
portion of the Coulee Dam National Recreation Area receives intensive
water recreation use by the public each year.  Public use here, as
measured by statistics on the numbers of swimmers and boats launched
at our two largest developed sites on the Arm, has been increasing at
a greater annual rate than it has in most other parts of the National
Recreation Area.  A visitor survey conducted by the National Park
Service last summer showed that over half of the visitors using the
Spokane Arm are from the city of Spokane or its surrounding communities.

The draft statement (page 125) suggests that water pollution in the
Spokane Arm is not now discouraging visitor use.  We believe that
presumption is untrue.  We have recently conducted several public
workshops in communities surrounding Lake Roosevelt to obtain citizen
input for a General Management Plan for the National Recreation Area,
and in the course of these workshops a number of citizens expressed
a deep concern over water pollution in the Spokane Arm.  Written com-
ments elicited from our visitor survey last summer exhibited a deep
concern over the health aspects of swimming in the Spokane Arm.

24

Digitized by Google

5

Furthermore, our information from qualified biologists is that the
toxic <u>Anabaena</u> algal blooms that occurred in the Spokane Arm last
summer are the direct result of unnaturally high amounts of nutrients
in the water.  It is our belief that storm sewer discharge from the
city of Spokane into the Spokane River is a major source of this
nutrient pollution into Lake Roosevelt.

6

On page 206, under Biological Resources, the bald eagle should be
treated as a species designated as threatened in the State of Washington
under the Federal Endangered Species Act.

Thank you for the opportunity to review this document.

Sincerely yours,

Charles S. Polityka
Regional Environmental Officer

Digitized by Google

003775

<u>U. S. Department of the Interior</u>

1.    According to the U. S. Geological Survey (Open File
Report 77-829, 1978) the Spokane Valley-Rathdrum Prairie
aquifer has not shown a long-term change in storage over
the past 50 years.  Discharge and recharge are essentially
equal.  This equilibrium has persisted in spite of an estimated
net industrial and agricultural pumping loss to the aquifer
of 175 cubic feet per second (cfs) and a 64 cfs loss from
existing sewer collection systems.  If all of the estimated
11.5 MGD of wastewater generated in Spokane Valley by 1990
were collected in sewers and transported to Spokane for treat-
ment, this would be a net loss of only 17.8 cfs.  Therefore,
it appears unlikely that elimination of on-site wastewater
disposal systems in the Spokane area will cause a significant
change in recharge of the aquifer.  It will, however, reduce
the threat of public health hazards being created by waste-
water contamination of the aquifer.

2.    The proposed CSO control action will require construction
of about 220 miles of new storm sewers.  Nearly all of this
construction will occur in existing rights-of-way.  Therefore,
it is unlikely that the project will affect the development
of sand and gravel resources.  There are extensive sand and
gravel deposits in the Spokane area including developed pits
near Felts Field and Riverside State Park.  There are also
extensive deposits in undeveloped areas.  Because it does
not appear that mineral resources will be significantly affected
by the proposed action, this subject area was not discussed
in the Draft EIS.  This is in keeping with the new CEQ guidelines
for EIS preparation, which encourage consideration of only
the significant environmental issues.

3.    Chapter 6 of the Draft EIS presents a summarization
of the environmental setting data reviewed in preparation
of the Spokane CSO impact analysis.  Our review of biological
data included discussions with local Washington Department
of Game officials and field surveys of all proposed construction
sites.  Our analysis indicated that loss of vegetation and
wildlife disturbance would not be a significant factor, especially
for the proposed project which is limited primarily to construction
within existing rights-of-way.  Therefore, biological impacts
were not discussed in detail.

      It should be noted, however, that the noise and increased
human activity associated with construction will disturb
wildlife frequenting the Spokane urban area.  This includes
a large number of bird species and a variety of rodents and
small mammals.  If any of the storage options or satellite
treatment were selected for CSO control, construction of
storage basins or satellite plants at sites 9B and 16B (see
Figure 2-3 in the Draft EIS) would remove relatively undisturbed
wildlife habitat.  Site 9B contains grassland and scattered

26

Digitized by Google

003776

pines while site 16B contains a mixture of pines and bankside
deciduous trees and shrubs.  This would require relocation of
those species utilizing the habitat.  No rare or endangered
species are expected to be affected.  However, it would be
desirable from a wildlife standpoint to relocate these
two storage/satellite treatment sites to already disturbed
areas if storage or satellite treatment were selected for
implementation.

4.   The potential for and environmental implications of
wastewater service regionalization are discussed on pages
158 to 170 of the Draft EIS.  This analysis is somewhat restricted
because the project being analyzed seeks primarily to control
CSOs.  There is no new plant under consideration in this
project.  The effect of the CSO control strategy on Spokane
treatment plant capacity was determined to be only a peripheral
issue to the main project objective - reduce public health
threats in the Spokane River by eliminating discharge of
untreated wastes to the river.

     The impact analysis indicates that CSO control does
not have a major effect on nutrient loadings in the river,
it would, however, have a significant impact on contamination
of the river with pathogenic organisms.  Therefore, a detailed
analysis of nutrient inputs and conditions up and down the
length of the Spokane River was not undertaken.  Such an
analysis was considered beyond the requirements of the CSO
issue.  This EIS was considered an inappropriate vehicle
for discussing broader regionalization plans of the entire
area.  As such plans are developed by the appropriate agencies,
the public and other agencies will be afforded an opportunity
to participate.

5.   The Draft EIS suggests on page 125 that CSOs from the
City of Spokane are apparently not discouraging visitor use
in the Spokane Arm of Roosevelt Lake.  This did not intend
to indicate water pollution in general was not affecting
visitor use of the lake.  The fact that park planning and
public surveys suggest water quality is a concern at the
lake is important to pollution control planning along the
entire Spokane River.

     Opinions received from users of the Spokane River near
Spokane contain similar feelings about river pollution.  The
findings of numerous personal interviews are included in
pages 118 to 125 of the Draft EIS.  However, it is important
to reiterate the EISs findings on the source of pollution.
Data compiled from numerous sources suggest that Spokane's
CSOs contribute only about 1 percent of the total annual phosphorus
and nitrogen reaching Long Lake.  This low nutrient input
is not likely to be the cause of recent algal blooms in Long
Lake and the Spokane arm of Roosevelt Lake.  There are numerous
sources of pollution affecting the Spokane River and CSOs
are only a small factor.

Digitized by Google

6.    Reference to the threatened status of the bald eagles is acknowledged and included as part of the Final EIS.

Digitized by Google



**DEPARTMENT OF TRANSPORTATION**
**UNITED STATES COAST GUARD**

MAILING ADDRESS(dp1)
COMMANDER
THIRTEENTH COAST GUARD DISTRICT
915 SECOND AVE.
SEATTLE, WASH. 98174
PHONE. 206 442-7523

16476
DPL79-261

23 MAR 1979

Mr. Donald P. Dubois
Regional Administrator
U. S. Environmental Protection Agency
Region 10
Seattle, WA  98101

Dear Mr. Dubois:

We have reviewed your draft environmental impact statement
of January 1979 addressing the City of Spokane Combined
Sewer Overflow Abatement Project.  We have no comments.

Thank you for the opportunity to review the document.

Sincerely,

RICHARD F. MALM
Captain, U. S. Coast Guard
Chief of Staff
Thirteenth Coast Guard District

Digitized by Google

003779

<u>U. S. Department of Transportation - Coast Guard</u>

1.   No response is required.

30

Digitized by Google

**Advisory
Council On
Historic
Preservation**

1522 K Street N.W.
Washington D.C.
20005

Reply to:    P. O. Box 25085
Denver, Colorado 80225

April 16, 1979



Mr. Roger K. Mochnick, M/S 443
201 EIS Coordinator
Environmental Protection Agency
Region X
1200 Sixth Avenue
Seattle, Washington    98101

Dear Mr. Mochnick:

Thank you for your request of February 21, 1979, for comments
on the draft environmental statement (DES) for the City of
Spokane Combined Sewer Overflow Abatement Project.  Pursuant
to Section 102(2)(C) of the National Environmental Policy Act of
1969 and the Council's regulations for the "Protection of
Historic and Cultural Properties" (36 CFR Part 800), we have
determined that your DES mentions properties of cultural and/or
historical significance; however, we need more information in
order to evaluate the effects of the undertaking on these
resources.  Please furnish additional data indicating:

1    Compliance with Section 106 of the National Historic Preservation
Act of 1966 (16 U.S.C. Sec. 470f, as amended, 90 Stat. 1320).

The environmental statement must demonstrate that either of the
following conditions exists:

1.  No properties included in or that may be eligible for
inclusion in the National Register of Historic Places are
located within the area of environmental impact, and the
undertaking will not affect any such property.  In making
this determination, the Council requires:

--evidence that you have consulted the latest edition of the
National Register (Federal Register, February 6, 1979, and its
monthly supplements);

Digitized by Google

003781

Page 2
Mr. Roger K. Mochnick
City of Spokane
April 16, 1979

1

—evidence of an effort to ensure the identification of properties eligible for inclusion in the National Register, including evidence of contact with the State Historic Preservation Officer, whose comments should be included in the final environmental statement. The State Historic Preservation Officer for Washington is Louis Guzzo.

2.   Properties included in or that may be eligible for inclusion in the National Register of Historic Places are located within the area of environmental impact, and the undertaking will or will not affect any such property.  In cases where there will be an effect, the final environmental impact statement should contain evidence of compliance with Section 106 of the National Historic Preservation Act through the Council's regulations for the "Protection of Historic and Cultural Properties" (36 CFR Part 800).

Should you have any questions, please call Brit Allan Storey at (303) 234-4946, an FTS number.

Sincerely,

Louis S. Wall
Chief, Western Office
  of Review and Compliance

32

Digitized by Google

003782

## Advisory Council on Historic Preservation

1.   As requested, the latest update of the National Register
of Historic Places (Federal Register, February 6, 1979) was
consulted to determine if properties of historic significance
might be affected by the proposed action.  The February 6
listing (and its latest monthly supplement, June 5, 1979)
included several more historic spots in Spokane, but the
proposed storm sewer construction project will not adversely
affect any of the properties.  All storm sewer construction
will be conducted in existing rights-of-way.  Some properties
will suffer temporary access problems; but this will last
only as long as construction and is not deemed significant.

     In order to verify the status of historic and archeological
resources in the Spokane area, the Washington Archeological
Research Center in Pullman, Washington was contacted a second
time.  No new archeological site information was reported
through that contact.  The Washington State Historic Preservation
Office was also contacted.  Its letter of comment is included
in this chapter.

     As stated in the Draft EIS, all pipeline construction
in the vicinity of the Spokane River should be closely monitored
for possible discovery of unrecorded archeological sites.
Surface reconnaissance in urbanized areas is not effective
at locating archeological material, and lands bordering the
river should be considered archeologically sensitive.  The
city's recently prepared historic landmarks survey (Keller,
n.d.) should also be consulted when it is made available
for public review.

33

Digitized by Google

003783



STATE OF
WASHINGTON

Dixy Lee Ray
*Governor*

**DEPARTMENT OF ECOLOGY**
Olympia, Washington 98504     206/753-2800
Mail Stop PV-11

April 19, 1979

Mr. Roger K. Mochnick
201 EIS Coordinator
U. S. Environmental Protection
  Agency - Region X
1200 Sixth Avenue
Seattle, Washington  98101

Dear Mr. Mochnick:

Thank you for providing us with review copies of your draft environmental
impact statement for the proposed "City of Spokane, Combined Sewer Over-
flow Abatement Project."

Your impact statement has been reviewed by Department of Ecology staff in
Olympia and in our Eastern Regional Office in Spokane. We wish to offer
the following comments for your consideration in preparation of the final
environmental impact statement.

1. We agree that the construction of separate storm sewers is the most
   desirable option for abating the problem of combined sewer overflows
   in Spokane.

2. The DOE is committed to insuring the correction of all combined
   sewer overflows by the City of Spokane regardless of the availability
   of state and federal funds for this purpose.

   In addition, a schedule for sewer separation must be developed prior
   to significant expansion of the sewer service area.

3. The DOE is not committed to funding Phase II of the Spokane CSO
   project. At the conclusion of Phase I (approximately five years
   hence), DOE will reevaluate the entire CSO project in terms of our
   continued committment of federal and state grant funds. Phase II
   will be rated and ranked relative to the other projects on the
   fiscal year's priority list. The Phase I funding allocation is:

   | | |
   |---|---|
   | EPA (75%) = | $20,085,000 |
   | DOE (15%) = | 4,017,000 |
   | City of Spokane (10%) = | 2,678,000 |
   | TOTAL | $26,780,000 |

4. The EIS states, with regard to the Hollywood and Meenach drainage
   areas, "Separation of stormwater in these two drainage areas would
   remove approximately 84% of the CSO that now flows into the
   Spokane River each year. This can be accomplished for approximately
   39% of the total construction cost of Alternative 3."

34

Digitized by Google

Mr. R. K. Mochnick
April 19, 1979
Page two

3    These figures are quoted in several sections of the EIS.
Obviously they are important in determining the boundaries of
the Phase I project area and the level of grant participation
in the project. However, we are unsure of the validity of storm
flow data used to develop these percentages. Information should
be obtained which can verify the validity of these estimated
removal percentages.

4    5.   Page 39 -- It is possible that at some future date there may be
federal requirements developed which will require treatment of
stormwater discharges. At the very least, it appears that EPA
is promulgating regulations which would require the issuance of
a general National Pollutant Discharge Elimination System permit
to cover stormwater discharges. This general permit may require
that some combination of Best Management Practices (BMP) be
implemented.

5    6.   Page 190 -- It is widely recognized that separation of storm
sewers will free capacity at the treatment plant and allow for
expansion of the sewer service area. This section in the EIS
points out that Phase I separation removes only a minimum amount
of storm flows at the treatment plant. We believe it is extremely
important that everyone concerned with the project understand that
significant expansion of the sewer service area cannot occur until
Phase II separation is undertaken.

In conclusion, we feel that a further breakdown in the EIS of Phase II
into subphases based on hydraulic integrity, water quality impact, and
contribution toward freeing excess capacity at the city sewage treatment
plant, would be very helpful. Subphasing of Phase II will allow better
decisions on the funds available each year during the Phase II CSO time
frame and will insure the best possible combination of federal, state,
and local funding.

Should you have questions concerning these comments or any other phase of
our involvement in this proposal, please contact Mr. Claude Sappington of
our Eastern Regional Office in Spokane at (509) 456-2926.

Sincerely,

John F. Spencer
Assistant Director
Office of Water Programs

JFS:as
cc:  Claude Sappington, Eastern Region
     Myron Saikewicz, Water Programs
     Dennis Lundblad, Comprehensive Management

Digitized by Google

003785

## Washington Department of Ecology

1.   No response required.

2.   These comments have been considered in preparing the
general response entitled <u>Phasing of the Proposed Action</u>
(Chapter 3).  It is recognized that the DOE funding alloca-
tion amounts are higher than those included in Table 5-3
of the Draft EIS and page   of the Final EIS because the
DOE numbers contain additional design and engineering costs
not added into the original construction cost estimates.

3.   The data used to predict an 84 percent removal of annual
CSO volume were taken from the <u>Facilities Planning Report for
Sewer Overflow Abatement</u> (Text) prepared by the Spokane City
Department of Public Works (1977).  Table 1 (page 7) of the
Text volume lists all combined sewer overflow points and
their average frequency, duration and volume of discharge.
The city's data had been taken with only minor modification
from the <u>Spokane Wastewater Study</u> prepared for the city in
1972 by Esvelt and Saxton/Bovay Engineers, Inc.  To our know-
ledge, no other comprehensive survey of CSOs has been under-
taken.  It is our understanding that the Esvelt and Saxton/Bovay
figures are based on calculations, using drainage basin acreage,
weir capacities and climatic data.  No systematic program
of field measurements was conducted.  The data are therefore
only estimates and should be considered as such.  These numbers
will be refined in the design stage of the project to more
accurately reflect the current overflow situation.

4.   This comment has been considered in preparing the general
response entitled <u>Stormwater Treatment</u> (Chapter 3).

5.   These comments have been considered in preparing the
general response entitled <u>Phasing of the Proposed Action</u>
(Chapter 3).



003786



STATE OF
WASHINGTON

Dixy Lee Ray
Governor

DEPARTMENT OF FISHERIES

115 General Administration Building, Olympia, Washington 98504      206/753-6600

February 23, 1979

Mr. Roger K. Mochnick
201 EIS Coordinator
U.S. EPA, Region X
1200 6th Avenue
Seattle, Washington  98101

Dear Mr. Mochnick:

> Draft EIS for City of Spokane
> Combined Sewer Outfall Abatement
> <u>Spokane County      WRIA T-54-57</u>

The Washington Department of Fisheries has reviewed the above referenced document.  Since the proposal does not appear to involve direct or indirect impacts upon resources under this Departments jurisdiction, we do not wish to make any comment at this time.

Thank you for the opportunity to review and comment.

Sincerely,

Gordon Sandison
Director

mr

RECEIVED
FEB 27 1979
ENVIRONMENTAL EVALUATION
BRANCH

Digitized by Google

003787

## Washington Department of Fisheries

1.   No response required.

Digitized by Google

003788



STATE OF
WASHINGTON

DEPARTMENT OF GAME
600 North Capitol Way/Olympia, Washington 98504    206/753-5700

Dixy Lee Ray
Governor

April 13, 1979

RECEIVED
EPA - REGION 10
APR 1 8 1979
WATER DIVISION

Mr. Donald Dubois
Regional Administrator
U. S. Environmental Protection Agency
Region 10
Seattle, Washington    98101

ENVIRONMENTAL IMPACT STATEMENT:

City of Spokane Combined Sewer Oveflow
Abatement Project, Spokane County

Dear Mr. Dubois:

Your document has been reviewed by our staff as re-
quested; our comments follow.

We recognize the need to control combined sewer over-
flow for reasons concerning public health, recreation,
aesthetics, and economics.  We must, however, raise ob-
jections to any abatement alternative which would compro-
mise water quality components affecting fish in either the
Spokane River, Long Lake, or Crab Creek.  In addition to
the brown trout fishery mentioned in the EIS, there is a
significant wild rainbow trout population in Crab Creek,
providing a quality fishery.  Rainbow trout are more sensi-
tive than brown trout to decreases in dissolved oxygen, or
increases in water temperature.

Therefore, Alternative #1 is the only abatement plan
we are supportive of.  Alternative #3 would allow untreated
stormwater runoff to enter the river.  This water can be ex-
pected to contain  cadmium, lead, mercury, arsenic, asbestos,
petrochemicals and other toxic substances, as stated in the
EIS.  Fecal coliform levels as high as 11,000 MPN per 100 ml
have been measured in Spokane stormwater, as mentioned on
page 112 of the EIS.  Alternative #3 does not incorporate any
controlls against accidental spills into storm drains.

Alternative #3 may accelerate sewering of the Spokane
Valley.  It has been suggested, however, that interceptor
lines large enough to accommodate projected wastewater flows
will be larger than existing city lines, which could create
a major bottleneck resulting in more overflows or back ups.

RECEIVED
APR 2 0 1979
EPA-EIS

RECEIVED
APR 1 7 1979
OFFICE OF
REGIONAL ADMINISTRATOR

39

003789

Page 2
April 13, 1979

4

        The U. S. Army Corps of Engineers Study (1976) prepared
by Kennedy-Tudor Consulting Engineers omits mention of two
fish species:  Kokanee (Oncornhynchus nerka) occur in both
Long Lake and Little Falls impoundments.  And, a substantial
wild eastern brook trout (Salvelinus fontinalis) population
occurs in all of the Spokane River, especially above Upriver
Dam, and in the Little Spokane River.

        In summary, we feel Alternative #1, or any other alternative
plan which would provide for storage lagoons where stormwater
runoff can be collected and treated at a later date, provides the
most comprehensive solution to the CSO problem.  Such a system
would appear to be the only alternative which would not simply
relocate the problem or replace one set of pollutants with
another.

        Thank you for the opportunity to review your document.  We
hope our comments are helpful.

Sincerely,

THE DEPARTMENT OF GAME

Douglass A. Pineo, Applied Ecologist
Habitat Management Division

DP:mjf

40

Digitized by Google

Washington Department of Game

1.    These comments are considered in the general response entitled <u>Export of Wastewater to Crab Creek</u> (Chapter 3).

2.    These comments are considered in the general response entitled <u>Stormwater Treatment</u> (Chapter 3).

3.    If interceptor sewers are constructed in Spokane Valley to convey wastewater to the Spokane treatment plant, they will not be sized so that hydraulic overloading of city interceptors would occur.  Connections would be made to city lines with sufficient capacity or a new interceptor through the city would be necessary.

4.    These comments are acknowledged and made a part of the Final EIS.

Digitized by Google



STATE OF            OFFICE OF ARCHAEOLOGY AND HISTORIC PRESERVATIO|
WASHINGTON .       111 West Twenty-First Avenue, Olympia, Washington  98504    206/753-4011

Dixy Lee Ray
Governor

June 26, 1979

Ms. Deborah Kirk
Environmental Protection Agency                    RECEIVED
Region 10
1200 Sixth Avenue M/S 443                          JUN 2 8 1979
Seattle, Washington  98101
                                                   EPA-FIS
Dear Deborah:

As per our previous conversation, I have the following comments regarding
the Draft Environmental Impact Statement for the City of Spokane Combined
Sewer Overflow Abatement Project.

*1* The document exhibits a well considered concern for the cultural environment.
The only changes I would recommend concern the publication of site locations.
On page 177, the Draft states that the cultural resources report by Hartman
and Robbins is available for public review at offices in Spokane and Seattle.
Please be advised that site locational data are exempted from public disclosure
under both federal and state law.  The limitation of access to locational data
is one of the most important protective measures available for archaeological
resources.  I would suggest that you delete that statement from the Final EIS
and advise those offices with copies of the report to ensure its security
except on a need-to-know basis.  I also suggest that portions of the Draft which
refer to specific site locations be amended for the same reasons.

*2* I concur with the recommendation for professional testing and/or monitoring
of high potential areas prior to or during construction.  Those areas where
sites have been identified within the project area should be professionally
evaluated to determine anticipated impacts and to provide alternatives for
mitigation of impact.  If sites are within the area of project impact, it will
be necessary to obtain a determination of eligibility for the National Register
of Historic Places and the comments of the President's Advisory Council on
Historic Preservation.  In that event, this office will be pleased to assist
in the necessary procedures.

Sincerely,

JEANNE M. WELCH, Deputy State
Historic Preservation Officer

Sheila Stump, Archaeologist

md                              42

Digitized by Google

<u>Washington Office of Archeology and Historic Preservation</u>

1.   The Draft EIS should be modified to indicate that all
site location data are <u>not</u> available for general public review.
Only the report narrative is available.  Maps and locational
descriptions are confidential.  Anyone desiring site location
information should contact the Washington Office of Archeology
and Historic Preservation.  Because this Final EIS does not
include a reprinting of the entire Draft EIS, it is not necessary
to delete the discussions of specific sites contained in
the Draft.

2.   As indicated in the response to comments from the Advisory
Council on Historic Preservation, no known historic or arch-
eological sites will be significantly impacted by the proposed
sewer separation construction.  This includes sites listed
on the National Register of Historic Places.

Digitized by Google



**STATE OF WASHINGTON**

Dixy Lee Ray
Governor

**OFFICE OF FINANCIAL MANAGEMENT**
House Office Building, Olympia, Washington 98504    206/753-5450

Orin C. Smith, Director

April 26, 1979

Mr. Roger K. Mochnick
201 EIS Coordinator
U.S. Environmental Protection
  Agency — Region X
1200 Sixth Avenue
Seattle, Washington  98101

Dear Mr. Mochnick:

Review of the Draft Environmental Impact Statement for the City of
Spokane Combined Sewer Overflow Project has been completed by agencies
of the State of Washington.  The review was coordinated by the Office of
Financial Management as the designated state clearinghouse.

Comments were received from the Washington State Parks and Recreation
Commission and Department of Ecology.  While it is understood that the
Environmental Protection Agency (EPA) will respond directly to the
enclosed comments, the agencies have identified several significant
issues which are highlighted below for your consideration in evaluating
the proposed project.

The State Parks and Recreation Commission comments are directed to the
Latenser Plan alternative.  Under the Latenser Plan, a pipeline and open
storage reservoir would be constructed in Riverside State Park.  In the
discussion of the Long-Term Effects of New Facilities on Adjacent Land
Uses on page 176, it is noted that the reservoir proposed under the
Latenser Plan "would eliminate future recreation development in that
vicinity".  In view of the Commission's plans to develop an equestrian
area at Fort George Wright in Riverside State Park, it is recommended
that the Latenser Plan be withdrawn from further consideration as a
possible alternative to the proposed project.

The Department of Ecology concurs with EPA's decision to propose construc-
tion of separate storm sewers as the most desirable option for abating
the combined sewer overflows in the City of Spokane.  The proposed
action consists of two major phases, the first being construction of
separate storm sewers in the Meenach and Hollywood drainage areas with
the second phase providing separate storm sewers for the remainder of
the City of Spokane.

RECEIVED

MAY 1  1979

EPA-EIS

44

Digitized by Google

003794

Mr. Roger K. Mochnick                    -2-                    April 26, 1979

The funding allocation for Phase 1 assumes federal (75 percent), state
(15 percent), and local (10 percent) cost sharing of construction costs.
While a Phase 2 allocation is included in the discussion of Construction
Costs and Cost Sharing of the proposed action, it is noted that Phase 2
is only speculative at this time.  The Department reiterates that the
state is not committed to funding Phase 2 of the project.  State participa-
tion in Phase 2 would be subject to a detailed evaluation of the Spokane
project at the conclusion of Phase 1.  The Department of Ecology (DOE)
would reevaluate the entire project in terms of continuing funding
support at that time and the Phase 2 project would be rated and ranked
relative to other projects on the fiscal year's priority list.

The Department also notes that significant expansion of the sewer service
area cannot occur until a schedule for sewer separation is developed and
the Phase 2 separation is undertaken.  The Department concludes that a
further breakdown of Phase 2 into subphases would be very helpful in
considering future funding for the Phase 2 project.

Thank you for the opportunity to review the draft statement.  We hope
you will find these comments useful in your consideration of this proposal.

                                        Sincerely,

                                        Thomas A. Mahar
                                        Assistant Director

TAM:de
enclosures

45

Digitized by Google

003795

## Washington Office of Financial Management

1.    The letter from the Washington Office of Financial Management
summarizes the comments received from other state agencies.
The reader is referred to responses to comments from the
Washington Department of Ecology and the Washington State
Parks and Recreation Commission for information on the Office
of Financial Management concerns.

46

Digitized by Google

003796

WASHINGTON STATE PARKS AND RECREATION COMMISSION

# MEMORANDUM

March 7, 1979

IN REPLY REFER TO:
35-2650-1820
Draft EIS - City of
Spokane - Combined
Sewer Overflow -
Abatement Project
(E-1571)

TO:     Mike Mills, Policy Analysis Division
        Office of Financial Management

FROM:   David W. Heiser, E.P., Chief
        Environmental Coordination

SUBJECT: Draft EIS - City of Spokane - Combined Sewer Overflow -
         Abatement Project

The staff of the Washington State Parks and Recreation Commission has reviewed
the above noted document and has the following comments:

Page 7, Latenser Plan, Disruptions Caused by Construction Activities

An equestrian area at Fort George Wright in Riverside State Park will
be constructed with the first stage in the summer of 1979.  Construction
of sewage facilities would disrupt equestrian use.

Page 73, Latenser Plan, Public/Semi-Public Facilities - Southeast Spokane

The storage bin, if constructed after the summer of 1979, would be
constructed within a developed operating state park equestrian area.

Page 176, Latenser Plan, Long-Term Effects of New Facilities on
Adjacent Land Uses.

The open reservoir in Riverside State Park, if within Fort George Wright,
would interfere with and be detrimental to an existing developed and
utilized equestrian area if the sewerage facility is contemplated to be
built after the summer of 1979.  This would not be acceptable to the
State Parks and Recreation Commission because they plan to develop the
area for equestrian use in the summer of 1979.

I have enclosed a copy of the staged development plan for the Equestrian Area.
Mr. Mike Rushton of Jones & Stokes Associates, Inc. was previously contacted
concerning the Latenser Plan.  A copy of that letter is enclosed for your
information.

Thank you for the opportunity to comment on this EIS.

DWH/PJP:jc

Enclosures

47

Digitized by Google

003797



STATE OF
WASHINGTON

Dixy Lee Ray
Governor

WASHINGTON STATE PARKS AND RECREATION COMMISSION
7150 Cleanwater Lane, Olympia, Washington 98504                          206/753-575!

March 2, 1979

                                                35-774-0555
                                                35-774-0720
                                                Riverside State Park - Fort
                                                George Wright Equestrian Area -
                                                Sewage Treatment Plant
                                                Preliminary DEIS - Overflow
                                                Abatement

Mr. Mike Rushton
Jones & Stokes Associates, Inc.
2321 P Street
Sacramento, California  95816

Dear Mr. Rushton:

Last November you sent me a packet of data relating to the DEIS which I had
expected to receive long before now. Several things have happened since you
wrote to me: my father was in the hospital for several months prior to passing
away in early February and our regional staff have been preparing plans for
development of the Fort George Wright area. Those plans are now being finalized
and I have enclosed a copy for your use.

On the question of the deed restrictions that relate to non-recreational use
of the land, I offer the following observations:

1. When the property was leased to Washington State Parks and Recreation
   Commission in 1963 there existed a number of outstanding easements of
   record across the property.

2. These include Washington Water Power, Salt Lake Pipeline Company,
   Pacific Northwest Bell, Great Northern Railway Company and the U.S.
   Government.

3. "For a period of twenty (20) years from the date of this conveyance,
   the property shall be continuously used and maintained as and for
   public park and public recreational area purposes, in accordance with
   the approved plan of utilization ..."

From the above restriction, I draw the conclusion that we have no authority
to grant any easements for this property (such as the Latenser Plan) until
1983. It would still be a matter of some considerable controversy, since
the property has been dedicated to equestrian use since the early 60's.

48

Digitized by Google

Mr. Mike Rushton                    -2-                    March 2, 1979

For the above reasons, I feel that the Latenser Plan is not viable <u>at this</u>
<u>location</u>.  If another site can be located, it might well be viable.

Thank you for the opportunity to provide this input.  Please send me a copy
of the DEIS when available.  Thanks!

                                        Sincerely,

                                        David W. Heiser, E.P., Chief
                                        Environmental Coordination

DWH:jc

Enclosure

49

Digitized by Google

003799

## Washington State Parks and Recreation Commission

1.    Plans for the Riverside State Park equestrian area were
received after publication of the Draft EIS; therefore, reference
to those plans was not included in the document.  The land
use conflict between the Latenser Plan storage reservoir
and the equestrian area is a significant impact and is acknow-
ledged in this Final EIS.  Current plans do not include imple-
mentation of the Latenser Plan, so the land use conflict should
be avoided.

Digitized by Google

003800



# Spokane Regional Planning Conference

March 12, 1979

Mr. Roger K. Mochnick, M/S 443
201 EIS Coordinator
U. S. Environmental Protection Agency
Region X
1200 Sixth Avenue
Seattle, WA. 98101

Dear Mr. Mochnick:

Please find comments attached received from the Transportation Study Division of
the Conference commencing review of the draft Environmental Impact Statement, "City
of Spokane Combined Sewer Overflow Abatement Project."  I believe the comments to be
self-explanatory.

Thank you for the opportunity to review this statement.

Sincerely yours,

SPOKANE REGIONAL PLANNING CONFERENCE

Jose M. Urcia, Director
JMU:ll
Enc. (1)

cc:  Robert Vaughan

51

Digitized by Google

003801

# Spokane Regional Planning Conference

## TRANSPORTATION STUDY DIVISION

Phone 509-456-4325

March 6, 1979

Mr. Jose M. Urcia
Conference Director
Room 353 City Hall
Spokane, Washington 99201

Dear Mr. Urcia:

The Conference Transportation Study has reviewed the draft Environmental Impact Statement, titled "City of Spokane Combined Sewer Overflow Abatement Project". Our review comments are related to transportation and air quality planning.

This document describes seven major alternatives to abate the combined sewer overflows at over 30 points in the City of Spokane. At the present time, the trunk sewer system is unable to transport all of the sanitary waste water and storm runoff to the sewage treatment plant.

These alternatives are:

1. Build 14 underground storage basins.
2. Build 14 small underground treatment plants.
3. Construct a storm sewer system of 220 miles to separate sanitary waste water from storm runoff.
4. Klicket Plan of smaller underground storage basins with surface lagoons.
5. Latenser Plan of a large open storage reservior in Riverside State Park where storm water is held for later treatment. Effluent from the Spokane sewer treatment plant would be discharged into the Crab Creek drainage basin.
6. Use a combination of 1 and 3.
7. No action

None of the alternatives will significantly affect ambient air quality nor interfer with the air quality implementation plan control strategies. During construction, temporary dust problems may be a problem in select areas; proper measures to hold dust down should be utilized.

It appears from this document that proposal number 3 may be the selected alternative. Alternative Number 3 will, during construction over an 8 to 10 year period, affect up to 220 miles of city streets. Most of the major arterials will be influenced by construction, either in the arterial right of way or by crossing the arterial. A number of major central business district streets will be affected such as Riverside, Sprague, Lincoln, Monroe, Spokane Falls Blvd. and First.

52

Digitized by Google

003802

Mr. Jose M. Urcia
March 6, 1979
Page 2


Some of the construction impact on traffic should be able to be reduced by
avoiding having the routes closed during peak hours.  The impact in the central
business district could probably be reduced by construction periods operating 24
hours a day, thus shortening the time the streets will be torn up.


Very truly yours,


Robert A. Vaughan, P.E.
Transportation Study Director


RAV/em

Digitized by Google

003803

Spokane Regional Planning Conference

1.    It is imperative that nuisance dust be kept to a minimum
along pipeline construction corridors, especially in residential
areas.    The city should ensure that frequent watering of
disturbed areas and compaction and resurfacing of completed
pipeline routes be a requirement of the construction contract.

2.    Mitigation of other construction-related impacts are
discussed on pages 75 to 89 of the Draft EIS.    Maintaining
through-access on roads in construction zones is desirable,
but 24-hour construction periods would probably violate the
Washington Environmental Noise Control Ordinance.    It restricts
construction noise between 10:00 p.m. and 7:00 a.m.

Digitized by Google

003804



SPOKANE COUNTY COURT HOUSE

# SPOKANE COUNTY

### OFFICE OF
## COUNTY ENGINEER

### ROBERT S. TURNER
#### COUNTY ENGINEER

## SPOKANE, WASHINGTON 99201

April 18, 1979

Roger K. Mochnick M/S 443
201 EIS Coordinator
U.S. Environmental Protection Agency, Region X
1200 Sixth Avenue
Seattle, WA 98101

APR 20 1979
TOTAL EVALUATION
BRANCH

SUBJECT:  EIS - City of Spokane
CSO Project

Dear Sir:

The project being reviewed is the "City of Spokane Combined Sewer Overflow Abatement Project" and is properly titled being a project intended to stop overflow at the points of interception. The EIS deals with the project as if it were a project to accomplish complete separation of sanitary and storm waste waters. In actual fact, the project proposes to reduce, not eliminate, storm waters from the combined system. Overflows can be stopped at the point of interception, but storm and other non-sanitary sewage flows will continue to flow through the system and to reach the central plant. This failure to recognize the difference between overflow abatement and separation most directly affects the EIS discussion of regionalization. These discussions assume that completion of phases 1 & 2 of Alternative 3 will effect complete separation, thus providing interceptor and plant capacity to accommodate extra-City flows. This is an erroneous assumption. Major additional expenditures beyond those projected for phases 1 & 2 would be necessary to accomplish the necessary degree of separation to achieve the results assumed; in fact, achieving full separation as the EIS seems to assume may well be an impossible task.

The writers and reviewers of the EIS statement are referred to Appendix A of the North Spokane Facilities Plan which addresses the subject in considerable detail. This Facilities Plan also points out that there are ways to connect North Spokane to the city treatment plant without waiting for the complete separation as is inferred by the CSO-EIS, although this will involve giving priority for full treatment to the North Spokane flow.

Digitized by Google

Roger Mochnick
April 18, 1979
Page 2

These comments are not intended to be negative to the proposed City project.
The project is honestly titled and would accomplish the intention of stop-
ping overflows.  There is, however, a general misconception abroad that
the project will go beyond this to accomplish full separation.  The EIS
report had an opportunity, perhaps even an obligation, to correct this
misconception and did not.

Very truly yours,

Robert S. Turner
County Engineer

56

Digitized by Google

003806

Spokane County Engineers

1.    These comments have been considered in preparing the
general response entitled <u>Wastewater</u> <u>Regionalization</u> <u>at</u> <u>the</u>
<u>Spokane</u> <u>Treatment</u> <u>Plant</u> (Chapter 3).

57

Digitized by Google

003807

# Spokane County
# Health District



West 1101 College Avenue    Spokane, Washington 99201

March 29, 1979

Roger K. Mochnick, '201' EIS Coordinator
U.S. Environmental Protection Agency, Region X
1200 Sixth Avenue, Mail Stop 443
Seattle, Washington    98101

**RECEIVED**

APR 5  1979

EPA-EIS

Dear Mr. Mochnick:

The Spokane County Health District has reviewed the EIS "Draft" for the City of
Spokane combined sewer overflow abatement project. Transmitted herein are our
comments:

1. It is of interest that in the Goals and Constraints Section, it is stated,
"The DOE must insure that the selected project is capable of complying with
the city's NPDES permit, which calls for eventual elimination of all CSO to
the river." Also, in the Necessity for and Purpose of the Environmental Impact
Statement, it is stated, "In the selection of a combined sewer overflow abate-
ment plan, it is the intent of NEPA that alternatives be evaluated and a plan
be selected on the basis of all environmental considerations, not just monetary
costs." The authors proceed, primarily due to monetary costs, to recommend
Alternative 3, which does not remove all CSO, and does not efficiently remove
effects on the river.

2. On page 9, it is stated, "Only the Latenser Plan would be likely to create
significant improvement in water quality in the Spokane River and Long Lake."

3. On page 10, Alternative 3 is said to be able to improve groundwater quality
condition in the Spokane Valley – Rathdrum Prairie Aquifer indirectly by
allowing eventual sewering of Spokane Valley residences, and this could
eliminate "septic tank contamination" of this sole-source aquifer. Some
observations are in order here:

   a. No study we are aware of has shown "septic tank contamination" of the
   aquifer. (Perhaps you mean on-site sewage disposal, not septic tanks.)
   On the other hand, the current '208' study, as well as other data, show
   increased population and man's activities increase pollution. As such,
   sewering the valley will encourage more population and hence more pollution.

   b. Adding more sewage to the STP will add more pollution to the river.

   c. The additional capacity needed at the STP to handle the total valley sewage
   will take further monetary investment.

4. On page 10, it is stated, "The Klicker sub-option would best remedy the over-
flow health hazard by eliminating all overflows." This is in opposition to
selection of Alternative 3.

| Administration | 456-3630 | Personal Health | 456-3613 | Environmental Health | 456-6040 |
| Clinic | 456-3640 | Viral Stansnics | 456-3670 | Laboratory | 456-3667 |

58

003808

March 29, 1979
Roger K. Mochnick
Page 2

5. On page 10, it is stated, "Health hazards and aesthetic problems associated with sewer backups would be most effectively eliminated by new storm sewers (Alternative 3)."

6. On page 13, it states that Alternative 3 would reduce energy consumption.

7. Alternative 3 would create a large savings in chemicals.

8. On page 17, the Latenser Plan would allow abandonment of the alum and ferric chloride use, a net savings of $452,700 annually.

9. On page 19, it is stated, " . . . a first step in efforts to make the Spokane plant a regional treatment plant, a regionalization which would produce a substantial cost savings for wastewater treatment for the Spokane Valley . . ." This statement is in direct opposition to data prepared by URS as part of the '208' study. The URS study shows essentially the same cost to use the STP as to use the new treatment facility.

10. The discussion on page 31 explaining why only 15 basins and not 24 would be utilized in the recommended Alternative 3 indicates the CSO would not be solved by this plan while it could be by both the Klicker and Latenser Plans.

The above are enough items to support our conclusions. We believe that, contrary to the stated goals and intent, the recommendation to use Alternative 3 is strictly based on monetary consideration. We believe the Latenser Plan has far and above, the most environmentally sound advantages. The difficulties of reuse of water and export to Crab Creek are real, but not insurmountable. In fact, this idea is being explored by EPA as "THE" method of waste disposal for the future. If the benefits of reuse of the water and added nutrients for crops and cleanup of the river are adequately evaluated, we believe this is the alternative of choice.

Even considering monetary effect, let's compare:
(The city population is 182,000 or based on 3.2 people per home, approximately 55,000 residences.)

ALTERNATIVE 3:   Construction cost – $ 64,050,000   O&M – $152,930
LATENSER PLAN:   Construction cost – $105,645,400   O&M – $587,900*
*However, this eliminates $452,700 of now expended funds on alum and ferric chloride.

A comparison cost to John Doe Citizen for "NO" financial assistance from anyone:
a. Construction cost spread over 10 years
   ALTERNATIVE 3–per person – $ 352.00 total = $ 35.20 per year = $ 2.93 per month
                per residence – $1165.00 total = $116.50 per year = $ 9.71 per month
   LATENSER PLAN–per person – $ 580.00 total = $ 58.00 per year = $ 4.83 per month
                per residence – $1921.00 total = $192.10 per year = $16.00 per month

b. O&M cost
   ALTERNATIVE 3–per person –              = $   .84 per year = $   .07 per month
                per residence –            = $  2.78 per year = $   .23 per month
   LATENSER PLAN–per person –              = $  3.23 per year = $   .27 per month
                per residence –            = $ 10.61 per year = $   .88 per month

59

Digitized by Google

003809

March 29, 1979
Roger K. Mochnick
Page 3


c.  O&M reduction by saved chemical
    LATENSER PLAN - per person -        = $  .74 per year = $.6425 per month
                    per residence -     = $ 2.46 per year = $.205  per month

d.  Total unaided cost per residence for 10 years equals
    ALTERNATIVE 3       = $ 9.94 per month
    LATENSER PLAN       = $16.98 per month
    LATENSER, LOWER O&M = $16.20 per month


Considering the overall benefits from this and the possibility of revenue from the
reuse of the water, the Latenser Plan would rank best from our viewpoint.

Sincerely,

ENVIRONMENTAL HEALTH DIVISION

*Edward M. Pickett*

Edward M. Pickett, R.S., M.P.H.
Director of Environmental Health

cmf

60

Digitized by Google

003810

Spokane County Health District

1.    Alternative 3 is planned to make a significant reduction
in CSOs, which create a health hazard in the Spokane River.
This does not include stormwater overflows, just CSOs.
Selection of a staged Alternative 3 as the recommended action
was not made "primarily due to monetary costs".   Several
of the alternatives were lower in cost (see pages 14 and
15 in the Draft EIS).   Alternative 3 provides a viable means
of reducing CSOs (a health problem in the Spokane River)
and eventually sewering areas over the Spokane Valley aquifer
that now use on-site disposal systems (a public health threat
to Spokane's sole source of domestic water).

2.    The water quality discussion on page 9 refers to chemical
quality only.   Changes in bacterial and other pathogenic
organism contamination of the river is discussed on page 10
as a public health consideration.

3.    Use of the term "septic tank" was inappropriate; "on-
site sewage disposal" more properly describes the various
wastewater disposal systems that are used by individual dwelling
units or commercial/industrial developments that are not
part of a central sewage collection system.   The recently
released Spokane Aquifer Cause and Effect Report (Esvelt,
1978) concludes that "there is a risk of bacteriological
degradation of the aquifer which accompanies current and
future development over and adjacent to the aquifer.   The
risk of contamination will increase with additional population
growth".   This indicates that present wastewater disposal
practices over the aquifer are a threat to aquifer water
quality.   Most wastewater disposed of over the aquifer is
passed through on-site systems.

It is agreed that continued development over the aquifer
increases the risk of aquifer contamination; this will be
especially true if on-site systems continue to be the main
form of wastewater treatment and disposal.   Construction
of sewers may stimulate additional development, but in the
absence of sewers, the use of on-site systems proliferates.

Wastewater reaching the Spokane River from the Spokane
plant has been treated to remove contaminants; waste-
water reaching the aquifer from on-site disposal systems
has only been filtered by the soil mantle.

4.    The Klicker Plan would best eliminate the CSO-related
health hazard in the Spokane River, but it is not capable
of adequately meeting the other two project objectives -
controlling sewer backup and flooding problems, and maintaining
the option of using the Spokane plant as a regional wastewater
facility.   Alternative 3 could accomplish these objectives
and would only be slightly less effective at reducing health
hazards in the Spokane River.

Digitized by Google

5.    No response required.

6.    The financial comparison of regionalization and construction of a new wastewater treatment plant in Spokane Valley utilized data in the U. S. Department of Army, Corps of Engineers (1976) Metropolitan Spokane study and treatment plant construction costs taken from EPA cost curves (U. S. Environmental Protection Agency, 1978).  The recently-prepared URS data were not available at the time the Draft EIS was being compiled.  It is not known whether the URS comparison was developed using the same treatment plant size and treatment level assumptions used to prepare the costs in Table 5-2 of the Draft EIS.

7.    Alternative 3 does not include use of storage basins. The discussion on page 31 relates to storage and satellite treatment alternatives only.

8.    The numbers are essentially correct for the approach utilized.  However, an error is evident in the $16.20 per month figure for "Latenser, Lower O&M".  This number should actually be $16.67 per month using the numbers contained in the County Health District letter.

      An approach which would more accurately reflect the actual costs involved would be to amortize the capital cost, an approach which would take into account interest charges. Amortizing capital costs over a 10-year period at 8 percent would make the "total unaided cost per residence for 10 years" as follows:

        Alternative 3              =  $14.69 per month
        Latenser Plan              =  $24.74 per month
        Latenser, Lower O&M        =  $24.53 per month

Thus, when interest charges are included in the calculations, the Latenser Plan is less favorable than shown in the County Health District letter.

Digitized by Google

003812



GLEN A. YAKE, P.E.
ASSISTANT CITY MANAGER · ENGINEERING

ROGER JAMES, P.E.
DIRECTOR OF PUBLIC UTILITIES

April 17, 1979

U.S. Environmental Protection Agency
1200 Sixth Avenue        M/S 443
Seattle, Washington 98101

Ladies and Gentlemen:

Following receipt of the Draft Environmental Impact Statement
on the City of Spokane Combined Sewer Overflow Project, we sent
copies of it to a number of interested local agencies in the City
of Spokane for their review and comments.  It was our hope that we
could take the comments and consolidate them into an overall City
comment, however, due to the critical involvement of key City
personnel in important legal matters and court appearances it has
not been possible for us to effect this consolidation.  Instead
we will send you the material which we have collected and hope that
you have an opportunity to read it and incorporate it into the
final draft.

Very truly yours,

Roger James, P.E.
Director Public Utilities

RJ:ajg

Encl.

RECEIVED

APR 1 8 1979

EPA-EIS

63

Digitized by Google

M E M O R A N D U M

March 16, 1979

TO:          Roger James, Director of Public Utilities

FROM:        Victor G. Cole, Manager - Finance

SUBJECT:     Draft Environmental Impact Statement - Combined
             Sewer Overflow Abatement Project

I have been examining the Draft Environmental Impact Statement for the
Combined Sewer Overflow Abatement Project and find that the cost alternates
probably should be updated prior to final adoption.

Some of the material is out of date, 1977 cost figures having been used.
Some of the material apparently may have been developed without a full
understanding of certain of the property tax laws.  The table on the
limitation of indebtedness, for example, is one that should be brought up
to date to more correctly reflect the City's financial position.  The
alternatives of property tax values have not given consideration to increased
valuation, changes in millage levies, and the effect of the 106% lid law.

The study mentions a combined water-sewer-refuse-utility tax of 6%, when, in
fact, the sewer utility tax is 9.3%.  The impact of tax rates is not under-
stood by this office because the assumptions built into the construction of
the impact tables do not appear to be sufficiently explained.  It is the
conclusion of this office that, while the differences may not be substantial
to the overall conclusions, readers of this environmental impact statements
are likely to arrive at erroneous opinions as to the ability of the City to
finance the project.

If the Environmental Protection Agency should agree that revisions ought to
be made and is willing to send its people to Spokane for the two or three
days that might be necessary to make the suggested revisions, this office
would be quite willing to set aside the time to work with the EPA representa-
tives accordingly.



RECEIVED
MAR 19 1979

Dept. of PUBLIC UTILITIES

Digitized by Google

003814

## City of Spokane Finance Department

1.   The estimated user charge increases and ad valorem taxation
increases presented on pages 142 to 154 of the Draft EIS
were prepared to indicate the general range of increases
that might be expected as a result of the alternatives.  The
analysis was not intended to present exact data; it sought
mainly to show relative differences between alternatives
for comparative purposes.  An update of the city's financial
position is not deemed necessary for this alternatives comparison.
We concur that the figures used are now out of date.

     The user cost and ad valorem taxation estimates adequately
illustrated the magnitude of the potential financial impact
of Spokane sewer system users.  It is believed that the magnitude
of the anticipated user cost increases included in the Draft
EIS are well within the level of accuracy expected from facilities
planning.  The specific means of collecting local funds and
allocating local costs are to be determined by the city.
Early indications were that the city would pay local costs
through adjustments in user charges.

2.   Reference to a 6 percent sewer user tax should be modified
to reflect the current 9.3 percent sewer utility tax.  The
important point is that this tax was not included in estimates
of sewer user charge increases that might result from the
various alternatives (Table 4-15, page 151 of the Draft EIS).

     In order to develop the estimated ad valorem tax increases,
the local equivalent annual cost of each alternative was
evenly distributed to all property in the city; a total assessed
valuation of $1,835,660,452 was assumed.  An estimated increase
per $1,000 of assessed value was calculated.  These estimated
rate increases were then applied to several typical properties
(one residential and one industrial) to indicate the magnitude
of the annual increase in a typical tax bill that the tax
rate increases would generate.



Digitized by Google

003815

INTER-OFFICE MEMO                                        April 2, 1979

TO:      John Swanson - Director Public Works

FROM:    Brad Blegen - Construction Engineer

SUBJECT:  Overflow Study Environmental Impact Statement (EIS) Comments

I have reviewed the EIS and have concluded that it is a very well
written document. The author(s) seem to have an excellent understanding
of the information presented in our report and also an excellent under-
standing of our sewer and treatment systems. I think the EIS presents
a favorable outlook towards our proposed storm sewer solution for solving
overflows and will be a very helpful document for the City in proceeding
with the program. I feel the information presented in the EIS is factual
with no significant errors detected.

From our standpoint probably the most important pages in the report
are 184, 185 & 186. Table 5-1 indicates that our proposed storm sewer
(multi purpose) project ($6.81 million) is only slightly more costly than
the proposed EPA storage basin (1 overflow/year) project when a credit is
given for regionalization ($6.18 million). The reason the credit calculated
in the EIS is larger than what we calculated earler in our report is because
of new Valley STP costs available to the authors of the EIS. Apparently we
will be funded (75% Fed. & 15% State) for Phase 1, and I believe these new
cost figures indicate that we should rightfully be eligible for substantial
amounts of state and federal funding assistance for Phase 2 if a regional-
ized approach is pursued. The EIS indicates that Phase 2 funding is too
far in the future to be committed now. Phase 2 funding will probably not
be resolved until a Valley sewage plan is developed.

One point I thought was interesting is on page 13 it is stated that
the storm sewer alternate (Alternate 3) would provide annual cost savings
to the City for electricity ($65,835) and chemicals ($132,600). If these
savings were really realized they would more than offset O&M costs on the
storm sewer system.

In conclusion probably the most important point made on the EIS is
that construction of Phase 1 storm sewers solves 84% of the overflow
problems for 39% of the total cost involved. It is a major step for
solving many backup and drainage problems and is the first step for
regionalization of the Spokane Metro area sewage system. Future funding
of Phase 2 will depend on results of more in depth regionalization studies.


/s/Brad

Digitized by Google

## City of Spokane Department of Public Works

1.   No response required.

Digitized by Google

003817



CITY PLAN COMMISSION
309 City Hall

RICHARD H. BARRETT, President

VAUGHN P. CALL, A.I.P.
Manager — Planning

E. T. CLEGG, A.I.P.
Planning Director

March 8, 1979



MAR 12 1979

ENVIRONMENTAL EVALUATION
BRANCH

Mr. Roger K. Mochnick, N/S 443
201 EIS Coordinator
U.S. Environmental Protection
   Agency, Region X
1200 Sixth Avenue
Seattle, WA 98101

Dear Mr. Mochnick:

    RE:  EIS, City of Spokane Combined Sewer Overflow
          Abatement Project

    We have reviewed the above Environmental Impact State-
ment and find it has fully discussed this project.

    Thank you for the opportunity to comment.

                Sincerely,

                E. Terry Clegg,
                Planning Director

ETC:GOZ:elt

Digitized by Google

003818

## City of Spokane Plan Commission

1.    No response required.

Digitized by Google

003819



DEPARTMENT OF PUBLIC WORKS & UTILITIES
GLEN A. YAKE, P.E.
ASSISTANT CITY MANAGER - ENGINEERING

ROGER JAMES, P.E.
DIRECTOR OF PUBLIC UTILITIES

April 3, 1979

## M E M O R A N D U M

To:      Glen A. Yake - Manager-Engineering

From:    Roger James - Director Public Utilities

Subject: EIS on the Combined Overflow Abatement Project

These are my notes after reviewing this project.

**1** Page 1, first paragraph, I do not interpret the NDDES permit as did the author. The City is simply not in violation of its waste discharge permit at this time.

**2** Page 5, fourth paragraph, we find a number of descriptive locations in the report which we have difficulty locating. For example, "Bridge Street", "East Town", Riverton Street", "Cedar Street Fire Station", "Spokane Branch Library", and "Rockwood Park Clinic". One can guess what the author means, but certainly with no degree of certainty.

**3** Page 20, first paragraph, once again how does one say something, we fail to see the reasoning behind the statement that we cannot accept any sewage from outside the City until Phase II of the CSO program is completed. We think that the truthfulness of this statement depends entirely on the assumptions made and that these assumptions should be stated.

**4** Page 39, third paragraph, Mr. Latenser always claimed that the trunk sewer in Jackson and Cleveland Ave, that is the big fifth ward sewer, was underloaded. I suppose that if one says this enough times some people will believe that to be true, nevertheless, we must state that it is a totally false statement.

**5** Page 51, second paragraph, we believe that this discussion is misleading, the EPA guidelines provide for determining the most cost-effective solution by an arbitrary means which cannot and should not be compared with costs shown in the Facility Plan. It seems to us that what the EPA sees fit to label a multipurpose plan is actually a multiple effect plan in which a system designed to correct the over-flow problem just coincidently also corrects certain other situations.

RECEIVED

APR 1 8 1979

EPA-EIS

Digitized by Google

003820

6     · Page 98, first paragraph, first let us correct a few facts. The City began to dump sewage into the river in 1890. Its studies relating to sewage treatment commenced in 1913. The City has been actively pushing ahead since that time.

    We believe that the Long Lake Dam was one of the last ones on the river to be built. However, most dams have undergone extensive rebuilding in recent years.

    We believe that the amount of water removed from the river for irrigation or other beneficial use has actually decreased markedly in recent years.

    While State and Federal agencies are Johnny-come-latelys in this area the City has been an active party in trying to clean up the river for over 60 years. Four times the City went to the voters and four times, because of active opposition by the media and lackluster support from the State, the issues were overwhelmingly defeated. The City was successful in attempt number five in 1946 and has pursued the program quite vigorously since that time.

7     Page 188, Table 5-3, the understanding left with the City by Senator Magnuson was that 75% federal funding, and 15% state funding, would be available for Phase I of this project. Following completion of Phase I a period of testing would ensue. If necessary all or portions of Phase II would follow utilizing whatever federal and state funds were then available.

    It is the City's position that the material on page 188, lower one half of the page, could be interpreted to mean that the City has agreed to proceed with Phase II even if no federal and state funds are available. This is definitely not the City's understanding.

8     Page 149, fifth paragraph, and page 152, first paragraph, we categorically reject the statements herein contained.

    The City is under orders from the DOE and through them from EPA to act on the storm sewer program. The required increases in sewer rates and/or tax rates are imminent, they could easily occur this year.

    On the other hand local groups such as the 208 Committee have not even concluded. As of now that sewering in the valley is necessary, the 208 report will be out in May 1979 and of course will be subject to final hearings.

    Insofar as the Spokane Valley is concerned we know of no funds to even officially study this area. Any project is, in our opinion, far enough down the line to allow an industry to build a plant in the valley and amortize it before sewer costs would be forthcoming.

    This seems to us like a deliberate attempt to mislead.

2             71

Digitized by Google

003821

9

Page 38, a number of pages following page 38 discuss in some detail financing abilities of the City of Spokane particularly as they relate to the ability of the City to proceed without the availability of federal and state grants.

We have asked Mr. Cole to comment on these pages since we feel they are based entirely on old figures and on interpretations of state law which are contrary to our general understanding of the state laws. We believe that the entire pages should be either totally redone or that they should simply be labeled as inaccurate and therefore of no value to anyone who studies the report. We believe that Mr. Cole's report will reinforce this opinion.

I think these are pretty much the ideas which I have come forward with, I have asked other people in the City to study certain sections of this report and hope to have reports from them before the day (April 3) is over.

RJ:ajg

72

3

Digitized by Google

003822

T.Y OF SPOKANE, WASHINGTON

DEPARTMENT OF PUBLIC WORKS & UTILITIES

**GLEN A. YAKE, P.E.**
ASSISTANT CITY MANAGER - ENGINEERING

**ROGER JAMES, P.E.**
DIRECTOR OF PUBLIC UTILITIES

April 17, 1979

M E M O R A N D U M

To:       Glen A. Yake - Manager-Engineering

From:    Roger James - Director Public Utilities

Subject: Further Comments on the Environmental Impact Statement (EIS)
         on Combined Overflow Abatement Project

10        Since the publication of the EIS the City has on a number of occasions
been advised that the report states that the City system will not handle
flows from the County without increasing the overflow to the river.  The
statements seem to indicate that this will be true until both Phase I and
Phase II of the project are completed.  We fail to find this statement in
the EIS, but in view of its persistence feel that it is necessary for us
to comment upon it.

          The City studies show:

          1.  The entire North Spokane area can be discharged to the Hollywood
system without increasing the volume of overflow to the Spokane River.

          2.  Considerable sewage from North Spokane could be added to the
Cochran Avenue system without increased overflows.  The extent to which
this can be done depends upon exactly how it is designed and constructed.
The theory behind this statement is that if the material could be dis-
charged to an existing facility, such as the Lidgerwood Lagoon, it could
then be pumped into the City system during dry weather periods and at off
peak hours.

          We believe that the following statement pretty well covers the
position regarding sewer service East of the City:

          "If we can assume the following:

          A.  The sewers in the Southwest portion of the City are separated
(this is the area South of the River and generally East of Perry Street).

          B.  All sanitary sewage from this area and from the Spokane Valley
is transported to either Mallon and Perry or Trent and Erie.

          C.  Phase I of the Spokane Combined Sewer Overflow Project is completed.

Digitized by Google

003823

*10*

D.  The North Spokane area is sewered and connected as outlined under either 1 or 2 above."

It is our feeling that if the conditions listed herein are met, overflows to the river will not increase during the period that the rest of the Phase II Project is being completed.

RJ:ajg

2

74

Digitized by Google

003824

## City of Spokane Public Utilities

1.   Recent discussions with Mr. Claude Sappington of DOE
indicate that Spokane is in technical violation of its waste
discharge permit because the CSO abatement project schedule
stipulated in the latest modification to the permit has not
been met.  A new schedule for compliance will be developed
once the EIS process is completed.

2.   No response required.

3.   This comment has been considered in preparing the general
response entitled <u>Wastewater Regionalization at the Spokane
Treatment Plant</u> (Chapter 3).

4.   No response required, as the Latenser Plan is no longer
being considered.

5.   EPA guidelines and program management memoranda have
been developed to assist in allocation of federal funds to
local public works projects.  The cost comparison and cost
allocation methodology of PRM 75-34 and PRM 77-4 are intended
to clearly indicate the most economic means of achieving
the legal mandates of the federal Clean Water Act.  The act
requires control and eventual elimination of discharge of
pollutants to the nation's waterways.  All local plans to
achieve this goal must be compared with the least-cost means
of achieving the goal.  In Spokane's case the most inexpensive
means of controlling the pollution (CSOs) would be construction
of storage basins sized for the 1-year frequency storm.  The
proposed action (Alternative 3) is more expensive than this
storage option and seeks to solve more than just the CSO
problem with the extra expense.  In order to comply with
its guidelines, EPA must assign this extra expense to the
local entity, thereby reserving federal funds for just the
water pollution control purpose they were originally allocated.

6.   The comments are acknowledged and incorporated into
the Final EIS.

7.   All decisions on the nature of and funding for Phase 2
will be made after Phase 1 results are analyzed.  DOE will
have primary responsibility for determining Phase 2 requirements.

8.   The information on pages 149 and 152 is not intended
to be misleading.  It simply provides a rough estimate of
the effects of allocating local share project cost on a property
tax (ad valorem tax) basis.  The exact means of distributing
the increased local costs would be left up to the city.  If
payment through property taxation is not desirable, user
charges or some other procedure may be used.  The ad valorem
taxation figures simply provide a second means of comparing
the various alternatives.  EPA requires only that the cost
allocation be equitable.

Digitized by Google

003825

Spokane County is seeking to study wastewater treatment possiblities in the Spokane Valley area through a regional 201 planning effort.  Application has been made for a grant to fund this planning; a grant award is expected in July.

9.    Refer to the Spokane City Finance Department letter for responses to these comments.

10.    These comments have been considered in preparing the general response entitled <u>Wastewater Regionalization at the Spokane Treatment Plant</u> (Chapter 3).

Digitized by Google

003826

April 4, 1979

M E M O R A N D U M

TO:        Roger James, Director Public Utilities

FROM       B. J. Schmitz, Traffic Engineering Director

SUBJECT:   ENVIRONMENTAL IMPACT STATEMENT CITY OF SPOKANE
           COMBINED SEWER OVERFLOW ABATEMENT PROJECT

We have reviewed the E.I.S. for the Combined Sewer
Overflow Abatement Project and are very concerned
with the effect that construction of recommended
Alternate 3 will have upon vehicle travel.

This Department will be intensely interested in
having input during design stages in order to
avoid proposals that would create critical traffic
conditions during construction.

_____
Traffic Engineering Director

bjs mrs



RECEIVED
APR 4 1979
Dept. of PUBLIC UTILITIES

Digitized by Google

003827

## City of Spokane Traffic Engineering Department

1.   Because the proposed action will be constructed under
the direction of the city, it is assumed that the Public
Utilities and Traffic Engineering Departments will consult
on traffic control problems.   Every effort should be made
to minimize serious traffic safety hazards and traffic
disruptions.   Several potential mitigation measures have
been suggested in the text of the Draft EIS (page 89); these
and other mitigations should be thoroughly explored prior
to start of construction.

Digitized by Google

003828



**BOVAY ENGINEERS, INC.**

HOUSTON • SPOKANE • BATON ROUGE
AUSTIN • ALBUQUERQUE • WASHINGTON, D. C.

April 3, 1979

Mr. Roger James, P.E.
Director of Public Utilities
North 221 Wall Street
Spokane, Washington  99201

Re:  CSO Abatement EIS Comments

Dear Mr. James:

    We have examined the final draft Environmental Impact Statement for
the Sewer Overflow Abatement project and enclose our initial comments for your
review.  We will continue to review the document and keep you informed of any
additional comments we feel are significant.  Please feel free to include any
of the notes in your written comments being submitted to EPA.

                              Sincerely,

                              BOVAY ENGINEERS, INC.

                              Robert E. Smith, P.E.

RES:er

Enclosure



RECEIVED
APR 3 1979

Dept. of PUBLIC UTILITIES

79

PROFESSIONAL ENGINEERS AND PLANNERS
EAST 808 SPRAGUE AVENUE    SPOKANE, WASHINGTON 99202    TEL 509 838-4111

Digitized by Google

003829

COMMENTS ON DRAFT ENVIRONMENTAL IMPACT STATEMENT

PREPARED FOR

CITY OF SPOKANE

COMBINED SEWER OVERFLOW ABATEMENT PROJECT

*1*

Pages 1 and 2 - It seems to be a gray area whether or not the City is in violation of its NPDES permit as evidenced by the conflicting statements 1) The City's NPDES permit specified cleanup of all CSO's by June 30, 1977 (is this true?) and 2) "... NPDES permit, which calls for eventual elimination of all CSO to the river."

*2*

Page 5 - Eastown?  Should this be Northtown?

Page 6, Table 1-1 - Eastown?  Same as for comment on page 5.

*3*

Page 7 - "construction is planned for most of the major streets in the downtown area."  Is this true?  Figure 4-2 shows less than 50 percent.

Chapter 1

*4*

Page 9 - There seems to be conflicting data in the report to support the statement, "Suspended solids loading would be increased by over 160 percent due to direct discharge of stormwater runoff."

*5*

Page 10 - States that the Klicker suboption would best remedy the overflow health hazard by eliminating all overflows.  No plan will eliminate all overflows because the overflow depends upon the intensity of the storm and no basin can be designed to handle the maximum possible storm.

*6*

Page 12 - Alternative 3 would eliminate sanitary wastewater related debris.

*7*

Page 13 - The costs for chemical savings and for additional costs is probably off by a factor of 2 because of recent and anticipated price increases. The statement that Alternative 3 would create a large savings in chemicals is definitely correct.

*8*

Page 16, Table 1-6 - Why does storage under Alternative No. 1 and storage under the Klicker Plan have such a wide variance, i.e., $94.10 vs. $30.38?

*9*

Page 19 - The last paragraph says Phase I would eliminate 84 percent of Spokane's CSO but would probably not result in discernible change in Spokane River water quality.  However, the same paragraph says that Phase I would eliminate the two largest sources of untreated wastewater discharge.  How can water quality not improve if this is true?  This conflicts with page 29 which says, "The constituents



RECEIVED
APR 3 1979
Dept. of PUBLIC UTILITIES

4/3/79

003830

*1* in the CSO which are of particular importance are pathogenic organisms and solid materials of sewage origin."

*10*        Would like to see backup data that says Phase 2 is absolutely necessary to function as a regional facility.

*11*        The total construction cost in the report for Phase 1, $24,980,000 is low.

*2*        Is the statement correct that the north central and southern region would not be relieved of the sewer backup problems, and that those areas are the most severe?

*3*        Page 20 - Is it correct that separation in the Hollywood and Cochran areas will not allow annexation of flows from north Spokane?

Stormwater Overflows - Chapter 2

*4*        Page 24 - Average daily flow for 1978 was 36.2 MGD.

*5*        Page 34 - The second paragraph is incorrect. The re-evaluation by the City did not result in a decision to size basins for one overflow per year. The one overflow per year criteria was dictated by the EPA.

*6*        We have not seen any discussion of future energy costs for pumping all the stored water

*7*        Page 36 - Further review of O&M costs will show that the estimated annual O&M costs for all alternatives is greater than the O&M costs for separation. It therefore becomes apparent that with excessive inflation in power and chemical costs that the City is being asked to fund an ever increasing O&M burden.

*8*        Page 37 - On the satellite treatment plants there is absolutely no guarantee that future regulations will not require secondary treatment. In every case there will not be land available. However, in the case of Cochran (Meenach) and Hollywood storm separation, there would be space available for primary treatment of stormwater.

*9*        Page 41 - Is the Fort Wright Bridge structurally sound enough to carry a 110-in pipe flowing full?

*10*        Page 60 to 63 - In most cases we are talking about acquisition of public/ private land. This would be extremely difficult at best.

*11*        Page 67 to 72 - It is recognized that storm sewer construction will disrupt many areas; however, the overriding point is that it can be scheduled in such a manner that only one recreational area or one semipublic facility is impacted at a time. The report currently leads one to believe that streets around all parks would be torn up at the same time.

Digitized by Google

003831

Page 75 - Mitigation measures for construction impacts. This is a good discussion, i.e., the limiting of construction to two continguous blocks, the appointing of a contractor's construction coordinator and the use of the off season when constructing facilities near parks and recreation areas. The preceding discussion which ends on page 90 concerning construction disruption seems to be objective and a good presentation of the subject.

Pages 92 and 93 - It appears that the report is based on the old generally accepted, 1/3, 1/3, 1/3 to determine labor payroll costs.

Page 94 - We concur with the emphasis on Garland Avenue.

Page 101, Table 4-5 - Again we would like to see the assumptions, data, calculations, etc., supporting the 160 percent increase in suspended solids loads to the Spokane River. Table B-10 shows stormwater runoff S.S. at 138-207 mg/l based on analyses of stormwater by treatment plant staff. I think clarification is needed as to whether this is combined stormwater or stormwater runoff. Sanitary sewage S.S. are generally at least 70 mg/l yet we show a range in Table 2-1 of 20 - 210 mg/l for CSO suspended solids which is lower than either of its constituents. How can this be? Table B-10 is inconsistent with Table 2-1 for CSO suspended solids and BOD.

Page 113 - Sediments from Hangman Creek and upstream areas would also mask the effect of CSO suspended solids at low flow periods.

Page 138 - Note: Costs are based on 1978. We are already looking at 1980 costs or two years of escalation on the project.

Page 145, Table 4-11 - Shows $9.5 million available for indebtedness on Councilmanic Bonds. Since this statement was as of September 31, 1977, it does not include the pavilion.

Page 154, Table 4-17 - As shown in several areas of the report separate storm sewers at $190 is again much cheaper than any other alternative except No. 4, Klicker Storage Sub-option, at $117.

Page 156 - All the energy figures in the report are based on present costs and are not escalated. This should be noted whenever O&M costs are considered as increases in energy costs are projected to be quite significant over the next 20-50 years.

Page 157 - When discussing chemical costs it should be noted that the price of alum went up 50 percent last year and such increases in the future with all chemicals should be a significant concern.

Page 160 - The draft by Kennedy Engineers suggesting that phosphorus removal units at the treatment plant cannot properly treat flows beyond 57 mgd without expansion may or may not be true. Conversion of stormwater clarifiers only to secondary clarifiers requires pump and piping modifications but not additional basins.

Digitized by Google

003832

Chapter 5 - Proposed Action

9          Page 182, Figure 5-1 - Note. that the area between A and Maple, Rowan and Garland is not proposed for storm sewer separation.

0          Page 186, first paragraph - EIS implies allocation of Phase I·costs between Federal, State and local entities has been firmly established.  This is not necessarily true.

31          Third paragraph - About 120 miles of storm sewer will be installed for Phase I, not 90.

32          Page 187, second paragraph - After Phase I, suspended solids loading would increase 15 percent annually, compared to the total 163 percent for Phase I and II.  If Phase I removes 84 percent of the CSO, these SS percentages appear to be inconsistent.

33          Page 188 - States that downstream coliform concentrations would be much lower with Alternative No. 3.

34          Page 188, third paragraph - Is it true that there are much fewer sewer backups in the Hollywood and Cochran  drainages?

35          Page 188, fourth paragraph - Last sentence is unnecessary as· it is restated in the footnote to Table 5-3.

          Table 5-3 - Numbers are correct if 87.8 percent total eligibility is correct.

36          Page 189, O&M - Add to paragraph, "O&M costs for Alternative No. 3 are substantially lower than any of the other alternatives."

37          Page 190 - Talks about sewer rates wherein the only increase in user charges would be that required to finance O&M and to raise the 10 percent share. Depending upon the City's cash position and the present fund surplus, there may not be a need to increase rates for the next ten years.

38          Page 191 - Table 5-4 - Shows an increase in user charges and probably can best be analyzed by the City accounting department.

39          Pages 190-192 - Says Phase II must be implemented before significant interceptor capacity is freed.  Should have calculations and backup data in EIS to support this as it is a· significant item.

Digitized by Google

003833

Chapter 6 - Affected Environment

40  Page 201 - Near the bottom of the page it infers that chlorine discharged from the sewage treatment plant may be partially responsible for low summer concentrations of total coliforms.

41  Page 204, Hangman Creek - Last sentence in the first paragraph is a questionable statement.  Should say, "The small flows from this nutrient-rich stream may not significantly influence Spokane River quality." (or, eliminate sentence).

42  Page 211, Table 6-5 - Gives some current and projected population figures. Increases for the City of Spokane average around 3 percent and those for the county average around 5 percent.  The City's is about right, but the county looks low.

43  Page 217 - States the largest single source of suspended particulates is unpaved roads.  A lot of the roads on the northeast area could very well be paved under the storm sewer project.

44  Page 219 - Starts the bibliography.  Bovay Engineers is listed as completing the Report on Additions and Modifications in 1978.  This is incorrect-- it's 1973.

45  Page 220 - There are certainly a lot of reports, etc., prepared on the Spokane area and to date the only one thing that has been done is building the treatment plant.

46  Page 227 - It is worthy to note that Ken Lauzen, Bob Kussman, Richard Thiel, and Norm Sievertson, the people who know something about the Spokane area, were evidently not contacted regarding this report.

47  Page 240 - Shows significant impacts based for Alternative No. 3 because the streets will be torn up.  Again, there are ways of minimizing the impacts.

Page 245 - Shows the storm sewer impacts on parks.  In general they are significant but can be mitigated.

Page 247 - Construction activity on semipublic/public facilities.  Same comment.  These impacts can be minimized.

48  Page 262, Footnote No. 7 - Seventy-five percent suspended solids removal for primary treatment sounds quite high.  What is this number based on?

Digitized by Google

003834

Bovay Engineering, Inc.

1.   The city's original NPDES permit did require elimination
of all CSOs by June 30, 1977.  However, when this schedule
could not be met, DOE issued several modifications to the
permit schedule.  These modifications state that DOE will
not initiate enforcement action against Spokane for failure
to achieve the June 30 clean-up deadline as long as they
comply with new schedules included in the modification orders.
The latest order (Docket No. DE 77-335, first amendment)
required elimination of dry weather CSO from three discharge
points by February 16, 1978, and full compliance with the
treatment plant total phosphorus effluent limitation by
February 1, 1978.  The latest time schedule for full CSO
control (Docket No. DE 77-833) required that plans and speci-
fications for the Meenach and Hollywood CSO corrections be
submitted no later than April 30, 1979.  This schedule is
under appeal by the city.

2.   The Eastown commercial area is located on the southwest
corner of Havana and Sprague at the city's eastern edge.
The reference should not be to Northtown.

3.   As indicated in Figure 4-2 of the Draft EIS, all down-
town streets except Stevens and Howard will face some dis-
ruption from storm sewer construction.  Some of the streets
will only be crossed by the new pipelines, but this will
nonetheless cause traffic delays and disruptions.

4.   This comment is considered in the general response entitled
Stormwater Treatment (Chapter 3).

5.   The storage basins and surface lagoons planned in the
Klicker Alternative were to be sized to accommodate stormwater
flows in excess of those expected from the 25-year frequency
storm.  While it is true that a CSO could still occur, statistically
it would be less than once every 25 years.

6.   No response required.

7.   The chemical costs were based on prices being paid by
Spokane as of September 1978.  They have undoubtedly increased
since that date.

8.   Alternative 1 (25-year storage) includes $28.9 million
of construction for relief sewers to correct sewer backup
problems.  This cost would be borne totally by the city and
would therefore be reflected in user cost increases.  The
Klicker sewer backup control strategy (gate valves and on-
site storage) would cost only $1 million.  As a result, the
city's share of Alternative 1 construction cost would be
$36.2 million while its share of the Klicker Plan would be
only $6.9 million.  This accounts for the extreme difference
in user charges shown in Table 1-6 of the Draft EIS.

Digitized by Google

003835

9.   Throughout the Draft EIS, discussions of bacterial and viral contamination of the river and its public health implications have been separated from other water quality considerations (e.g., nutrients, suspended solids, BOD).  The statement on page 19 of the Draft EIS refers to water quality exclusive of the pathogenic organism question.  Data analyzed in the EIS indicate that CSOs contribute generally less than 1 percent of the river's load of nutrients and suspended solids; therefore, elimination of the estimated 84 percent of the CSO would probably have little effect on these water quality parameters.  From a public health standpoint, however, the 84 percent CSO elimination (pathogenic organisms and solid materials of sewage origin) would be significant because of the reduced health risk.

10.   This comment was considered in preparing the general response entitled Wastewater Regionalization at the Spokane Treatment Plant (Chapter 3).

11.   The Phase 1 construction cost figures are based on data presented in the city's CSO facilities plan (Spokane City Department of Public Works, 1977), and utilized the same unit costs presented in that report.  The facilities plan estimates were made in 1977, so may be slightly low due to inflation over the past 2 years.

12.   The statement is consistent with backup location and severity information supplied by the Spokane City Department of Public Works.

13.   This comment was considered in preparing the general response entitled Wastewater Regionalization at the Spokane Treatment Plant (Chapter 3).

14.   The 39 MGD average daily flow estimate was based on data from January to June 1978.

15.   It was not intended to indicate that the city concluded basins should be sized to allow one overflow per year.  This was an EPA determination.

16.   No energy cost estimates were made for pumping from storage in either the city or Klicker storage plans.

17.   The proposed action is presently stormwater separation; therefore, the city is not being asked to fund an ever-increasing O&M burden.

18.   No response required.

19.   The structural integrity of the Fort Wright Bridge was not analyzed in the EIS; the Latenser Alternative is no longer being considered, so the question does not warrant further investigation.



20.  The potential acquisition problems are recognized and have been considered in selecting the proposed action.

21.  It is stated at numerous points in the report that Phase 1 construction would be spread over a 5-year period and that individual sites would be affected for only a 2- to 3-week period.  There was no intent to indicate all parks would be affected simultaneously.

22.  No response required.

23.  These comments are responded to, in part, in the general response entitled Stormwater Treatment (Chapter 3).  It has been verified that the data reported as stormwater quality was indeed obtained from stormwater (not CSO) measurements. Total suspended solids and BOD quality listed in Table 2-1 is transposed; BOD should be listed at 20-210 mg/l and total suspended solids should be 76-220 mg/l.

24.  We concur with this assessment.

25.  No response required.

26.  Refer to the Spokane City Finance Department letter for response to this comment.

27.  No response required.

28.  Future increases in energy and chemical costs are acknow-ledged and have been considered in selecting the proposed action.

29.  No attempt has been made to verify Kennedy Engineers suggestion.  The phosphorus removal capability should be thoroughly investigated prior to any regionalization efforts that might result from sewer separation.

30.  The funding allocation for Phase 1 has not been finalized, but it is felt that it will be very similar to that identified in the Draft EIS.

31.  The revised estimate is acknowledged.

32.  Phase 1 would reduce CSO by 84 percent, but total storm-water separation would increase direct stormwater runoff to the river by over 5 billion gallons per year.  This accounts for the large increase in suspended solids loading to the river (see Tables B-10 and B-11 of the Draft EIS).

33.  No response required.

34.  This statement is supported by sewer backup location and frequency information supplied by the Spokane City Depart-ment of Public Works.

Digitized by Google

003837

35.   No response required.

36.   The statement is accurate, but not needed in the Phase 1 impact analysis.

37.   No response required.

38.   See Spokane City Finance Department letter for additional comments on user charges.

39.   This comment was considered in preparing the general response entitled <u>Wastewater Regionalization at the Spokane Treatment Plant</u> (Chapter 3).

40.   There has been no field study to determine whether treatment plant chlorine residual is affecting downstream bacterial levels, but this possibility is suggested by the coliform sampling data presented in the metropolitan Spokane report (U. S. Department of Army, Corps of Engineers, 1976).

41.   Qualifying the statement about Hangman Creek's influence on Spokane River water quality is problably warranted in light of the relatively limited data available on Hangman Creek quality.

42.   The population projections presented in Table 6-5 were developed in 1975 by the Spokane City Plan Commission.   It is possible that the county numbers are low when the rapid growth of the last 2 or 3 years is considered.

43.   No response required.

44.   The typographical error in the BIBLIOGRAPHY is acknowledged; the correct date is 1973.

45.   No response required.

46.   Ken Lauzen played a major role in compiling data for and preparing the Draft EIS; he is listed on page 227 under U. S. Environmental Protection Agency, Olympia, Washington.

47.   No response required.

48.   The suspended solids removal estimate is based on manu-facturer's literature for the type of treatment used by the city in its cost estimates.

Digitized by Google

003838

RECEIVED

APR 1 3 1979

EPA-FIS

April 10, 1979

Environmental Protection Agency
Seattle, Washington

Dear Sirs:

Evidently the City of Spokane can save substantial sums by building Phase I of the Storm Sewer project, than completing the rest of the Sewage Abatement project as outlined in the Klicker plan.

I request that you make an analysis of costs for such a combination.

Phase I in the North portion of the City will than handle 84% of sewage presently discharged. Klicker plan storage tanks and lagoons will handle 16%.

Costs of cleaning such storage should be reasonable. The concrete floors of storage should be sloped so that a "sprinkling system" will clean automatically. The "sprinklers" would throw a stream of water almost fire hose size, the water broken up slightly, and rotate very slowly. Nozzles similar to those used in the huge automatic irrigation systems that irrigate a 50 acre circle of land should be used.

If these were turned on while the last of the storm water was draining out there is little cleaning left to be done.

Of course the storage tanks can be designed so that lots of labor is necessary, but our projections should not be based on poorly designed storage.

This should not affect regionalization of sewage problems. The Valley can still be hooked on to the North Bluff intercept. It has a huge circumference and the slight additional flow should make comparatively small difference. Possibly it would be necessary to pump this line downhill during a storm. However this seems to be a most remote possibility, but the figures aren't presently available to me to quote.

It might be necessary to pump a small amount of this Valley sewage into the North Bluff intercept as there is an area East of Division St that will not gravity flow.

Obviously the piping and pumps necessary for regionalization are chargeable to future plans to hook up to our treatment plant. There is no reason for the City to pay extra now for our Sewage Abatement project. If they hook on, and this is still an open question, they should pay then.

As far as plant capacity is concerned it appears obvious that the plant can handle regionalization as storm volume will be only 16% of previous calculations. We should be able to trickle this in at night when flow is 30% to 40% under day time flow. This actually makes a more efficient operation than normal fluctuations.

Sincerely

Jake Klicker
We the People

89

003839

## Jake Klicker

1.    Mr. Klicker has requested that costs be developed for a new
alternative.   This alternative would use storm sewers in
certain areas in the northwest portion of the city, and the
Klicker concept of covered and open storage basins to control
CSO in the remainder of the city.   Storm sewers would be
constructed for drainage areas 12 and 15 (see Figure 1 in
this report), which is the identical area for construction
of the Phase 1 storm sewers in Alternative 3 of the Draft
EIS.   Construction of these storm sewers would eliminate
the need for the large reservoir at Bridge Street proposed
in the earlier Klicker Plan as well as pipelines to connect
this large reservoir to existing interceptors.   Other than
these changes, this new alternative is identical to the Klicker
Storage Suboption described on pages 34 to 36 of the Draft
EIS.

The cost for this new alternative would be as follows:

| | |
|---|---|
| Total Construction Cost | $55,042,970 |
| O&M Cost | 245,370 per year |
| Average Annual Cost | 5,638,490 per year |

These costs can be compared with the costs for other alternatives,
which are presented in Table 1-4, page 14 of the Draft EIS.
When the costs are compared, it should be noted that the
average annual cost for Mr. Klicker's new alternative is
less than the average annual cost for Alternative 3, which
is the proposed project.   This comparison should be tempered,
however, by the fact that Phase 2 (of Alternative 3) costs
are only speculative at present.   There will be a reevaluation
of CSO control after the results of Phase 1 separation have
been analyzed.   Mr. Klicker's proposed Phase 2 approach could
also be evaluated at that time.



003840

## Oral Comments

The following oral comments were received at the Draft EIS public hearing held in the City of Spokane on April 4, 1979. The comments are briefly summarized; for a complete version of the testimony see the hearing transcript attached at the back of this report.

Roger James

Mr. James indicated that the figures and discussions of user charges presented in the Draft EIS should be revised, as they are out of date and inappropriate. This comment was considered in preparing the response to the Spokane City Finance Department's letter in the preceding section of this chapter.

James Schasre

Mr. Schasre asked if the stormwater collected by new separate storm sewers would be treated prior to discharge to the Spokane River. Mr. Burd of EPA, Mr. James of Spokane City Utilities, and Mr. Arnquist of DOE all made oral responses at the time of the question. The general response was that there are currently no plans or requirements for treatment of stormwater discharges, and none is foreseen in the near future.

Robert Smith

Mr. Smith pointed out that water quality data in Tables 2-1 and B-10 of the Draft EIS were inconsistent. BOD and suspended solids numbers were in conflict. A check of the report text found that BOD and suspended solids numbers in Table 2-1 had been transposed. This transposition is acknowledged and corrected to read: BOD - 20-210 mg/l and Total Suspended Solids - 76-220 mg/l.

Mr. Smith also questioned whether data reported in Table B-10 as stormwater quality was not in fact CSO quality. A check of the data and its source verified that it was stormwater quality.



003841

Digitized by Google

003842

Digitized by Google

003843

Digitized by Google

# BIBLIOGRAPHY

## References

Bovay Engineers, Inc.  1973.  City of Spokane, Washington
    report on additions and modifications to the wastewater
    treatment plant.  3 vols.

----------.  1977.  Preliminary draft, facilities planning
    report for sewer overflow abatement supplement -
    construction grant allocation analysis.  Prepared for
    City of Spokane Dept. of Public Works.

Esvelt and Saxton-Bovay Engineers, Inc.  1972.  Action plan
    for better wastewater control - advanced waste treatment,
    high river water quality, better environment.  Prepared
    for the city of Spokane.

Esvelt, Larry A.  1978.  Spokane aquifer cause and effect
    report - summary report of '208' water quality results and
    cause and effect relationships for water quality in the
    Spokane Rathdrum aquifer.  Prepared for Spokane County
    Engineers.

Keller, S.  [n.d.]  Historic landmarks survey: a report and
    site inventory of Spokane's historic resources.  Un-
    published report, prepared for the Spokane City Plan
    Commission.

Kennedy Engineers, Inc.  1978.  Preliminary draft facilities
    plan - North Spokane suburban area sewerage system.  Pre-
    pared for Spokane County.

----------.  1978a.  Rough draft amendment to the North Spokane
    facilities plan.  Prepared for the Spokane County Engi-
    neers.

----------.  1979.  North Spokane wastewater facilities plan.
    Prepared for Spokane County Engineers.

Spokane City.  Department of Public Works.  1977.  Facilities
    planning report for sewer overflow abatement.  5 vols:
    text, exhibits, back-up data, appendices and supplement.

U. S. Army Corps of Engineers.  1976.  Metropolitan Spokane
    region water resources study.  Summary report, technical
    report and 11 appendices.  Prepared by Kennedy-Tudor
    Consulting Engineers.

U. S. Environmental Protection Agency.  1978.  Construction
    costs for municipal wastewater treatment plants: 1973-
    1977.  Office of Water Program Operations, Washington,
    D. C. 43019-77-013.  MCD-37.

Digitized by Google

003845

Digitized by Google

003846

Digitized by Google

003847

Digitized by Google

TRANSCRIPTS OF PUBLIC HEARINGS
ON DRAFT EIS

Digitized by Google

003849

BEFORE THE UNITED STATES

ENVIRONMENTAL PROTECTION AGENCY

REGION 10


A PUBLIC HEARING

ON

AVAILABILITY OF AN ENVIRONMENTAL IMPACT STATEMENT

COMBINED SEWER OVERFLOW ABATEMENT PROJECT

CITY OF SPOKANE, WASHINGTON


BEFORE

MICHELLE COYLE

HEARING OFFICER


2:30 P.M.

APRIL 4, 1979

COUNTY HEALTH DISTRICT OFFICES

ROOM 140, W. 1101 COLLEGE

SPOKANE, WASHINGTON

CAROL L. DEWEY
Court Reporter Inc.
N. 5107 PERRY
SPOKANE, WASHINGTON 99203
(509) 448-8467

---

I N D E X

| Speaker's Name | Title | Page |
|---|---|---|
| Michelle Coyle | Hearing Officer | 2 33 |
| Robert Burd | Director of Water Division, EPA | 8 |
| Charles Hazel | Jones & Stokes Associates | 10 25 |
| Robert Gummerman | Jones & Stokes Associates | 12 23 |
| Mike Rushton | Jones & Stokes Associates | 18 |
| Roger James | Director of Utilities, City of Spokane | 27 |
| James Schasre | President, Lake Spokane Environmental Association | 34 |

CAROL L. DEWEY
Court Reporter Inc.
N. 5107 PERRY
SPOKANE, WASHINGTON 99203
(509) 448-8467

i

2:30 P.M., April 4, 1979

1
2
3    MS. COYLE:  I would like to convene this
4    hearing on Environmental Protection Agency's Draft
5    Environmental Impact report or EIS for the City of Spokane
6    Combined Sewer Overflow Abatement Project.
7        Let the record indicate that this meeting is taking
8    place at 2:35 in the afternoon at the County Health
9    District Office, Room 140, West 1101 College, Spokane.
10        I would like to welcome you all here.  I appreciate
11    your attending and taking your time to come and share your
12    opinions with us.  I realize that many of the issues which
13    will be discussed this afternoon will be of direct
14    concern to you.
15        My name is Michelle Coyle, and I am an attorney with
16    the Office of Regional Counsel, Environmental Protection
17    Agency, Region 10, Seattle.  Mr. Donald P. Dubois, who is
18    our Regional Administrator, has designated me as Hearing
19    Officer for this hearing.  As Hearing Officer, I would
20    like to tell you the purpose of this hearing.  We will
21    maintain an agenda which will be orderly presentations
22    by all of us here, and I would like to prescribe a few
23    rules and procedural ground rules for the hearing.
24        To begin with, a public hearing is basically to allow
25    local citizens to comment, in this case on a Draft

1    Environmental Impact Statement which has been prepared for
2    EPA concerning the City of Spokane's Combined Sewer
3    Overflow Abatement Project.
4        The EIS was prepared pursuant to what is known as
5    NEPA, or the National Environmental Policy Act, of 1969,
6    which, basically, required federal agencies to prepare
7    statements on major federal actions significantly affecting
8    the quality of the human environment.  The federal action
9    in this case will be an EPA grant to the City of Spokane,
10    under the Federal Water Pollution Control Act Amendment
11    of 1972, which would cover 75 percent eligible cost for
12    design and actual construction of the project.  EPA has
13    previously awarded a grant to the City of Spokane for
14    initial planning of this project.  I understand that the
15    proposed Step 3 Project has been placed on the State of
16    Washington's fiscal year 1980 priority list.  EPA only
17    funds projects which are on this list.  However, before
18    any decision to award further grants to this project is
19    made by EPA, the NEPA process must be completed.  This
20    process involves a review by EPA of comments received on
21    the Draft Environmental Impact Statement, both at this
22    hearing and through written submissions, preparation  of
23    a Final Environmental Impact Statement, and a 30-day public
24    review period following publication of a final EIS.
25        The Draft Environmental Impact Statement which is the

Digitized by Google

CAROL L. DEWEY

CAROL L. DEWEY

003851

subject of this hearing discusses environmental impact
of the proposed project, as well as the impact of
alternatives to the project, including the No-action
alternative. We are not going to try to limit the scope
of any inquiries you might have at this hearing too much,
but I would like to ask you and remind you that your
comments and statements should be in line with the purpose
of this hearing, which is to evaluate the environmental
impact of the proposed project and the various alternatives.

Those wishing to testify at this hearing have been
encouraged to review the Draft Environmental Impact
Statement, which has been on file at the City of Spokane
Library, which address is West 906 Main, and has been
located there at the library since about the middle of
February. Additional copies of the DEIS can be obtained
from Roger K. Mochnick, 201 Environmental Impact Statement
Coordinator, at EPA's Regional Headquarters located at
1200 Sixth Avenue in Seattle, Washington, 98101. Copies
of this document are available for review also at EPA's
Region 10 library, which is also located at Regional
Headquarters.

Persons who are unable to testify at this hearing,
either this afternoon or this evening, or who wish to
furnish comments after the hearing, are encouraged to do
so by writing Mr. Mochnick at the above-named address.

I would like to remind you that the deadline for
comments is April 19, 1979 and, for your information, the
additional copies of the EIS and the public notice for
this meeting are available from Ms. Michalene Ward, who
is seated at the table at the entrance to this room.

I would like to mention that there will be a definite
order for this hearing. All questions from the floor should
be reserved to the third stage of this hearing, this
afternoon. The discussion-and-question period will be
held after all interested parties have had an opportunity
to express their views.

This is roughly what the agenda will be: Part 1,
the introductory phase of this afternoon's presentation,
will include a brief statement from Mr. Robert Burd, who
is seated here in a blue coat and yellow shirt. Mr. Burd
is the Director of EPA's Water Division, and he will make
a statement concerning the Draft Environmental Impact
Statement process and procedures in arriving at an Impact
Statement.

Additionally, Mr. Charles Hazel, who is seated to
Mr. Burd's left at the far end of this table, who is a
member of Jones & Stokes, EPA's consulting firm for the
Environmental Impact Statement, will make a presentation
on the Draft Environmental Impact Statement.

Seated to my immediate left is Mr. Roger Jones of

CAROL L. DEWEY
Court Reporter
S. 1007 Pine
SPOKANE, WA 99201
(509) 448-8467

4

COYLE

CAROL L. DEWEY
Court Reporter
S. 1007 Pine
SPOKANE, WA 99201
(509) 448-8467

5

COYLE

003852

Digitized by Google

the City of Spokane, who will give a brief statement, as well.

After the statements of these three individuals, oral presentations will be made in the following order: If there are any federal government representatives in the audience who wish to make a statement, they will go first; then state representatives, county representatives, city representatives, and then individuals and citizen groups. As of this moment, I do not have any requests for making a statement from anyone other than those seated here at the head table, so if you do wish to make a presentation, let me know.

If anyone needs to leave early, please let Michalene Ward, who is seated at the table by the entrance to this room, know, so I can give you an opportunity to speak.

Following the presentation of the testimony, in Part 2 of the agenda, we will have a discussion-and-question period. Questions may be asked of the panel sitting here at the table, through me. The panel may have to ask their various associates in the audience to answer the more technical questions.

As Hearing Officer, I reserve the right to limit discussion as such may be necessary. Since this is an informal hearing, no cross-examination is really necessary or appropriate. As already stated, please ask your

questions of the panel through me, and they will field them or field the question to the proper person. Presentations, since so few people have notified me that they would like to make a presentation, could be as long as 15 to 20 minutes. Written material should be left with me following your presentation, if you have it, or sent to Mr. Mochnick at the address I noted earlier. You are under no obligation to submit written material, but a written account helps us keep our records in order and makes it easier for the individual making the transcript. Written material must be submitted before the deadline of April 19, and I believe the release of the Final Environmental Impact Statement is scheduled for approximately six to eight weeks following the close of the comment period.

A record is being made by the court reporter, Ms. Carol Dewey, and, therefore, I ask that you clearly state your name and address and affiliation, if any, before you speak. I also ask that if anyone wants to make a statement, that you please come forward, pick up this microphone or speak clearly into the microphone, so that your comments will be picked up.

Copies of the transcript of this hearing will be available for your inspection at the main Spokane Library where our Draft Environmental Impact Statement is, as well

CAROL L. DEWEY
Court Reporter Inc.
Suite 1207
SPOKANE, WASHINGTON 99201
(509) 838-1467

7

003853

1  as EPA's Seattle Regional Office.

2  Are there any questions about the procedure to be

3  followed?

4  Seeing none, let me introduce Mr. Burd, who will make

5  the first introductory comments.

6  MR. BURD:  I would like to spend a few minutes

7  to review the rationale we went through at EPA in making

8  the decision to prepare an Environmental Impact Statement

9  on the City of Spokane's plan to control combined sewer

10  overflows, and, by the way, I hope everyone has picked up

11  the handout that is available.  It does have a definition

12  of what combined overflows are, in case you are unfamiliar

13  with the term and the problems it may create.

14  Basically, we felt that an Environmental Impact

15  Statement on the City's facilities plan for the combined

16  sewer overflow project would provide a greater public

17  awareness of the issues that are involved with this

18  project, and also greater public participation in the

19  decision-making process as to what would be the best of

20  the alternate solutions in solving combined-sewer-overflow

21  problems.

22  We felt this particular project in Spokane was a

23  proper project.

24  There were a number of alternatives that needed to

25  be considered, quite a number of alternatives, which

1  eventually were reduced to basically seven in the Draft

2  Environmental Impact Statement.  We thought there were

3  significant economic issues involved with this project,

4  economic issues that the citizens of Spokane would be

5  very much interested in and would become, hopefully, more

6  familiar with through the preparation of an Environmental

7  Impact Statement.

8  We also felt that there were major environmental

9  issues to be dealt with here.  There was the impact of

10  controlling, or not controlling, combined sewer overflows

11  on water quality in the Spokane River and Long Lake.

12  There were significant environmental issues dealing with

13  construction practices.  If you were, for example, to

14  tear up streets and separate 220 miles of sewers, what

15  would be the impact on the citizens of that kind of

16  activity?

17  There also was, I think, an important potential

18  benefit here to certain parts of the City that experienced

19  drainage problems in the form of flooded basements.  That

20  was an issue that we felt could use greater attention.

21  Then there was the significant environmental issue of

22  the relationship of this plan of controlling combined

23  sewer overflows to the concept of operating a regional

24  sewage treatment plant here, a regional sewage treatment

25  plant that could potentially serve the outlying areas of

1 Spokane County. We thought all these issues were very
2 important, and some members of the public in the Spokane
3 area sought greater public involvement than had been,
4 they felt, available up to that time.

5 So, based on their interest, and, again, the signi-
6 ficant economic and environmental interests, EPA then made
7 the decision to prepare an Environmental Impact Statement,
8 and I think it has been a good process and has demonstrated
9 that the public is interested, and there has been greater
10 public participation than perhaps there was before.

11 I think the issues involved have been very well
12 highlighted. There were, prior to this date, two workshops
13 held as we were going through the development of the Draft
14 Environmental Impact Statement where members of the public
15 have had the opportunity to discuss with us and our
16 consultants the alternatives, such as cost, and other
17 factors related to the Impact Statement.

18 So that's the rationale behind the decision to do an
19 EIS, which has led to the hearing today, and, as the Hearing
20 officer mentioned, there will be an opportunity for comment
21 after this, and up to the point of final EIS.

22 MS. COYLE: Mr. Hazel.

23 MR. HAZEL: My name is Charles Hazel. I
24 represent Jones & Stokes Associates, the prime contractor
25 for the preparation of the Environmental Impact Statement.

1 I would like to introduce two of my associates who
2 were principally involved in the preparation of the docu-
3 ment, Mike Rushton and Robert Gummerman. They will be
4 making a short presentation of some of the key material in
5 the document, in the EIS, and will be available to answer
6 technical questions later on.

7 To add somewhat to the purpose and scope of the EIS
8 given by Mr. Burd, I would like to indicate that the
9 Draft Environmental Impact Statement is a composite of
10 information and data that was locally available gathered
11 from various agencies and individuals in the area and
12 sorted, analyzed and evaluated and interpreted to prepare
13 the EIS. State EPA regulations and other factors have,
14 naturally, affected some of these interpretations and use
15 of data.

16 The Draft EIS presents results and conclusions derived
17 from the data and discussions we have gathered together in
18 the workshops that were held and presented in a way which
19 we believe point out the key issues and key data available
20 relating to these issues, and, hopefully, present it in a
21 way which is understandable and organized, so persons can
22 use it so they understand the project.

23 With that, I wish to introduce again Mike Rushton,
24 who will make a short presentation of some of the materials
25 in the EIS, and he will be followed by Robert Gummerman.

Digitized by Google

bob is first. I had it backwards.

MR. GUTERMAN: In the City's Facilities Plan, there were three alternatives which were mentioned, and these are on this slide, labeled as Alternatives 1, 2 and 3.

Since the City's Facilities Plan, there were two plans which were formulated by private citizens. These are called the Klicker and Latenser Plans, and an alternative which was developed in the course of the EIS process is here labeled as the Combination concept, and, as required by federal law, a No-action alternative. What we are going to do now is go through a description of these one at a time.

Alternative 1 is a concept that uses underground storage basins to store the waste water flow and than gradually put it back into the interceptor, and it is conveyed to the treatment plants for subsequent treatment.

In the City's Facilities Plan, the underground storage basins were sized so there would be one overflow event on the average of every 25 years. A subsequent analysis by the City and EPA and also as a portion of this EIS process showed the cost effective size for a storage basin was such that there would be one overflow event every year. So the EIS process looked at Alternative 1, storage basin concept, using two different sizes. One would allow an overflow event every 25 years, and the smaller size would allow an overflow event once every year. The alternatives looked at storage basins located at 14 different locations.

Another part of Alternative 1 and Alternative 2 is relief sewers. We would have to look at the project objectives, one of the project objectives being to eliminate combined sewer overflow, stormwater overflow, which the storage basins do, and the second is to solve basement flooding and drainage problems, and this is accomplished with relief sewers.

So Alternative 1 is storage basins plus relief sewers.

Alternative 2 has what is called satellite treatment plants, and these are located at the same locations as the underground storage basins, at 14 different locations. The satellite treatment plants provide a low level of treatment compared to what is provided by the city's treatment plant, called priority treatment, and it is mainly a process of sedimentation, with the addition of chlorine.

As I stated, Alternative 2 also requires relief sewers, about 55 miles of relief sewers, to solve basement flooding and urban drainage problems.

Alternative 2, as it is presented in the EIS, is identical to Alternative 2 in the City's Facilities Plan,

Digitized by Google

003856

1  and allows one overflow every 25 years.

2      Alternative 3 is construction of storm sewers.  The

3  way the sewer system is set up now in the City of Spokane,

4  or a principal portion of it, and leads to the problem we

5  are facing now, the storm water and sanitary waste are

6  conveyed in one sewer.  Alternative 3 would construct new

7  storm sewers to segregate these flows, and the existing

8  system would then be used to convey sanitary waste, and

9  the new system would convey storm water, which would then

10  go directly to the river.

11      There are 220 miles of storm sewers which would be

12  required, and like I said, these would convey storm water

13  directly to the river, and, depending upon the time of the

14  year and intensity of the storm, which is used to calculate

15  how much runoff there would be, there would be somewhere

16  between 60 and 110 days that storm water would be conveyed

17  to the river.

18      Alternative 3, which is called the Klicker Plan, is

19  really a sub-option of Alternative 1, which uses storage.

20  The Klicker Plan uses underground storage basins which are

21  sized to contain all flows which would occur once every

22  five years.  When a storm producing a greater amount of

23  precipitation and runoff than this occurred, the storage

24  basins would overflow into open lagoons which would be

25  located adjacent to the storage basins, and these lagoons

1  would then contain any flow in excess of the five-year

2  storm event.

3      As in Alternative 1, the flows from storage basins

4  and open lagoons would then, following the cessation of

5  the storm, be put back into the interceptor and conveyed

6  to the treatment plant for treatment.

7      Another factor which differentiates the Klicker

8  Plan from Alternative 1 is a large storage lagoon located

9  between Bridge Street and the Spokane River, and this

10  storage basin would also have a portion which is closed

11  and underground and another portion which is open and at

12  ground level.

13      The Latenser Plan uses a combination of flow rerout-

14  ing and storage in a large open storage basin which is

15  across the river from the treatment plant, in Riverside

16  State Park.  This open storage basin would contain all of

17  the flow during a storm which would normally be the CSO,

18  and then, when the storm passes, this flow would be

19  directed into the treatment plant.  As differentiated from

20  all those alternatives, the treatment concept is different.

21  In the Latenser Plan, all the advanced waste water

22  treatment at the tertiary facility would be abandoned

23  and only secondary treatment would be provided.  The

24  effluent from the secondary treatment plant would be

25  exported using a pipeline and a balancing reservoir to a

CAROL L. DEWEY
Court Reporter, Inc.
U.S. District Court
SPOKANE, WASHINGTON 99201

CAROL L. DEWEY
Court Reporter, Inc.
U.S. District Court
SPOKANE, WASHINGTON 99201

Digitized by Google

1  pump station in the Crab Creek drainage basin, and it
2  would flow down Crab Creek a distance and be collected
3  and utilized for agricultural irrigation.
4      The Combination Concept, which was developed as a
5  portion of the EIS process, tried to combine, solely on
6  a cost basis, initially the best features of storage and
7  storm sewers and dividing the 15 different drainage
8  basins within the City, it looked at each one of these
9  on a cost basis to determine whether storage basins or
10  storm sewers were more cost effective.  The conclusion of
11  this was that in five areas storm sewers were the most
12  cost effective, and in 10 areas storage basins were the
13  most cost effective technique.
14      The No-action alternative, which is required to be
15  analyzed, would consist basically of doing nothing other
16  than treating wastewater as it comes down the interceptors
17  into the existing treatment facility.  There would still be
18  CSO and still be a stormwater plant.  The NPDES would
19  continue to be violated because of the existence of the
20  stormwater plant and existence of CSO and the objective
21  of the EIS to promote or to leave open the option for
22  regionalization would not be met.
23      Coming out of this analysis, which looked at cost
24  and also looked at environmental and cost to society or
25  social impact is the apparent best project alternative.

1  The apparent best project alternative, or the proposed
2  project, is actually what's called a Phase I or division
3  of what was previously called Alternative 3, which is the
4  construction of storm sewers.  The phases have been
5  divided into two, Phase I and Phase II, and here we see
6  what is a proposed project in the north and northwest
7  portions of the City.
8      The proposed action in Phase I eliminates approximately
9  85 percent of the overflow and only 33 percent of the
10  total storm sewer cost is expended in performing this,
11  and this is how Phase I was actually defined, as that
12  portion of Alternative 3 which was cost effective at the
13  present time.
14      This would involve the construction of about 90
15  miles of storm sewers in the construction period, which
16  would take between three and five years, and a detailed
17  schedule has not been formulated at this time.
18      Phase II, which isn't shown here, is construction
19  of storm sewers in the remainder of the City, and this
20  would solve the remaining 15 to 16 percent of the over-
21  flow and would require approximately 61 percent of the
22  remainder of the cost of Alternative 3.
23      Phase II is a necessary component of this alternative
24  to allow full compliance with the NPDES program and also
25  to keep open the option for use of the City's treatment

CAROL L. DEWEY
Court Reporter for
U.S. District Court
Spokane, Washington 99201
(509) 458-4062

16                      CONFIDENTIAL

CAROL L. DEWEY
Court Reporter for
U.S. District Court
Spokane, Washington 99201
(509) 458-4062

17                      CONFIDENTIAL

Digitized by Google

plant for regionalization.

The project, in addition to being cost effective, was divided into Phase I and Phase II because at the present time there is insufficient federal and state grant funding to carry out the entire Alternative 3, whereas Phase I could be funded at the present time.

In a later part of this presentation, we will discuss the probable cost-sharing of Phase I, but now I would like to turn it over to Mike Rushton so he can discuss various impacts of the project.

MR. RUSHTON: Thank you, Bob.

I would like to run through, briefly, some of the findings of the Environmental Impact Statements and in terms of the impacts themselves, and in most cases these are broken down into Phase I and Phase II impacts of the proposed action, and I am dealing only with the proposed action.

In terms of construction problems related to this project, you see on the slide the area that would be affected by Phase I. There would be approximately 90 miles of separate storm sewers constructed in this area of the City over a three- to five-year period. This would, obviously, lead to typical construction-type problems of blocking of access, traffic disruptions, noise and dust and safety hazards created in the

construction zones, and this sort of thing. In most cases, any particular stretch of road would only be affected for a two- or three-week period, but this whole project would take three to five years to complete.

Phase II construction would cover the remaining part of the City, the remaining mileage of the total 220 miles of separate sewer construction, and at this time a time frame for that part of the project has not been developed, but it would also take at least five years to complete that construction, and you run into the same sorts of construction-related impacts along the pipeline route, traffic disruption, blocking of access and so forth.

It is important to note that in Phase II construction the downtown core part of the City would be affected. Phase I is mostly in the residential part of the City.

In terms of water quality implications, the City presently is contributing pollutants to the Spokane River from three different points.

You see here some bar graphs that estimate the loadings of the nitrogen and phosphorous to the Spokane River from the existing wastewater treatment plant downstream from the City, the stormwater treatment plant which is located at the same point, and then combined sewer overflows that occur at numerous points within the

Digitized by Google

1 City.

2 The major parameters we are looking at here are

3 nitrogen and phosphorous, mainly because these are the

4 elements of the wastewater which pertain to the

5 nitrification of the river.

6 This is another bar graph indicating the City's

7 current loading to the river compared to measurements

8 of nitrogen and phosphorous made at the head of Long

9 Lake in the year 1978, and you can see here that

10 approximately 2,030 tons of nitrogen phased into Long

11 Lake in 1978, as measured at the point at the head of the

12 lake.

13 The second bar indicates an approximation of what

14 the City is contributing to the river in terms of CSO,

15 stormwater plant discharge and advance wastewater

16 treatment discharge.

17 Phase I construction will reduce the smaller

18 increment here, the CSO increment, by approximately 84

19 percent in volume, and it will also reduce the storm-

20 water inflow to the treatment plant by approximately

21 one-quarter.

22 This results in approximately a three percent

23 reduction in the City's nitrogen loads and a five percent

24 reduction in the City's phosphorous loads to the river.

25 I am talking about only the middle bar here. Phase I

1 construction will eliminate three to five percent of

2 that middle bar.

3 Phase II, once it is completed, will eliminate all

4 CSOs, all storm plant discharge, and another large

5 increment of the stormwater that is currently going

6 through the treatment plant. This reduces the City's

7 total load of nitrogen and phosphorous, nitrogen about

8 22 percent and phosphorous about 21 percent. This large

9 percentage removal is due not only to the removal of

10 CSOs and storm plant discharges, but also is expected

11 to improve removal efficiency at the existing wastewater

12 treatment plant, due to the fact that flows through the

13 plant will be on a much more even basis throughout the

14 year rather than peaking every time there is a storm.

15 These removals still will probably not show a major

16 increase in water clarity downstream from the City or a

17 major decrease in the potential algae growth in the Long

18 Lake area.

19 The public health implications of the proposed

20 project. As stated earlier, Phase I controls overflows

21 at both Meanach and Hollywood overflow points. Each of

22 these triangles represents a current overflow. The size

23 of the circle shows general annual relationships of the

24 volume of discharge from those points. Phase I will

25 control the two larger circles here, representing about

Digitized by Google

003860

04 percent of the annual volume of CSO to the river.
This will be a major reduction in bacterial and viral
contamination that reaches the river, benefiting, of
course, the use of the river throughout the year. However,
period CSO events will continue to occur from the other
25 overflow points that are not controlled by Phase I.

Phase II, when it is completed, would eliminate the
remainder of the smaller overflows in the City.

Finally, the influence of the project on the
regionalization potential of the treatment plant. If
stormwater flows through the wastewater treatment plant
are eliminated, the plant has a capacity of serving a
much larger area than the City of Spokane. The plant
has now an average dry weather flow capacity of about
40 million gallons a day, and the present dry weather
flows through that plant are approximately 28 million
gallons a day. However, on an annual basis, the plant
is now treating about 11 million gallons a day of storm-
water that is diverted through the combined sewer system
to the treatment plant.

So, by eliminating stormwater overflows to the
plant, there is a sizeable increase in capacity at that
treatment plant.

Phase I will reduce the stormwater flows through
the plant by about 25 percent. That's in Phase I. Phase

II will free up an additional increment of interceptor
and treatment plant capacity for these other areas, and
once both phases are complete, this is when the region-
alization potential of the plant is really realized.

With stormwater plant clarifier conversion at the
treatment plant, these clarifiers are not treating storm-
water. It is diverted to secondary clarifiers and could
increase the plant's present average flow capacity from
40 million gallons to about 60 million gallons a day.
This is sufficient to accommodate projected flows out to
about the year 2000 from both the City, North Spokane
and most of the Spokane Valley. There is a potential
also that some expansion of phosphorous-removal capability
will have to go along with this modification of clarifiers
but that hasn't been developed to any great detail yet,
as to how extensive that would be.

I think I will turn it back to Bob to talk about
costs.

MR. GUFFERNEN: This chart shows the cost for
the apparent best project alternative, or the proposed
project, for Phase I, Phase II, and the total cost.

Phase I, the total construction cost is roughly
25 million dollars, and for Phase II, it is 39 million
dollars, to give a total construction cost of 64 million
dollars. That's if the project were constructed at the

003861

1 present time.

2 Now, the allocation of the project costs between

3 EPA, the State of Washington, and the City are governed

4 by a very complex formula which allocates the cost for a

5 multi-purpose project, which this is, between pollution-

6 control features and drainage features.

7 Looking at the total cost of 64 million dollars

8 if it were constructed today and utilizing this formula,

9 the project as we have calculated it is 85.7 percent

10 eligible for state and federal funding.

11 When it is divided into Phase I and Phase II, the

12 funding for Phase I is 100 percent eligible for federal

13 funding. 100 percent eligible, when it is translated,

14 means that 75 percent of the cost is paid by the federal

15 government, 15 percent by the state and 24 percent by the

16 City, as is shown in this chart.

17 At the present time, the funding for Phase II cannot

18 be determined, since there is no money allocated by the

19 state and federal governments at the present time for

20 funding from years subsequent to about 1981, and Phase

21 II would be constructed somewhat after 1981.

22 The translation of the City's share of the

23 construction and the operation and maintenance of this

24 project is shown at the bottom here, and it could be

25 done either of two ways, or a combination of these two

---

1 ways.

2 The first way that is shown is to increase the

3 users' charges per connection, and I would like to point

4 out that this estimate of $6.73 per month is based on

5 total connections in the City, and it is not based on

6 industry absorbing more than the cost of, say, one

7 connection. So when it is actually allocated through

8 according to federal regulations, it is somewhat less

9 per household connection.

10 The second way to do it is a tax rate increase, an

11 ad valorem taxation method, and if the entire City's

12 share of construction O and M were carried this way,

13 the tax rate increase would be $.21 per thousand dollars

14 of assessed valuation.

15 Like I said, there may be some combination of these

16 two funding methods which could be utilized.

17 I will turn the presentation back now to Charlie

18 Hazel.

19 MR. HAZEL: One thing that should be corrected

20 on the chart is that the $6.73 per month is $6.73 per

21 year, not per month.

22 MR. GUTERMUTH: No, that's per month.

23 MR. HAZEL: That should lead to a good question,

24 whether it is $6.73 a month or $6.73 a year.

25 To summarize our conclusions, the impact from the

1   proposed Phase I project, the construction impacts are

2   localized to the area previously shown on the map and in

3   the handout.  The CSO, Combined Sewer Overflows, will

4   continue to discharge from 25 locations along the river,

5   and, therefore, Phase I of the project will only partly

6   abate the pollutants going into the river.

7   About 16 percent of the original volume of CS

8   overflow would still enter the river.  Sewer backup and

9   street flooding within the City would be corrected within

10  approximately one-third of the City area.  Flows to the

11  advanced wastewater treatment plant will be reduced by

12  595 million gallons per year, and in doing this, there

13  would be some conservation of chemicals and energy, and,

14  therefore, cost of operation to the plant, based on those

15  flows.  Flow reduction will be insufficient to fully

16  encompass regionalization if this is presented as a

17  regionalization option.

18  The amount of nutrients removed will probably have

19  no measurable  effect on the algae problems reported in

20  the downstream area, but control of about 84 percent of

21  the combined sewer overflow should significantly reduce

22  the risk to public health for the pathogens that enter

23  the river.

24  With that, that completes our presentation.

25  MR. GUNDERMAN:  It is per year.

1   MR. HAZEL:  It is per year.

2   MS. COYLE:  For the record, that is $6.73 per

3   year.

4   MR. GUNDERMAN:  Per connection.

5   MS. COYLE:  Mr. James.

6   MR. JAMES:  Roger James, the Director of

7   Utilities with the City of Spokane, and I would say a

8   couple things before I start.

9   Number one, it is a real pleasure for me to be here

10  today to represent the City and to participate in this

11  very important meeting, and, secondly, I would also say

12  that the assignment which you have given me to present

13  at the meeting today has pretty well been covered by the

14  last two speakers, so I think I will vary a little bit from

15  my original assignment and talk a little bit, briefly and

16  rather quickly, about some of the historical points in

17  the development of this system and some of the things

18  that are perhaps not too well known to many of the

19  people in the audience today.  I will try to run through

20  these quite rapidly.

21  It might be of interest to know that the first

22  sewers in the City of Spokane were constructed and

23  placed into operation in 1890.  They were in the area

24  just west of the downtown business district.  The sewer

25  system in the downtown area was built during the 1900's.

Digitized by Google

003863

sewer construction has continued rather evenly throughout
all of the years since that time, and up until about 1940,
about the beginning of World War II, all sewers
constructed within the City were combined sewers, meaning
that they not only carried away sanitary sewage from
houses, commercial, industrial, institutions, but also
carried stormwater from catch basins and roof drains
and this type of thing. All of them, with the exception
of some of the very few first built, were of the combined
sewer variety.

The City of Spokane has a long history of interest
in sewage treatment, and I think maybe some people are
not aware of that. It might be interesting to know that
the City began seriously considering building sewage
treatment in 1913. The City developed a number of
programs for providing sewage treatment over the years
with the help of their consulting engineer, a firm which
was at that time located in Chicago, Illinois.

On four occasions before World War II, we presented
comprehensive plans to the voters of the City of Spokane
for sewage treatment facilities for the City, and I might
say we were rather horrendously defeated at the polls in
every attempt to do this, but some very concentrated
efforts were made to do it.

Finally, in 1946, the fifth presentation was made,

and at that time the bond issue was successful and
money was made available to start the process of sewage
treatment.

The construction of intercepting sewers along the
river was commenced in 1947. The original sewage treat-
ment plant was built and placed in operation in 1958.
It was significantly enlarged and upgraded in 1962. The
City, in the interim period, had built seven, what we
call satellite treatment plants, to treat areas of the
City which are not tributary to the main sewer system,
and still operates these seven plants, the idea being
that eventually they will be tied into the sewer system,
but at the present time it is more economical to keep
them completely separate from the existing system.

The efforts to rebuild a sewage treatment plant and
enlarge it and upgrade it were started in 1967. The
actual design work began in 1972. Construction of the
sewage treatment plant was commenced in 1975 and went on
line in 1977. It is a very modern plant. We are very
proud of the job that it does. We are meeting the
standards in our NPDES permit, and have consistently met
the standards, with the new treatment plant. We think
it is a real model, and we think it is an excellently-
operated plant.

The City was under orders from the state and the

CAROL L. DEWEY
Court Reporter plus
E. Staff reporter
SPOKANE, WASHINGTON 99201
(509) 456-8147
38

CAROL L. DEWEY
Court Reporter plus
E. Staff reporter
SPOKANE, WASHINGTON 99201
(509) 456-8147
39

Digitized by Google

1  federal government to do something about this combined-
2  sewer overflow problem and pursue it to that objective.
3  They did apply for a Step 1 grant to do the original
4  planning for this project.  The planning was done with
5  engineers from our own Public Works Department and the
6  Facility Plan was prepared by them.
7      A great many different ideas were considered
8  in solving this problem, and the three listed first on
9  the showing there a few minutes ago were the three which
10  we decided were worthy of some additional study; that is,
11  the storage basin concept plan, one involving statisti-
12  cally one overflow each 25 years.  These were very large
13  basins to be constructed at various points along the
14  Spokane River.  They are an expensive operation, because,
15  of course, as you realize, they have to be very large, in
16  the first place.  Then, in the second place, they have to
17  be equipped with extremely large pumps because when they
18  fill up they have to be pumped back into the system, ready
19  for the next rain.  You really have to get that material
20  out of there in a hurry, and because they are in the
21  congested areas of the City and because of the possible
22  concern and nuisance arising from them, some very
23  elaborate plans have to be included to clean them and put
24  them in shape so they will not be a nuisance.
25      We investigated, secondly, what they have referred

1  to as satellite-treatment-plant concept where we would
2  build small, automatic plants at these various outlets
3  and they would go on line whenever material started to
4  overflow and run only during the overflow period.
5      And, finally, this process of sewer separation,
6  in which we made what is essentially a brand-new sewer
7  system over the entire City, disconnected the catch
8  basins and roof drains from the existing sewer, and
9  tied them into the new one, and used the existing sewer
10  exclusively for sanitary sewers.
11      The cost of these has been mentioned before.  Our
12  figures were about 64 million dollars for the sewer-
13  separation concept, which was by far the most inexpensive
14  and most cost effective of the three plans we investigated.
15      The part which has been designed as Phase I, which
16  included something better than a-third of the City toward
17  the north end, we estimated it would cost about 24
18  million.  These figures were based on the concept of
19  taking enough stormwater out of the system so the system
20  would not overflow.
21      However, we did come up with the cost of another
22  eight million dollars which would be necessary were it
23  necessary that we actually remove all of the stormwater
24  from the sewers, and not just enough to keep them from
25  overflowing.  We estimated another eight million dollars

Digitized by Google

would be required to accomplish that purpose, and this
was the plan that we went to the State of Washington
with.

I would comment just briefly on the matter of costs.
We have been reviewing the Environmental Impact
Statement, and, frankly -- and I don't mean to say this
in a derrogatory manner, but, frankly, we feel the entire
chapter relating to costs and charges for services should
really be redone because the figures are out-of-date and
because we think they are based on assumptions which are
simply not in accordance with Washington State law and
would not be possible. So we will be filing a statement
later on in that, attempting to point out why we believe
these things to be true.

The City is anxious to proceed with this project
and to get it underway as best we can. Our figures
indicate that the dry-weather flow runs about 20 million
gallons per day. We can provide the complete advanced
wastewater treatment to sewage at the rate of about 77
million gallons a day. We can treat all of the sewage
which gets into the interceptor, somewhere around a rate
of 125 million gallons a day, either at the present time,
we can treat the 77 million with the complete advanced
wastewater treatment, and the balance of the 125 million,
about 48 million, would receive primary treatment and

disinfection. The project, we think, has been rather
carefully worked out. We are prepared to move ahead
with it as soon as the necessary steps of the EIS and
the financing can be worked out. We are very happy to
have the people in the EPA and the others here today
to talk to the citizens of Spokane regarding this
project. We think it is a good project, and we hope we
can get underway rather shortly.

Thank you very much.

MS. COYLE: Now, hopefully, going into part
two of our agenda, there are several federal employees
in the audience this afternoon, but I understand they
are not prepared to make any comments at this point, but
would be willing to answer questions. Some of these
individuals are Deborah Kirk, who is Project Officer on
the Environmental Impact Statement, Mr. Ken Lawson, who
is the Project Engineer with respect to this project.

In the event we have questions and they are the
individuals who are best qualified to answer, they would
be willing to do so.

We also have several representatives from the State,
two individuals from the State who, again, would be
willing to field questions if they arise, Mr. John
Arnquist and Mr. Claude Sappington.

There may be other representatives here. I am not

CAROL L. DEWEY
Court Reporter, Inc.
S. 320 Howard
SPOKANE, WASHINGTON 99201
(509) 456-3467
003866

aware of anyone here being from the County. Mr. Dobratz,
if any questions arise you might be able to handle, I
hope you will be willing to help us out.

Aside from Mr. James, I believe Mr. Yake has left
the room.

MR. JAMES: Mr. Blagen is in the back row
there.

MS. COYLE: Mr. Blagen may be able to answer
questions.

Are there any questions at this point from individuals
in the audience? I haven't received any cards suggesting
that there might be.

SIR?

MR. SCHASRE: Gentlemen, my name is James
Schasre. I am here as President of Lake Spokane
Environmental Association.

We are interested in this EIS report in a lot of
respects. One particular facet of it that we are
vitally interested in is what kind of treatment, if any,
is contemplated for the storm sewer overflow before it is
dumped into the river? In other words, is it going to be
collected directly from the various basins, together with
all the debris normally found on the street and the salt
from the winter and so on and so forth, dumped directly
into the river, or is it going to be treated in some

fashion? If it is going to be treated, we would like to
know what the cost of that would be, or if study has been
given as to what the cost of that treatment might be.

MS. COYLE: Mr. Burd?

MR. BURD: Mr. James may be able to answer
better than I am, but the project doesn't, as far as I
know, contemplate treatment of stormwater that is
separated from the combined sewer and discharged
separately.

I think it should be pointed out that there is
considerable difference in the characteristics, the
quality of the combined sewer overflow that is presently
discharged into the river and the characteristics of
the separated stormwater. Combined sewer overflow has
a much greater pollution load, in terms of organic
solids, in terms of bacteria. Stormwater has a much
lower contribution of those pollutants that I think we
are most concerned about in the Spokane River and Long
Lake. Certainly, there are some, as you indicate, the
stormwater washing off of streets, parking lots, does
carry along with it the debris and dirt and other things,
oil from automobiles, that are on the streets and parking
lots; but, again, the pollution load from that source is
considerably less than that from combined sewer overflow,
and hopefully there will be programs in the city and

Digitized by Google

003867

County that perhaps will more efficiently remove some
of the debris from the streets and parking lots so even
less of that material would be carried along in the
stormwater.

MS. COYLE: Mr. James, do you have anything to
add?

MR. JAMES: I guess I would kind of echo some
of the things Mr. Burd has said.

There is no contemplation at this time of a
treatment for the separated stormwater. It is our
considered opinion that if treatment of stormwater becomes
a necessity, that the type of treatment which would have
to be provided for the stormwater would be considerably
different from the type of treatment which is provided for
sanitary, domestic sewage, and, therefore, it is our
feeling and our judgment that, if we are required at some
time to treat the stormwater, that it would be necessary
to separate it before it could be treated, and so we feel
that, even if this is a future outlook, that this is a
step in the right direction, and a step which, in our
opinion, would be necessary in order to accomplish that
kind of treatment. This is our feeling.

We did some studies in connection with our Facilities
Plan, and undoubtedly will do more on the possible effects
of discharging the stormwater directly to the river, and

at least as a result of the studies that we did, we
came to the conclusion -- and I am sure that the EPA
and the DOE at that time concurred in this decision --
that treatment under the present guidelines was not
considered to be necessary.

Thank you.

MS. COYLE: Any other questions anyone might
have?

MR. SCHASKE: I believe the DOE has conducted
some studies along the lines of the question I just asked.
I would like to hear what the DOE has concluded in that
regard, for the record.

MR. ARNQUIST: My name is John Arnquist, and I
am with the Department of Ecology here in Spokane, and
basically the answers that Bob and Roger gave about
stormwater treatment are shared by the Department of
Ecology. At this time, we have no requirement for the
City to treat separated stormwater, nor do we foresee
any in the immediate future.

MS. COYLE: Thank you, Mr. Arnquist.

Any other questions from the audience?

MR. JAMES: I would like to mention, Madam
Chairman, that the City, as of this moment, does not
have a consulting engineer on the storm separation
project. The City is engaged in the process of making

Digitized by Google

003868

1   the selection. The engineering firm which designed the
2   sewage treatment plant, and which, in all probability,
3   will work with us on the separation project, is repre-
4   sented here in the audience by Mr. Bob Smith, and I
5   think I would at least like to have people know who he
6   is, if they don't know who he is. He is here, if anyone
7   wishes to talk to him, Mr. Bob Smith from Bovay Engineers
8   here in Spokane, Washington.
9           MS. COYLE:  If there are no questions --
10   Mr. Smith?
11           MR. SMITH:  I have one question. Several
12   places in the report, we talked about the increased
13   suspended solid load by storm sewer separation, and I
14   think there is a conflict in two of the tables you have,
15   Table 2-1 and Table B-10, and somehow I couldn't always
16   come up with the same numbers.
17       In other words, on Table 2-1, you have got Total
18   Suspended Solids, 20 to 210, and on Table B-10, you have
19   76 to 220.  Looks like Suspended Solids BOD have been
20   inadvertently flip-flopped, and I'm wondering which
21   numbers have been used.
22       Perhaps Mr. Rushton could answer.
23           MR. RUSHTON:  Table 2-1?
24           MR. SMITH:  And B-10.
25           MR. GUTHERMAN:  I don't think we can answer that

1   at the present time.
2           MR. SMITH:  I don't doubt there might be an
3   increase of some sort in mineral matter and that type
4   of thing.  I am wondering, I guess, if that was
5   clarified.
6       I also wanted to know, you have got a footnote of
7   number six that the treatment plant provided some data
8   on stormwater runoff.  I am wondering if that shouldn't
9   be clarified, to make sure that was stormwater runoff
10   and not combined sewer overflow.
11           MR. GUTHERMAN:  We will clarify that.
12           MR. SMITH:  I don't know where they would have
13   gotten a sample of purely stormwater runoff to make up
14   an analysis.
15           MR. GUTHERMAN:  That was information furnished
16   by the City, and it was indicated it was for stormwater
17   runoff.
18           MR. JAMES:  I think, Mr. Smith, Mr. Flagen
19   can help you with that question because he is familiar
20   with what you are talking about. He will talk to you
21   afterward, or now, or whenever you want him to.
22           MR. BLAGEN:  I would like to say one comment
23   now.  We did take a few samples of stormwater runoff.
24           MS. COYLE:  Any other questions or comments
25   by any other representatives here?

Digitized by Google

I might have one question of Mr. Burd.

If I were a citizen of the City of Spokane, I would probably be very concerned about the economic alternatives, the economics of the alternatives proposed, and I believe as were discussing this earlier, that the proposed option is the second most cost effective, not the most cost effective.

What rationale could you give me for justifying that selection?

MR. BURD:  EPA regulations and the law generally require the selection of the least-cost alternative unless there are other factors, particularly environmental factors, that would justify going through a somewhat more expensive alternative.

In the case here, the proposed recommended alternative is the second least costly, but we feel it has some environmental advantages over the strictly least-costly alternative, plus it has the advantage of allowing regionalization of sewage facility in the area so that additional sewage from Spokane County could be received by the City sewage treatment plant.

That, in itself, by the way, could certainly lead, and probably would lead, to additional environmental advantage, to have the regional, rather than multiple, treatment plants around the County.  This is a case where

there are some definite environmental advantages, and the institutional advantage of regional sewage treatment plants that overrides the least-costly alternative, and I think would justify the second-least-costly alternative.

MS. COZIE:  Any other questions?

If not, for the record, I would like to give to our reporter a copy of the Notice of this public hearing, and Affidavit of Publication, which I would give to you after the meeting is closed.

If there are no further questions or comments, then this meeting is adjourned at 3:40.

Thank you for coming.  I appreciate it.

(Hearing is concluded.)

003870

Digitized by Google

C E R T I F I C A T E

As court reporter, I hereby certify that
this transcript is a true and accurate record
of the facts, matters and proceedings of the
meeting held on Wednesday, April 4, 1979.

CAROL L. DEWEY

Seattle, Washington

April 16, 1979

CAROL L. DEWEY

---

CHANGES IN FORM AND SUBSTANCE
TO BE MADE IN FOREGOING TRANSCRIPT

PAGE      LINE      CHANGES IN FORM AND SUBSTANCE AND REASONS
                              THEREFOR:

CERTIFICATE

I, MICHELLE COYLE, Hearing Officer, do hereby certify
that the foregoing is a true and correct transcript of the
public hearing held on Wednesday, April 4, 1979, at 2:30 in
the afternoon.

MICHELLE COYLE, Hearing Officer

Environmental Protection Agency

CAROL L. DEWEY

43

003871

Notice of Public Hearing
on and Availability of
An Environmental Impact Statement
for the Combined Sewer Overflow Abatement Project
for the City of Spokane, Washington

Notice is hereby given of public hearings to be held by the Environmental Protection Agency, Region 10 (EPA) on the City of Spokane's application to EPA for grant assistance in the abatement of combined sewer overflows. The hearings will be held on April 4, 1979, at 2:30 p.m. in the County Health District Offices, Room 140, W. 1101 College, and at 7:30 p.m. at the Shadle Park High School Auditorium, R. 4327 Ash.

The purpose of this hearing is to allow all interested parties an opportunity to express their views and furnish specific data on matters pertinent to the proposed action. Detailed information on the project is found in EPA's Draft Environmental Impact Statement. This document is on file and available for public inspection at the City of Spokane Library, W. 906 Main. Copies of the Draft Environmental Impact Statement can be obtained by request from EPA, 1200 Sixth Avenue, Seattle, WA 98101, ATTN: MS 443.

Public participation is encouraged by EPA. Exhibits, written statements, and other documentary evidence relating to the environmental impact of the proposed action can be submitted prior to the hearing. Anyone who has additional comments on the subject of the hearing may submit comments, exhibits, and evidence by April 19, 1979. Comments should be sent to EPA, 1200 Sixth Avenue, Seattle, WA 98101, ATTN: MS 443.

---

# Affidavit of Publication

STATE OF WASHINGTON
County of Spokane,                    } ss.

CHRISTINE CASSEY

, de solemnly swear that I am the

Printer; Clerk of the Spokesman-Review-Daily Chronicle , a newspaper established and

regularly published, once each                         -day

(1/Day) , in the English language, in and of general circulation in the

City of Spokane, Spokane County, Washington; that said newspaper has been so established and regularly published, and has not stad general circulation continuously for more than six (6) months prior to the 22nd day of July, 1941; that said newspaper is printed in an office maintained at its place of publication in the City of Spokane, Washington; that said newspaper was approved and designated as a legal newspaper by order of the Superior Court of the State of Washington for Spokane County as on the 22nd day of July, 1941, and that said order has not been revoked and which is in full force and effect; that the notice attached hereto and which is a part of the proof of publication

was published in said newspaper:

publication having been made once each                    times, the

from the    14th    day of    March    , A. D. 1979,

to the    _____    day of    _____    , A. D. 19____.

That said    notice    was published in the regular and entire issue of every number of the paper during the period and time of publication, and that the notice was published in the newspaper proper and not in a supplement.

_____

Subscribed and sworn to before me at the City of Spokane; this

_____    day of    March    , 19 79

_____
Notary Public in and for the State of Washington,
residing at Spokane, Wash.

Form C-16

BEFORE THE UNITED STATES

ENVIRONMENTAL PROTECTION AGENCY

REGION 10


A PUBLIC HEARING

AVAILABILITY OF AN ENVIRONMENTAL IMPACT STATEMENT

COMBINED SEWER OVERFLOW ABATEMENT PROJECT

CITY OF SPOKANE, WASHINGTON


BEFORE

MICHELLE COYLE

HEARING OFFICER


7:30 P.M.

APRIL 4, 1979

SHADLE PARK HIGH SCHOOL AUDITORIUM

NORTH 4327 ASH

SPOKANE, WASHINGTON

CAROL L. DEWEY

---

7:30 P.M., April 4, 1979

MS. COYLE: Let the record indicate that it is now 8:00 p.m., and we are here at the Shadle Park High School Auditorium, North 4327 Ash, in Spokane; that we have been present since 7:30, the time that was officially designated as the commencement of this meeting.

No private citizens are present, and I would like to open the floor under these circumstances to any questions from the various representatives and governmental officials who are present.

Are there any questions or comments on the part of any persons present?

I only see one individual who wasn't here this afternoon. Do you have any questions?

In that case, I would like to close the meeting -- It is about 8:03 -- and recommend that those individuals who did not make use of this evening's meeting still have until April 19, 1979 to submit their written comments to EPA, Roger Mochnick, care of the EPA Regional Office, Region 10, Seattle, Washington, 98101.

(Hearing is concluded.)

CAROL L. DEWEY
Court Reporter, Inc.
S 3417 Perry
SPOKANE, WASHINGTON 99203
(509) 448-8467



C E R T I F I C A T E

As court reporter, I hereby certify that this transcript is a true and accurate record of the facts, matters and proceedings of the meeting held on Wednesday, April 4, 1979.

Carol L. Dewey

Seattle, Washington

April 16, 1979



CHANGES IN FORM AND SUBSTANCE
TO BE MADE IN FOREGOING TRANSCRIPT

PAGE    LINE    CHANGES IN FORM AND SUBSTANCE AND REASONS
THEREFOR:

CERTIFICATE

I, MICHELLE COYLE, Hearing Officer, do hereby certify that the foregoing is a true and correct transcript of the public hearing held on Wednesday, April 4, 1979, at 7:30 in the evening.

MICHELLE COYLE, Hearing Officer
Environmental Protection Agency

Digitized by Google

003874

Notice of Public Hearing
on and Availability of
An Environmental Impact Statement
for the Combined Sewer Overflow Abatement Project
for the City of Spokane, Washington

Notice is hereby given of public hearings to be held by the Environmental Protection Agency, Region 10 (EPA) on the City of Spokane's application to EPA for grant assistance in the abatement of combined sewer overflows. The hearings will be held on April 4, 1979, at 2:30 p.m. in the County Health District Offices, Room 140, W. 1101 College, and at 7:30 p.m. at the Shadle Park High School Auditorium, N. 4327 Ash.

The purpose of this hearing is to allow all interested parties an opportunity to express their views and furnish specific data on matters pertinent to the proposed action. Detailed information on the project is found in EPA's Draft Environmental Impact Statement. This document is on file and available for public inspection at the City of Spokane Library, W. 906 Main. Copies of the Draft Environmental Impact Statement can be obtained by request from EPA, 1200 Sixth Avenue, Seattle, WA 98101, ATTN: MS 443.

Public participation is encouraged by EPA. Exhibits, written statements, and other documentary evidence relating to the environmental impact of the proposed action can be submitted prior to the hearing. Anyone who has additional comments after attending the hearing may submit comments, exhibits, and evidence by April 19, 1979. Comments should be sent to EPA, 1200 Sixth Avenue, Seattle, WA 98101, ATTN: MS 443.

Affidavit of Publication

STATE OF WASHINGTON,
County of Spokane, ss.

CHRISTINE CROSBY

—do solemnly swear that I am the

Principal Clerk of the Spokesman-Review-Daily Chronicle a newspaper established and regularly published, once each _____ day,

(Weekly) in the English language, in and of general circulation in the City of Spokane, Spokane County, Washington; that said newspaper has been so established and regularly published and has six (5) months prior to the 23rd day of July, 1941; that said newspaper is printed in an office maintained at its place of publication in the City of Spokane, Washington; that said newspaper was approved and designated as a legal newspaper by order of the Superior Court of the State of Washington for Spokane County on the 23rd day of July, 1941; and that said order has not been revoked and is in full force and effect; that the notice attached hereto and which is a copy of the proof of publication,

was published in said newspaper _____ times,

publication having been made once each _____ time

from the _____ 14th _____ day of _____ March _____, A. D. 1979,

to the _____ day of _____ A. D. 19

That said _____ notice _____ was published in the regular and entire issue of every number of the paper during the period of time of publication, and that said notice was published in the newspaper proper and not in a supplement.

Subscribed and sworn to before me at the City of Spokane, this _____ 14th _____ day of _____ March _____, 1979

Notary Public in and for the State of Washington, residing at Spokane, Wash.

003875



C E R T I F I C A T E

As court reporter, I hereby certify that
this transcript is a true and accurate record
of the facts, matters and proceedings of the
meeting held on Wednesday, April 4, 1979.

CAROL L. DEWEY

Seattle, Washington

April 16, 1979



CHANGES IN FORM AND SUBSTANCE
TO BE MADE IN FOREGOING TRANSCRIPT

PAGE    LINE    CHANGES IN FORM AND SUBSTANCE AND REASONS
THEREFOR:

CERTIFICATE

I, MICHELLE COYLE, Hearing Officer, do hereby certify
that the foregoing is a true and correct transcript of the
public hearing held on Wednesday, April 4, 1979, at 7:30 in
the evening.

MICHELLE COYLE, Hearing Officer
Environmental Protection Agency

Digitized by Google

003876

## Affidavit of Publication

STATE OF WASHINGTON } ss.
County of Spokane.

I, _____ Principal Clerk of the Spokesman-Review-Daily Chronicle a newspaper established and

_____ do solemnly swear that I am the regularly published once each _____ day

(Week) (Day) in the English language, in and of general circulation in the City of Spokane, Spokane County, Washington; that said newspaper has been so established and regularly published and has had general circulation continuously for more than six (6) months prior to the 23rd day of July, 1941; that said newspaper is printed in an entire issue in said place of publication in the City of Spokane, Washington; that said newspaper was approved and designated as a legal newspaper by order of the Superior Court of the State of Washington for Spokane County on the 23rd day of July, 1941, and that said order has not been revoked and is in full force and effect; that the notice attached hereto and which is a part of the proof of publication.

was published in said newspaper _____ times, the publication having been made once each _____ time,

from the _____ 14th _____ day of _____ March _____ A. D. 19 79

to the _____ day of _____ A. D. 19 ____

That said _____ notice _____ was published in the regular and entire issue of every number of the paper during the period of time of publication, and that the notice was published in the newspaper proper and not in a supplement.

Subscribed and sworn to before me at the City of Spokane, this 14th day of _____ March _____ 1979

Notary Public in and for the State of Washington, residing at Spokane, Wash.

Form C-14

---

Notice of Public Hearing
on and Availability of
An Environmental Impact Statement
for the Combined Sewer Overflow Abatement Project
for the City of Spokane, Washington

Notice is hereby given of public hearings to be held by the Environmental Protection Agency, Region 10 (EPA) on the City of Spokane's application to EPA for grant assistance in the abatement of combined sewer overflows. The hearings will be held on April 4, 1979, at 2:30 p.m. in the County Health District Offices, Room 140, W. 1101 College, and at 7:30 p.m. at the Shadle Park High School Auditorium, N. 4327 Ash.

The purpose of this hearing is to allow all interested parties an opportunity to express their views and furnish specific data on matters pertinent to the proposed action. Detailed information on the project is found in EPA's Draft Environmental Impact Statement. This document is on file and available for public inspection at the City of Spokane Library, W. 906 Main. Copies of the Draft Environmental Impact Statement can be obtained by request from EPA, 1200 Sixth Avenue, Seattle, WA 98101, ATTN: MS 443.

Public participation is encouraged by EPA. Exhibits, written statements, and other documentary evidence relating to the environmental impact of the proposed action can be submitted prior to the hearing. Anyone who has additional comments after attending the hearing may submit comments, exhibits, and evidence by April 19, 1979. Comments should be sent to EPA, 1200 Sixth Avenue, Seattle, WA 98101, ATTN: MS 443.

Digitized by Google

# U.S. ENVIRONMENTAL PROTECTION AGENCY

## REGION X

1200 SIXTH AVENUE
SEATTLE, WASHINGTON 98101



REPLY TO
ATTN OF: M/S 443

JUL 3 1 1979

To:  All Interested Governmental Agencies, Public Groups and Citizens

In compliance with Section 102(2)(c) of the National Environmental
Policy Act of 1969, the Environmental Protection Agency has prepared
a Final Environmental Impact Statement (EIS) entitled "City of
Spokane Combined Sewer Overflow Abatement Project." The Final EIS
is enclosed for your review and any comments you may have.

After a careful review of all comments received on the Draft EIS and
an evaluation of the environmental impacts associated with each of
the alternatives considered, EPA recommends the implementation of
Alternative 3, separation of storm and sanitary waste flows.  EPA
has determined that this alternative will provide a cost effective
and environmentally sound approach to the project.

Comments on this Final EIS and on EPA's recommendation are welcome.
At the close of the 30-day review period, September 10, 1979, a final
decision will be made concerning the award of construction grant funds
to the City of Spokane for implementation of the recommended project.

Please send any comments you may have or requests for additional
copies of the EIS to EPA at the above address, attention:  Roger K.
Mochnick, Environmental Evaluation Branch, M/S 443.

Sincerely,

Donald P. Dubois
Regional Administrator

Attachment

Digitized by Google

003880

Digitized by Google



Digitized by Google

Digitized by Google

003883

Digitized by Google

003884





8/13/2012
269273 1 31
T 00
HF GROUP - IN

003885

