# EXHIBIT 22

Page 1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF WASHINGTON
 2   _____
                                 )
 3   CITY OF SPOKANE, a          )
     municipal corporation       )
 4   located in the County of    )
     Spokane, State of           )
 5   Washington,                 )   Case No.
                                 )   2:15-cv-00201-SMJ
 6              Plaintiff,       )
                                 )
 7       -vs-                    )
                                 )
 8   MONSANTO COMPANY, et al.,   )
                                 )
 9              Defendants.      )
     _____
10

11

12            SHOOK HARDY & BACON L.L.P.
            2001 MARKET STREET - SUITE 3000
13         PHILADELPHIA, PENNSYLVANIA  19103
                  JANUARY 17, 2020
14                   9:11 A.M.

15

16
                   ORAL DEPOSITION OF
17                  JOHN P. WOODYARD

18

19

20

21

22

23   REPORTED BY:

24   DEBRA SAPIO LYONS, RDR, CRR, CRC, CCR, CLR, CPE

25   JOB NO. 174202
```

Page 44

1                 John P. Woodyard
2   sure that you and I are on the same page --
3   that you have participated in multiple PCB
4   projects for industry and government.
5             What did you mean by "industry"?
6       A.    Private corporations.
7       Q.    Anything else?
8       A.    I don't think so.  I think that's
9   what I was thinking when I wrote that.
10      Q.    Okay.  We covered this a little
11  bit before, but I want to ask you some -- a
12  few more specific questions on the scope of
13  what you're planning on testifying to with
14  regard to the EPA.  Okay?
15      A.    Okay.
16      Q.    I'm wondering, are you planning on
17  rendering opinions on EPA's intent with regard
18  to various regulations?
19      A.    Possibly, particularly in the
20  context of preambles and guidance documents
21  surrounding the regulations that are intended
22  to help people understand their intent.
23      Q.    Would the testimony that you're
24  providing or may provide with regard to the
25  intent of the EPA, would it be a matter of

Page 45

 1                John P. Woodyard
 2   reading the various documents that undergird
 3   that regulation, such as preambles and things
 4   of that nature, documents that EPA has
 5   created?
 6        A.   No, it would -- it would go beyond
 7   that.  I've worked directly with EPA for most
 8   of the last 40 years in some capacity and --
 9   and have had communications, conversations
10   with them that have -- that have colored my
11   view on -- on a lot of these issues.
12        Q.   So your intent is to -- the scope
13   of your description of EPA intent goes to
14   discussions with third parties at the EPA or
15   related to the EPA; correct?
16        A.   Including, but not limited to
17   that, that group that you just described, yes.
18        Q.   And your intention is to give
19   opinions on EPA's intent not only from the
20   documents that the EPA has promulgated itself,
21   or the regulations, but also through your
22   discussions with various EPA officials and
23   people knowledgeable about EPA?
24        A.   Including those, but not limited
25   to those.

```
                                                          Page 46
 1                   John P. Woodyard
 2          Q.    Fair enough.
 3          A.    It could include a broad range
 4   of contact I've had with the agency and with
 5   people who've interacted with the agency.
 6          Q.    Is there any other basis for --
 7   you describe -- you've given me the various
 8   other EPA documents, such as preamble and the
 9   written word of the EPA, and then you've
10   indicated through your experience with
11   communications and conversations with EPA
12   officials and other people.
13                Are there any other bases for your
14   rendering an opinion on the intent of the EPA?
15          A.    I -- I think pretty broadly that
16   covers it, but there are a broad range of
17   communications I might have had with EPA or
18   people that interacted with EPA during that
19   time.
20          Q.    And what particular expertise do
21   you have that would allow you to provide an
22   opinion on the intent of a regulatory body?
23          A.    Well, I think you mischaracterized
24   my testimony.  The -- it's not -- it's not my
25   in -- I forget the word you used.
```

Page 47

1                       John P. Woodyard
2          Q.    Expertise.
3          A.    -- expertise in understanding
4    their intent.  It's my experience in
5    interacting with them and communicating with
6    them on their intent in a variety of specific
7    situations.
8          Q.    Communications with these third
9    parties?
10         A.    With EPA and -- and clients and
11   others who've interacted with EPA as well.
12         Q.    Those would be with third parties
13   that are not before us today?
14         A.    That would be correct.  That would
15   include such as trade associations, individual
16   clients who were involved in EPA discussions,
17   permits, things of that nature.
18         Q.    Have you -- you've never worked
19   for the EPA, I assume?
20         A.    As an employee?  No.
21         Q.    Yes, sir.
22               You mentioned a couple of
23   documents.  One was the preamble, but you said
24   a couple of other things and I forget what it
25   was.  My question is:  Are there any

Page 48

```
 1                    John P. Woodyard
 2   particular documents that you have reviewed
 3   that you're relying upon in giving opinions on
 4   the EPA's intent?
 5           A.    I think -- I think I referred
 6   generally to preambles and guidance documents.
 7           Q.    What do you mean by that, sir?
 8           A.    Mean by what?
 9           Q.    Guidance documents.
10           A.    What I mean by that is documents
11   EPA has published, including memoranda, but
12   also booklets, question-and-answer documents,
13   things of that nature that are specifically
14   intended to inform the regulated community on
15   what they meant by certain rules and
16   certain -- certain technical requirements in
17   the regulations.
18           Q.    And those would be documents that
19   are published or put out by the EPA?
20           A.    Yes, those are publicly available.
21           Q.    Are you relying upon any other
22   documents from other sources other than the
23   EPA in rendering opinions on the EPA's intent?
24           A.    That's hard to say because going
25   back to my earlier testimony, part of -- part
```

Page 49

1            John P. Woodyard
2    of my experience in -- in understanding EPA's
3    intent has to do with communications I may
4    have had with EPA, which might have been
5    dialogues with EPA, it may have been reviewing
6    permits and other communications related to
7    client issues.  So a lot of it's
8    conversational and it might not be a document
9    I'm relying on or even a document that I would
10   recall.
11        Q.   And I understand that.  I --
12   you've -- I think I understand that you've
13   indicated that for your purpose in determining
14   EPA's intent, you're going to rely upon
15   various -- various conversations with the EPA
16   and its various people over the years.  I
17   understand that.
18             My question goes specifically to
19   documents that those -- that may exist that
20   you're relying upon to render an opinion about
21   EPA's intent.
22        A.   In -- you're referring to this
23   case?
24        Q.   Yes, sir.
25        A.   I can't recall any offhand.

Page 149

1          John P. Woodyard
2  Mr. Goutman know so that he can supplement
3  your testimony for me, please, sir?
4        A.   Yes.
5             MR. MCDOUGAL:  Pass the witness.
6        Thank you.
7             MR. GOUTMAN:  Sure.
8  EXAMINATION
9  BY MR. GOUTMAN:
10       Q.   I have a few follow-up questions.
11            You mentioned in your discussions
12  with Mr. McDougal about EPA regulations, that
13  you would characterize them as highly
14  technical.  What did you mean by that?
15       A.   I meant that the regulations for
16  the most part are instructions or --
17  or other -- other communications that are
18  really focused on -- focused for engineers and
19  geologists to -- to apply.
20       Q.   And in your view, would somebody,
21  an engineer such as yourself who has 40 years
22  of experience in dealing with these
23  regulations, be of assistance to the judge and
24  jury in interpreting what those regulations
25  mean?

Page 150

John P. Woodyard

```
 2          A.   I, yes, I believe so.  That's why
 3   I put that information in to my report and
 4   other reports.  It's -- unless you have a
 5   technical background, it would be difficult
 6   for you to understand how the regulations are
 7   applied.
 8          Q.   Have there been Court cases where
 9   you have testified in front of judge and jury
10   on this very subject matter, that is the
11   meaning and interpretation of these highly
12   technical environmental regulations?
13          A.   Yes, there have been several
14   actually.
15          Q.   Okay.  And in those cases, the
16   Court permitted you to testify about that
17   subject matter; correct?
18          A.   Yes, that's correct.
19          Q.   And those cases were, what,
20   PennDOT?
21          A.   The PennDOT case we discussed
22   earlier, as well as, I believe it's two
23   different cases in -- in Alabama related to
24   the Anniston Plant.
25          Q.   In informing your views as to the
```

Page 151

John P. Woodyard

```
 1                  John P. Woodyard
 2   interpretation of those environmental
 3   regulations, you have mentioned in addition to
 4   your 40 years of experience, conversations
 5   you've had with EPA personnel.
 6              Did you also take into account the
 7   actions taken by the EPA with respect to
 8   different situations and the regulations that
 9   apply to those situations?
10         A.   I have indeed.  Actually, the --
11   when I talked about conversations, most of
12   those have been specific to projects, specific
13   to sites; and -- and any conversation, or at
14   least the essence of any conversation I would
15   have had would have been memorialized in the
16   permit documents associated ultimately with --
17   with that particular project, and there have
18   been dozens of those.
19         Q.   Now, I'm aware that OSHA, for
20   example, when they investigate a workplace
21   situation will issue a formal document that
22   might contain interpretations of OSHA
23   regulations.
24              Are you aware of that procedure?
25         A.   Right, they issue -- I think
```

Page 152

John P. Woodyard

```
 2   they're called letters of interpretation or
 3   something like that.
 4           Q.   Does --
 5           A.   Typically on a letterhead.
 6           Q.   Does the EPA do that?
 7           A.   No.  In fact, the -- OSHA has had
 8   for -- forever, for at least one or two
 9   decades now, a policy of posting every letter
10   of interpretation on their website so other
11   people can find it and apply it to their --
12   their own situations.
13                EPA has a history of being opaque
14   about that.  They certainly aren't openly
15   transparent.  They never post permits or
16   anything on their website, so it's -- it's
17   almost impossible for somebody to know what
18   EPA has approved in the past for other people
19   unless you've got people like me who are the
20   folks on the ground who get involved in those
21   things and can communicate precedents and
22   conditions to other clients.
23           Q.   Does the permitting process or the
24   conclusion of the permitting process in the
25   end reflect the EPA's interpretation of the
```

Page 153

1          John P. Woodyard
2    regulations?
3              MR. MCDOUGAL:  Objection, form.
4              THE WITNESS:  It in --
5    BY MR. GOUTMAN:
6         Q.   What does the permitting process
7    represent with respect to EPA regulations?
8         A.   Well, fundamentally the permitting
9    or approval process for anything under the PCB
10   regulations deals with situations that aren't
11   self-implementing.  In other words, they
12   aren't -- they aren't things you can just do
13   by reading the regulations.  They require EPA
14   approval of something, and that something
15   often deviates from what the regulations
16   suggest, and so there has to be discussion of
17   -- of how EPA came to the conclusion that
18   there's no unreasonable risk, and all the
19   background that went into it, including all
20   the documents that might have been submitted
21   associated with that, that request.
22        Q.   So without knowledge of these
23   permitting outcomes, if you will, one wouldn't
24   have knowledge as to how the EPA interprets
25   its own regulations?

Page 154

1                    John P. Woodyard
2         A.    That -- well, that's been my
3    experience and that's -- that's part of the
4    value I bring to clients when they're
5    encountering a new or somewhat complex
6    situation.
7         Q.    Just some other miscellaneous
8    questions.
9               You were asked about PCB
10   biodegradation.  Do you know whether, in fact,
11   in the peer-reviewed literature biodegradation
12   rates or ranges are published for PCBs?
13        A.    I've reviewed a lot of that
14   material over the years, and -- and there's
15   clearly a lot of research, a lot of focus on
16   that.  It's slow, but there's no question that
17   PCBs degrade in the environment over time.
18        Q.    And do different types of PCBs
19   biodegrade at different rates?
20        A.    They do.
21        Q.    Now, you were questioned about the
22   Monsanto -- Monsanto's decision to leave the
23   incineration business.
24              Do you know whether, in fact, when
25   that decision was made, whether there were

Page 163

1           John P. Woodyard
2       I'm wrong just because you included
3       "intent" in the second iteration of that
4       question, he said that he was going to rely
5       upon it in terms of how the regulations are
6       interpreted.
7              Is that fair?
8              THE WITNESS:  Yes.
9    BY MR. MCDOUGAL:
10       Q.   Is that -- that is fair then;
11   correct?
12       A.   Yes.
13       Q.   So your intention is to rely upon
14   EPA permitting outcomes to testify about how
15   EPA regulations are to be interpreted?
16       A.   Yes.
17       Q.   And which of those EPA permitting
18   outcomes will you rely upon in rendering that
19   testimony?
20       A.   Well, the whole -- the whole of my
21   experience in all those different permits, for
22   example.
23              We -- the context I was responding
24   to in making that statement was that you were
25   suggesting earlier that -- that conversations

1                John P. Woodyard

2    were somehow just conversations, when, in
3    fact, they were steps toward getting to a
4    written permit which memorialized those
5    conversations and that those permits are not
6    publicly available, the process is not
7    generally documented, just the outcome.  And
8    that's -- that's part and parcel to the
9    experience that I have that's valuable to
10   clients.
11        Q.   And I'm wondering if you have
12   today any specific EPA permitting outcomes
13   that form the basis of that testimony.
14        A.   And my answer, again, is all of
15   them.
16        Q.   And what document would reflect
17   what you mean by "all of them"?
18             What would encompass an
19   identification of those outcomes?
20             Is there a document we could look
21   at that would reflect those EPA outcomes that
22   you're relying on?
23             MR. GOUTMAN:  Objection, overly
24        broad.  If I might, it might be helpful --
25             MR. MCDOUGAL:  Sure.

```
 1                  John P. Woodyard
 2             MR. GOUTMAN:  -- to maybe go to his
 3       report and say, "With respect to this
 4       interpretation of this regulation, what
 5       permitting outcome?"  'Cause just it's very
 6       overly broad and that's why he's giving you
 7       all of them.
 8    BY MR. MCDOUGAL:
 9         Q.   Let me ask you this.
10              In reviewing your report, are
11    there particular places in your report that
12    identify specific EPA outcomes that you're
13    going to rely upon in testifying to EPA's
14    interpretation?
15         A.   As it relates to something in
16    Spokane?
17         Q.   Yes, sir.
18         A.   I don't believe I did that by --
19    again, what I'm responding to is -- is -- is
20    ensuring that -- that that experience broadly
21    defined with all those different permits,
22    either permits I've obtained or others have
23    that I've reviewed, how that flavors my -- my
24    skill set, if you will, in helping clients
25    with compliance issues, cleanup issues, and
```

Page 166

John P. Woodyard

1  
2  the like.
3       Q.   Over your roughly 40 years of
4  experience?
5       A.   Correct.
6       Q.   It's my understanding then that
7  there are not specific EPA outcomes that you
8  can identify that you would direct
9  specifically in the City of Spokane case that
10 would reflect EPA's interpretation?
11      A.   That -- that I can't say offhand.
12      Q.   Okay.
13      A.   All I'm trying to do is enhance or
14 at least illustrate the depth of my experience
15 in dealing with this and my credibility as
16 somebody who -- who can describe what the
17 regulations mean.
18           MR. MCDOUGAL:  Objection,
19    unresponsive.
20 BY MR. MCDOUGAL:
21      Q.   Talking about the incinerators,
22 Mr. Goutman asked you about the availability
23 of certain incinerators, and I think that you
24 indicated there were some additional
25 incinerators that were available.

TSG Reporting - Worldwide (877) 702-9580

Exhibit 22

447

Page 170

1        John P. Woodyard

2              CERTIFICATE

3   COMMONWEALTH OF PENNSYLVANIA    )

4                                   ) ss:

5   COUNTY OF PHILADELPHIA          )

6          I, Debra Sapio Lyons, a Registered
    Diplomat Reporter, a Certified Realtime Reporter,
7   a Certified Realtime Captioner, an Approved
    Reporter of the United States District Court for
8   the Eastern District of Pennsylvania, a Certified
    Court Reporter for the State of New Jersey; and
9   Notary Public within and for the States of New
    Jersey, New York and the Commonwealth of
10  Pennsylvania do hereby certify:

11         That John P. Woodyard, the witness whose
    deposition is hereinbefore set forth, was duly
12  sworn by me and that such deposition is a true
    record of the testimony given by such witness, to
13  the best of my ability and thereafter reduced to
    typewriting under my direction.
14
           I further certify that I am not related
15  to any of the parties to this action by blood or
    marriage and that I am in no way interested in
16  the outcome of the matter.

17         In witness whereof, I have hereunto set
    my hand this 21st day of January, 2020.
18

19
                    _____
20
                    DEBRA SAPIO LYONS
21                  CRR, RDR, CRC, CCR, CPE

22

23

24

25