**OFFICE OF THE CITY ATTORNEY**
Elizabeth L. Schoedel (WSBA #20240)
Salvatore J. Faggiano (WSBA #15696)
Assistant City Attorneys
808 W. Spokane Falls Blvd.
Spokane, Washington 99201
Telephone: (509) 625-6225

**BARON & BUDD, P.C.**
Scott Summy, TX Bar No. 19507500 (*Pro Hac Vice*)
Carla Burke, TX Bar No. 24012490 (*Pro Hac Vice*)
Celeste Evangelisti, CA Bar No. 225232 (*Pro Hac Vice*)
Brett Land, WSBA #53634
Cary McDougal, TX Bar No. 13569600 (*Pro Hac Vice*)
Alicia Butler, TX Bar No. 00797823 (*Pro Hac Vice*)
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219
Telephone: (214) 521-3605

John P. Fiske, CA Bar No. 249256 (*Pro Hac Vice*)
Jason J. Julius, CA Bar No. 249036 (*Pro Hac Vice*)
11440 West Bernardo Court, Suite 265
San Diego, CA 92127
Telephone: (858) 251-7424
[Additional Attorneys on Signature Page]

*Attorneys for Plaintiff City of Spokane*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| CITY OF SPOKANE, a municipal corporation located in the County of Spokane, State of Washington,<br><br>Plaintiff,<br>v.<br><br>MONSANTO COMPANY, SOLUTIA INC., and PHARMACIA CORPORATION, and DOES 1 through 100.<br>Defendants. | Case No.: 2:15-cv-00201-SMJ<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS'** ***DAUBERT*** **MOTION TO EXCLUDE THE EXPERT TESTIMONY OF LISA RODENBURG**<br><br>Hearing: March 12, 2020<br>Oral Argument Requested |

Notwithstanding the hyperbole in Defendants' *Daubert* motion, there is nothing wrong with the methodology employed, or the data used, by Dr. Lisa Rodenburg in formulating her expert testimony. Defendants are either mistaken about the facts or flat wrong about the bases for her opinions. And tellingly, Defendants have not challenged Dr. Rodenburg's qualifications.[1] Defendants have thrown 10 pages of mud against the wall, but none sticks. For the following reasons, Defendants' *Daubert* motion to exclude the expert testimony of Dr. Lisa Rodenburg should be denied.

**I.    Argument.**

To begin, Dr. Rodenburg never stated that byproduct PCBs were the main problem facing the Spokane River, as Defendants maintain, which is contrary to the conclusions she reaches in this case. *See* ECF No. 402 at 2 & ECF No. 403-1 at 4-5. Rather, Dr. Rodenburg stated that byproduct PCBs were the main problem facing the Spokane County Regional Water Reclamation Facility ("SCRWRF"). *See* ECF No. 403-1 at 88-89. Spokane County is not a plaintiff in this lawsuit, and the loads and characteristics of PCBs to the Spokane River from the SCRWRF are markedly different from those of the Spokane's Riverside

---

[1] Aside from her achievements as a Professor of Environmental Science at Rutgers, Dr. Rodenburg is an international expert on the identification of inadvertent PCBs. *See* ECF No. 403-1 Ex. A at 1-2, 45-46 (citing her peer-reviewed publications).

Park Water Reclamation Facility ("RPWRF").  *See* Exhibit 6 to Land Declaration in Support of Plaintiff's Response to Defendants' Daubert Motions ("Land Decl.") at Dep. at 72-73, 117-18.  Indeed, in her expert report, Dr. Rodenburg noted that commercial PCBs – i.e., not inadvertent -- account for more than 90% of PCBs in the treated effluent of the Spokane Waste Water Treatment Plant.  *See* ECF No. 403-1 at 4-5.

**A.    The Data Underlying Dr. Rodenburg's Opinions Is Reliable.**

Defendants complain that "much" of the sampling data reviewed by Dr. Rodenburg was selected by Plaintiff's counsel.  *See* ECF No. 402 at 3.  While it is true that Plaintiff's counsel provided some data—which primarily came from the State of Washington's online database—to Dr. Rodenburg for her review, most of the data relied upon by Dr. Rodenburg was provided by the Spokane River Regional Toxics Task Force, including all of the surface water data, most of the Kaiser groundwater data, and more than half of all data used for her Multiple Linear Regression analysis.  *See* Land Decl. Ex. 6 at 91:8-17, 95:13-20, 96:14-17; 96:22-97:4; ECF No. 403-1 at 27-37 (Source Data Column).  She did not base her testimony or opinions on representations made by Plaintiff's counsel, as Defendants suggest.

Defendants next contend that "Rodenburg does not know whether the data are representative of the Spokane River." ECF No. 402 at 3.  This is incorrect.  During her deposition, Dr. Rodenburg explained that the samples she analyzed were collected to be representative of the Spokane River in its entirety.  Land Decl. Ex. 6 at 103:17-18. She also

looked at the Spokane River at both low flow and high flow and noted that the samples were "pretty representative of the highest flow you're going to get in the Spokane River." *Id.* at 105:2-12. Thus, she was able to determine that the surface water data was representative of the entire range of typical flow conditions in the Spokane River. In addition, her expert report contains Exhibit 1, which is a bar chart of PCB sources at nine sites in the river ranging from river mile 57 to 112. ECF No. 403-1 at 19. Consequently, she was aware that the surface water data was representative of the River spatially and in terms of river flow. And regardless, Dr. Rodenburg's report simply contends that, in the samples collected by the Spokane Regional Toxics Task Force, commercial PCBs make up about 90% of the total PCBs present – whether this is representative of the River would be a proper issue for cross examination, not a sufficient basis for exclusion.

Defendants claim that Dr. Rodenburg's data is unreliable because she "did not make any effort to confirm that the data she reviewed has been subjected to appropriate QA/QC and blank correction." *See* ECF No. 402 at 4. Defendants are again mistaken. As she noted in her expert report and in her deposition, she did an extensive review of blank correction procedures for the surface water data and other studies that she relied upon. *See* Land Decl., Ex. 6 at 182:25-184:5; ECF No. 403-1 at 6, 18. She also performed blank correction on the Kaiser groundwater data, because she determined that it had not been blank corrected. Land Decl., Ex. 6 at 186:14-17.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
*DAUBERT* MOTION TO EXCLUDE THE EXPERT
TESTIMONY OF LISA RODENBURG - 4

Defendants next state that Dr. Rodenburg "relied on data that were 'flagged' by the sampling laboratories as unreliable." ECF No. 402 at 7. Defendants criticize Dr. Rodenburg for considering data that had been flagged "N" by laboratories. *Id.* at 4-5. But data that is flagged "N" by laboratories does not mean non-detect as Defendants claim. Instead, "N" flags denote data that does not meet certain criteria and is therefore flagged as EMPC (estimation maximum possible concentration). *See* ECF No. 403-1 at 192 (272:5-12); ECF No. 403-1 at 200. EMPC is not equivalent to non-detect, and may be treated as a detection. *See* Land Decl., Exhibit 7 at 34 ("In a case where a peak is present but did not meet all identification criteria, the analyte should be considered as detected and the result should be reported as EMPC.").

And while it is true that Dr. Rodenburg originally failed to correctly input raw data on a couple of occasions, she corrected these errors in her errata report, and the original inaccuracies affected just 0.37% of the data in question. *See* ECF No. 403-1 at 197-200. In any event, the error had no effect on Dr. Rodenburg's expert opinions and conclusions. *Id.* Defendants also chastise Dr. Rodenburg "for reporting the presence of Aroclor PCBs in at least 31 samples for which her analyses returned negative coefficients." ECF No. 402 at 5. But again, Defendants fail to mention that this error was corrected in Dr. Rodenburg's errata report, and this error had no effect on the conclusions she reached in her original report. *See* ECF No. 403-1 at 197-200.

B.   **Dr. Rodenburg's Methodology Is Reliable and Widely Accepted.**

Defendants contend that Dr. Rodenburg "rigged" her Positive Matrix Factorization ("PMF") and Multiple Linear Regression ("MLR") analyses by using "various data manipulations." ECF No. 402 at 8-9. Defendants' contentions have no merit. First, Defendants claim that Dr. Rodenburg failed to "numerically determine the extent to which sampling data resembled byproduct PCBs, despite admitting that she could have done so." *See* ECF No. 402 at 6. It is correct that Dr. Rodenburg did not compare samples to byproduct PCB patterns. Instead, Dr. Rodenburg compared sampling data to Aroclor PCB patterns or "fingerprints." In so doing, Dr. Rodenburg was following the methodology used by the authors of multiple peer-reviewed papers.[2]

Defendants complain that when a factor did not numerically match an Aroclor, Dr. Rodenburg "visually" compared the factor "to determine whether the sample more closely resembled an Aroclor or byproduct fingerprint," which led to the undercounting of byproduct PCBs, because she was not familiar with the thousands of byproduct fingerprints. ECF No. 402 at 6. But if the factor does not visually resemble an Aroclor fingerprint, then it cannot be characterized as an Aroclor and must be a byproduct fingerprint. She need not be familiar with the fingerprints of all byproduct PCBs in order to characterize a fingerprint. There was no undercounting of byproduct PCBs.

---

[2] *See* Land Declaration, Exhibits 10-12.

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
*DAUBERT* MOTION TO EXCLUDE THE EXPERT
TESTIMONY OF LISA RODENBURG - 6

Next, Defendants complain that Dr. Rodenburg employed R2 values "of her own creation" that have never been subject to peer-review and are contradicted by literature that she cites favorably in her report. ECF No. 402 at 7-9. Defendants are just wrong. To begin, the creation of a study standard does not equate to a flawed methodology. Second, the values used in Dr. Rodenburg's analysis were previously used in the Green-Duwamish River study that was funded by the State of Washington and overseen by the US EPA. *See* Land Decl., Ex. 9. And, she followed the same methodology in her recent peer-reviewed publication, "Source Apportionment of Polychlorinated Biphenyls in Atmospheric Deposition in the Seattle, WA, USA Area Measured with Method 1668." See Land Decl. at Exhibit 8. Third, the statement that "a published study that Rodenburg cites favorably used different R2 values, requiring a value of 0.9 or greater to determine whether a sample contained PCBs and rejecting an R2 value of 0.725 as insufficient" is incorrect. ECF No. 402 at 10. In that paper, the authors used a program called "COMSTAR" to analyze capillary column PCB data using "an outlier detection and elimination algorithm." Land Decl., Exhibit 13 at 1187. This method checks whether the peaks in a measured PCB chromatogram match those in a chromatogram of an Aroclor standard. *Id*. When peaks did not match the Aroclor chromatogram, they were flagged as outliers and discarded from the comparison. *Id*. If enough outliers are excluded, the R2 value should near the perfect value of 1.00. *See id.* Thus, this approach is not designed to determine whether Aroclors are present, but rather to quantify the concentrations of Aroclors that are present. *See id.*

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
*DAUBERT* MOTION TO EXCLUDE THE EXPERT
TESTIMONY OF LISA RODENBURG - 7

Thus, the R2 values cited in that paper bear no relationship to the R2 values used in Dr. Rosenburg's analysis.

Defendants also contend that Dr. Rodenburg failed to "consistently interpret R2 values" because she attempted to translate R2 to a percentage-weight of Aroclor PCBs." *See* ECF No. 402 at 8-9. Dr. Rodenburg consistently used the R2 values as indicators of similarity to Aroclors. The fact that she also used the R2 values to estimate the fraction of PCBs that might be due to non-Aroclor or inadvertent sources does not contradict the other usage of the R2 values. Just because there are two ways to interpret the R2 value does not make one or both of them invalid.

Defendants also criticize Dr. Rodenburg's analysis because she failed to consider "significant alternative sources" of PCBs including foreign-manufactured PCBs, atmospheric deposition of PCBs produced in Asia, and the City's waste-to-energy incineration plant. *See* ECF No. 402 at 9. This is not true. First, Dr. Rodenburg's expert report specifically analyzed "atmospheric deposition" samples, which should have included any PCBs produced by the incineration plant. *See, e.g.*, ECF No. 403-1 at 32-33. Second, Dr. Rodenburg's analysis looks at whether fingerprints resemble Monsanto's Aroclors, Land Decl. Ex 6 at 81:3-7, so whether Rodenburg considered atmospheric deposition of PCBs from Asia is not relevant. Moreover, courts "do not require experts to eliminate all other possible causes of a condition for the expert's testimony to be reliable." *See Wendell v. GlaxoSmithKline, LLC*, 858 F.3d 1227, 1237-38 (9th Cir. 2017).

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
*DAUBERT* MOTION TO EXCLUDE THE EXPERT
TESTIMONY OF LISA RODENBURG - 8

Finally, Defendants argue that Dr. Rodenburg erroneously assumed that Aroclors are the "main source" of PCBs in the effluent of the Inland Empire Paper facility. ECF No. 402 at 9. Defendants point out that her assumption that recycling of NCR paper is the source of Aroclor PCBs in Inland Empire's effluent is undermined by the fact that (1) NCR paper has not been made since 1971, and (2) paper can only be recycled between 5 and 7 times. ECF No. 402 at 10. Defendants contend that PCBs in Inland Empire's effluent are byproduct PCBs from pigments on paper it recycles. ECF No. 402 at 10.

Dr. Rodenburg disagrees with Defendants. Importantly, she notes that the PCB fingerprints in Inland Empire's effluent match the profile of Aroclor 1242 with R2 values as high as 0.94 when PCB 11 is excluded. *See* ECF No. 403-1 at 29-30. Moreover, NCR paper manufactured before 1971 may have been stored in offices for decades before being recycled. The facts that NCR paper hasn't been produced since 1971 and arguably cannot be recycled more than 5 to 7 times does not undermine Dr. Rodenburg's conclusions. Her opinions are based solely on the chemical analysis of PCBs discharged from Inland Empire Paper. Based on this analysis, Dr. Rodenburg believes the PCBs resemble commercial, rather than inadvertent, PCBs regardless of whether they came from NCR paper or another of the myriad uses for which Monsanto sold PCBs.

Defendants' position that their explanation for PCBs in the effluent of Inland Empire is more reasonable than Dr. Rodenburg's opinion is an argument that goes to the weight of the evidence, not the admissibility of her opinions and testimony.

## II. Conclusion.

For these reasons, the Court should deny Defendant's Daubert Motion to Exclude the Expert Testimony of Lisa Rodenburg.

RESPECTFULLY SUBMITTED this 14th day of February 2020.

By: s/ Brett Land
**BARON & BUDD, P.C.**
Scott Summy (*admitted Pro Hac Vice*)
Carla Burke (*admitted Pro Hac Vice*)
Celeste Evangelisti (*admitted Pro Hac Vice*)
Brett Land WSBA #53634
John P. Fiske (*admitted Pro Hac Vice*)
Jason J. Julius, (*admitted Pro Hac Vice*)
Cary McDougal, (*admitted Pro Hac Vice*)
Alicia Butler, (*admitted Pro Hac Vice*)

**OFFICE OF THE CITY ATTORNEY**
Elizabeth L. Schoedel WSBA #20240
Salvatore J. Faggiano WSBA #15696
Assistant City Attorneys

**GOMEZ TRIAL ATTORNEYS**
John H. Gomez (*admitted Pro Hac Vice*)

*Attorneys for Plaintiff City of Spokane*

# CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system. The NEF for the foregoing specifically identifies recipients of electronic notice.

By: s/ Brett Land
Brett Land WSBA #53634

PLAINTIFF'S OPPOSITION TO DEFENDANTS'
*DAUBERT* MOTION TO EXCLUDE THE EXPERT
TESTIMONY OF LISA RODENBURG - 11